1  Victor A. Sahn (CA Bar No. 97299)
     *victor.sahn@gmlaw.com*
2  Mark S. Horoupian (CA Bar No. 175373)
     *mark.horoupian@gmlaw.com*
3  Steven F. Werth (CA Bar No. 205434)
     *steven.werth@gmlaw.com*
4  Greenspoon Marder LLP
   a Florida limited liability partnership
5  333 South Grand Ave., Suite 3400
   Los Angeles, CA  90071
6  Telephone: 213.626.2311
   Facsimile: 954.771.9264
7

8  Attorneys for Spring Mountain
   Vineyard Inc.

9              **UNITED STATES BANKRUPTCY COURT**

10             **NORTHERN DISTRICT OF CALIFORNIA**

11                   **SANTA ROSA DIVISION**

| | |
|---|---|
| 12  In re: | Case No. 1:22-bk-10381 CN |
| 13  SPRING MOUNTAIN VINEYARD INC., a Delaware corporation, | Chapter 11 |
| 14 | **DEBTOR'S EMERGENCY MOTION FOR ORDER AUTHORIZING DEBTOR TO PAY PREPETITION CLAIMS OF CERTAIN COMPANIES AS CRITICAL VENDORS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| 15        Debtor. | |
| 16        Federal EIN:  36-3844911 | |
| 17 | |
| 18 | [Omnibus Declaration of Constantine S. Yannias filed concurrently herewith] |
| 19 | |
| 20 | Date:       October 6, 2022<br>Time:       3:00 p.m.<br>Place:      U.S. Bankruptcy Court |
| 21 | Courtroom 215<br>1300 Clay Street, Suite 300 |
| 22 | Oakland, CA 94612 |

**GREENSPOON MARDER LLP**
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1

TO THE HONORABLE CHIEF JUDGE CHARLES NOVACK, UNITED STATES BANKRUPTCY JUDGE; THE OFFICE OF THE UNITED STATES TRUSTEE; AND ALL OTHER INTERESTED PARTIES:

## EMERGENCY MOTION

Spring Mountain Vineyard Inc., a Delaware corporation, the debtor and debtor in possession in the above-captioned case ("Debtor"), pursuant to 11 U.S.C. §§ 105(a), 363(b), and 364(c)(1), Rule 4001(c) of the Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules 9006-1, hereby moves this Court for an order authorizing the Debtor to pay the pre-petition claims of the following entities (collectively, the "Critical Vendors"), who have distinct roles in the Debtor's operations that cannot be easily replicated by others and are necessary for the continuance of the Debtor's business:

**1.      Conway Beverage Group, LLC, dba Elite Brands, a California limited liability company ("Elite"):  owed $69,329.20.**

Elite is a wine broker.  In March, 2017, the Debtor and Elite entered into a brokerage agreement pursuant to which Elite agreed to act as the Debtor's independent broker for the sale and marketing of the Debtor's wine in the United States.  That agreement is attached hereto as **Exhibit 1**.  This agreement is an executory contract which the Debtor intends to assume.

Around February, 2022, the Debtor was scammed by an imposter who impersonated Elite and as a result, the Debtor wired $36,870.00 that should have gone to Elite, to an imposter.  Elite asked the Debtor to pay it $36,870.00 for real, but the Debtor convinced Elite to wait until the Debtor could obtain a return of these diverted funds.  Just prior to the Petition Date, the Debtor obtained $36,814.60 of these funds and intended to send them to Elite, but the Debtor commenced this case before these funds could be transferred to Elite.  Elite has now demanded that the Debtor turn over this $36,814 that should have been paid to Elite in February 2022.

Additionally, Elite provided brokerage services to the Debtor in September, 2022, for which it has earned commissions in the amount of $32,514.60.  Elite has asked the Debtor to pay that amount to Elite, as well, as a condition of continuing to perform services.  It has also informed the Debtor that if these amounts are not paid, Elite will suffer significant financial harm  and may

Case: 22-10381   Doc# 18   Filed: 10/04/22   Entered: 10/04/22 11:41:16   Page 2 of 60

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    need to take drastic actions by the end of the week, which would affect Elite's ability to continue

2    to act as the Debtor's broker. The Debtor cannot allow this to occur. The Debtor requires Elite's

3    services to continue in operations in this bankruptcy case, and does not want to disrupt this

4    relationship. Elite is an important partner in the Debtor's success. Losing Elite's services would

5    result in significant harm to sales, receipts, and potentially the Debtor's brand itself.

6         **2.      Wine Service Cooperative ("<u>WSC</u>"): owed $141,500**.

7         WSC operates a storage warehouse for its members for wine case goods at three separate

8    locations in California, and provides other storage and shipping services for its members. The

9    Debtor and WSC entered into an agreement dated January 2014, later amended October 11, 2018,

10    that sets out WSC's duties. Under that agreement, WSC (i) stores the Debtor's bottled wine, (ii)

11    fulfils customer orders for bottled wine, by shipping such bottles to the Debtor's customers, and

12    (iii) provides the Debtor with a designated aisle in its retail location for the display of the Debtor's

13    bottles, so that customers may peruse the Debtor's wine selection. The Debtor's contract with

14    WSC is attached as **Exhibit 2**.

15         WSC stores the vast majority of the Debtor's bottled wine. The Debtor only stores an

16    extremely limited amount of bottled wine at the Vineyard. The Debtor does not pack or ship

17    bottled wine to customers who order it. All of those tasks are performed by WSC. WSC plays a

18    critical role in the Debtor's operations, and losing WSC's services would be devastating to the

19    Debtor's business--essentially the Debtor would no longer be able to ship wine in the United States

20    until it locates another distributor and moves its bottled wine to that distributor's location. WSC

21    has informed the Debtor that it has ceased shipping the Debtor's bottles, and will not resume

22    shipping unless the Debtor pays it the amount it is owed for pre-petition services: $141,500. The

23    Debtor will suffer significant harm if it is unable to fulfil customer orders.

24         **3.      Napa Valley Petroleum: $13,985.27**

25         Napa Valley Petroleum provides the Debtor with gasoline, which is necessary for the

26    Debtor to operate its tractors during the harvest season, which it is currently in. Napa Valley

27    Petroleum has informed the Debtor that if the amount owed to it as of the Petition Date is not paid,

28    $13,985.27, it will not continue delivering gasoline to the Vineyard. While the Debtor probably

could obtain gasoline from a different source given time, the Debtor is in the middle of harvest and does not have that time. Losing the service of Napa Valley Petroleum would cause significant disruption to the Debtor's operations at this critical point of the harvest.

### 4. C Q & A Consulting: approximately $30,000

C Q A Consulting ("CQA") is the Debtor's alcohol beverage compliance consultant. CQA handles all of the Debtor's compliance requirements for products sold to wholesalers, retailers, and consumers in every state where it is licensed except California, and provides services to the Debtor in all states where the Debtor does business, except California. CQA processes license applications and renewals, registers products (including brands and labels), appoints distributors and territory assignments for each, posts prices, makes periodic reports of shipments and returns for sales and excise taxes, and takes other actions necessary to maintain the Debtor's business in compliance with the applicable laws related to alcoholic beverages in each state. The Debtor's contract with CQA, dated July 1, 2014, is attached hereto as **Exhibit 3**.

The Debtor does not believe it owes CQA any amount as of the Petition Date, based upon CQA's prepetition services which remain unpaid. However, the Debtor will need to pay CQA approximately $30,000 shortly in order to fund CQA's payments to all of the various entities, some of which amount will relate to taxes owed for sales, or license payments owed, that relate to the Debtor's business operations conducted prior to the Petition Date. The Debtor must ensure that these entities receive prompt payment, so that it can continue to do business with all proper license fees and taxes paid.

The Debtor currently has sufficient funds to pay the Critical Vendors these amounts.

**FOR THESE REASONS**, the Debtor respectfully requests that this Court enter an order (1) granting this Motion, (2) authorizing, but not directing, the Debtor to pay the Critical Vendors the amounts indicated, and (3) providing such other and further relief as is proper.

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1

Dated:  October 4, 2022

Greenspoon Marder LLP
A Florida limited liability partnership

By: _____

Victor A. Sahn
Mark S. Horoupian
Steven F. Werth
Bankruptcy Counsel for Spring Mountain
Vineyard Inc.

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

### A. **The Debtor**

Since 1992 the Debtor has owned the Spring Mountain Vineyard in Napa County, California (the "Vineyard"). The Vineyard is the primary asset of the Debtor, an ongoing business with 61 employees, millions of dollars in annual sales, and relationships with dozens of suppliers and thousands of customers. The Debtor's business consists primarily of growing grapes in its 135 vineyard blocks, harvesting those grapes and pressing them into wine in casks, bottling that wine from casks, and the storage and sale of that wine.

### B. **Elite**

Elite is a wine broker, whose services are set out in Exhibit 1. It provided brokerage services to the Debtor in September, 2022, for which it has earned commissions in the amount of $32,514.60. Elite has asked the Debtor to pay that amount to Elite as a condition of continuing to perform services. It has also informed the Debtor that if this amount, as well as $36,814.60 that the Debtor received, which Elite will suffer significant financial harm and may need to take drastic actions by the end of the week, which would affect Elite's ability to continue to act as the Debtor's broker. The Debtor cannot allow this to occur. The Debtor requires Elite's services to continue in operations in this bankruptcy case, and does not want to disrupt this relationship. Elite is an important partner in the Debtor's success. Losing Elite's services would result in significant harm to sales, receipts, and potentially the Debtor's brand itself.

### C. **Wine Service Cooperative**

The Debtor has a unique relationship with WSC, as WSC essentially serves as the Debtor's warehouse space for bottles, and also its packing and shipping servicer. WSC plays a critical role in the Debtor's operations, and losing WSC's services would be devastating to the Debtor's business--essentially the Debtor would no longer be able to ship wine in the United States until it locates another distributor and moves its bottled wine to that distributor's location. WSC has informed the Debtor that it has ceased shipping the Debtor's bottles, and will not resume shipping

Case: 22-10381   Doc# 18   Filed: 10/04/22   Entered: 10/04/22 11:41:16   Page 6 of 60

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

unless the Debtor pays it the amount it is owed for pre-petition services, which the Debtor's believe could be up to $141,500.

