Victor A. Sahn (CA Bar No. 97299)
  *victor.sahn@gmlaw.com*
Mark S. Horoupian (CA Bar No. 175373)
  *mark.horoupian@gmlaw.com*
Steven F. Werth (CA Bar No. 205434)
  *steven.werth@gmlaw.com*
Greenspoon Marder LLP
a Florida limited liability partnership
333 South Grand Ave., Suite 3400
Los Angeles, CA 90071
Telephone: 213.626.2311
Facsimile: 213.629.4520

Attorneys for Spring Mountain
Vineyard Inc.

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SANTA ROSA DIVISION

| | |
|---|---|
| In re: | Case No. 1:22-bk-10381 CN |
| SPRING MOUNTAIN VINEYARD INC., a Delaware corporation, | Chapter 11 |
| Debtor. | **OMNIBUS DECLARATION OF CONSTANTINE S. YANNIAS IN SUPPORT OF DEBTOR'S "FIRST-DAY" EMERGENCY MOTIONS** |
| Tax ID: 36-3844911 | Date: October 6, 2022<br>Time: 3:00 p.m.<br>Place: U.S. Bankruptcy Court<br>Courtroom 215<br>1300 Clay Street, Suite 300<br>Oakland, CA 94612<br>[VIA ZOOM ONLY] |

I, Constantine S. Yannias, declare:

## PRELIMINARY STATEMENTS

1.   I am over the age of 18 years.

2.   I have personal knowledge of the facts stated herein. I can testify that these facts are true and correct.

Case: 22-10381   Doc# 26   Filed: 10/04/22   Entered: 10/04/22 14:18:30   Page 1 of 35

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

3.     I am the Chairman and President of Spring Mountain Vineyard Inc., a Delaware corporation ("Debtor").

4.     I have been President and Chairman of the Debtor since August 1993.

5.     In my capacity as President of the Debtor, I am involved in its day-to-day operations including issues regarding financial matters, issues regarding operational concerns from the vineyard operations, sales issues and all related matters to its doing business.  I have also worked for the Debtor's principal, Mr. Jaqui Safra, since approximately 1985 and am also involved in his other businesses since the start of my employment with him; for example, I presently also spend time on the Encyclopedia Britannica business, although a much larger portion of my time is spent on the Debtor's business

6.     Since 1992 the Debtor has owned the Spring Mountain Vineyard in Napa County, California (the "Vineyard").  The Vineyard is the primary asset of the Debtor, an ongoing business with 70 employees, millions of dollars in annual sales, and relationships with dozens of suppliers and thousands of customers.  Its website is www.springmountainvineyard.com.

7.     The Vineyard itself is an incomparable property, unique from all other vineyards in the Napa Valley.  The Vineyard has been producing fine wine since the late 1800s.  It was once four separate properties, each with its own vineyard and winery:  Spring Mountain Vineyards, was originally owned by Tiburcio Parrott who grew olives, citrus, grapes, and built a home on the property he named Miraville; Chateau Chevalier, once owned by Fortune Chevalier, whose stone winery began making wine in 1891; and La Perla, founded in 1873 by Charles Lemme and expanded by the Schilling Spice family. The fourth vineyard was called Streblow Vineyards.

8.     The total size of the property which includes the Vineyard is approximately 845 acres.  The Vineyard features approximately 135 vineyard blocks across approximately 211 acres,each with a different elevation, soil and exposure to the elements and each producing a unique and diverse grape.  A substantial portion of the Vineyard is sloped east-facing, which is the most beneficial facing for growing grapes as it provides protection from the sun (unlike southern-facing slopes) and in the entire Napa Valley region, there are only 2,500 acres of east-facing slopes.

9.       The Vineyard is also improved with the estate residence, two winery buildings, a tasting room, six wells, cisterns, an irrigation system, a historic barn, and other outbuildings.  The Vineyard also has extensive winery caves that have been completely finished and utilized for barrel storage and private events.

10.       The Debtor built a reservoir on the property in 2015, but the construction failed and part of it has slid, requiring reconstruction.  The reservoir is planned to hold 50 acre feet of water once complete.  At the present time, the reservoir does not need to be constructed in order for the Debtor to have adequate water for its operations, however, the reservoir project is something that it will further contemplate doing in the future.

11.       **Filing of Chapter 11 Case:** The Debtor's Chapter 11 filing was brought about by a number of extraordinary events which, when taken together, have led the Debtor to this point:

A.       The COVID pandemic has drastically reduced tourism in Napa County where the Debtor's winery is located.  The Declaration of Mr. John Vaughan which talks about all of the monumental challenges that Napa County has faced in recent years, provides much greater detail about the financial issues that have been faced by the Debtor in recent years.  Exhibit number 1 to Mr. Vaughan's declaration is his June 21, 2021 appraisal report which is a full appraisal of the Property's value as of that time.  It speaks not only of the COVID pandemic, it also speaks of the Glass Fire in 2020 that caused severe damage and/or destroyed multiple building structures (including some which are historic and irreplaceable) on the Property and destroyed or severely damaged several significant portions of the Debtor's vineyard stock (i.e. its grape growing vine plants).  This damage has been discussed in the separately submitted Declaration of Jay B. Spievack, Esq., who is the Debtor's litigation counsel in claims brought by the Debtor against several insurance carriers who have failed to live up to their obligations to pay the Debtor's various building and vineyard damage claims as well as other covered claims related to the Glass Fire.

B.       The Debtor has had difficulties with its secured lender, MGG California, LLC as agent for a number of related lenders.  MMG is the Debtor's primary or only secured

creditor/lender. Debtor borrowed $185,000,000 from MGG in 2019. Since the Loan was made, Debtor has made the following payments to them:

1) $41,290,000 from sale of non-debtor real estate

2) $24,485,000

3) $7.25 Million from Insurance Payment

4) $10,568,301 from interest reserve established at time of loan

5) $20,030,488.27 regular monthly payments or payment of fees

There may have been other payments, but these payments, over the four years since this Loan originated, total at least **$103,623,789.00.** Notwithstanding this performance, Debtor has had difficulties with MGG for some time and these difficulties have created problems and issues with its operations as it deals with MGG's demands that have come because this is a defaulted loan.

C. **Decline in Tourism:** As identified above and in the Declaration of Mr. Vaughan, tourism in the Napa Valley and St. Helena has dramatically decreased. Further some of the most venerable hotels have been burned to the ground in one or more of the fires that have taken place.

12. It is important to note that it was never contemplated that the Debtor's revenues, standing alone, would pay down and pay off the Debtor's loan from MGG. That is because even before the problems presented by the COVID pandemic, the collapse of tourism in Napa County, California (although it is now returning as demonstrated in the June, 2021 appraisal report from Mr. Vaughan), and the devastating Glass Fire, the Debtor's revenues, standing alone, were not sufficient to service MGG indebtedness. That is why the very large lump sum payments have been made to them over the last four years and is the reason for the return that they have earned and been paid on this loan since that time. It is also, therefore, consistent with the loan history of the Debtor's Loan relationship with MGG for the Debtor to expect that the private placement financing that it will be obtaining through William Blair (and as provided in greater detail in the separately filed Declaration of Jorge Cauz, the Chief Executive Officer of Encyclopedia

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

Britannica; MGG has a pledge of the stock of Britannica which secures a $75 Million portion of its indebtedness. Even though there are two liens ahead of them, as Mr. Cauz's declaration makes clear, this will be paid most likely by early-January, 2023.