      D.    **<u>Napa Valley Petroleum</u>**

      Napa Valley Petroleum provides the Debtor with gasoline, which is necessary for the Debtor to operate its tractors during the harvest season, which it is currently in. Napa Valley Petroleum has informed the Debtor that if the amount owed to it as of the Petition Date is not paid, $13,985.27, it will not continue delivering gasoline to the Vineyard.

      E.    **<u>C Q A Consulting</u>**

      CQA handles all of the Debtor's compliance requirements for products sold to wholesalers, retailers, and consumers, and provides services to the Debtor in all states except California where the Debtor does business. CQA processes license applications and renewals, registers products (including brands and labels), appoints distributors and territory assignments for each, posts prices, makes periodic reports of shipments and returns for sales and excise taxes, and takes other actions necessary to maintain the Debtor's business in compliance with the applicable laws related to alcoholic beverages in each state except California.

      The Debtor believes it does not owe CQA any amount as of the Petition Date, based upon CQA's prepetition services which remains unpaid. However, the Debtor will need to pay CQA approximately $30,000 shortly in order to fund CQA's payments to all of the various entities it handles, some of which amount will relate to taxes owed for sales, or license payments owed, that relate to the Debtor's business operations conducted prior to the Petition Date. The Debtor must ensure that these entities receive prompt payment, so that it can continue to do business with all proper license fees and taxes paid.

**II.**

**<u>THE COURT SHOULD APPROVE THE PROPOSED ARRANGEMENT</u>**

      The Court may authorize payment of prepetition claims in appropriate circumstances based on sections 105(a) and 363(b) of the Bankruptcy Code. Section 105(a), which codifies the inherent equitable powers of the bankruptcy court, empowers a bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

title." Under section 105(a), courts may permit pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's business.

The Ninth Circuit has acknowledged that payment of prepetition claims is appropriate in certain circumstances. For instance, in *Burchinal v. Central Washington Bank (In re Adams Apple, Inc.)*, 829 F.2d 1484, 1490 (9th Cir. 1987), the Ninth Circuit acknowledged the importance of paying certain prepetition claims in a reorganization case, even when the claimants are provided an advantage over other creditors:

> [A] "fundamental tenet" -- rehabilitation of debtors . . . may supersede the policy of equal treatment. Cases have permitted unequal treatment of pre-petition debts when necessary for rehabilitation, in such contexts as (i) pre-petition wages to key employees; (ii) hospital malpractice premiums incurred prior to filing; (iii) debts to providers of unique and irreplaceable supplies; and (iv) peripheral benefits under labor contracts.

*Adams Apple*, 829 F.2d at 1490 (citation omitted). *See also*, *Weinstein, Eisen & Weiss, LLP v. Gill (In re Cooper Commons, LLC)*, 424 F.3d 963, 969 (9th Cir. 2005) (citing *Adams Apple* for its rejection of the fundamental tenet of bankruptcy law that like creditors must always be treated alike).

Courts have also authorized payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so. *See, e.g., In re Ionosphere Clubs, Inc.*, 98 B.R. at 175 (finding that a sound business justification existed to justify payment of certain claims); *Armstrong World Inds., Inc. v. James A. Phillips, Inc., (In re James A. Phillips, Inc.)*, 29 B.R. 391, 397 (S.D.N.Y. 1983) (relying on section 363 to allow contractor to pay prepetition claims); *In re Tropical Sportswear Int'l Corp.*, 320 B.R. 15, 20 (Bankr. M.D. Fla. 2005) ("Bankruptcy courts recognize that section 363 is a source for authority to make critical vendor payments, and section 105 is used to fill in the blanks.").

More recently, the United States Supreme Court tacitly sanctioned payments on prepetition claims to critical vendors, as well as "roll up" agreements and other transactions that do not directly comport with the Bankruptcy Code's payment priority scheme, under appropriate circumstances. In *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017), the Supreme Court discussed *In re Iridium Operating LLC*, 478 F.3d 452 (2nd Cir. 2007), and noted the following:

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

> We recognize that *Iridium* is not the only case in which a court has approved interim distributions that violate ordinary priority rules. But in such instances one can generally find significant Code-related objectives that the priority-violating distributions serve. Courts, for example, have approved "first day" wage orders that allow payment of employees' wages, "critical vendor" orders that allow payment of essential suppliers' prepetition invoices, and "roll-ups" that allow lenders who continue financing the debtor be paid first on their prepetition claims. [Citations omitted]. In doing so, these courts have usually found that the distributions at issue would "enable a successful reorganization and make even the disfavored creditors better off." [Citation omitted].

*Czyzewski*, 137 S. Ct. at 985.

The various courts' approaches to payment of prepetition claims, which the Supreme Court acknowledged, is particularly appropriate where prepetition creditors — here, the Critical Vendors -- provide vital goods to a debtor that would be unavailable if the debtor did not satisfy its prepetition obligations. *See In re Structurlite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) ("a bankruptcy court may exercise its equity powers under § 105(a) [of the Bankruptcy Code] to authorize payment of prepetition claims where such payment is necessary 'to permit the greatest likelihood of survival of the debtors and payment of creditors in full or at least proportionately'").

Bankruptcy courts in the Ninth Circuit authorize payments to vital suppliers and trade creditors where the payment of such claims is essential for the continued operation of the business. *See, e.g., In re American Suzuki Motor Corp.,* Case No. 12-22808 (Bankr. C.D. Cal. Nov. 7, 2012) [Docket No. 69] (authorizing payment of claims critical vendors such as equipment suppliers and IT service providers); *In re ISE Corporation*, Case No. 10-14198 (Bankr. S.D. Cal. Dec. 8, 2010) [Docket No. 276] (authorizing payment of critical vendor prepetition claim); *In re Victor Valley Community Hospital*, Case No. 10-39537 (Bankr. C.D. Cal., Sept. 17, 2010) [Docket No. 34] (authorizing the debtor to pay prepetition claims of emergency room doctors, medical director doctors, and nursing registries who were critical vendors); *In re Woodside Group, LLC*, Case No. 08-20682 (Bankr. C.D. Cal. Aug. 27, 2008) [Docket No. 18] (approving stipulation allowing debtors to pay ordinary course providers of goods and services in the ordinary course of business).

9

For the reasons stated above, the Critical Vendors are essential. The Debtor sells a specialty, and highly regulated product. It partners with several key players to provide key services that the Debtor cannot do - leaving the Debtor to focus on the fundamentals of vineyard production, casking, and bottling. The Debtor's business is not one where it can simply find a new supplier for a part that is manufactured by multiple companies, and thus can afford to end its relationship with a former supplier. The Debtor requires that existing relationships be preserved, as those relationships are akin to business partnerships and the experience those business partners have in working with the Debtor and its wine are a key component of the Debtor's value. A successful reorganization in this case will depend upon the maintenance of these relationships.

## **CONCLUSION**

Based on the foregoing, Debtor requests that the Court grant the Motion.

Dated: October 4, 2022

Greenspoon Marder LLP
A Florida limited liability partnership

By: _____
Victor A. Sahn
Mark S. Horoupian
Steven F. Werth
Bankruptcy Counsel for Spring Mountain Vineyard Inc.

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

10

# EXHIBIT 1

## BROKERAGE AGREEMENT

This BROKERAGE AGREEMENT is made as of March 3, 2017, (the "Effective Date") by and between Spring Mountain Vineyard, Inc. ("Winery") and Conway Beverage Group, LLC dba: Elite Brands, a California limited liability company ("Broker"). (Broker and Winery are sometimes individually referred to herein as "party" and collectively as "parties".)

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties, intending to be legally bound hereby, agree as follows:

1. <u>Broker's Responsibilities</u>. Broker agrees to and shall act as an independent broker for the sale and marketing of the Winery's wines described in **Exhibit A**, attached hereto (the "Products") throughout the territories set forth in **Exhibit A** (the "Territories"). Broker is not an employee of Winery for any purpose whatsoever and shall serve solely as an independent contractor. Broker shall devote its commercial best efforts to achieve maximum sales of the Products throughout the Territories and shall, at Broker's sole cost and expense, maintain a staff adequate for that purpose ("Field Sales Personnel"). Subject to the provisions of this Agreement, Broker shall have sole control of the manner and means of performing the Services. Broker represents and warrants to Winery that, throughout the term of this Agreement, it shall obtain and hold any and all licenses and permits required of Broker under any applicable laws to carry out its duties and obligations under this Agreement. Broker shall have the authority to act on Winery's behalf only as expressly provided for in this Agreement and shall not otherwise be entitled to bind or commit Winery or make representations on Winery's behalf.

2. <u>Services Provided by Broker</u>. Throughout the term of this Agreement, Broker will:

    a. Maintain and manage of Field Sales Personnel in the Territory to achieve maximum sales of the Products throughout the Territories.

    b. Provide Winery with monthly reports of field sales activity, such as shipments to the wholesaler(s), wholesaler(s) sales to the trade, (depletions) and relevant market events and competitive activity related to the Products of commercial interest to the Winery ("Monthly Reports"). On or before the 15 day of each calendar month, Broker will provide Winery with the Monthly Report for the immediately preceding month.

    c. Receive orders from wholesalers and promptly direct such orders to Winery and/or warehouse for invoicing and shipment.

1

d. Review and reconciliation of wholesaler charges, (bill backs).

e. Provide marketing and sales support activities specified in **Exhibit B**. Guidelines for sales expenses to be paid by Broker are set forth in Exhibit B hereto.

f. Fulfill the compliance functions specified in **Exhibit C**, if any..

g. Deliver the management activities specified in **Exhibit D**, if any.