13.     Napa County regulates all vineyards by capping the amount of gallons of wine per year each vineyard can manufacture. The Debtor possesses permits to manufacture 48,000 gallons per year, which is a substantial amount for a vineyard in that area. For a number of years, the Debtor has been retaining a majority of each year's production in order to build a vertical inventory library reaching back to 1979. This inventory was part of what the Debtor owned at the time we purchased it from its prior owner and was included in the inventory that we received. The Vineyard's library is comprised of 79,000 cases of wine., and this significantly enhances the value of the Spring Mountain brand, making it more competitive to established French vineyards, and is a significant factor in drawing visitors (and purchasers) to the Vineyard's tasting room.

14.     The Wine Inventory has a wholesale value of $82 million and a retail value of $164 million.

15.     The Debtor commenced a bankruptcy reorganization case by filing a voluntary chapter 11 petition on September 29, 2022 (the "Petition Date").

16.     The Debtor continues to manage and operate its businesses as debtor in possession. No trustee or creditors' committee has been appointed in the Debtor's bankruptcy case.

17.     To minimize the adverse effects of the commencement of the Debtor's chapter 11 case, while at the same time preserving value for the benefit of stakeholders, the Debtor has filed a number of emergency motions requesting various forms of "first day" relief (collectively, the "First Day Motions").

18.     I submit this declaration in support of the First Day Motions. The various forms of relief requested in the First Day Motions are intended and necessary to maximize the value of the Debtor's estate (the "Estate") and allow the Debtor to sustain its current business operations in chapter 11 while it pursues a reorganization.

19.     I am familiar with the contents of each of the First Day Motions and, to the best of my knowledge, believe that the relief sought in each of the First Day Motions: (a) will enable the

Debtor to avoid disruption to its operations and sustain its operations while in chapter 11; (b) are critical to the Debtor's ability to maximize the value of the Estate; and (c) best serve the interests of the Estate and creditors. Further, it is my belief that the relief sought in the First Day Motions is, in each case, narrowly tailored and necessary to achieve these goals.

## BACKGROUND

20.     The Debtor's business consists primarily of growing grapes in its 135 vineyard blocks, harvesting those grapes and pressing them into wine in casks, bottling wine from casks, and the storage and sale of that wine. On the growing side of the equation, the Debtor is currently engaged in (i) grafting existing vineyards to Cabernet Sauvignon, (ii) transitioning existing vineyards from very high density gobelet trellis systems to high density 4 wire VSP systems, and (iii) replanting older vineyards to modern resistant rootstock. Currently the Debtor is in its harvest season, which is approximately one-third completed, and will be fully completed by the end of October.

21.     The Vineyard manufactures its own wine, using grapes grown at the Vineyard. The Debtor has never casked wine using grapes grown from any other site. The Debtor bottles and casks that wine on site. Casks are stored at the Vineyard in the caves, but bottles are stored off-site. The Debtor has an ongoing contract with Wine Service Cooperative, which (i) holds all of the Debtor's bottled wine inventory, and (ii) ships and packs the Debtor's bottled wine to satisfy customer orders,

22.     The Debtor's vines are predominately Cabernet Sauvignon (the most coveted varietal in Napa Valley by far), with varying clones and farmed in what might be considered a more traditionally French/Bordeaux-style.

23.     The Debtor's revenue comes almost entirely from the sale of wine and grapes.

24.     The Debtor sells its wine wholesale, exports wine abroad, operates a wine club which ships wine at regular intervals to customers, and also operates a tasting room. The Debtor also sells its grapes to other wineries.

25.     The budget attached as Exhibit 1 to the Cash Collateral Motion ("Budget") is a 13-week cash flow budget that runs through December 31, 2022. The Budget reflects the bare

minimum of expenses that must be paid for the Debtor to stay in business--largely labor and insurance expenses. These expenses are ongoing, regular, and essential to keep the Debtor operating during harvest season and leading into the holiday season. Some fluctuation in actual expenses is likely to occur, so the Debtor requests that it be deemed compliant with the Budget provided the Debtor does not exceed Budget line items by more than 15%, and does not exceed the total Budget by that same margin, being 15%.

26. The Budget, which includes additional expenses relating to professional fees the Debtor will incur during this bankruptcy case, indicates that by the end of the 13-week period, the Debtor will have expenses of $1.7 million more than its projected income. To bridge that gap, Mr. Safra on September 30, 2022, deposited $600,000 into the Debtor's bank account. This payment was made as an equity contribution. As set forth in the Budget, that amount will be sufficient to cover the Debtor's expenses through the end of November. For December, 2022 operating costs, Mr. Safra will deposit another $1.1 million into the Debtor's account not later than November 15, 2022.

27. On October 2, 2022, the Debtor sent the Budget to MGG along with an explanation of its line items. The Debtor is continuing to discuss the Budget with MGG but to date, MGG and the Debtor have not agreed that the Debtor may use MGG's cash collateral (MGG as the Debtor's secured lender is defined below in paragraph 28) to fund items identified in the Budget. The Debtor does not blame anyone for this as the parties did not have an opportunity prior to the Chapter 11 filing and before the exercise of MGG's remedies on September 30, 2022, to negotiate and reach an agreement prior to the Chapter 11 filing.

28. The Debtor has traditionally financed its operations through secured lending. Prior to October 2018, the Debtor had a loan secured by substantially all of the real and personal property of the Debtor, however, this debt was refinanced with MGG. On October 11, 2018, the Debtor refinanced this debt and entered into a new lending relationship. The Debtor entered into a "Credit and Guaranty Agreement" and numerous related agreements (collectively, the "Credit Facility") with fourteen lenders, and MGG California LLC, as administrative agent and collateral agent for those lenders (collectively with MGG California LLC, "MGG"), pursuant to which

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

Debtor obtained a loan ("Loan") in the amount of $185 million. The Debtor's obligations were guaranteed by its 100% equity interest holder, Freecrest Limited, a company organized under the laws of the British Virgin Islands ("Freecrest"), and Mr. Jacob E. Safra ("Mr. Safra"), the beneficial owner of the Debtor.

29. Pursuant to the Credit Facility, and related amendments and forbearance agreements entered into between MGG and the Debtor since that date, MGG possesses perfected security interests in substantially all of the Debtor's assets, including cash, accounts receivable, intellectual property, wine inventory, and real property, except for the Unrestricted Cash (as defined below).

30. The Debtor and MGG amended the terms of the Credit Facility on March 25, 2019, pursuant to a "First Amendment and Waiver to Credit and Guaranty Agreement," and again on July 8, 2020, pursuant to a "Second Amendment and Waiver to Credit and Guaranty Agreement." As part of this forbearance agreement, Mr. Safra gave MGG a $75 million third-priority lien in Britannica.