3. <u>Winery's Responsibilities</u>.

a. Winery is the owner of the brands and wine inventories, and holds federal and California state winery or winegrower licenses and permits. Winery will be responsible for obtaining or holding any and all necessary licenses, permits and related report filings with all agencies and regulatory and tax authorities necessary for the sale and distribution of the Products in the Territory and all direct or indirect costs associated therewith. Winery represents to Broker that it has or will obtain necessary licenses and permits to conduct its business in the Territory or a subset of the Territory as described in **Exhibit A**. Winery will supply to Broker on request copies of such licenses or permits to facilitate Broker's compliance functions. Winery further represents that ongoing compliance activity such as tax payments and report filings will be maintained through Winery's own offices or those of a contracted service as described in **Exhibit C**.

b. Winery will notify Broker within thirty (30) days of any event in which the Winery surrenders, sells or otherwise loses control of facilities, inventories or other assets necessary to support the Sales Targets.

c. Winery is responsible for timely payment of undisputed wholesaler charges, not to exceed sixty (60) days from receipt of wholesaler's invoice.

4. <u>Annual Sales Targets</u>.  During the Term of this Agreement as defined below, Broker and Winery shall have the following obligations:

a. Broker and Winery shall conduct a meeting prior to the effective date and annually in the month of November thereafter to (i) establish in writing annual sales volumes for the calendar year and (ii) establish in writing specific monthly shipment and wholesaler depletion volumes for the calendar year, ("Sales Targets").

b. Broker and Winery shall meet annually in the month of July to review the annual Sales Targets and performance to date, and may revise the annul Sales Targets provided that such revisions are in writing signed by both parties and attached to the original Sales Targets for the twelve-month period established in January of the year. Broker may not unilaterally reduce the annual agreed sales target.

2

c.      Broker and Winery shall each use commercial efforts to reach a timely agreement on annual sales volumes and Sales Targets. In the event of failure to agree on annual sales volumes or Sales Targets by February, the existing multi-year plan and Sales Targets shall apply for the periods until new annual sales volumes and Sales Targets are agreed to or this Agreement terminates.

d.      Broker shall provide Winery with monthly reports of sales and depletions pursuant to Paragraph 2.b above..

e.      The Sales Targets and related pricing and policies for the first year of this Agreement are described in **Exhibit E**.

5.      <u>Territories</u>.  Broker shall serve as the exclusive broker and shall be entitled to represent and market the Products to distributors and retail accounts (including on- and off-premise retailers) for Winery in the Territories set forth on **Exhibit A**, as it may be modified from time to time by mutual agreement. Broker may recommend assignment or termination of wholesalers in the Territories to Winery, but any wholesaler assignment or termination will be determined by Winery in its sole discretion and is subject to Winery's prior approval in writing.

6.      <u>Term</u>. The initial term of this Agreement shall begin on the Effective Date set forth above and end one year thereafter (the "Initial Term"). Thereafter, and subject to the termination provisions of Paragraph 7 of this Agreement, the Term will be automatically extended for a one (1) year and six (6) month period (the "Extended Term"). The Initial Term and each Extended Term, if any, are collectively referred to as the "Term." The Term is subject to the right of either party to terminate the Agreement pursuant to Paragraph 7 below.

7.      <u>Termination</u>.

a.      <u>Termination at End of Initial Term or Extended Term</u>. This Agreement may be terminated by either party without cause at the conclusion of the Initial Term or the conclusion of the one (1) year and six (6) month Term, provided the party desiring to terminate provides written notice (pursuant to Paragraph 19 below) to the other party at least thirty days (30) days prior to the end of the Initial Term or any successive Extended Term, whichever is applicable.

b.      <u>Termination for Cause</u>. Either party may terminate this Agreement for any material breach, including but not limited to non-payment by Winery of any and all amounts due and owing to Broker, by giving thirty (30) days written notice to the breaching party. The written notice shall state in detail the nature of the breach, what if any action is necessary for cure, and provide the breaching party thirty (30) days from the date of the notice to cure the breach (or such longer period if cure cannot in good faith be completed in thirty (30) days, provided that cure is promptly commenced and

3

0013

carried through to completion). At the end of the cure period, if the breach has not been cured, the Agreement shall be immediately terminated.

      c.    <u>Bankruptcy; Suspension or Revocation of Licenses/Permits</u>. This Agreement shall also terminate automatically and without prior notice upon the filing by Broker or Winery of any petition for relief or reorganization under any state or federal bankruptcy or insolvency statute, or an action by a party to wind up, discontinue or dissolve its business. Either party may terminate this Agreement upon written notice to the other party in the event that the non-terminating party fails to hold and maintain the permits and licenses needed in order for that party to meet it duties and obligations under this Agreement.

      d.    <u>Performance Termination</u>. If Broker fails to meet the annual Sales Targets for any year during the Term, Winery may terminate this Agreement by providing written notice to Broker, and such Termination will be effective 30 days thereafter.

      e.    <u>Termination without Cause</u>. Winery may terminate a remainder of the Initial Term or Term without cause by giving one hundred eighty (180) days written notice to the Broker. Broker will continue to earned agreed upon commissions for sales during that period. Upon completion of the one hundred eighty (180) day notice period, Winery will pay Broker a buy out sum equal to the previous one hundred eighty (180) days of Commissions earned.

      f.    <u>Duties Upon Termination</u>. Upon termination of this Agreement by either party for any reason:

      i.    Broker shall return at its own expense all goods and material related to the Products in Broker's possession, custody, or control, including but not limited to marketing material.

      ii.    The parties shall not publicly disparage one another.

      iii.    Broker and Winery shall cease all use of each others' name and Broker shall refer all inquiries and orders to Winery.

      iv.    Any and all sums due to Broker shall be paid in full within thirty (30) days of termination.

      8.    <u>Compensation</u>.

      a.    As compensation for Broker's services described herein, Winery will pay Broker a monthly commission as described in more detail below (the "Commission").

      b.    The Commission will be calculated by taking the gross sales for each of the Products in the Territory for purchase orders procured by Broker (not including any Winery house accounts, direct to consumer sales, Winery website and mailing or tasting

4

room sales) multiplied by the commission percentage for said product identified in **Exhibit E**.

      c.     Winery will pay Broker the Commission on or before thirty after the end of the month for which such Commission is calculated.

      d.     Commission is paid net of DA, SPA, Fat Pallets, all bill backs, marketing and programming.

      e.     For any payments that are more than thirty days past due, Broker is entitled to late payment penalties equal to 1.5% of the total outstanding balances which shall be calculated and owed to Broker on a monthly basis.

      9.     <u>Policies and Procedures</u>.

      a.     Broker agrees to sell the Products according to the price list, sales policies, and credit terms established by Winery. Winery may in its sole discretion modify such prices, terms, and policies. Winery shall notify Broker in writing at least thirty (30) days prior to the effective date of any such modifications. Approval of terms or conditions of sale, including the extension of credit, shall comply with the policies of Winery set forth in **Exhibit E,** attached hereto, as it may be modified from time to time by Winery in its sole discretion. Broker shall cause the Products to be sold FOB from Winery's warehouse or warehouses at a price set by Winery. Any special discounts proposed by the trade to either the Broker or Winery, must be approved in writing by the two parties in advance of acceptance of such proposals. Winery may, in its sole discretion, accept, reject, or modify purchase orders forwarded to Winey by Broker. Broker must receive Winery approval for any variances from the pricing schedule.

      b.     Broker shall have sole responsibility to provide payment to Field Sales Personnel and for any commissions or other compensation to salespersons or other individuals in Broker's employ who assist Broker in providing the services. Broker may not engage any sub-agent or sub-broker without Winery's prior written consent. Any such other sub-agent or sub-broker shall be advised in writing of the provisions of this Agreement relating to the Services to be provided by such parties and shall agree to be bound by and provide such services only in accordance with the terms and conditions of this Agreement. Broker shall make payment to all agents on receipt of the commission money from the Wineries. Wineries shall make payments to Broker on the receipt of money from trading accounts. Broker indemnify, defend, and hold Winery and each of its direct and indirect parents, members, shareholders, subsidiaries, agents, employees and affiliates harmless form any and all claims, suits, losses, damages, liability, or expenses (including without limitation, court costs and reasonable fees of counsel and other experts) brought, raised, or alleged by, or in any way related to Broker's engagement of, any sub-agent or sub-broker.

5

10.     Wholesaler Invoicing.  Winery shall conduct all normal and customary invoicing of wholesalers and shall copy Broker on all invoices.

11.     Operations.

a.     All purchase orders procured by Broker shall be sent directly by distributor/buyer to Winery with a copy to Broker.

b.  Broker and Winery will cooperate to prepare orders for pick-up and schedule pick up dates with freight forwarders and/or wholesaler logistics contacts.

c.  All payments from sales facilitated by Broker will be paid to Winery directly.

12.     Trademarks.

a.     Broker acknowledges that Winery is the owner of, or otherwise has the right to use, all trademarks, trade names, graphic logos, designs and depictions relating to such trademarks, trade names and domain names related to the Products ("Trademarks") in the Territories.  Winery  retains all right, title and interest in and to the Trademarks and nothing in this Agreement shall restrict, impair, transfer, license, convey or otherwise alter or deprive Winery of any of its rights or interest in the Trademarks.   Nothing contained herein shall constitute an assignment of the Trademarks, or grant to Broker any right, title or interest therein, except the right to use the Trademarks.

b.     Broker further agrees (i) not to remove the Trademarks from the Products; (ii) not to alter the Trademarks in anyway; (iii) not to use any trademark, trade name, or designation of origin other than the Trademarks and Broker's trade name in connection with the promotion, advertising, or sale of the Products; and (iv) not to use the Trademarks in connection with any products, goods, business or services other than the Products.

c.     Broker agrees not to modify the Trademarks or use them in any manner not approved in writing by Winery.

d.     In the event that Broker becomes aware of any infringement of the Trademarks, or any claim that the Trademarks infringe the propriety rights of a third party, Broker shall immediately notify Winery thereof in writing. Should Winery in its sole discretion, decide to take legal action in respect of the same, such action shall be at the sole cost and for the sole benefit (including any recovery of damages) of Winery. Upon the request of Winery, Broker shall cooperate with Winery in connection with any such action but at no additional expense to Broker. Broker shall not undertake any action against any purported infringement of the Trademarks or defend against any

6

claim that the Trademarks infringe on the rights of another, without the prior written consent of Winery.