31. In February 2021, the Debtor and MGG entered into a forbearance agreement relating to the Loan. The forbearance agreement was amended twice, and in the second amendment, dated July, 2022, MGG required that the Debtor retain a Chief Restructuring Officer. Debtor retained Getzler Henrich & Associates LLC ("Getzler") as its financial advisor and Mr. Kevin Krakora ("Mr. Krakora"), one of the managing directors of Getlzer, as the Debtor's Chief Restructuring Officer. Mr. Krakora and his team including Peter Ekman have been an excellent addition to the Debtor's operations.[1]

---

[1] From the website of Getzler Henrich regarding Mr. Krakora: Mr. Krakora is the managing director, based in Chicago. He has over 30 years of experience in corporate turnarounds, strategic consulting, financial and operational restructurings, and debtor bankruptcy situations. He has extensive experience advising both companies and senior lenders in complex debt restructurings, financings and workouts. Kevin specializes in advising and working with under-performing companies to develop and implement business transformation strategies, operational/financial improvements and turnaround plans. Kevin has served in interim management positions, including as a Chief Restructuring Officer and Independent Director. He has led numerous §363 sales processes in Chapter 11 cases as well as business and assets sales in out-of-court situations.

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

32. The forbearance agreements established a Termination Date by which if certain events had not occurred, MGG could record certain documents and immediately take possession of the Debtor's real and personal property. That Termination Date was eventually extended to September 30, 2022. The Debtor requested that MGG extend that date an additional time, but MGG declined to do so. The Debtor, faced with the imminent loss of all of its property, commenced this bankruptcy case.

33. As part of the concessions made in exchange for MGG's forbearance reached in the June, 2022 forbearance, the Debtor and Mr. Safra agreed that they would retain a broker to sell the Vineyard by a certain date. The Debtor entered into a brokerage agreement with Engels & Voelkers, a well-known real estate broker, to list and sell the Vineyard. The Debtor has been assisting Engels & Voelkers with the marketing and sale of the Vineyard since at least March 2021.

34. Since entering into the Forbearance Agreement in February 2021, the Debtor has at all times acted in good faith and in accordance with its obligations. The Debtor has been assisting Engels & Voelkers with the marketing and sale of the Vineyard since at least March 2021. In

---

Kevin leads the automotive and security alarm practices at Getzler Henrich. He has substantial experience in numerous industries, including airline, automotive, healthcare, industrial/manufacturing, and security/alarm among others. Kevin advises boards of directors and executive management teams regarding strategic alternatives and performance improvement plans, assisting both in their development and implementation. He has worked with financially distressed companies to address liquidity issues, improve refinancings and out-of-court debt restructurings, recapitalizations and divestitures. He has advised the Official Committee of Unsecured Creditors in several high-profile bankruptcies including AMR Corporation (American Airlines), North American Petroleum Corporation USA, Pappas Telecasting Companies and UAL Corporation (United Airlines). Kevin recently served as president and chair of TMA Global, a global organization comprised of turnaround and corporate renewal professionals with 55 chapters worldwide. He is a Certified Turnaround Professional and a frequent speaker on restructurings and distressed M&A.

mid-2021, Mr. Safra paid approximately $40 million to MGG (exact detail of payments to MGG are provided above). Mr. Safra paid another $25 million to MGG in October 2021, which at that point brought to $98.5 million the amount that the Debtor and Mr. Safra had paid MGG in connection with the Loan, after taking into account other, smaller payments made as well as $20 million in regular interest payments. The total paid to date is approximately $103,623,789

35. One of the Debtor's payments to MGG, of approximately $7.25 million, came from insurance proceeds relating to the Glass Fire which occurred in September 2020, which burned various forested areas, destroyed half of the vineyard blocks, and ruined the entire 2020 harvest. The Debtor's cost to rebuild its infrastructure from the Glass Fire is significant. .

36. At the time of the Glass Fire, the Debtor possessed fire insurance in multiple tiers that covered part of the Debtor's losses. The lowest tier, covering damage of up to $8.25 million, has paid the Debtor (of which $7.25 million was paid to MGG). Six higher tiers of coverage have so far not paid. Prior to the Petition Date, the Debtor retained the law firm Cohen Tauber Spievack & Wagner P.C., to pursue these insurance claims. I anticipate that the Debtor will seek to retain this same form, post-petition, as the Debtor's special litigation counsel and special corporate counsel.

37. On March 11, 2022, Debtor filed an action captioned *Spring Mountain Vineyards, Inc. v. Landmark American Ins. Co.*, Case No. 22CV000270 (Napa County, California Superior Court). In this action, the Debtor claims that its six (6) excess insurers for the policy period July 1, 2020 to July 1, 2021, breached their obligations to cover the Debtor for approximately $28 million in unreimbursed property damage and losses it sustained due to the Glass Fire. That litigation is now stayed due to the commencement of this bankruptcy case.

38. Despite the Debtor and Mr. Safra paying approximately $98.5 million plus $7.25 Million of insurance proceeds with respect to the Loan--more than half of its original principal balance--the Loan balance has actually increased as it is currently incurring interest at a post-default rate of more than 16%. The Debtor estimates that as of the Petition Date, MGG is owed approximately $205 million.

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

39. The Debtor communicated with MGG prior to the Petition Date about further continuing the Termination Date under the Forbearance Agreement, past September 30, 2022, to give Mr. Safra additional time to liquidate or refinance non-Debtor assets which cross-collateralize the Loan. One of those assets is Mr. Safra's 100% equity interest in Encyclopaedia Britannica, Inc. ("Britannica"). MGG did not agree to continue that date.

40. Britannica is a private company, indirectly and wholly owned by Mr. Safra, that owns incredibly valuable intellectual property assets and a highly lucrative ongoing business that spins off substantial free cash flow with comparably minimal operating expenses, resulting in an annual EBITDA that was approximately $21 Million in 2021, and will exceed $26 Million in 2022 and increase to more than $34 Million in 2023.

41. Mr. Safra has engaged, and is actively working with, well-known bankers at William Blair & Company ("William Blair") to conduct a private placement of the equity of Britannica. The private placement – which is expected to close by the end of the year – will enable Mr. Safra to pay $75 million to MGG, reducing the amount owing to approximately $130 million, and at that debt level, Mr. Safra will be able to obtain a refinance of the Loan.

42. Facing the otherwise imminent loss of the Vineyard, the Debtor and Mr. Safra filed a motion before the Supreme Court of the State of New York, County of New York ("New York Court"), captioned *Spring Mountain Vineyard Inc. et al. v. MGG California, LLC et al.*,, Case No. 653564-2022, which was assigned to the Honorable Justice Robert Reed of the NYS Commercial Division. In that motion the Debtor sought a TRO and injunction against MGG, seeking to enjoin them from exercising purported loan remedies. The New York Court heard the Debtor's motion on September 29, 2022, and denied that motion. The Debtor commenced this bankruptcy case in order to prevent MGG from foreclosing on the Debtor's real and personal property on September 30, 2022.

**Management Team**

43. I am the President and sole Director of the Debtor. On July 5, 2022, the Debtor--by agreement with MGG--retained Getzler Henrich & Associates LLC as its financial advisor. On or

about August 22, 2022, the Debtor appointed Mr. Kevin Krakora, a professional at Getzler, as its Chief Restructuring Officer. There are no other officers.

44. Since the Debtor retained Mr. Krakora as CRO, the Debtor has paid Getzler $100,000 per month for Getlzer's services. I have worked closely with Mr. Krakora since his retention as CRO, to restructure the Debtor's operations and improve its revenue.