13.    Title to Wine.  Title to the Products shall remain with the Winery until such time as the Products are sold to distributors or retailers.  Broker shall not, without the prior written consent of Winery, own any of the Products or represent to any parties that it owns the Product.

14.    Insurance.   The Broker shall obtain and maintain all insurance appropriate to the activities of the Broker.  Such insurance shall include but not be limited to appropriate workers compensation insurance and general liability insurance, and cover any liability arising from the use by Broker or its employees, agents, or offices of motor vehicles and any activities of Broker.

15.    Successors and Assigns . Subject to Section 16, this Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns, provided, however, that Winery's prior written consent will be required before this Agreement is assigned or delegated to an assignee, transferee or successor of Broker by way of asset sale, equity sale, merger, reorganization, consolidation or conversion of Broker, which consent may be given or withheld in Winery's sole discretion.

16.    Assignment.  Neither party may assign or transfer its rights or obligations under this Agreement without the prior written consent of the other.

17.    Confidentiality .  Each party shall not disclose or use, either during or after the term of this Agreement, any proprietary or confidential information of the other party, written or oral, without the prior written consent of the other party except to the extent necessary to perform its services hereunder.  Proprietary or confidential information includes, without limitation, the following: (i) any written, printed, graphic or electronically recorded materials; (ii) business plans, customer lists, operating procedures, trade secrets, design formulas, know-how and processes, computer programs and inventories, discoveries and improvements of any kind, and (iii) information belonging to customers and suppliers of such entities about whom either party gained knowledge as a result of the other party's performance hereunder. Neither party shall disclose to any third party, without the written consent of the other party either during or after the term of this Agreement, any of the material terms contained herein; provided, that such prohibition shall not apply to disclosures of such information or otherwise proprietary or confidential information made in the course of preparing, prosecuting or defending litigation, complying with applicable governmental regulations or submitting information to tax or other governmental authorities or to either parties' financial or legal advisors; provided further, that if a party is required by law to make any such disclosure of any such information, it will give reasonable advance notice to the party whose confidential or proprietary information is to be disclosed of

Case: 22-10381    Doc# 18    Filed: 10/04/22    Entered: 10/04/22 11:41:16    Page 18 of
60

the intent to make such disclosure and will use diligent efforts to secure confidential treatment of such information prior to its disclosure (whether through protective orders or otherwise).

18. **Indemnification**.

a. **Indemnification of Broker**. Winery agrees to indemnify and hold harmless Broker from all costs or obligations that arise from Winery's grossly negligent or intentionally harmful acts or omissions in performing its obligations hereunder, any failure by Winery to perform any other responsibility expressly assigned to it by this Agreement, or any other breach by the Winery of its representations, warranties, or obligations hereunder. .

b. **Indemnification of Winery**. Broker agrees to indemnify, defend, and hold Winery and each of its direct and indirect parents, members, shareholders, subsidiaries, agents, employees and affiliates from any and all claims, suits, losses, damages, liability, or expenses (including, without limitation, court costs and reasonable fees of counsel and other experts) that arise from Broker's grossly negligent or intentional acts or omissions in performing its obligations hereunder, any failure by Broker to perform any other responsibility expressly assigned to it by this Agreement, or any other breach by the Broker of its representations, warranties, or obligations hereunder. .

19. **Notices**. Any notice, request, demand or other communication required or permitted under this Agreement shall be deemed to be received when personally delivered or five (5) days after any deposit in the United States mail, postage pre-paid, addressed:

In the case of Winery, to:

> Spring Mountain Vineyard
> 2805 Spring Mountain Road
> St. Helena, CA 94574
> Attn: Susan Doyle, General Manager

or to such other person or address as Winery may from time to time furnish to Broker.

In the case of Broker to:

> Conway Beverage Group, LLC
> Dba: Elite Brands
> 3238 Old Heather Road
> San Diego, CA 92111
> Attn: Mr. Jay Conway

8

or to such other person or address as Broker may from time to time furnish to Winery.

20. <u>Construction; Choice of Law; Venue.</u> Captions are used herein for reference purposes only and will not be construed to limit the provisions of any section hereof or used in any way to interpret the meaning of the provisions therein contained. The validity, interpretation and performance of this Agreement shall be controlled by and construed under the laws of the State of California, and this Agreement shall be deemed to have been executed in the County of Sonoma. Exclusive jurisdiction and venue for any dispute, action or proceeding arising under or related to this Agreement will be in the state court located in Sonoma County, California.

21. <u>Arbitration.</u> Any dispute under Subsection 7(a) of this Agreement shall be submitted and decided by one arbitrator pursuant to an arbitration conducted in accordance with the California Code of Civil Procedure ("Rules"), as then in effect, unless the parties hereto mutually agree otherwise in writing; provided, however, that any claim for an amount that may be awarded in Small Claims Court or that requests injunctive relief shall be excluded from arbitration. Within twenty (20) days after written notice by either party to the other requesting arbitration and stating the basis of the party's claim, the parties shall agree on an arbitrator. The arbitrator shall be an attorney or judge with at least fifteen (15) years of combined experience or service on the bench. The arbitrator shall be selected from the then sitting panel of JAMS/ENDISPUTE. The arbitration proceedings are to be held at the JAMS/ENDISPUTE office in the City of Santa Rosa, California.

If the parties fail to mutually agree to and select an arbitrator within such twenty (20) day period, on application by either party within fifteen (15) days' notice to the other party, the arbitrator from the aforesaid panel shall be promptly appointed by the then presiding Judge of the Superior Court of California in and for Sonoma County. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations. All notices, including notices under California Code of Civil Procedure § 1290.4 shall be given in writing to the parties.

The decision of the arbitrator so reached shall be binding and conclusive upon all of the parties to this Agreement (whether they participated in said arbitration or not after receipt of proper notice) and judgment in accordance therewith may be entered by any court having jurisdiction thereof. The costs of any arbitration (to include reasonable counsel fees, and expert witness fees, as both are determined by the arbitrator) shall be borne exclusively by the non-prevailing party or parties. The decision of the arbitrator may only be appealed on the grounds specifically contained in the statutes governing arbitration.

Notwithstanding the submission of the issue of termination pursuant to Paragraph 7 to arbitration, the termination shall not be delayed. The issues to be arbitrated shall be whether termination was permitted pursuant to Paragraph 7, and the amount due upon termination, if any.

22.   Force Majeure.  The performance of any party to this Agreement shall be excused in any case where a fire, flood, accident, insurrection, commandeering of vessels, acts of God, perils of the sea, collapse of regional economic conditions, government restrictions or any other unavoidable cause makes performance hereunder impossible.

23.   Severability.  To the extent that any provision of this Agreement is found to be unenforceable and/or unconscionable, such provision(s) shall be severed, and the remainder of the Agreement given full force and effect without said provision(s).

24.   Entire Agreement.   This Agreement constitutes all the agreements, understandings, representations, conditions, warranties, and covenants made between the parties to this Agreement and supersedes any prior contracts or understandings. Any modifications or amendments to this Agreement must be in writing signed by the parties.

25. No Waiver.  No waiver by either party of any breach or default of any of the covenants or agreements herein contained will be deemed a waiver as to any subsequent or similar breach or default unless in a writing, signed by the party or parties against whom enforcement of the wavier is sought.

In witness whereof, the parties have executed this Agreement as of the Effective Date set forth above.

**SPRING MOUNTAIN VINEYARD**

By: _____
    Don Yannias, CEO

Date:_____

**CONWAY BEVERAGE GROUP, LLC, dba Elite Brands**

By: _____
    Jay Conway

Date:_____ 3/6/17

10

**Exhibit A**

**Products/Brands and Territories**

Products/Brands to include in Brokerage Agreement are as follows:

**Spring Mountain Vineyard Brand**
**Spring Mountain Vineyard Estate Cabernet Sauvignon**
**Spring Mountain Vineyard *Elivette Red Blend***
**Spring Mountain Vineyard Estate Sauvignon Blanc**
**Spring Mountain Vineyard Estate Chardonnay**
**Spring Mountain Vineyard Estate Pinot Noir**
**Spring Mountain Vineyard Estate Syrah**

Products shall include successive bottlings of the Products itemized above.

Territories

Broker shall serve as an exclusive broker for Winery in the United States and the District of Columbia.

Trademarks

**Exhibit B**

### Marketing Services

Winery & Broker will develop an agreed upon marketing budget to support the brand.

Broker will allocate 10% of Commission paid, up to a maximum of $30,000 per annum, for a marketing budget for the Products ("Broker's Contribution"). Winery The marketing budget may be adjusted during the term of this Agreement if mutually agreed to in writing by the parties.

Specific items for which Broker's Contribution may be spent are limited to:

All wine samples—both distributor (50%/50%) and supplier (100%)
Wine List charges
Trade Tasting
Printed Promotional Materials (including but not limited to; brochures, back cards, shelf talkers, best press reprints, folios, press materials)
Freight for PR mailings
Soft Goods (wearables)
Programming funds (distributor sales incentives)
Photography
Advertising
All other charges and expenses are the exclusive responsibility of Winery.
Commission and Commission Bonus are illustrated on Exhibit E.

**Exhibit C**

## Compliance Services

Winery is responsible for all legal compliance filing; including but not limited to production filings, label filings, and distributor appointments.

Winery will conduct compliance activities through its own offices.