45. I reside in Chicago, Illinois. In order to operate the Debtor, I require that a manager be at the Debtor's premises in person. There are two managers who are at the Vineyard premises on a daily basis, a sales manager and a vineyard manager. Additionally, Peter Ekman who has been assisting Getzler is at the Vineyard three to four days a week. He is an expert in wine vineyard operations and turnaround assignments. I rely on these individuals to manage the daily operations of the Vineyard.

**Company's Financing History**

46. The Debtor is a privately held company, wholly owned by Freecrest, and beneficially owned by Mr. Safra. As part of the Credit Facility, Freecrest pledged its interest in the Debtor to MGG.

47. The Debtor has historically been financed by secured lending, as described above. The Debtor has also obtained funds for payment of certain obligations, such as the paydown of MGG by approximately $100 million, from Mr. Safra.

48. On September 30, 2022--the day after the Petition Date--Mr. Safra transferred $600,000 of his own money into the Debtor's bank account as an equity infusion (the "Unrestricted Cash"). MGG does not have a security interest in the Unrestricted Cash. The Unrestricted Cash allows the Debtor a small cushion of time in which it can pay post-petition expenses, but the Debtor cannot reorganize this estate without the use of MGG's cash collateral.

**COVID**

49. The COVID-19 Pandemic has had a significant impact on the economy and, by extension, real estate markets. Napa County's recovery has had difficulty finding traction amid a

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

resurgence of COVID-19 cases that only now appears to be declining. Napa's heavy concentration in leisure/hospitality has subjected the area to larger than average job losses during the pandemic, but Napa has recouped roughly half of the jobs lost since the start of the pandemic.

50. Napa County now no longer is subject to any restrictions in indoor capacity, and travel restrictions have also risen. Napa is highly dependent on travel and has the highest share of jobs in leisure/hospitality in California. This summer, the Debtor sought to bolster its staff, to prepare for a surge in "post-pandemic" travel, and on-site tastings are crucial because they boost direct-to-consumer sales, which have higher profit margins than selling through a distributor.

51. The Debtor's historical income has been as follows:

    a. For fiscal year 2019 (January 1, 2019, through December 31, 2019), the Debtor had revenue of $7,208,290

    b. For fiscal year 2020, the Debtor had $6,747,288 in revenue.

    c. For fiscal year 2021, the Debtor had $8,277,138 in revenue.

    d. For January 1, 2022, through June 30, 2022, the Debtor had $3,806,159 in revenue.

**The Debtors' Cash Management**

52. As of the Petition Date, the Debtor utilized four (4) bank accounts at JP Morgan Chase (collectively, the "Debtor Accounts"), all of which collectively form the Debtor's cash management system. The Debtor Accounts are used solely for the operation of the business. A chart identifying the Debtor Accounts is attached hereto as **Exhibit 1**.

53. Pre-petition, the Debtor's cash management system generally ran as follows:

    a. Revenues generated from sales made through the Debtor's website (customers can order wine and merchandise through the website), at the Debtor's on premises tasting room, and for regular purchases through the Debtor's wine club are made through its point of sale system, eCellars, which is connected to an account at Global Payments ("eCellars"). Funds from the wine club and direct to customer sales through Global Sellers are collected from these credit card sales, after processing fees are deducted, and deposited into the account ending in 7558 (the "DTC Account").

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

b.      Wholesale receipts for bulk shipments, including bulk wine and grapes, and brokerage sales of bottled wine are received either by wire transfer, ACH, or paper check, and deposited into the account ending in 7699 (the "Operating St. Helena Account").

c.      The Debtor also maintains an account ending in 9022 (the "Chicago Operating Account").  This account received funding from the Debtor's secured creditor MGG, and from the Debtor's principal.

d.      Finally, the Debtor has a payroll account, account which is account ending in 9525 (the "Payroll Account").  The Debtor makes direct deposits to certain salaried employees, and transfers funds form the Payroll account to an outside payroll company, Paychex, which then issues payments to the Debtor's employees.

54.    The Debtor uses the DTC Account and the Operating St. Helena Account to make payments to its vendors and to fund the Payroll Account.   Funds from the Chicago Operating Account are transferred to the Operating St. Helena Account, the Payroll Account, and occasional to make certain transfers to pay professional fees and other payments as needed.

**The Debtors' Assets**

55.    The Debtor's primary asset is the Vineyard.  The Debtor's appraiser John Vaughn of Newmark Knight Frank, a noted and very well respected appraisal firm, has appraised the Vineyard (which does not include the Wine Inventory), at $218,700,000 as of August 27, 2022..

56.    The Debtor's next most valuable asset is the Wine Inventory.  Napa County regulates all vineyards by capping the amount of gallons of wine per year each vineyard can manufacture.  The Debtor possesses permits to manufacture 48,000 gallons per year, which is a substantial amount for a vineyard in that area.  For a number of years, the Debtor has been retaining a majority of each year's production in order to build a vertical inventory library reaching back to 1979.  The Vineyard's library is comprised of 79,000 cases of wine.

57.    Additionally, in early 2020, MGG voiced concerns over the Debtor's ability to repay the Loan, and demanded additional collateral from Mr. Safra.  As a demonstration of his good faith, in July 2020, Mr. Safra agreed to provide such collateral, in the form of a $75 million third-lien security interest that he gave to MGG on Mr. Safra's 100% equity interest in Britannica.

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

Finally as shown in the separately filed Declaration of Jay B. Spievack, the Debtor's litigation counsel, claims through filed litigation have been brought against the insurance carriers who failed to comply with their duties to pay the damage suffered by the Debtor in the Glass Fire in 2020. This asset has been valued through Mr. Spievack's opinion regarding the value of this claim, at $35 Million. This asset is a portion of additional security in the Debtor's assets held by MGG. To date, prior to filing litigation, MGG received $7.25 Million from certain of the Debtor's insurance carriers who properly paid on their claims (although the Debtor continues to seek additional recoveries from one of them)

### The Debtors' Debt Structure

### Secured Debt

58.     At or about the Petition Date, the Debtor has secured debt in the aggregate amount of approximately $205 million, held by MGG. The Debtor has no other secured creditors.

### Unsecured Debt

59.     As of about the Petition Date, the Debtors have general unsecured debt (not counting amounts owing to insiders). Insiders are owed more than $70 Million for their advances for the benefit of the Debtor. Debtor believes that their interests are also deserving of the same protection and the same reorganization value as will be paid to other unsecured creditors in this bankruptcy case. The Debtor believes that the value in its assets more than covers repayment of these insider obligations..

60.     Of the amount, the amount owed to the Debtors' top 20 unsecured creditors is $2,526,854.57.

### The Debtors' Employees

61.     The Debtor has 70 employees (the "Employees"). The Debtor anticipates hiring additional employees to the extent customer demand, in particular in-person demand, at the Winery increases.

62.     Of the Debtor's 70 Employees: (i) 45 conduct farming-related activities on the Debtor's vineyard, including, for example, harvesting grapes, pruning, weeding, and fertilizing (the "Vineyard Employees"), services that are particularly critical at this time of year, and (ii) 16

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

employees, which include the Debtor's winemaker, vineyard manager, VP of sales and marketing, and other employees involved in management, production, sales, and marketing-related activities for the Debtor (the "Corporate Employees").

63. Each of the Vineyard Employees are paid on an hourly basis. As for the Corporate Employees, nine are salaried and seven are paid on an hourly basis. All of the Corporate Employees and 12 of the Vineyard Employees are employed on a full-time basis. The other 33 Vineyard Employees currently work 40 hours per week to perform necessary harvesting activities essential for this time of year, but their employment currently is expected to terminate once the harvest ends (estimated to be around October 15, 2022).