Winery possesses all necessary licenses and permits to sell wine through the three tier system in the Territory, with the following exceptions:

**No exceptions**

**Exhibit D**

## Management Services

**None**

0024

**Exhibit E**
**Sales Targets, Pricing, Terms, & Commission**

| SKU | Shipment Target – March 1, 2017-December 31, 2017 | |
|---|---|---|
| **Estate Cabernet Sauvignon** | 3114 | |
| **Estate Sauvignon Blanc** | 168 | |
| *Elivette* | 375 | |
| **Library** | 0 | |
| | **Total** | 3657 |

Commission is paid net of DA, SPA, Fat Pallets, all bill backs, marketing and programming.

The Commission structure will operate as follows:

| Brand | Total | EB Commission % |
|---|---|---|
| **Spring Mountain Vineyard** | 18% | 18% |

*EB: Elite Brands*

1. Extended Term(s):

The commission percentages to be mutually agreed upon by both parties (with a similar structure as in the Initial Term) but scaled down accordingly in relation to new base volume.
2. Each year in November, the parties may, by mutual agreement, adjust the annual sales goals based on available inventory and desired rates of sale.

15

**Product Pricing – FOB Winery warehouse, per 12 x 750 ml case unless noted:**

| Brand | SKU | FOB |
|---|---|---|
| **Spring Mountain Vineyard** | Estate Cabernet Sauvignon | $225 / 6pk |
| | Estate Sauvignon Blanc | $126 / 6pk |
| | *Elivette Red Wine* | $450 / 6pk |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Sales Terms and Conditions:

For sale of goods to a wholesaler:
    a. All goods sold FOB Consolidation Point, (TBD).
    b. Terms of sale are net 30 days of invoice, unless otherwise agreed to by Winery, in writing. Late payment shall be assessed a late payment fee 1.5% of invoice per month.
    c. Samples pulled by wholesaler may be billed to Winery at 50% of laid in cost.
    d. Samples pulled by broker may be billed by distributor to Winery at 100% of laid in cost (reasonable discretion should be/will be used)
    e. Wholesaler event costs may be billed to Winery under terms agreed to in advance of the event and in writing.
    f. Depletion allowances to be pre-approved by Winery and billed to Winery.
        i. Broker managers will forward approved DA invoices for payment.

# EXHIBIT 2

ACKNOWLEDGEMENT AGREEMENT

October 11, 2018

THIS ACKNOWLEDGEMENT AGREEMENT (this "Agreement"), executed and delivered as of the date first written above, by and among Wine Service Cooperative (the "Cooperative"), Spring Mountain Vineyard Inc., a Delaware corporation (the "Company"), Wilmington Trust, National Association (the "Existing Agent") and MGG California LLC (the "New Agent").

W I T N E S S E T H

WHEREAS, (i) the Cooperative, the Company and Fortress Credit Corp. (the "Fortress Agent") have previously entered into (a) that certain Agreement, dated as of January 28, 2014 attached hereto as Exhibit A (the "Existing Warehouse Agreement"), (b) that certain Bailee Notice, dated as of January 28, 2014 attached hereto as Exhibit B (the "Existing Bailee Notice" and (c) that certain Bailee Acknowledgement, dated as of January 28, 2014 attached hereto as Exhibit C (the "Existing Bailee Acknowledgement" and, together with the Existing Warehouse Agreement and the Existing Bailee Notice, collectively, the "Existing Cooperative Bailment Agreements") in respect of Collateral held by the Cooperative in support of a prior financing facility (the "Fortress Financing") and (ii) the Existing Agent, the Company and certain affiliates of the Company entered into that certain Credit and Guaranty Agreement (the "Existing UBS Credit Agreement"), dated as of May 19, 2017, by and among Jacob E. Safra and the Company, the lenders from time to time party thereto and the Existing Agent;

WHEREAS, in connection with the termination of the Fortress Financing, the Company terminated the security interests granted to the Fortress Agent in connection with the Collateral held by the Cooperative;

WHEREAS, in connection with the entry into the Existing UBS Credit Agreement, the Cooperative, the Company and the Existing Agent entered into that certain Acknowledgement Agreement (the "Prior Acknowledgment Agreement"), dated as of May 19, 2017, pursuant to which the Existing Agent replaced and acceded to the rights of the Fortress Agent in respect of the Existing Cooperative Bailment Agreements;

WHEREAS, the New Agent, the Company and certain affiliates of Company are entering into that certain Credit and Guaranty Agreement (the "New Credit Agreement"; capitalized terms used but not defined herein shall have the meanings assigned to them in the Credit Agreement), dated as of the date hereof, by and among the Company (in such capacity, collectively, the "Borrower"), the Lenders from time to time party thereto (the "Lenders") and the New Agent, pursuant to which the Lenders will extend credit to the Borrower (such extension of credit and the application thereof, the "New Financing");

WHEREAS, in connection with the New Financing, the Company will terminate the security interests granted to the Existing Agent in connection with the Collateral held by the Cooperative;

WHEREAS, in furtherance of the foregoing and to secure the payment and performance of all of the Company's obligations and liabilities to the Lenders under the New Credit Agreement, the parties hereto have agreed that the Existing Collateral Access Arrangements shall be deemed to be and hereby are amended and restated as more specifically set forth herein, such that the New Agent shall replace, and accede to the rights of, the Existing Agent in respect of the Existing Cooperative Bailment Agreements;

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Cooperative, the Existing Agent, the New Agent and the Company hereby covenant and agree as follows:

1.     The Cooperative hereby confirms that, as of the date hereof: (a) the Company is a member of the Cooperative in good standing, (b) the Company has paid all membership dues and other amounts owing to the Cooperative to date, (c) there is no default by the Company in the performance of any of its obligations owing by the Company to the Cooperative by virtue of the Company's membership in the Cooperative, the Cooperative's organizational documents or any other contractual arrangement between the Company and the Cooperative, or, to the knowledge of the Cooperative, any fact or circumstance which, with the giving of notice or the passage of time, would become a default and (d) the Existing Cooperative Bailment Agreements are in full force and effect.

2.     The parties hereto acknowledge and agree that, as of the date hereof: (a) each of the Existing Cooperative Bailment Agreements shall be amended by replacing all references therein to "Wilmington Trust, National Association" and "Wilmington" therein with "MGG California LLC" and "MGG," respectively in each case as agent on behalf of the lenders under the New Financing, (b) the New Agent shall replace and accede to all of the rights of the Existing Agent under each Existing Cooperative Bailment Agreement and that the Existing Agent shall no longer have any rights thereunder and (c) the Cooperative and the Company shall send all notices that, under the Existing Cooperative Bailment Agreements, prior to giving effect to the amendments set forth in clause (a), would have been sent to the Existing Agent, to the New Agent at the address specified for the New Agent below.

*[Signature page Follows]*

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered as of the day and year specified at the beginning hereof.

**COOPERATIVE:**

WINE SERVICE COOPERATIVE

By: ROBERT HOLMES
Title: GENERAL MANAGER

**EXISTING AGENT:**

WILMINGTON TRUST, NATIONAL ASSOCIATION

By: _____
Title: _____

**COMPANY:**

SPRING MOUNTAIN VINEYARD INC.

By: Constantine S. Yannias
Title: President

**NEW AGENT:**

MGG CALIFORNIA LLC

By: _____
Title: _____

New Agent Notice Address

One Penn Plaza, Suite 5320
New York, New York 10119
Attention: Kevin Griffin
Telephone: 212-356-6100
Email: creditagreementnotices@mgginv.com

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered as of the day and year specified at the beginning hereof.

**COOPERATIVE:**

WINE SERVICE COOPERATIVE

By: _____
Title: _____

**EXISTING AGENT:**

WILMINGTON TRUST, NATIONAL ASSOCIATION, as Existing Agent

By: Jennifer Anderson
Title: Vice President

**COMPANY:**

SPRING MOUNTAIN VINEYARD INC.

By: Constantine S. Yannias
Title: President

**NEW AGENT:**

MGG CALIFORNIA LLC

By: _____
Title: _____

New Agent Notice Address

One Penn Plaza, Suite 5320
New York, New York 10119
Attention: Kevin Griffin
Telephone: 212-356-6100
Email: creditagreementnotices@mgginv.com

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered as of the day and year specified at the beginning hereof.

**COOPERATIVE:**

WINE SERVICE COOPERATIVE

By: _____
Title: _____

**EXISTING AGENT:**

WILMINGTON TRUST, NATIONAL ASSOCIATION

By: _____
Title: _____

**COMPANY:**

SPRING MOUNTAIN VINEYARD INC.

By: Constantine S. Yannias
Title: President

**NEW AGENT:**

MGG CALIFORNIA LLC

By: _____
Title: _____

New Agent Notice Address

One Penn Plaza, Suite 5320
New York, New York 10119
Attention: Kevin Griffin
Telephone: 212-356-6100
Email: creditagreementnotices@mgginv.com

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered as of the day and year specified at the beginning hereof.

**COOPERATIVE:**

WINE SERVICE COOPERATIVE

By: _____
Title: _____

**EXISTING AGENT:**

WILMINGTON TRUST, NATIONAL ASSOCIATION

By: _____
Title: _____

**COMPANY:**

SPRING MOUNTAIN VINEYARD INC.

By: Constantine S. Yannias
Title: President

**NEW AGENT:**

MGG CALIFORNIA LLC

By: _____ Kevin F. Griffin
Title: _____ CEO

New Agent Notice Address

One Penn Plaza, Suite 5320
New York, New York 10119
Attention: Kevin Griffin
Telephone: 212-356-6100
Email: creditagreementnotices@mgginv.com

**Exhibit A**

Existing Warehouse Agreement

[Attached]

{00323344.RTF; 2}

0033

# AGREEMENT

This Agreement is made this 28th day of January 2014, by and between the Wine Service Cooperative, an agricultural cooperative incorporated in the State of California, ("WSC"), and Fortress Credit Corp., 1345 Avenue of the Americas, 46th Floor, New York, New York 10105 ("Fortress"), and Spring Mountain Vineyard Inc. ("Winery").