64. The Debtor pays its Employees biweekly, for a total of 26 payroll dates per year, generally paid one week in arrears. The Debtor utilizes Paychex as its payroll processor. As more particularly described in the Debtor's concurrently-filed motion for order authorizing the Debtor to maintain its bank accounts and cash management system, the Debtor maintains a payroll account, through which the Debtor makes direct deposits to certain Employees. All other employees are provided paper payroll checks, issued by Paychex, against this payroll account. Such checks issued for the most recent pre-petition payroll likely were not cashed prior to the Petition Date.

65. The Employees currently receive approximately $175,000 collectively each bi-weekly pay period, not counting benefits, 401(k) funding, and reimbursement of expenses.

66. The Debtor operates a 401(k) programs for its Employees, but does not match funds placed into those programs by the Employees.

**THIS CHAPTER 11 CASE**

67. The Debtor commenced this reorganization case to restructure its operations and debt. The Debtor believes that a successful overall reorganization will maximize the value of the Estate and allow the Debtor to emerge from chapter 11 with a reorganized and viable ongoing business.

68. However, a successful restructuring likely will require cooperation of certain stakeholders in the Debtor, including MGG, and potentially others.

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

## FACTS IN SUPPORT OF "FIRST-DAY" EMERGENCY MOTIONS

### Motion For Order Granting Use Of Cash Collateral (the "Cash Collateral Motion")

69.     As a result of the Credit Facility, MGG possesses a security interest in the Debtor's cash collateral, with the exception of the Unrestricted Cash.  No other entity possesses an interest in the Debtor's cash collateral.[2]

70.     The Debtor has two significant, and inflexible, operating costs.  The first is insurance, which skyrocketed as a result of the many fires which destroyed an entire season of grapes and damaged half of the vineyard blocks and actually increased before the Glass Fire took place.  Over the next 13 weeks, insurance is projected to cost approximately $984,000.  The second is the Debtor's 70 employees, approximately 40 of whom are, at this very moment, harvesting grapes.  The Debtor projects $1.4 million in salary expenses over the next 13 weeks to these employees.  During this same period, the Debtor projects that its income will be approximately $2.2 million.  The shortfall will be made up by equity infusions from Mr. Safra, including the Unrestricted Cash, with another infusion of equity to be made in December.  Mr. Safra will make an additional cash infusion of $1.4 Million by November 15, 2022 in order to cover operating costs through December 31, 2022.

71.     Mr. Safra has engaged, and is actively working with at the present time, with well-known investment bankers at William Blair & Company to conduct a private placement of the equity of Britannica.  Mr. Jorge Cauz, who has submitted a separate declaration in support of the First Day Motions, is the Chief Executive Officer of Britannica.  In that capacity and based upon his many years of experience (and very high educational attainment) in the Educational Technology and related areas, has conservatively estimated Mr. Safra's equity in Britannica at

---

[2] While the Debtor has more than made its case for approval of cash collateral usage, the Debtor notes that it can utilize the Unrestricted Cash to pay its obligations from the bankruptcy filing date to the date of a final hearing on cash collateral usage approximately 15 days after the preliminary hearing on October 6, 2022.  The Debtor will just seek to replace the $600,000 reserve with cash collateral generated after the final hearing so that the reserve will remain available to financially bridge the Debtor's operations from the bankruptcy filing date to November 30, 2022.

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

between $450 Million and $550 million. The first lien on Britannica is for $100 million, and the second lien is no more than $25 million, making MGG's third lien oversecured and more than "in the money". I anticipate that this portion of MGG's secured claim will be paid by year end or in early January, 2023. This payment of $75 Million will substantially reduce the Debtor's obligation to MGG.

72. The Debtor's claims against the multiple insurance carriers for their failure to pay claims for which they were responsible following the Glass Fire in the fall of 2020 have a value of $35,000,000, as the damages actually suffered exceed the available coverage. MGG has a security interest in this eventual recovery. Additionally, with respect to some of the insurance defendants, Mr. Spievack believes that the Debtor may additionally recover punitive damages and attorneys' fees.

**Motion for Order Authorizing Payment and/or Honoring of Prepetition Workforce Obligations, Including Compensation, Benefits, Reimbursements, Withholding Taxes, Accrued Vacation, and Related Claims (the "Workforce Obligations Motion")**

73. A true and correct list of the Debtor's current Employees, including each Employee's job title/position/role, bi-weekly basic compensation amounts or hourly rate, compensation status (salaried or hourly), and full-time or hourly employment status, is attached to the Workforce Obligations' Motion as **Exhibit 1**.

74. The Debtor's most recent payroll covered the period from September 11, 2022, to and including September 24, 2022, for which Debtor remitted funds to Paychex on September 28, 2022.

75. The Debtor's first payroll due post-petition falls on October 14, 2022. In order to meet this date, the Debtor must remit the necessary funds to Paycheck by October 12, 2022. This next payroll will cover the period from September 25, 2022, through and including October 8, 2022. As a result, this payroll period will cover four days of pre-petition wages and 10 days of post-petition wages (including the Petition Date).

76. The average amount the Debtor needs for any given payroll period ranges from approximately $150,000 to $175,000 for basic wages only (not including any benefits or employer

taxes, or reimbursement for any expenses). The Debtor anticipates the next payroll for Employees will total approximately $175,000.

77. The Debtor offers its full-time Employees various benefits as part of their overall compensation package. Such benefits include coverage plans for medical (via AG Health), dental (via Delta Dental), and vision (via VSP Vision Care). The Debtor pays approximately $45,000 per month towards the Employee medical plan. The Debtor also offers its full-time Employees the opportunity to participate in a 401(k) plan. The Debtor withholds in the aggregate of approximately $3,500 per pay period from its full-time Employees' pay on account of the 401(k) plan, and pays approximately $2,500 per month in 401(k) administrator fees. As part of the relief sought in this Motion, the Debtor seeks authority to pay any pre-petition amounts withheld from such Employees' pay on account of the 401(k) plan that were not remitted to the administrator prior to commencement of this case.

78. Employees accrue paid vacation after 30 days from the beginning of employment as full-time employees. Employees accrue paid sick leave in accordance with California law. Twenty-four hours of such sick leave is available to every California employee starting every January 1. These sick leave days do not carry over to the next period, and unused hours are not paid out upon termination.

79. Employees are entitled to reimbursement of certain business-related expenses. Employees seeking such reimbursement submit mileage and expense reimbursements to the Debtor's Accounts Payable department. The Debtor estimates that some of the Employees will not have timely submitted receipts and/or other documentation for a minimal amount of reimbursement of business expenses as of the Petition Date. Further, some reimbursement checks that were issued prior to the Petition Date will likely not have been cashed before the Petition Date. The Debtor estimates that the total of both the unpaid expenses and outstanding checks for expenses already paid will total less than $100.

80. As a result of the Debtor's commencement of this case, absent Court order, the Debtor will be restricted from paying and/or honoring accrued and unpaid wages, salaries,

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

vacation, and other forms of employee compensation and benefits attributable to the pre-petition period.