RECITALS:

A.       WSC operates a storage warehouse for its members for wine case goods (the "Stored Goods") at 1150 Dowdell Lane, St. Helena, California 94574, and 60 Harlow Court, Napa, California 94558 and 241 Tower Road, American Canyon, California 94503 (the "Warehouse"), and provides other storage and shipping services at the Warehouse for its members. Winery is a member in good standing of WSC.

B.       Under statute, WSC's By-laws, WSC maintains a lien on all Winery's Stored Goods in WSC's possession for an amount equal to all amounts due to WSC for reservation fees, shipping and handling charges, storage fees, order processing expenses, sums advanced by WSC on behalf of the Winery to third parties, including state and federal taxing authorities, motor carriers, and all other accrued charges, debts and obligations owed to WSC by Winery, including (without limitation) WSC's charges in connection with the removal of Winery's Stored Goods from the Warehouse by Fortress or its agent under section 1 below of this agreement (collectively: "Winery's Charges").

C.       WSC desires to aid Winery in the securing and maintenance of lines of credit, financing agreements, and other financial arrangements from various lenders. WSC further desires to provide assurance to Winery's lenders that, should the need arise, they will be able to exercise their remedies for Winery's default under their loan arrangements with Winery.

D.       Fortress has or will have a lien on Winery's Stored Goods located in WSC possession.

NOW, THEREFORE, the parties agree as follows:

1.       WSC acknowledges that the Winery's Stored Goods are subject to a security interest granted by the Winery to the Fortress and agrees that, in the exercise of its rights under the agreement(s) granting the security interest, the Fortress or its agents may assemble and remove the Stored Goods from the Warehouse, at Fortress's expense, upon reasonable prior notice to WSC; provided, however, that the Fortress shall pay WSC an amount equal to all accrued Winery's Charges due and owing by Winery to

1

WSC before undertaking such removal.

2.     This agreement is not a present waiver of WSC's lien rights against Winery's Stored Goods.  However, WSC agrees not to exercise its lien rights against Winery's Stored Goods without giving thirty (30) days written notice to Fortress. Further, if Winery defaults under its loan agreement with Fortress, WSC agrees to wave its lien rights against Winery's Stored Goods, upon receipt of Fortress's payment of accrued Winery's Charges, as set forth in Paragraph 1., above.

3.     Fortress shall make reasonable efforts to notify WSC in the event that an event of default has occurred under its agreement(s) with Winery and Fortress decides to exercise its remedies there under.  Winery hereby consents to Fortress's providing such information to WSC.

4.     WSC shall have no obligation or responsibility to verify or determine that the property of Winery stored from time to time with WSC does, in fact, constitute collateral subject to the security interest held by Fortress, and WSC shall have no obligation to verify or determine that Winery is or is not acting in the ordinary course of business with respect to storing, removing, shipping or receiving Winery's property.

WINE SERVICE COOPERATIVE

By: _____
        Bob Holmes
Title:   General Manager
        1150 Dowdell Lane
        St. Helena, CA  94574
        707-963-9474 (voice)
        707-963-9359 (fax)
        bob@wineservicecoop.com

2

Fortress Credit Corp.

By: _____

Print Name: CONSTANTINE M. DAKOLIAS

Title: PRESIDENT _____


Fortress Credit Corp.
1345 Avenue of the Americas, 46th Floor
New York, NY 10105
Attention: Mr. Constantine M. Dakolias
Fax: (212) 798-6131


WINERY: Spring Mountain Vineyard, Inc.


By: _____

Print Name: _____

Title: _____


Signature Page to Warehouse Agreement

Fortress Credit Corp.

By: _____

Print Name: _____

Title: _____


Fortress Credit Corp.
1345 Avenue of the Americas, 46th Floor
New York, NY 10105
Attention: Mr. Constantine M. Dakolias
Fax: (212) 798-6131


WINERY: Spring Mountain Vineyard, Inc.

By: _____

Print Name: DON YANNIAS

Title: PRESIDENT

**EXHIBIT B**

<u>Existing Bailee Notice</u>

[Attached]

{00323344.RTF; 2}

**BAILEE NOTICE**

From: Spring Mountain Vineyard Inc.

To: Wine Service Cooperative

Copy: Fortress Credit Corp.

January 28 , 2014

Dear Sirs,

We give you notice that we have granted a security interest to Fortress Credit Corp. (the **Security Agent**) in all right, title and interest that we now have or hereafter acquire in, to and under all goods (including inventory) comprising wine, whether contained in bottles (or other containers for wine used as alternatives to bottles) or barrels, and whether or not produced by us, together with all documents to the extent they evidence, represent or relate to any right, title or interest in any such wine, that is now or hereafter in the your possession (collectively, the **Wine**).

Until you receive a notice or instruction from the Security Agent to the contrary (an **Enforcement Notice**), we may exercise all rights with respect to the Wine. After the Security Agent has delivered to you an Enforcement Notice, the Security Agent will have the exclusive right to exercise all of our rights and powers with respect to the Wine and we hereby authorize you to recognize such exclusive right.

If there is a conflict between instructions you receive from us and instructions you receive from the Security Agent, you are to follow the Security Agent's instructions.

We irrevocably direct you to hold possession of the Wine for the Security Agent's benefit. In addition, we irrevocably instruct and authorize you, without any further authorization from us or notice to us, from and after the date of this letter, to:

1. disclose to the Security Agent any information in your possession relating to the Wine which the Security Agent may request;

2. comply with the terms of any notice or instructions you receive from the Security Agent relating to the Wine, including, without limitation, at the time or after you receive an Enforcement Notice, instructions from the Security Agent relating to the delivery of the Wine;

3. permit the Security Agent and its agents and representatives, at any reasonable time and from time to time, to inspect the Wine, to examine and make copies of and abstracts from your records concerning the Wine and to discuss these records and other matters relating to the Wine with your officers and employees; and

4. send copies of any notices and other information required or permitted to be sent to us with respect to the Wine to the Security Agent as follows:

Case: 22-10381    Doc# 18    Filed: 10/04/22    Entered: 10/04/22 11:41:16    Page 41 of
60
0039

Fortress Credit Corp.
1345 Avenue of the Americas
46th Floor
New York, New York 10105
Attention: Mr. Constantine M. Dakolias
Fax: (212) 798-6131

The instructions in this letter may not be revoked or amended without the prior written consent of the Security Agent.

We request that you indicate your agreement to the terms of this notice by signing and returning to the Security Agent and to us copies of the acknowledgment that is attached.

Yours faithfully,

Spring Mountain Vineyard Inc.

By: DON YANNIAS

Title: PRESIDENT

**EXHIBIT C**

Existing Bailee Acknowledgement
[Attached]

{00323344.RTF; 2}

## BAILEE ACKNOWLEDGEMENT

From: Wine Service Cooperative

To: FORTRESS CREDIT CORP.

and

SPRING MOUNTAIN VINEYARD INC.

Ladies and Gentlemen:

We confirm that we have received from Spring Mountain Vineyard Inc. (**Spring Mountain**) a notice dated January 28, 2014 (the **Notice**) stating that Spring Mountain has granted to Fortress Credit Corp. (the **Security Agent**) a security interest in all **Wine** (as defined in that notice) belonging to Spring Mountain that is now or hereafter in the our possession.

We confirm that we:

1. hold possession of the Wine for the benefit of the Security Agent (subject to our warehouseman lien);

2. accept the instructions and authorizations contained in the Notice and undertake to comply with the terms of the Notice;

3. have not received notice of any claim or interest of any third party in or to the Wine; and

4. will not deliver any Wine to Spring Mountain or any other person if we receive instructions from the Security Agent to the contrary.

Yours faithfully,

Wine Service Cooperative

By: BOB HOLMES
Title: GENERAL MANAGER

Case: 22-10381    Doc# 18    Filed: 10/04/22    Entered: 10/04/22 11:41:16    Page 44 of 60

0042

# EXHIBIT 3

# C Q & A CONSULTING
## COMPLIANCE SERVICES AGREEMENT

This Compliance Services Agreement (hereinafter "Agreement"), dated as of July 1, 2014 ("Effective Date") is entered into by and between (i) C Q & A Consulting ("CQA"), and (ii) Spring Mountain Vineyard, Inc., dba Spring Mountain Vineyard ("Customer"). CQA and Customer agree as follows:

1. **CQA Obligations**

   1.1. <u>Compliance Services.</u> CQA agrees to provide certain alcohol beverage compliance services to Customer for Customer's products that may be sold to wholesalers, retailers and consumers, and will act as Customer's compliance consultant in various states with Customer's authorization pursuant to a separate appointment letter. In states selected by Customer and solely with the authorization, direction and information provided by Customer, CQA will process license applications and renewals, register products (including brands and labels), appoint distributors and territory assignments for each; post prices; make periodic reports of shipments and returns for sales and excise taxes, and take other actions as required to maintain Customer's business in compliance with the applicable laws related to alcoholic beverages in each selected state. CQA will also assist Customer in obtaining federal label approvals with the Tax and Trade Bureau ("TTB"). Specific services for selection by Customer are outlined on <u>Exhibit A</u>.

   1.2. <u>License Maintenance.</u> Upon request by Customer, CQA may provide services to Customer to update, change, or maintain its California and federal alcohol beverage licenses.

   1.3. <u>Information and Billing.</u> CQA will keep Customer informed on a reasonably timely basis regarding the status of Customer's licenses and registrations. CQA will bill Customer for compliance services and any expenses advanced by CQA on a monthly basis.

   1.4. <u>Exclusions.</u> CQA will not provide any services to Customer in connection with marketing Customer's products, identifying and selecting independent sales agents, selecting distributors, or take any other action with regard to Customer's products or business that is not authorized by Customer.

   1.5. <u>Third Party Software.</u> CQA will use certain third party software programs that meet CQA's approval ("Third Party Software Programs") to maintain Customer data and generate required reports. Any such third party software provider will bill Customer directly for the licensing of these product(s).

2. **Customer Obligations.**

   2.1. <u>Licenses.</u> Customer will submit to CQA (a) current copies of its state and federal licenses authorizing its manufacture, importation, or sale of alcoholic beverages prior to CQA providing any services hereunder, and (b) all license and registration renewal forms at least 30 days before their respective due dates.