81.     This Motion also seeks authority to pay and/or honor all wages, compensation, benefits, reimbursements, withholding and payroll taxes, accrued vacation time, and related claims (collectively with Employee wages, the "Employee Compensation"), with respect to the outstanding pre-petition period and on an ongoing basis for post-petition period, as well as to authorize and direct the bank against which pre-petition checks for Employee Compensation and claims were issued (JP Morgan Chase Bank, the "Issuing Bank") to honor any such pre-petition checks, including, but not necessarily limited to, any payroll checks or expense reimbursement checks issued prior to the Petition Date that were not cashed by the Employees before the Petition Date.

82.     Approval of the Motion is necessary in order to maintain workforce stability, morale, and loyalty, and in order to sustain the work ethic and effort of the Debtor's workforce and Employees.  If the Debtor is not authorized to pay and honor the Employee Compensation as requested herein, the Debtor and its efforts to maximize the value of the Estate and creditor recovery could be immediately and severely disrupted.

**Motion for Order (1) Deeming Utility Companies Adequately Assured of Future Performance, (2) Establishing Procedures for Requests for Additional Assurance, and (3) Restraining Utility Companies From Discontinuing Alternating or Refusing Service (the "Utilities Motion")**

83.     In connection with the operation of the Business, the Debtors obtain electricity, natural gas, water/sewage, trash removal/waste, telephone and other similar services from a number of different utility suppliers (the "Utility Providers").  The Utility Providers are identified in the chart attached to the Utilities Motion as Exhibit 1.  This Exhibit 1 details the name and address of the Utility Providers, the type of service provided, the debtor entity to which the service relates, the amount of the Debtor's average monthly expense, the amount owed to each Utility

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

Provider as of the Petition Date, and the amount of the deposit held by each Utility Provider, if any.

84.     The Debtor's monthly utility bill is approximately $7,500.

85.     None of the Utility Providers hold any deposits from the Debtor.

86.     The Debtor proposes to provide adequate assurance to the Utility Providers by making a deposit equal to one-half of the Debtor's average monthly expense for each Utility Provider, as identified on Exhibit 1 to the Utilities Motion, into a segregated account, as adequate assurance (the "Adequate Assurance Deposit") upon this Court's entry of the order on the Utilities Motion.  The Debtor anticipates that the total amount of Adequate Assurance Deposit that the Debtor will make if the Motion is granted is $3,884.

**Motion for Order Authorizing Debtors to Maintain Bank Accounts and Cash Management System and Continue Use of Its Existing Business Forms (the "Cash Management Motion")**

87.     As set forth in more detail in the Cash Management Motion, one form of relief sought through that motion is authority for the Debtor to maintain its existing cash management system.  A description of the Debtor's general cash management system is set forth above under the heading "The Debtors' Cash Management."

88.     The Debtor seeks authority to continue to maintain the Debtor Accounts for the duration of the Chapter 11 Case.  If the Debtor is required to close its existing accounts immediately, open all new bank accounts and substantially alter its existing cash management system, there likely would be a significant disruption in the Debtor's ability to collect and disburse funds in the ordinary course of its operations.  Such a disruption would negatively impact the Debtor's ability to make a smooth transition into chapter 11.   The Debtor will work with its bank, JP Morgan Chase, to change the designation on the Debtor Accounts to reflect that the Debtor Accounts are maintained by a Debtor in Possession.

89.     If the Debtor is not permitted to maintain and utilize its cash management and banking system (with certain modifications described herein), the Debtor, the Estate, and creditors will be prejudiced by:  (i) the resulting disruption in the ordinary financial affairs and business

operations of the Debtor; (ii) potential delay in the administration of the Estate; and (iii) the unnecessary cost to the Estate to set up new accounts and new systems.

## **Debtors' Emergency Motion For Order Authorizing Debtor To Pay Prepetition Claims Of Certain Companies As Critical Vendors ("Critical Vendors Motion")**

90.     Conway Beverage Group, LLC, dba Elite Brands, a California limited liability company ("Elite") is owed $69,329.20 of the Petition Date.  Elite is a wine broker.  In March, 2017, the Debtor and Elite entered into a brokerage agreement pursuant to which Elite agreed to act as the Debtor's independent broker for the sale and marketing of the Debtor's wine in the United States.  That agreement is attached to the Critical Vendor Motion as Exhibit 1.  This agreement is an executory contract which the Debtor intends to assume.

91.     Around February, 2022, the Debtor was scammed by an imposter who impersonated Elite and as a result, the Debtor wired $36,870.00 that should have gone to Elite, to an imposter.  Elite asked the Debtor to pay it $36,870.00 for real, but the Debtor convinced Elite to wait until the Debtor could obtain a return of these diverted funds.  Just prior to the Petition Date, the Debtor obtained $36,814.60 of these funds and intended to send them to Elite, but the Debtor commenced this case before these funds could be transferred to Elite.  Elite has now demanded that the Debtor turn over this $36,814 that should have been paid to Elite in February 2022.

92.     Additionally, Elite provided brokerage services to the Debtor in September, 2022, for which it has earned commissions in the amount of $32,514.60.  Elite has asked the Debtor to pay that amount to Elite, as well, as a condition of continuing to perform services.  It has also informed the Debtor that if these amounts are not paid, Elite will suffer significant financial harm and may need to take drastic actions by the end of the week, which would affect Elite's ability to continue to act as the Debtor's broker.  The Debtor cannot allow this to occur.  The Debtor requires Elite's services to continue in operations in this bankruptcy case, and does not want to disrupt this relationship. Elite is an important partner in the Debtor's success—it is responsible for marketing its wine to potential customers in the 49 states of the United States other than

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

California. Losing Elite's services would result in significant harm to sales, receipts, and potentially the Debtor's brand itself.

93. Wine Service Cooperative ("WSC") is owed $141,500 as of the Petition Date. WSC operates a storage warehouse for its members for wine case goods at three separate locations in California, and provides other storage and shipping services for its members. The Debtor and WSC entered into an agreement dated January 2014, later amended October 11, 2018, that sets out WSC's duties. Under that agreement, WSC (i) stores the Debtor's bottled wine, (ii) fulfils customer orders for bottled wine, by shipping such bottles to the Debtor's customers, and (iii) provides the Debtor with a designated aisle in its retail location for the display of the Debtor's bottles, so that customers may peruse the Debtor's wine selection. The Debtor's contract with WSC is attached to the Critical Vendors Motion as Exhibit 2.

94. WSC stores the vast majority of the Debtor's bottled wine. The Debtor only stores an extremely limited amount of bottled wine at the Vineyard. The Debtor does not pack or ship bottled wine to customers who order it. All of those tasks are performed by WSC. WSC plays a critical role in the Debtor's operations, and losing WSC's services would be devastating to the Debtor's business--essentially the Debtor would no longer be able to ship wine in the United States until it locates another distributor and moves its bottled wine to that distributor's location. WSC has informed the Debtor that it has ceased shipping the Debtor's bottles, and will not resume shipping unless the Debtor pays it the amount it is owed for pre-petition services: $141,500. The Debtor will suffer significant harm if it is unable to fulfil customer orders.

95. In addition to the foregoing, I understand that WSC asserts a warehouseman's lien under California law. WSC will not ship any of the Debtor's inventory to customers, large and small, without payment of their prepetition claim. WSC **has possession of all of the Debtor's inventory.** They process all of the Debtor's orders and stage and ship the Debtor's larger orders. The Debtor will be out of business without payment of their prepetition claim.