   2.2. <u>Invoices.</u> Customer will provide CQA with each of Customer's monthly shipping invoices before the third day of the month following the month in which such shipments were made.

   2.3. <u>Authorizations, Accounts, and Invoices.</u> Customer must provide written authorization to CQA for CQA to obtain or renew any licenses or product registrations for Customer's products, and must maintain sufficient funds on deposit with CQA to cover these compliance services and related

Case: 22-10381    Doc# 18    Filed: 10/04/22    Entered: 10/04/22 11:41:16    Page 46 of 60    0043

costs. If Customer does not provide such authorizations or maintain such funds, CQA will have no obligation to process requests to obtain or renew any license or product registration for Customer's products or licenses.

2.4. <u>Third Party Software.</u> Customer agrees to obtain one of the CQA-authorized Third Party Software Programs Customer will pay the licensing fees for such Third Party Software Program directly to the provider. Customer will provide CQA with a login and password for accessing the Third Party Software Program.

3. **Term and Termination.** The term of this Agreement commences on the Effective Date and will terminate upon thirty (30) days written notice from either party. Notwithstanding the foregoing, CQA may immediately terminate this Agreement if Customer is in default of any of its obligations described in this Agreement and has not cured any such default after five (5) days written notice provided by CQA. Upon any such default, CQA will have no obligation to provide services to Customer until such default is cured.

4. **Fees.** Fees payable in connection with this Agreement are outlined on <u>Exhibit B</u>. Customer agrees to pay all invoices received from CQA upon receipt.

5. **Indemnification.** In consideration of the services to be performed by CQA, Customer agrees to indemnify and hold harmless CQA, and its shareholders, officers, directors, employees or agents, from and against
   (1) any claims, actions, demands, liabilities, damages, losses, costs and expenses (including reasonable attorney fees) arising out of or from CQA's performance of its obligations under this Agreement; and
   (2) claims brought by third parties for product liability, infringement of intellectual property rights, receivable defaults and Customer's non-compliance with regulatory requirements (including, but not limited to,Customer's or its authorized representative's compliance with federal, state, and local regulations concerning advertising, sales and marketing activities, product labeling and content, use of samples, any required solicitor permits, FDA / Bioterrorism Act prior notice and facility registration requirements, use of non-conforming wood packaging material, etc).

   The above indemnification does not cover any third party claims or actions against Customer and/or its designated distributor or CQA arising solely through the act or gross negligence of CQA, its shareholders, officers, directors, employees or agents.

6. **Force Majeure.** Any delay in or failure of performance by either party under this Agreement will not be considered a breach of this Agreement and will be excused to the extent caused by any occurrence beyond the reasonable control of such party including, but not limited to, natural disasters, acts of God, acts of terrorism, strikes, power outages and governmental restrictions.

7. **Independence of Parties.** Nothing contained in this Agreement shall create any partnership, joint venture, agency or other relationship between Customer and CQA except that of independent contractors. Neither party can legally bind the other party without its prior written consent. Notwithstanding the foregoing, Customer may appoint specific representatives of CQA to be Customer's attorney-in-fact for alcoholic beverage compliance matters in any number of states. CQA makes no representations with regard to legal or tax matters and Customer is advised to consult its own advisors on such matters.

8. **General Provisions.** This Agreement may be executed in counterparts, all of which together shall constitute one agreement. This Agreement shall be construed according to the laws of the State of California except for California principles of conflicts of law. This Agreement sets forth all of the terms

and conditions of the agreement between the parties, and supersedes and supplants all prior agreements, representations, promises, understandings and the like between the parties. This Agreement will not be amended except in writing signed by Customer and by CQA. In any legal action taken to enforce this agreement, the party prevailing in the action shall be compensated by the non-prevailing party for attorneys' fees and expenses and costs of collection. As used in this Agreement, "notice" shall be deemed given when delivered in writing in person, or when delivered by electronically receipted facsimile, or 5 days after it is sent in writing by express mail or courier. The address information to be used for notices is set forth below.

**Signature Page follows.**

**C Q & A Consulting**

Signature: *Deanna L* _____

Name: Deanna Leon

Title: President

Address: PO Box 777
Pinole, CA 94564

Phone: (510) 964-7901

Fax: (510) 223-8140

E-mail: dleon@cqaconsult.com

Customer: _Spring Mountain Vineyard_

Signature: _SH Peter_ _General Manager_

Name: _George H Peterson_

Title: _General Manager_

Address: _2805 Spring Mtn Rd_
_St. Helena CA 94574_

Phone: _707. 967. 4188_

Fax: _707- 963- 2753_

Email: _George @ springmtn. com_

Case: 22-10381    Doc# 18    Filed: 10/04/22    Entered: 10/04/22 11:41:16    Page 49 of
60                                                                                0046

## EXHIBIT A
## SERVICE AGREEMENT

**I.  BASE SERVICES (Check as applicable)**

**A.  Direct-to-Consumer:**
- License Renewals (state fees are not covered by base rates)
- Notification of changes in sales tax rates
- Monthly, Quarterly, Semi-Annual and Annual Shipping Reports
- Monthly, Quarterly, Semi-Annual and Annual Excise Taxes
- Monthly, Quarterly, Semi-Annual and Annual Sales Tax Returns
- All other alcoholic beverage law-related submissions required by state (excluding corporate and franchise taxes)
- Filing of above reports (only with Power of Attorney)
- Issuing checks for above reports (only with Power of Attorney)

  → **Select Direct-to-Consumer service:  Yes __x___  No _____**

**B.  Direct-to-Wholesale:**
- License Renewals (state fees are not covered by base rates)
- Monthly Shipping Reports and Taxes
- Price posting, as required
- Label registration, as required (state fees are not covered by base rates)
- All other alcoholic beverage law-related submissions required by state
- Filing of above reports (only with Power of Attorney)
- Issuing checks for above reports (only with Power of Attorney)

  → **Select Direct-to-Wholesale service:  Yes ___x__  No _____**

**C.  Direct-to-Trade:**
- License Renewals (state fees are not covered by base rates)
- Monthly, Quarterly, Semi-Annual and Annual Shipping Reports
- Monthly, Quarterly, Semi-annual and Annual Excise Taxes
- Price posting, as required
- Label registration, as required (state fees are not covered by base rates)
- Distributor appointments and sales territory designations
- All other alcoholic beverage law-related submissions required by state
- Filing of above reports (only with Power of Attorney)
- Issuing checks for above reports (only with Power of Attorney)

  → **Select Direct-to-Trade service:  Yes _____  No ___x__**

Case: 22-10381    Doc# 18    Filed: 10/04/22    Entered: 10/04/22 11:41:16    Page 50 of
60                                                                                                                          0047

**II. ADDITIONAL SERVICES (Check as applicable; See Exhibit B below for associated fees)**

- License applications for all items in Section I above (fee determined by difficulty of application): Yes__x___ No_____

- COLA applications: Yes __x___ No ____

- UNIMERC applications and fees: Yes _x____ No _____

- Other services as requested *Ship Compliant Software - passthrough Cost*

**NOTE:** None of the services described above include licensing, registration, reporting, and/or taxes of any kind related to or arising from Customer's doing business in its home state (state of incorporation and/or domicile). Any such home state compliance services will be considered "Additional Services" hereunder.

July 1, 2014

To Whom It May Concern:

By this letter, the undersigned, on behalf of Spring Mountain Vineyard, Inc. dba Spring Mountain Vineyard, appoints Deanna Leon (located in Pinole, California), as its Alcohol Compliance Consultant, and authorizes the named consultant to sign and submit any documents required to obtain, renew and maintain a license/permit to ship alcoholic beverage products into your state. This grant of authority includes, but is not limited to, signing license and license renewal applications, product/brand/label registration forms, distributor appointments, territorial assignments, price postings, monthly shipping reports, sales tax applications, sales tax reporting, bond applications and surety bonds, and to be the recipient of any communication from your state regarding these matters. This grant of authority is effective as of the date written above.

This appointment and authorization shall remain in force until the undersigned or other authorized company representative revokes it in writing. This appointment is intended to supersede and replace any prior similar appointments given to other consultants.

Please send all correspondence with regard to these matters to the above-named Deanna Leon, c/o C Q & A Consulting, PO Box 777, Pinole, CA 94564. Other contact information is: phone 510-964-7901; fax 510-223-8140; cell 510-685-4599; email dleon@cqaconsult.net.

Should you have questions about the foregoing, please feel free to contact us.

Sincerely,
Spring Mountain Vineyard, Inc.
dba Spring Mountain Vineyard


By: _____
          Owner/Officer

County of Napa
State of California

On this ____ day of _____, before me _____, the undersigned person, personally appeared _____, known to me to be the person whose name is subscribed to the within instrument and acknowledged that ___ executed the same for the purposes therein contained. In witness whereof I hereunto set my hand.

_____
Signature of Notary

_____
Date Commission Expires

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 333 South Grand Avenue, Suite 3400, Los Angeles, CA 90071.

A true and correct copy of the foregoing document entitled (*specify*): <u>DEBTOR'S EMERGENCY MOTION FOR ORDER AUTHORIZING DEBTOR TO PAY PREPETITION CLAIMS OF CERTAIN COMPANIES AS CRITICAL VENDORS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF</u> will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) <u>October 4, 2022</u> I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page.