96. Napa Valley Petroleum provides the Debtor with gasoline, which is necessary for the Debtor to operate its tractors during the harvest season, which it is currently in right now. Napa Valley Petroleum has informed the Debtor that if the amounts owed to it as of the Petition

GREENSPOON MARDER LLP
333 SOUTH GRAND AVENUE, SUITE 3400
LOS ANGELES, CALIFORNIA 90071
TEL 213.626.2311 • FAX 213.629.4520

1    Date is not paid, $13,985.27, it will not continue delivering gasoline to the Vineyard. While the
2    Debtor probably could obtain gasoline from a different source given time, the Debtor is in the
3    middle of harvest and does not have that time to find and establish a relationship with a new
4    supplier. It needs this gasoline every day at present. Losing the service of Napa Valley Petroleum
5    would cause significant disruption to the Debtor's operations at this critical point of the harvest.

6         97.    C Q A Consulting ("CQA") is the Debtor's alcohol beverage compliance
7    consultant. CQA handles all of the Debtor's compliance requirements for products sold to
8    wholesalers, retailers, and consumers in every state where it is licensed except California, and
9    provides services to the Debtor in all states where the Debtor does business, except California.
10   CQA processes license applications and renewals, registers products (including brands and labels),
11   appoints distributors and territory assignments for each, posts prices, makes periodic reports of
12   shipments and returns for sales and excise taxes, and takes other actions necessary to maintain the
13   Debtor's business in compliance with the applicable laws related to alcoholic beverages in each
14   state. The Debtor's contract with CQA, dated July 1, 2014, is attached to the Critical Vendors
15   'Motion as Exhibit 3.

16        98.    The Debtor does not believe it owes CQA any amount as of the Petition Date,
17   based upon CQA's prepetition services which remain unpaid. However, the Debtor will need to
18   pay CQA approximately $30,000 shortly in order to fund CQA's payments to all of the various
19   entities, some of which amount will relate to taxes owed for sales, or license payments owed, that
20   relate to the Debtor's business operations conducted prior to the Petition Date. The Debtor must
21   ensure that these entities receive prompt payment, so that it can continue to do business with all
22   proper license fees and taxes paid.

23        I declare under penalty of perjury under the laws of the United States of America
24   that the foregoing is true and correct.

25        Executed October 4, 2022, in Chicago, Illinois.

26

27

28   Constantine S. Yannias

51122584_1

# EXHIBIT 1

# Bank Accounts



REAL CHALLENGES. REAL SOLUTIONS.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 333 South Grand Avenue, Suite 3400, Los Angeles, CA 90071.

A true and correct copy of the foregoing document entitled (*specify*): **OMNIBUS DECLARATION OF CONSTANTINE S. YANNIAS IN SUPPORT OF DEBTOR'S "FIRST-DAY" EMERGENCY MOTIONS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) October 4, 2022 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page.

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) October 4, 2022, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 4, 2022 | Patricia Dillamar | */s/ Patricia Dillamar* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

PMD 51997903v1 CC 51988413v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                   **F 9013-3.1.PROOF.SERVICE**

## 1. SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")

Office of the U.S. Trustee / SR
USTPRegion17.SF.ECF@usdoj.gov

Elvina Rofael on behalf of U.S. Trustee Office of the U.S. Trustee / SR
elvina.rofael@usdoj.gov, Katina.Umpierre@usdoj.gov,GemMil.Langit@usdoj.gov

Victor A. Sahn on behalf of Debtor Spring Mountain Vineyard Inc.
victor.sahn@gmlaw.com, vsahn@ecf.inforuptcy.com

Phillip John Shine on behalf of U.S. Trustee Office of the U.S. Trustee / SR
phillip.shine@usdoj.gov

## 3. SERVED BY OVERNIGHT MAIL, U.S. MAIL AND EMAIL

**Debtor**
Spring Mountain Vineyard Inc.
2805 Spring Mountain Road
St. Helena, CA 94574-1798
Attn:  Don Yannias, President
email:  don@bimi.com

**Debtor's Financial Advisor And Chief Restructuring Officer**
Attn:  Kevin A. Krakora, Managing Director
Getzler Henrich & Associates LLC, a Hilco Global Company
150 S. Wacker Drive | 24th Floor
Chicago, IL 60606
Tel:   (312) 283-8071
email:  kkrakora@getzlerhenrich.com

**U.S. Trustee**

Tracy Hope Davis
United States Trustee for Region 17
Office of The United States Trustee
450 Golden Gate Avenue, 5th Floor, Suite #05-0153
San Francisco, CA 94102
Tel:  (415) 705-3300

**Attorneys For U.S. Trustee**

Office of the United States Trustee
Attn:  Elvina Rofael
450 Golden Gate Ave., Rm. 05-1053
San Francisco, California 94102
email:  Elvina.Rofael@usdoj.gov
Tel:  (415) 705-3333

PMD 51997903v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                          F 9013-3.1.PROOF.SERVICE

Case: 22-10381    Doc# 26    Filed: 10/04/22    Entered: 10/04/22 14:18:39    Page 28 of 35

Office of the United States Trustee
Attn: Phillip J. Shine
280 South First Street, Rm. 268
San Jose, CA 95113
email: phillip.shine@usdoj.gov
Tel: (408) 535-5526

**Secured Creditors**
MGG (BV) Limited
MGG Canada Fund LP
MGG Insurance Fund Series Interests of t
MGG Investment Group LP
MGG Onshore Funding I LLC
MGG SF Drawdown Master Fund (Cayman) LP
MGG SF Drawdown Unlevered Fund II LP
MGG SF Drawdown Unlevered Fund LP
MGG SF Drawdown Unlevered Master Fund I
MGG SF Evergreen Unlevered Fund LP
MGG SF Evergreen Master Fund (Cayman) LP
MGG SF Evergreen Unlevered Fund LP
MGG SF Evergreen Unlevered Master Fund I
MGG Specialty Finance Fund I LP
MGG Specialty Finance Fund LP
c/o MGG California, LLC
One Penn Plaza 53rd Fl
Attn Kevin F. Griffin, CEO
New York, NY 10119-0002
Tel: (212) 356-6100
creditagreementnotices@mgginv.com

**Counsel for Secured Creditors**

Bradley R. Bobroff, Esq.
Proskauer Rose LLP
Eleven Times Square
New York, NY 10036-8299
Tel: (212) 969-3643
email: bbobroff@proskauer.com

Scott P. Cooper, Esq.
Proskauer Rose LLP
2029 Century Park East, Suite 2400
Los Angeles, California 90067-3010
Tel: (310) 284-5669
email: scooper@proskauer.com

Frederic Ragucci, Esq.
Proskauer Rose LLP
Eleven Times Square
New York, NY 10036-8299

PMD 51997903v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

Case: 22-10381    Doc# 26    Filed: 10/04/22    Entered: 10/04/22 14:18:30    Page 29 of 35

F 9013-3.1.PROOF.SERVICE

Tel:  (212) 969-3023
email: FRagucci@proskauer.com

Jeff. J. Marwil, Esq.
Proskauer Rose LLP
70 W. Madison
Suite 3800
Chicago, IL 60602-4342
email:  jmarwil@proskauer.com