**2. <u>SERVED BY UNITED STATES MAIL</u>**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

**3. <u>SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL</u>** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) <u>October 4, 2022</u>, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☒ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 4, 2022 | Patricia Dillamar | /s/Patricia Dillamar |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

CC 51988413v1 CC 51988413v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                **F 9013-3.1.PROOF.SERVICE**

**1. SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

Office of the U.S. Trustee / SR
USTPRegion17.SF.ECF@usdoj.gov

Elvina Rofael on behalf of U.S. Trustee Office of the U.S. Trustee / SR
elvina.rofael@usdoj.gov, Katina.Umpierre@usdoj.gov,GemMil.Langit@usdoj.gov

Victor A. Sahn on behalf of Debtor Spring Mountain Vineyard Inc.
victor.sahn@gmlaw.com, vsahn@ecf.inforuptcy.com

Phillip John Shine on behalf of U.S. Trustee Office of the U.S. Trustee / SR
phillip.shine@usdoj.gov

**3. SERVED BY OVERNIGHT MAIL AND EMAIL**

**Debtor**
Spring Mountain Vineyard Inc.
2805 Spring Mountain Road
St. Helena, CA 94574-1798
Attn: Don Yannias, President
email: don@bimi.com

**Debtor's Financial Advisor And Chief Restructuring Officer**
Attn: Kevin A. Krakora, Managing Director
Getzler Henrich & Associates LLC, a Hilco Global Company
150 S. Wacker Drive | 24th Floor
Chicago, IL 60606
Tel: (312) 283-8071
email: kkrakora@getzlerhenrich.com

**U.S. Trustee**

Tracy Hope Davis
United States Trustee for Region 17
Office of The United States Trustee
450 Golden Gate Avenue, 5th Floor, Suite #05-0153
San Francisco, CA 94102
Tel: (415) 705-3300

**Attorneys For U.S. Trustee**

Office of the United States Trustee
Attn: Elvina Rofael
450 Golden Gate Ave., Rm. 05-1053
San Francisco, California 94102
email: Elvina.Rofael@usdoj.gov
Tel: (415) 705-3333

CC 51988413v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

Case: 22-10381    Doc# 18    Filed: 10/04/22    Entered: 10/04/22 11:41:15    Page 54 of 60

F 9013-3.1.PROOF.SERVICE

Office of the United States Trustee
Attn: Phillip J. Shine
280 South First Street, Rm. 268
San Jose, CA 95113
email: phillip.shine@usdoj.gov
Tel: (408) 535-5526

**Secured Creditors**

MGG (BV) Limited
MGG Canada Fund LP
MGG Insurance Fund Series Interests of t
MGG Investment Group LP
MGG Onshore Funding I LLC
MGG SF Drawdown Master Fund (Cayman) LP
MGG SF Drawdown Unlevered Fund II LP
MGG SF Drawdown Unlevered Fund LP
MGG SF Drawdown Unlevered Master Fund I
MGG SF Evergreen Unlevered Fund LP
MGG SF Evergreen Master Fund (Cayman) LP
MGG SF Evergreen Unlevered Fund LP
MGG SF Evergreen Unlevered Master Fund I
MGG Specialty Finance Fund I LP
MGG Specialty Finance Fund LP

c/o MGG California, LLC
One Penn Plaza 53rd Fl
Attn Kevin F. Griffin, CEO
New York, NY 10119-0002
Tel: (212) 356-6100
creditagreementnotices@mgginv.com

MGG Investment Group LP
One Penn Plaza 53rd Fl
Attn Kevin F. Griffin, CEO
New York, NY 10119-0002
Tel: (212) 356-6100
creditagreementnotices@mgginv.com

**Counsel for Secured Creditors**

Bradley R. Bobroff, Esq.
Proskauer Rose LLP
Eleven Times Square
New York, NY 10036-8299
Tel: (212) 969-3643
email: bbobroff@proskauer.com

CC 51988413v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                                                    F 9013-3.1.PROOF.SERVICE

Case: 22-10381    Doc# 18    Filed: 10/04/22    Entered: 10/04/22 11:41:16    Page 55 of 60

Scott P. Cooper, Esq.
Proskauer Rose LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3010
Tel:  (310) 284-5669
email:  scooper@proskauer.com

Frederic Ragucci, Esq.
Proskauer Rose LLP
Eleven Times Square
New York, NY  10036-8299
Tel:  (212) 969-3023
email:  FRagucci@proskauer.com

Jeff. J. Marwil, Esq.
Proskauer Rose LLP
70 W. Madison
Suite 3800
Chicago, IL 60602-4342
email:  jmarwil@proskauer.com

**20 Largest Unsecured Creditors**
Allen Group
Attn:  Timothy Allen, CPA - Managing Partner
120 Stony Point Road,  #230
Santa Rosa, CA 95401
(707) 528-3860
tim@allenwine.com
Tim@allengroupllp.com
Brent Garrison
Brent@allengroupllp.com

Bartelt Engineering
Attn:  Paul Bartelt
303 Jefferson St #200B
Napa, CA 94559
(707) 258-1301

Belkorp AG, LLC
Attn:  Laura Correll, Accounting
2413 Crows Landing Rd
Modesto, CA 95358
(209) 205-3706
ar@belkorpag.com

Brown's Auto Parts
Attn Dan Beltramai, Owner
1218 Main St.
Saint Helena, CA 94574-1901
(707) 963-3638

CC 51988413v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

brownsauto169@gmail.com

Castino Restaurant Equipment And Supply
50 Utility Ct.
Rohnert Park, CA 94928-1659
(707) 585-3566
sales@castinosolutions.com

Central Valley
Attn: Gerry Cruz, Accounting Mgr.
1100 Vintage Avenue.
Saint Helena, CA 94574
707 261-1900
gerryc@centralvalley.com

Chubb Group of Insurance Companies
P.O. Box 777-1630
Philadelphia, PA 19175-0001
(800) 372-4822

Conway Beverage Group, LLC
Dba: Elite Brands
3238 Old Heather Rd.
San Diego, CA 92111-7716
Attn: Mr. Jay Conway

Famille Sylvain
855 Bordeaux Way #239
Napa, CA 94558-7549
(707) 492-3308

Francois Freres USA Inc.
1403 Jefferson St.
Napa, CA 94559-1708
(707) 294-2204

G3 Enterprises Inc.
(Tapp Labels)
580 Gateway Dr.
Napa, CA 94558
(707) 252-8300

IPFS
49 Stevenson St. #127
San Francisco, CA 94105-2909
(877) 687-9826

Napa County Treasurer
1195 3rd St. #108
Napa, CA 94559-3035

CC 51988413v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

Case: 22-10381    Doc# 18    Filed: 10/04/22    Entered: 10/04/22 11:41:16    Page 57 of 60

F 9013-3.1.PROOF.SERVICE

(707) 253-4311

Napa Ford Lincoln
170 Soscol Ave.
Napa, CA 94559
(707) 255-2580

Napa Valley Petroleum
P.O. Box 2670
Napa, CA 94558-0528
(707) 252-6888

Ramondin U.S.A. Inc.
541 Technology Way
Napa, CA 94558
(707) 944-2277

Stanzler Law Group
Attn: Jordan S. Stanzler
390 Bridge Pkwy #220
Redwood City, CA 94065
(650) 739-0200
email:   Jstanzler@stanzlerlawgroup.com

Tonnellerie Sylvain
855 Bordeaux Way
Napa, CA 94558
(707) 492-3308

Wilbur Ellis Company LLC
c/o Registered Agent Solutions Inc.
720 14th St.
Sacramento, CA 95814-1905
(707) 963-3495

Wine Service Cooperative
1150 Dowdell Lane
Saint Helena, CA 94574
Attn:  Bob Holmes
General Manager
Tel: (707) 963-9474
Fax: (707) 963 9359
bob@wineservicecoop.com

**<u>Critical Vendor</u>**

C Q & A Consulting
P.O. Box 777
Pinole, CA 94564
Attn:  Deanna Leon

CC 51988413v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                                F 9013-3.1.PROOF.SERVICE

Case: 22-10381    Doc# 18    Filed: 10/04/22    Entered: 10/04/22 11:41:15    Page 58 of
60

Tel: (510) 964-7901
Fax: (510) 223-8140
email: dleon@cqaconsult.com

**Request for Special Notice**
Attorneys for Mt. Hawley Insurance Company
Michael D. Prough
Dean C. Burnick
Prough Law, APC
1550 Parkside Drive, Suite 200
Walnut Creek, CA 94596
T: (925) 433-5894
F: (925) 482-0929
Email: mdp@proughlaw.com
          dcb@proughlaw.com

Dept. of the Treasury, Alcoholic Beverage Control
Attn: Tracie Parker, Lic. Rep. I
50 D Street Room 130
Santa Rosa, CA. 95404
Phone: (707) 576-2165
Fax: (707) 638-9537

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346
(800) 973-0424

California Department of Tax and Fee Administration
Special Operations Bankruptcy Team MIC: 74
P.O. Box 942879
Sacramento, CA 94279-0074
(800) 400-7115

Franchise Tax Board
Bankruptcy Section, MS A-340
P.O. Box 2952
Sacramento, CA 95812-2952
916-845-4750

Employment Development Department
Bankruptcy Unit-MIC 92E
P.O. Box 826880
Sacramento, CA 94280-0001

Service by Mail Address:
Employment Development Department
Attn: MIC 53
800 Capital Mall
Sacramento, CA 95814

CC 51988413v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                           F 9013-3.1.PROOF.SERVICE

**Courtesy Email**

Jay B. Spievack, Esq.
Cohen Tauber Spievack & Wagner P.C.
420 Lexington Ave., Suite 2400
New York NY 10170-2499
email:  jspievack@ctswlaw.com

Joseph Vann, Esq.
Cohen Tauber Spievack & Wagner P.C.
420 Lexington Ave., Suite 2400
New York NY 10170-2499
email:  jvann@ctswlaw.com

Will Densenberger
Engel & Volkers St. Helena - Napa Valley
1111 Main Street, Suite A
St. Helena, CA 94574
(707) 302-8133
email:  will@nvwineestates.com

John C. Vaughan
Newmark Knight Frank
4675 MacArthur Court, Suite 1600
Newport Beach, CA 92660
email:  john.vaughan@nmrk.com

Peter Ekman:  PEkman@hilcoglobal.com

Mark Kasowitz:  MKasowitz@kasowitz.com

Gavin D. Schryver:  GSchryver@kasowitz.com

CC 51988413v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                                 F 9013-3.1.PROOF.SERVICE