**20 Largest Unsecured Creditors**
Allen Group
Attn:  Timothy Allen, CPA - Managing Partner
120 Stony Point Road,  #230
Santa Rosa, CA 95401
(707) 528-3860
tim@allenwine.com
Tim@allengroupllp.com
Brent Garrison
Brent@allengroupllp.com

Bartelt Engineering
Attn:  Paul Bartelt
303 Jefferson St #200B
Napa, CA 94559
(707) 258-1301

Belkorp AG, LLC
Attn:  Laura Correll, Accounting
2413 Crows Landing Rd
Modesto, CA 95358
(209) 205-3706
ar@belkorpag.com

Brown's Auto Parts
Attn Dan Beltramai, Owner
1218 Main St.
Saint Helena, CA 94574-1901
(707) 963-3638
brownsauto169@gmail.com

Castino Restaurant Equipment And Supply
50 Utility Ct.
Rohnert Park, CA 94928-1659
(707) 585-3566
sales@castinosolutions.com

Central Valley
Attn:  Gerry Cruz, Accounting Mgr.
1100 Vintage Avenue.
Saint Helena, CA 94574

PMD 51997903v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

Case: 22-10381    Doc# 26    Filed: 10/04/22    Entered: 10/04/22 14:18:30    Page 30 of
35

F 9013-3.1.PROOF.SERVICE

707 261-1900
gerryc@centralvalley.com

Chubb Group of Insurance Companies
P.O. Box 777-1630
Philadelphia, PA 19175-0001
(800) 372-4822

Conway Beverage Group, LLC
Dba: Elite Brands
3238 Old Heather Rd.
San Diego, CA 92111-7716
Attn: Mr. Jay Conway

Famille Sylvain
855 Bordeaux Way #239
Napa, CA 94558-7549
(707) 492-3308

Francois Freres USA Inc.
1403 Jefferson St.
Napa, CA 94559-1708
(707) 294-2204

G3 Enterprises Inc.
(Tapp Labels)
580 Gateway Dr.
Napa, CA 94558
(707) 252-8300

IPFS
49 Stevenson St. #127
San Francisco, CA 94105-2909
(877) 687-9826

Napa County Treasurer
1195 3rd St. #108
Napa, CA 94559-3035
(707) 253-4311

Napa Ford Lincoln
170 Soscol Ave.
Napa, CA 94559
(707) 255-2580

Napa Valley Petroleum
P.O. Box 2670
Napa, CA 94558-0528
(707) 252-6888

Ramondin U.S.A. Inc.

PMD 51997903v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012 F 9013-3.1.PROOF.SERVICE

541 Technology Way
Napa, CA 94558
(707) 944-2277

Stanzler Law Group
Attn: Jordan S. Stanzler
390 Bridge Pkwy #220
Redwood City, CA 94065
(650) 739-0200
email:  Jstanzler@stanzlerlawgroup.com

Tonnellerie Sylvain
855 Bordeaux Way
Napa, CA 94558
(707) 492-3308

Wilbur Ellis Company LLC
c/o Registered Agent Solutions Inc.
720 14th St.
Sacramento, CA 95814-1905
(707) 963-3495

Wine Service Cooperative
1150 Dowdell Lane
Saint Helena, CA 94574
Attn:  Bob Holmes
General Manager
Tel: (707) 963-9474
Fax: (707) 963 9359
bob@wineservicecoop.com

**Critical Vendor**

C Q & A Consulting
P.O. Box 777
Pinole, CA 94564
Attn:  Deanna Leon
Tel:  (510) 964-7901
Fax:  (510) 223-8140
email:  dleon@cqaconsult.com

**Request for Special Notice**
Attorneys for Mt. Hawley Insurance Company
Michael D. Prough
Dean C. Burnick
Prough Law, APC
1550 Parkside Drive, Suite 200
Walnut Creek, CA 94596
T: (925) 433-5894
F: (925) 482-0929

PMD 51997903v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                                                F 9013-3.1.PROOF.SERVICE

Case: 22-10381    Doc# 26    Filed: 10/04/22    Entered: 10/04/22 14:18:30    Page 32 of
35

Email: mdp@proughlaw.com
dcb@proughlaw.com

**Utilities**

AT&T
PO Box 5014
Carol Stream, IL  60197
(707) 967-1178

AT&T Long Distance
PO Box 5014
Carol Stream, IL  60197
(707) 967-1178

Comcast Business
PO Box 60533
City of Industry, CA  91716
(955) 564-1056

Culligan
1249 Illinois Street Suite 1
Fairfield, CA 94533
(707) 558-1000

Direct TV
PO Box 105249
Atlanta, GA  30348
800 288-2020

Federal Express
PO Box 7722
Pasadena, CA 91109
(800) 463-3339

M&M Sanitary Company
1208 Green Island Rd.
American Canyon, CA 94503
(800) 675-0025

Pacific Gas & Electric
P.O. Box 997300
Sacramento, CA  95899
(800) 468-4743

City of St. Helena
1572 Railroad
St. Helena, CA  94574
Attn: Stephanie Killingsworth
Senior Accounting Technician
(707) 968-2750 x 513
skillingsworth@cityofsthelena.org

PMD 51997903v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Upper Valley Disposal Service
1285 Whitehall Lane
St. Helena, CA  94574
(707) 963-7988

Dept. of the Treasury, Alcoholic Beverage Control
Attn: Tracie Parker, Lic.Rep. I
50 D Street Room 130
Santa Rosa, CA. 95404
Phone: (707) 576-2165
Fax: (707) 638-9537

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346
(800) 973-0424

California Department of Tax and Fee Administration
Special Operations Bankruptcy Team MIC: 74
P.O. Box 942879
Sacramento, CA 94279-0074
(800) 400-7115

Franchise Tax Board
Bankruptcy Section, MS A-340
P.O. Box 2952
Sacramento, CA 95812-2952
916-845-4750

Employment Development Department
Bankruptcy Unit-MIC 92E
P.O. Box 826880
Sacramento, CA 94280-0001

<u>Service by Mail Address:</u>
Employment Development Department
Attn: MIC 53
800 Capital Mall
Sacramento, CA 95814

PMD 51997903v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

F 9013-3.1.PROOF.SERVICE

**Courtesy Email**

Jay B. Spievack, Esq.
Cohen Tauber Spievack & Wagner P.C.
420 Lexington Ave., Suite 2400
New York NY 10170-2499
email: jspievack@ctswlaw.com

Joseph Vann, Esq.
Cohen Tauber Spievack & Wagner P.C.
420 Lexington Ave., Suite 2400
New York NY 10170-2499
email: jvann@ctswlaw.com

Will Densenberger
Engel & Volkers St. Helena - Napa Valley
1111 Main Street, Suite A
St. Helena, CA 94574
(707) 302-8133
email: will@nvwineestates.com

John C. Vaughan
Newmark Knight Frank
4675 MacArthur Court, Suite 1600
Newport Beach, CA 92660
email: john.vaughan@nmrk.com

Peter Ekman: PEkman@hilcoglobal.com

Mark Kasowitz: MKasowitz@kasowitz.com

Gavin D. Schryver: GSchryver@kasowitz.com

PMD 51997903v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                                                                                      **F 9013-3.1.PROOF.SERVICE**

Case: 22-10381    Doc# 26    Filed: 10/04/22    Entered: 10/04/22 14:18:30    Page 35 of 35