Victor A. Sahn (CA Bar No. 97299)
  *victor.sahn@gmlaw.com*
Mark S. Horoupian (CA Bar No. 175373)
  *mark.horoupian@gmlaw.com*
Steven F. Werth (CA Bar No. 205434)
  *steven.werth@gmlaw.com*
**Greenspoon Marder LLP**
a Florida limited liability partnership
333 South Grand Ave., Suite 3400
Los Angeles, CA  90071
Telephone: 213.626.2311
Facsimile: 954.771.9264

Attorneys for Debtor in Possession,
Spring Mountain Vineyard Inc.

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SANTA ROSA DIVISION

| | |
|---|---|
| In re: | Case No. 1:22-bk-10381 CN |
| SPRING MOUNTAIN VINEYARD INC., a Delaware corporation, | Chapter 11 |
| Debtor. | **MOTION OF DEBTOR AND DEBTOR IN POSSESSION FOR AUTHORITY TO IMPLEMENT KEY EMPLOYEE RETENTION PLAN; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF KEVIN A. KRAKORA IN SUPPORT THEREOF** |
| Federal EIN:  36-3844911 | <u>**Hearing Information**</u><br><br>Date: January 18, 2023<br>Time: 11:00 a.m.<br>Place: U.S. Bankruptcy Court<br>Courtroom 215<br>1300 Clay Street<br>Oakland, CA 94612<br>*Videoconference via Zoom Webinar* |

MSH 52792708v1

**TO THE HONORABLE CHARLES NOVACK, UNITED STATES BANKRUPTCY JUDGE, THE UNITED STATES TRUSTEE FOR REGION 17, CREDITORS, AND OTHER PARTIES IN INTEREST:**

Spring Mountain Vineyard, Inc, a Delaware corporation, the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case (the "Debtor"), pursuant to 11 U.S.C. § 503(c)(3), hereby moves this Court for an order authorizing the Debtor to implement a key employee retention plan for corporate level and managerial non-insider employees (the "Motion").

As more particularly set forth in the accompanying memorandum of points and authorities, the Motion is made on the following grounds: As part of its overall efforts to reorganize, the Debtor has retained an investment banker to implement a process through which the Debtor is selling the Debtor's vineyard property and accompanying wine inventory as a going concern. The investment banker is hired to conduct a sale of process, with the goal of paying the Debtor's indebtedness to the Debtor's secured creditor, MGG California, in full at the closing of such a transaction. Given the potential for a change of ownership of the Debtor's business and the uncertainty surrounding the bankruptcy process, the Debtor has serious concerns that certain employees the Debtor has determined are critical to the Debtor's reorganization process may seek out other employment and leave the Debtor out of fear their position at the Debtor may be terminated in short order. As a result, the Debtor seeks to implement a modest key employee retention program (described below) for a select group of non-insider employees.

The 15 employees the Debtor has identified as critical to the successful implementation and achievement of its restructuring objectives and the goal of maximizing the value of the bankruptcy estate (the "Estate") -- none of which are "insiders" of the Debtor as defined in 11 U.S.C. § 101(31) -- fall within the following categories (collectively, the "Corporate Employees"): senior managers (3 employees) who oversee the sales, vineyard and cellar departments, sales staff (8 employees), and cellar/administrative staff (4 employees). As detailed below, each of these Employees (the "KERP Participant") plays an essential role within the company and are necessary to the successful implementation of the Debtor's restructuring goals. In an attempt to retain these

MSH 52792708v1

Corporate Employees in the interim and during the essential phases of this case, the Debtor seeks to implement the following "Key Employee Retention Plan" (the "Retention Plan"):

- The 15 KERP Participants in the Retention Plan, identified on Exhibit 1 hereto, will be entitled to receive a one-time bonus (the "KERP Bonus") on the occurrence of (i) the closing of a sale of the Debtor's business; or (ii) the confirmation of a plan of reorganization ("KERP Trigger Event").

- The KERP Bonus shall be paid from a fund established for that purpose (the "KERP Pool"). The KERP Pool shall not exceed $150,000. The amount of each KERP Participant's individual KERP Bonus shall be set by the Chief Restructuring Officer, in his sole discretion but after consultation with the Debtor's President, Constantine Yannias. In determining the amount each KERP Participant will receive, the Chief Restructuring Officer shall consider factors including the importance of the individual to the Debtor's operations, whether the individual is currently compensated at, above, or below market, and the difficulty of replacing the individual.

- A KERP Participant automatically becomes ineligible to receive any KERP Bonus if he or she is terminated for "cause," or voluntarily ends his or her employment prior to a KERP Trigger Event.

- To be eligible for a KERP Bonus and as a condition to receive a KERP Bonus, the KERP Participant must execute a release and all required documentation in a form approved by the Debtor (the "KERP Release"). The KERP Release will release any and all claims that the KERP Participant has or may acquire against the Debtor related to its employment or termination of employment, whether arising pre- or post-petition, including WARN liability or any claim to severance. The KERP Bonus will also be in lieu of any compensation that is due or owing, except for accrued, ordinary course salary, commissions, production bonuses, and PTO that will be deemed to have been accrued when actually earned and will be treated and paid in accordance with the priority scheme of the Bankruptcy Code and the terms

3

of any confirmed plan.

As noted above, the Debtor has serious concerns that it may lose the Corporate Employees at this essential period. With the potential for a sale of the business to a new owner, and the general inherent uncertainty of the reorganization process, the Corporate Employees have expressed concern for their future with the Debtor and, in response, may be (or may soon start) searching for new employment. The continued employment of each of the Corporate Employees is especially critical to facilitate the investment banker's sale process, contribute to prospective buyers' due diligence, and maintain stable operations through the bankruptcy proceedings. If the Corporate Employees were to leave, the Debtor believes that recruiting desirable replacement employees with similar skills would be difficult because of the Corporate Employees' respective levels of experience, personal knowledge regarding the Debtor's business operations, and the fact that the Debtor is in bankruptcy and running a sale process that may lead to a change in ownership. Further, it makes no sense to expend the time and effort to train new employees for what may be a relatively short time period that they would be needed and the inefficiencies of a substantial learning curve. The Debtor operates with a very lean corporate staff, and therefore, losing any of the Corporate Employees would be extremely disruptive, especially at this critical period.

The Debtor's ability to maintain its business operations, preserve the value of its assets, and maximize stakeholder recoveries through a successful and expedient restructuring process hinges on the Debtor's ability to retain the Corporate Employees during this critical period. The Debtor is convinced that the departure of any of the Corporate Employees would have an immediate and significant adverse effect on the administration of this case and bankruptcy estate (the "Estate"), the operations of the Debtor's business, and maximizing the value of the Estate. Based on the foregoing, the Debtor believes there are compelling business reasons for the Debtor's immediate implementation of the Retention Plan for the select group of Employees.

The Debtor recognizes that any payments made under the Retention Plan (to the extent approved) must be consistent with its authority to use cash collateral MGG. No payment will be made to a KERP Participant that is not in conformity with a cash collateral budget, in effect at the

MSH:5279270841

1    time, and approved by MGG or otherwise ordered by the Court.

2          This Motion is based on this notice of Motion and Motion, the accompanying

3    memorandum of points and authorities, the declaration of Kevin A. Krakora and any exhibits

4    thereto, the record in this case, all facts and documents that are the subject of judicial notice, and

5    any further evidence or argument that may be presented prior to or at the hearing on the Motion.

6          **WHEREFORE**, the Debtor respectfully requests that the Court enter an order: (1)

7    granting the Motion; (2) approving the Retention Plan; (3) authorizing (but not directing) the

8    Debtor to implement the Retention Plan and take any and all actions necessary to implement and

9    effectuate the Retention Plan; and (4) providing such other or further relief.

10   Dated:  December 21, 2022              **GREENSPOON MARDER LLP**
                                            A Florida limited liability partnership

11

12
                                           By:   */s/Mark S. Horoupian*
13                                               Victor A. Sahn
                                                 Mark S. Horoupian
14                                               Steven F. Werth
                                                 Attorneys for Debtor in Possession,
15                                               Spring Mountain Vineyard Inc.

16

17

18

19

20

21

22

23

24

25

26

27

28

MSH 52792708v1

5

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 6

I. FACTS ............................................................................................................................... 6

    A.     Background ....................................................................................................... 6

    B.     Summary of Restructuring Goals And Means of Maximizing The Value of The Estate ...................................................................................................... 7

    C.     Employees ...................................................................................................... 7

         1.     General ............................................................................................... 7

    D.     The Proposed Retention Plan ......................................................................... 8

II. THE RETENTION PLAN SHOULD BE APPROVED .................................................... 11

    A.     Standard ......................................................................................................... 11

    B.     Immediate Implementation of The Retention Plan And The Corresponding Proposed Retention Bonus Payments Are Justified by The Facts And Circumstances of This Case ........................................................................... 13

III. CONCLUSION ................................................................................................................. 16

DECLARATION OF KEVIN A. KRAKORA ............................................................................. 17

# **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

*In re Borders Group, Inc.*,
453 B.R. 459 (Bankr. S.D. N.Y. 2011) ................................................................ 14

*In re Foothills Texas, Inc.*,
408 B.R. 573 (Bankr. D. Del. 2009) ................................................................... 13

*In re Glob. Aviation Holdings Inc.*,
478 B.R. 142 (Bankr. E.D.N.Y. 2012) ............................................................... 13

*In re Global Aviation Holdings Inc.*,
478 B.R. 142 (Bankr. E.D.N.Y. 2012) ............................................................... 12

*In re Goodwill Ind. Of S. Nev., Inc.*,
Case No. 17-14398 (Bankr. D. Nev. Jan. 4, 2018), Docket No. 270 ................. 15

*In re HDOS Enterprises*
No. 2014-bk-12028-NB (C.D. Cal. Jun. 6, 2014) [Docket No. 334] .................. 15

*In re KB Toys, Inc.*,
No. 08-13269 (KJC) (Bankr. D. Del. Jan. 6, 2009) [Docket No. 207] ............... 15

*In re Mervyn's Holdings, LLC*
No. 08-11586 (KG) (Bankr. D. Del. Oct. 30, 2008) [Docket No. 794] .............. 16

*In re Metabolife Intl., Inc.*,
Case No. 05-06040-PB11, Docket Nos 97, 189 (Bankr. S.D. Cal. 2005) ........... 15

*In re New Century TRS Holdings, Inc.*
No. 07-10416 (KJC) (Bankr. D. Del. Aug. 15, 2007) [Docket. No. 2245] ......... 16

*In re NMI Systems, Inc.*,
179 B.R. 357 (Bankr. D.D.C. 1995) ................................................................... 13

*In re Velo Holdings, Inc.*,
472 B.R. 201 (Bankr. S.D.N.Y. 2012) ............................................................... 13

*In re Verity Health System of California, Inc.*,
Case No. 18-20151, Docket No. 814 at 5 (Bankr. C.D. Cal. Nov. 13, 2018) ..... 15

## **STATUTES**

11 U.S.C. § 101(31) ..................................................................................................... 12

11 U.S.C. § 502(f) ........................................................................................................ 11

11 U.S.C. § 503 ............................................................................................................ 11

11 U.S.C. § 503(b) .................................................................................................. 11

11 U.S.C. § 503(c) ............................................................................................. 11, 12

11 U.S.C. § 503(c)(1) ........................................................................................ 12, 13

11 U.S.C. § 503(c)(2) .............................................................................................. 13

11 U.S.C. § 503(c)(3) .............................................................................................. 12

MSH 52792708v1

# MEMORANDUM OF POINTS AND AUTHORITIES[1]

## I.

## FACTS

**A.    Background**

Since 1992, the Debtor has owned the Spring Mountain Vineyard in Napa County, California (the "Vineyard"). The Vineyard is the Debtor's primary asset. The Debtor runs an ongoing business with up to 70 employees, millions of dollars in annual sales, and relationships with dozens of suppliers and thousands of customers.

The Vineyard features approximately 135 vineyard blocks across approximately 211 acres, each with a different elevation, soil and exposure to the elements and each producing a unique and diverse grape. The Vineyard is also improved with the estate residence, two winery buildings, a tasting room, six wells, cisterns, an irrigation system, a historic barn, and other outbuildings. The Vineyard also has extensive winery caves that have been completely finished and utilized for barrel storage and private events.

The Debtor's business consists primarily of growing grapes in its 135 vineyard blocks, harvesting those grapes and pressing them into wine in casks, bottling that wine from casks, and storing and selling that wine. The Debtor's revenue comes almost entirely from the sale of wine and grapes.

The Debtor has traditionally financed its operations through secured lending. Prior to October 2018, the Debtor had a loan secured by substantially all of the real and personal property of the Debtor. On October 11, 2018, the Debtor refinanced this debt and entered into a new lending relationship. The Debtor entered into a "Credit and Guaranty Agreement" and numerous related agreements with fourteen lenders, and MGG California LLC, as administrative agent and collateral agent for those lenders (collectively with MGG California LLC, "MGG"), pursuant to which Debtor obtained a loan (the "Loan") in the amount of $185 million.

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the motion to which this memorandum of points and authorities is appended.

MSH 52792708v1

On September 29 ,2022 (the "Petition Date"), the Debtor commenced this bankruptcy case. As more particularly set forth in the *Omnibus Declaration of Constantine S. Yannias in Support of Debtor's "First Day" Emergency Motions* [Dkt. No. 26], the Debtor's bankruptcy filing was brought about by a number of extraordinary events, including, but not necessarily limited to, the drastic decline in tourism caused by the COVID-19 pandemic and difficulties the Debtor experienced with its secured lender that negatively impacted the Debtor's operations.

The Debtor commenced this reorganization case to restructure its operations and debt. The Debtor believes that a successful overall reorganization will maximize the value of the Estate and allow the Debtor to emerge from chapter 11 with a reorganized and viable ongoing business.

The Debtor continues to manage its affairs and operate its business as a debtor in possessions. No trustee or creditors' committee has been appointed in this case.

**B.     Summary of Restructuring Goals And Means of Maximizing The Value of The Estate**

As stated above, as part of its agreement with MGG for continued use of cash collateral, the Debtor has retained retain BNP Paribas and Bank of the West ("BNP-BOTW") as its investment banker for the purpose of bringing about a transaction whereby the Debtor's business and assets will be sold or a capital partner will be located, in either case with the end result being the payment in full of MGG's secured claim.   Pursuant to the agreed upon timelines with MGG, the transaction is anticipated to close by mid-April, 2023.

**C.     Employees**

**1.     General**

In connection with operation of the Business, as of the Petition Date, the Debtor had 61 employees (not including insiders) (collectively, the "Employees," and each, an "Employee"). Of the Debtor's Employees: (i) 45 conduct farming-related activities on the Debtor's vineyard, including, for example, harvesting grapes, pruning, weeding, and fertilizing (the "Vineyard Employees"), services that are particularly critical up until the close of the harvest season, and (ii) the remaining 16, which include the Debtor's winemaker, vineyard manager, VP of sales and marketing, and other employees involved in management, production, sales, and marketing-related activities for the Debtor (the "Corporate Employees"). Each of the Vineyard Employees are paid

on an hourly basis. As for the 15 current Corporate Employees (one departing employee's position is currently vacant), eight are salaried and seven are paid on an hourly basis. All of the Corporate Employees and 12 of the Vineyard Employees are employed on a full-time basis. The other 33 Vineyard Employees worked approximately 40 hours per week to perform necessary harvesting activities essential for the harvest season. Since the harvest season ended (in approximately the end of October), approximately 27 Vineyard Employees have been terminated to date.

Of the current Employees, the Debtor has determined that the Corporate Employees discussed immediately below are critical to the Debtor's reorganization and restructuring efforts (none of whom is an insider of the Debtor under section 101(31) of the Bankruptcy Code). As a result, to incentivize this group of employees to remain in the Debtor's employ during this reorganization process even as the Debtor attempts to sell its Business, the Debtor created and seeks to implement the Retention Plan (discussed below). The members of the group of Employees covered by the Retention Plan are listed on Exhibit 1 attached hereto.

**D.     The Proposed Retention Plan**

In an attempt to retain these Employees during this important period in the Debtor's case and business in general, the Debtor developed the following modest Retention Plan:

- The 15 participants in the Retention Plan (the "KERP Participants"), identified on Exhibit 1 hereto, will be entitled to receive a one-time bonus (the "KERP Bonus") on the occurrence of (i) the closing of a sale of the Debtor's business; or (ii) the confirmation of a plan of reorganization ("KERP Trigger Event"). No additional Employees will be added to the Retention Plan.

- The KERP Bonus shall be paid from a fund established for that purpose (the "KERP Pool"). The KERP Pool shall not exceed $150,000. The amount of each KERP Participant's individual KERP Bonus shall be set by the Chief Restructuring Officer, in his sole discretion but after consultation with the Debtor's President, Constantine Yannias, and with the applicable department heads. In determining the amount each KERP Participant will receive, the Chief Restructuring Officer shall consider factors including the importance of the individual to the Debtor's

MSH 52792708v1                                      8

operations, whether the individual is currently compensated at, above, or below market, and the difficulty of replacing the individual employee.[2]

- A KERP Participant automatically becomes ineligible to receive any KERP Bonus if he or she is terminated for "cause," or voluntarily ends his or her employment prior to a KERP Trigger Event.

- To be eligible for a KERP Bonus and as a condition to receive a KERP Bonus, the KERP Participant must execute a release and all required documentation in a form approved by the Debtor (the "KERP Release"). The KERP Release will release any and all claims that the KERP Participant has or may acquire against the Debtor related to its employment or termination of employment, whether arising pre- or post-petition, including WARN liability or any claim to severance. The KERP Bonus will also be in lieu of any compensation that is due or owing, except for accrued, ordinary course salary, commissions, production bonuses, and PTO that will be deemed to have been accrued when actually earned and will be treated and paid in accordance with the priority scheme of the Bankruptcy Code and the terms of any confirmed plan.

As noted above, the Debtor has serious concerns that it may lose the Employees at this essential period. Certain Corporate Employees have expressed concern for their future with the Debtor and, in response, may be (or may soon start) searching for new employment. In fact, since the Bankruptcy Case was filed, and in the weeks leading up to the filing, at least four Corporate Employees have resigned from the Debtor. If the Corporate Employees were to leave, the Debtor believes that recruiting desirable replacement employees with similar skills would be difficult because of the Corporate Employees' respective levels of experience, personal knowledge regarding the Debtor's business operations, and the fact that the Debtor is in bankruptcy and running a sale process that may lead to a change in ownership. The wine industry has a highly

---

[2] The Debtor will share its proposed schedule of KERP Bonuses with MGG and with the Office of the United States Trustee, confidentially, prior to its implementation.

MSH 52792708v1                                                              9

competitive labor market, which would make the replacement of any lost Corporate Employees difficult if not impossible.   Indeed, the Debtor has been unable to fill four vacancies in its sales department despite aggressive recruiting. Further, it makes no sense to expend the time and effort to train new employees for what may be a relatively short time period that they would be needed and the inefficiencies of a substantial learning curve.

The Debtor's ability to maintain its business operations, preserve the value of its assets, and maximize stakeholder recoveries through a successful and expedient restructuring process hinges on the Debtor's ability to retain the Corporate Employees during this critical period.  The Debtor is convinced that the departure of any of the Corporate Employees would have an immediate and significant adverse effect on the administration of this case and Estate, the operations of the Debtor's business, and maximizing the value of the Estate.  The continued employment of each of the Corporate Employees is especially critical to facilitate the investment banker's sale process, contribute to the due diligence process, and maintain stable operations through the bankruptcy proceedings. The Debtor operates with a very lean corporate staff, and therefore, losing any of the Corporate Employees would be extremely disruptive, especially at this critical period.

Based on the foregoing, the Debtor believes there are compelling business reasons for the Debtor's immediate implementation of the Retention Plan for this select group of Employees. With the sale process already underway, the Debtor has concluded that it is imperative that it offer the KERP Participants these potential retention benefits without delay to incentivize them to elect to remain with the Debtor through the applicable retention period and continue to expend the significant efforts they have performed to date in their respective roles, as well as additional duties associated with administration of the chapter 11 case.  The Debtor needs approval to implement the Retention Plan so that the KERP Participants do not leave the Debtor for alternative jobs that may offer more stable employment situations and comparable, if not superior, compensation packages.

The Debtor recognizes that any payments made under the Retention Plan (to the extent approved) must, and will ensure they, comport the approved budgets (the "Cash Collateral

MSH 52792708v1                        10

Budget") for use of cash collateral effective at the time that the payments to the Employees are to be made.

The Debtor believes that the amounts to be paid under the Retention Plan are relatively modest, will be consistent with the Cash Collateral Budget, and are fair and reasonable. Moreover, the Retention Plan only applies to a very limited pool of employees. The Retention Plan applies to only 15 Employees, those the Debtor determined are most crucial to the Debtor's continued business activities and sale process, and most at risk of seeking alternate employment and departing the Debtor's employ. The Retention Plan is tailored to retain these particular key Employees.

Further, the Retention Plan incentives were developed after consideration of the Debtor's market conditions and industry standards, and the Debtor believes that its Retention Plan is consistent with those market conditions and industry standards. The Retention Plan is designed to retain the KERP Participants through the periods set forth above and to ensure that they remain productive during these periods. Therefore, the Debtor has exercised sound business judgment in developing and implementing the Retention Plan.

## II.

## THE RETENTION PLAN SHOULD BE APPROVED

**A.      Standard**

Section 503 of the Bankruptcy Code provides, in relevant part, that "[a]fter notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including[.]"  11 U.S.C. § 503(b).  Bankruptcy Code section 503(b) continues by listing various types of claims that are deemed to be administrative expense claims.

Section 503(c) of the Bankruptcy Code provides, in relevant part:

> (c) Notwithstanding subsection (b) there shall neither be allowed, nor paid –
>
> . . . .
>
>      (3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date

1    of the filing of the petition.

2    11 U.S.C. § 503(c).

3    The Retention Plan "must be analyzed under § 503(c)(3), which governs bonus payments

4    to employees that are outside of the ordinary course.  Such payments are permitted only if they are

5    'justified by the facts and circumstances of the case.' 11 U.S.C. § 503(c)(3)." *In re Global*

6    *Aviation Holdings Inc.*, 478 B.R. 142, 150 (Bankr. E.D.N.Y. 2012).  The Court in *Global Aviation*,

7    stated that:

8    > The appropriate standard for determining whether an outside the ordinary course
     > compensation proposal is justified by the facts and circumstances of a given case
9    > was articulated in *In re Dana Corp.*, 358 B.R. 567, 576-77 (Bankr.S.D.N.Y.2006)
     > ("Dana II ") as follows:

10
     > • whether the plan has a reasonable relationship to the results to be obtained;
11

12   > • whether the cost is reasonable in light of the debtor's assets, liabilities, and earnings
     > potential;
13

14   > • whether the scope of the plan is fair and reasonable or discriminates unfairly;

15
     > • whether the plan comports with industry standards;
16

17   > • whether the debtor undertook due diligence in investigating the need for a plan, the
     > employees that should be incentivized, market standards; and
18

19   > • whether the debtor received independent counsel in performing due diligence in
     > creating and authorizing the incentive compensation.
20
     *Id.*
21

22   The Retention Plan is not subject to the restrictions set forth in §§ 503(c)(1) and (2) of the

23   Bankruptcy Code, because the plan is not applicable to any "insiders"(as such term is defined by §

24   101(31)). Generally, the Bankruptcy Code defines an "insider" to include, among other things, "an

25   officer of the debtor" and a "person in control of the debtor." 11 U.S.C. § 101(31). Courts have

26   also concluded that an employee may be an "insider" if that employee has "at least a controlling

27   interest in the debtor or . . . exercise[s] sufficient authority over the debtor so as to unqualifiedly

28   dictate corporate policy and the disposition of corporate assets*." In re Velo Holdings, Inc.*, 472

B.R. 201, 208 (Bankr. S.D.N.Y. 2012) (citation omitted) (emphasis added). Although certain of the KERP Participants hold titles, including the terms "vice president of sales," and "Vineyard Manager" they do not take part in the strategic management or decide "critical financial decisions" of the Debtor, and thus are not "insiders" within the meaning of the Bankruptcy Code. *See In re Foothills Texas, Inc.*, 408 B.R. 573, 579 (Bankr. D. Del. 2009) (holding that the "mere title of a person does not end the inquiry" of whether they are an insider) (cited by *In re Glob. Aviation Holdings Inc.*, 478 B.R. 142, 148 (Bankr. E.D.N.Y. 2012) ("[T]itles such as 'vice president' are not determinative [as to insider status].")). For example, in *In re NMI Systems, Inc.*, 179 B.R. 357, 370 (Bankr. D.D.C. 1995), the court found that a vice president was not an insider because he was not "in the inner circle making the company's critical financial decisions." The KERP Participants' respective scopes of authority are limited and their titles reflect only their relative position below upper management and functions within the organization and not any real insider status or responsibility. As a consequence, the KERP Participants are not "insiders" as defined in the Bankruptcy Code, and, accordingly, the Debtor maintains that §§ 503(c)(1) and 503(c)(2) do not apply to the Retention Plan.

**B.** <u>**Immediate Implementation of The Retention Plan And The Corresponding Proposed Retention Bonus Payments Are Justified by The Facts And Circumstances of This Case**</u>

Considering the foregoing factors, the Debtor believes the proposed retention incentives are justified by the facts and circumstances of this case and should, therefore, be approved. First, the Debtor submits that the Retention Plan has a reasonable relationship to the result to be obtained. As set forth above, pursuant to the Retention Plan, the Debtor's goal is to retain the KERP Participants at least through April, 2023 to facilitate the efficient and successful pursuit of the Debtor's restructuring goals in this case. Since the retention amounts to be paid to the KERP Participants pursuant to the Retention Plan will not be paid (to the extent deemed entitled to such payment) until a transaction is closed or a plan of reorganization is confirmed, the KERP Participants will be inclined to remain with Debtor for that critical period. Therefore, the Retention Plan will aid the Debtor in the goal of retaining the KERP Participants as needed

1    through the consummation of the anticipated transaction in this case.

2        Second, the Debtor submits that the amount proposed to be paid to the KERP Participants

3    under the Retention Plan is reasonable in light of the Debtor's assets and liabilities.  Indeed, the

4    proposed individual payment amounts are relatively modest, especially in light of the important

5    roles the KERP Participants play and the additional duties imposed upon them in light of the

6    bankruptcy case.  Furthermore, with assets and liabilities each in excess of $200 million, the

7    maximum payments in the aggregate of $150,000 that would be distributed under the Retention

8    Plan are reasonable in relation to total assets and liabilities, and amount to approximately 10.4% of

9    the annualized salaries of the KERP Participants, taken in aggregate.  Additionally, the Debtor will

10   ensure that any payments made will comport with the Cash Collateral Budget operative at the time

11   of the proposed payments.

12       Third, the Retention Plan does not discriminate unfairly.  Discrimination is permitted as

13   long as it is fair because different employees may have different values to the debtor's

14   reorganization efforts.  *See In re Borders Group, Inc.*, 453 B.R. 459, 475-76 (Bankr. S.D. N.Y.

15   2011).  As set forth above, while the Debtor had over 61 employees as of the Petition Date (many

16   of which are seasonal), all of whom are very important to the Debtor's operations and

17   reorganization, the Debtor has identified certain corporate-level and managerial employees who

18   are absolutely critical and key to the contemplated tasks and anticipated outcome in this case.

19   While the Debtor does not minimize the importance of the Vineyard Employees, the potential loss

20   of those employees, particularly after harvest season has ended, would not be as detrimental to the

21   Debtor's reorganization efforts as the loss of the Corporate Employees who are the participants in

22   the proposed Retention Plan.   With respect to the KERP Participants, while the amount of the

23   KERP Bonus will differ from individual to individual, the Debtor's CRO will determine the

24   individual amounts based upon the importance of the KERP Participant to the Debtor's operations,

25   the difficulty of replacing the employee, and whether the employee's current salary is at, below or

26   above market.  These decisions will be made strictly as necessary to incentivize the employee in

27   question to remain with the Debtor through the reorganization process.  Therefore, the Debtor

28   submits that the Retention Plan does not discriminate unfairly.

Fourth, based upon the experience of the Debtor's Chief Restructuring Officer, Kevin A. Krakora, coming from his involvement in numerous restructuring cases spanning over three decades, and his overall knowledge of the Debtor's industry and other similarly-sized companies, the Debtor believes that the Retention Plan falls well-within industry standards. This is especially true given the relatively modest amounts proposed to be paid to each of the KERP Participants under the Retention Plan.

Fifth, Mr. Krakora came to the conclusion that the Retention Plan was necessary based upon his investigation, including discussions with the Debtor's department managers, and direct discussions with the Employees. Mr. Krakora reviewed incentive plans in similar type cases, and concluded that the proposed Retention Plan falls within market standards.

Finally, the Debtor received input from Mr. Krakora, its outside wine operations and management consultant, Peter Ekman, of Jigsaw Advisors, the department heads, and Mr. Yannias, and consulted with Debtor's general bankruptcy counsel, Greenspoon Marder, in developing the Retention Plan, determining its need, reasonableness and appropriateness.

As a result, the Debtor believes that the Retention Plan is fair, reasonable, justified, and reflects a proper exercise of the Debtor's business judgement.

The Retention Plan comports with other similar programs approved, including within the Ninth Circuit. *See, e.g.*, See *In re Verity Health System of California, Inc.*, Case No. 18-20151, Docket No. 814 at 5 (Bankr. C.D. Cal. Nov. 13, 2018) (approving up to 30% of salaries in KERP up to $1.3 million for 20 employees); *In re Metabolife Intl., Inc.*, Case No. 05-06040-PB11, Docket Nos 97, 189 (Bankr. S.D. Cal. 2005) (bonuses paid upon completion of sale process); *In re Goodwill Ind. Of S. Nev., Inc.*, Case No. 17-14398 (Bankr. D. Nev. Jan. 4, 2018), Docket No. 270 (19 participants in KERP, with aggregate of $170,000) (amounts were approximately two-months of salary for each-employee); *In re HDOS Enterprises,* No. 2014-bk-12028-NB (C.D. Cal. Jun. 6, 2014) [Docket No. 334] (approving KERP of 30% bonus to 15 non-insider employees payable after either effective date of plan or closing of sale). Such plans are also routinely approved in other districts. *See, e.g.*; *In re KB Toys, Inc.*, No. 08-13269 (KJC) (Bankr. D. Del. Jan. 6, 2009) [Docket No. 207] (approving retention plan for 28 non-insider employees contemplating payments

of approximately $300,000 (inflation adjusted to $414,000)); *In re Mervyn's Holdings, LLC*, No. 08-11586 (KG) (Bankr. D. Del. Oct. 30, 2008) [Docket No. 794] (approving retention plan for 93 non-insider employees contemplating payments of approximately $1.3 million (inflation adjusted to $1.8 million)); *In re New Century TRS Holdings, Inc.*, No. 07-10416 (KJC) (Bankr. D. Del. Aug. 15, 2007) [Docket. No. 2245] (approving retention plan for non-insider employees contemplating payments of approximately $800,000).

**III.**

**CONCLUSION**

**WHEREFORE**, the Debtor respectfully request that the Court enter an order: (i) approving Retention Plan; (ii) ruling that payments made pursuant to the plan be afforded administrative-expense priority pursuant to §§ 105(a), 363(b), 503(b), 503(c), and 507(a) and are authorized to be made by the Debtor pursuant to the terms of the Retention Plan; and (iii) grant to the Debtor such other and further relief as the Court may deem proper.

Dated:  December 21, 2022              **GREENSPOON MARDER LLP**
                                       A Florida limited liability partnership


                                       By:  */s/Mark S. Horoupian*
                                       _____
                                            Victor A. Sahn
                                            Mark S. Horoupian
                                            Steven F. Werth
                                            Attorneys for Debtor in Possession,
                                            Spring Mountain Vineyard Inc.

MSH 52792708v1                                         16

## DECLARATION OF KEVIN A. KRAKORA[3]

I, Kevin A. Krakora, declare:

1.     I am a managing director of Getzler Henrich & Associates, LLC.  I am the Chief Restructuring Officer ("CRO") of Spring Mountain Vineyard Inc., a Delaware corporation, the debtor in possession in the above-captioned case (the "Debtor").  I have served in this capacity for the Debtor since August 22, 2022.

2.     Since my appointment as the CRO of the Debtor, I have become familiar with the Debtor's business operations, its revenues and expenses.  In my role, I work with a team of individuals including Peter Ekman, an experienced winery, tech and e-commerce CEO.  In addition to Mr. Ekman, I consult with the Debtor's president and chairman, Constantine Yannias, the Debtor's bankruptcy counsel, and the various department heads of the Debtor.

3.     The Debtor continues to manage its affairs and operate its business as a debtor in possessions.  No trustee or creditors' committee has been appointed in this case.

4.     As part of its agreement with MGG for continued use of cash collateral, the Debtor has retained retain BNP Paribas and Bank of the West ("BNP-BOTW") as its investment banker for the purpose of bringing about a transaction whereby the Debtor's business and assets will be sold or a capital partner will be located, in either case with the end result being the payment in full of MGG's secured claim.  Pursuant to the agreed upon timelines with MGG, the transaction is anticipated to close by mid-April, 2023.

5.     In connection with operation of the Business, as of the Petition Date, the Debtor had 61 employees (not including insiders) (collectively, the "Employees," and each, an "Employee"). Of the Debtor's Employees: (i) 45 conduct farming-related activities on the Debtor's vineyard, including, for example, harvesting grapes, pruning, weeding, and fertilizing (the "Vineyard Employees"), services that are particularly critical up until the time of harvest, and (ii) the remaining 16, which include the Debtor's winemaker, vineyard manager, VP of sales and

---

[3] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the foregoing motion to which this declaration is attached.

marketing, and other employees involved in management, production, sales, and marketing-related activities for the Debtor (the "Corporate Employees"). Each of the Vineyard Employees are paid on an hourly basis. As for the 15 current Corporate Employees, eight are salaried and seven are paid on an hourly basis. All of the Corporate Employees and 12 of the Vineyard Employees are employed on a full-time basis. The other 33 Vineyard Employees worked approximately 40 hours per week to perform necessary harvesting activities essential for the harvest season. Since the harvest season ended (in approximately the end of October), approximately 27 Vineyard Employees have been terminated to date.

6.     Of these Employees, I have determined that the Corporate Employees discussed herein are critical to the Debtor's reorganization and restructuring efforts (none of whom is an insider of the Debtor under section 101(31) of the Bankruptcy Code). As a result, to incentivize this group of Employees to remain in the Debtor's employ during this reorganization process even as the Debtor attempts to sell its Business, I worked with the Debtor to create and the Debtor seeks to implement the Retention Plan (discussed below). The members of the group of Employees covered by the Retention Plan (the "KERP Participants") are listed on Exhibit 1 attached hereto.

7.     In an attempt to retain these Employees during this important period in the Debtor's case and business in general, we developed the following modest Retention Plan:

- The 15 KERP Participants in the Retention Plan, identified on Exhibit 1 hereto, will be entitled to receive a one-time bonus (the "KERP Bonus") on the occurrence of (i) the closing of a sale of the Debtor's business; or (ii) the confirmation of a plan of reorganization ("KERP Trigger Event").

- The KERP Bonus shall be paid from a fund established for that purpose (the "KERP Pool"). The KERP Pool shall not exceed $150,000. The amount of each KERP Participant's individual KERP Bonus shall be set by me, in my sole discretion but after consultation with the Debtor's President, Constantine Yannias, and with the applicable department heads. In determining the amount each KERP Participant will receive, I will consider factors including the importance of the individual to the Debtor's operations, whether the individual is currently

compensated at, above, or below market, and the difficulty of replacing the individual employee.[4]

- A KERP Participant automatically becomes ineligible to receive any KERP Bonus if he or she is terminated for "cause," or voluntarily ends his or her employment prior to a KERP Trigger Event.

- To be eligible for a KERP Bonus and as a condition to receive a KERP Bonus, the KERP Participant must execute a release and all required documentation in a form approved by the Debtor (the "KERP Release"). The KERP Release will release any and all claims that the KERP Participant has or may acquire against the Debtor related to its employment or termination of employment, whether arising pre- or post-petition, including WARN liability or any claim to severance. The KERP Bonus will also be in lieu of any compensation that is due or owing, except for accrued, ordinary course salary, commissions, production bonuses, and PTO that will be deemed to have to have accrued when actually earned and will treated and paid in accordance with the priority scheme of the Bankruptcy Code and the terms of any confirmed plan.

8.     I have serious concerns that the Debtor may lose the KERP Participants at this essential period.  Certain Corporate Employees have expressed concern for their future with the Debtor and, in response, may be (or may soon start) searching for new employment.  In fact, since the Bankruptcy Case was filed and in the weeks leading up to the filing, at least four Corporate Employees have resigned from the Debtor.  If the KERP Participants were to leave, I believe that recruiting desirable replacement employees with similar skills would be difficult because of the KERP Participants' respective levels of experience and personal knowledge regarding the Debtor's business operations, and a tight labor market.

---

[4] The Debtor will share its proposed schedule of KERP Bonuses with MGG and with the Office of the United States Trustee, confidentially, prior to its implementation.

9.      The wine industry has a highly competitive labor market, which would make the replacement of any lost KERP Participant difficult if not impossible. Indeed, the Debtor has been unable to fill four vacancies in its sales department despite aggressive recruiting. Further, it makes no sense to expend the time and effort to train new employees for what may be a relatively short time period that they would be needed and the inefficiencies of a substantial learning curve.

10.     The Debtor's ability to maintain its business operations, preserve the value of its assets, and maximize stakeholder recoveries through a successful and expedient restructuring process hinges on the Debtor's ability to retain the KERP Participants during this critical period. I am convinced that the departure of any of the KERP Participants would have an immediate and significant adverse effect on the administration of this case and Estate, the operations of the Debtor's business, and maximizing the value of the Estate. The Debtor operates with a very lean corporate staff, and losing any of the KERP Participants would be extremely disruptive, especially at this critical period.

11.     Based on the foregoing, there are compelling business reasons for the Debtor's immediate implementation of the Retention Plan for this select group of Employees. With the sale process already underway, I have concluded that it is imperative that it offer the KERP Participants these potential retention benefits without delay to incentivize them to elect to remain with the Debtor through the applicable retention period and continue to expend the significant efforts they have performed to date in their respective roles, as well as additional duties associated with administration of the chapter 11 case. The Debtor needs approval to implement the Retention Plan so that the KERP Participants do not leave the Debtor for alternative jobs that may offer more stable employment situations and comparable, if not superior, compensation packages.

12.     I recognize that any payments made under the Retention Plan (to the extent approved) must, and will ensure they, comport the approved budgets (the "Cash Collateral Budget") for use of cash collateral effective at the time that the payments to the KERP Participants are to be made.

13.     Although certain of the KERP Participants hold titles, including the terms "vice president of sales," and "Vineyard Manager," they do not take part in the strategic management or

decide "critical financial decisions" of the Debtor.

14. I respectfully submit that the amounts to be paid under the Retention Plan are relatively modest, will be consistent with the Cash Collateral Budget, and are fair and reasonable. Moreover, the Retention Plan only applies to a very limited pool of Employees. The Retention Plan applies to only 15 Employees, those the Debtor determined are most crucial to the Debtor's continued business activities and most at risk of seeking alternate employment and departing the Debtor's employ. The Retention Plan is tailored to retain these particular key Employees.

15. Further, the Retention Plan incentives were developed after consideration of the Debtor's market conditions and industry standards, and I believe that the Retention Plan is consistent with those market conditions and industry standards.

16. The Retention Plan has a reasonable relationship to the result to be obtained. As set forth above, pursuant to the Retention Plan, the Debtor's goal is to retain the KERP Participants at least through April, 2023 to facilitate the efficient and successful pursuit of the Debtor's restructuring goals in this case. Since the retention amounts to be paid to the KERP Participants pursuant to the Retention Plan will not be paid (to the extent deemed entitled to such payment) until after a transaction is closed or a plan of reorganization is confirmed, the KERP Participants will be inclined to remain with Debtor for that critical period. Therefore, the Retention Plan will aid the Debtor in the goal of retaining the KERP Participants as needed through the consummation of the anticipated transaction in this case.

17. I submit that the amount proposed to be paid to the KERP Participants under the Retention Plan is reasonable in light of the Debtor's assets and liabilities. Indeed, the proposed individual payment amounts are relatively modest, especially in light of the important roles the Employees play and the additional duties imposed upon them in light of the bankruptcy case. Furthermore, with assets and liabilities each in excess of $200 million, the maximum payments in the aggregate of $150,000 that would be distributed under the Retention Plan are reasonable in relation to total assets and liabilities, and amount to approximately 10.4% of the annualized salaries of the KERP Participants, taken in aggregate.

18. While the Debtor currently had over 61 employees (many of which are seasonal) as

of the Petition Date, all of whom are very important to the Debtor's operations and reorganization, the Debtor has identified certain corporate-level and managerial employees who are absolutely critical and key to the contemplated tasks in this case. While I do not minimize the importance of the Vineyard Employees, the potential loss of those employees, particularly after harvest season has ended, would not be as detrimental to the Debtor's reorganization efforts as the loss of the Corporate Employees who are the participants in the proposed Retention Plan. With respect to the KERP Participants, while the amount of the KERP Bonus will differ from individual to individual, I will determine the individual amounts based upon the importance of each KERP Participant to the Debtor's operations, the difficulty of replacing the employee, and whether the employee's current salary is at, below or above market. These decisions will be made strictly as necessary to incentivize the employee in question to remain with the Debtor through the reorganization process.

19. Based upon my experience, coming from my involvement in numerous restructuring cases spanning over three decades, and my overall knowledge of the Debtor's industry and other similarly-sized companies, I believe that the Retention Plan falls well-within industry standards. This is especially true given the relatively modest amounts proposed to be paid to each of the KERP Participants under the Retention Plan.

20. I came to the conclusion that the Retention Plan was necessary based upon my investigation, including discussions with the Debtor's department managers, and direct discussions with the Employees. I reviewed incentive plans in similar type cases, and believe that the proposed plan is consistent therewith.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1      21.     In developing the Retention Plan, I consulted and received input from the Debtor's

2 outside wine operations and management consultant, Peter Ekman, of Jigsaw Advisors, the

3 Debtor's president and chairman, the Debtor's general bankruptcy counsel, and the various

4 department heads.

5      I declare under penalty of perjury that the foregoing is true and correct, and that this

6 declaration was executed on December 20, 2022, in Chicago, Illinois.

7

8

9

10                            Kevin A. Krakora

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

**SPRING MOUNTAIN VINEYARD**
**KEY EMPLOYEE RETENTION PLAN**

| Employee | Position | 2022 Salary/Wages | Proposed KERP Bonus |
|---|---|---|---|
| Dermot Whelan | Vice President of Sales and Marketing | | |
| Ron Rosenbrand | Vineyard Manager | | |
| Barrett Anderson | Winemaker | | |
| Keith Baker | DTC Sales Director | | |
| Tracy Jones | Tasting Room Manager | | |
| Anthony Thomas | Assistant Winemaker | | |
| Lauri Bareilles | Office Manager/Bookkeeper | | |
| Hector Maldonado | Wine Club Manager | | |
| Fabi Gonzalez | Sales, Wine Educator | | |
| Catherine White | Sales, Wine Educator | | |
| Jacob Hlavsa | Sales, Wine Educator | | |
| Gera Vigil | Sales, Wine Educator | | |
| Val Delgadillo | Sales, Wine Educator | | |
| Ian Shetler | Oenologist | | |
| Aurillio Ramos | Cellar Lead | | |
| **Totals** | | $ 1,445,120 | $ 150,000 |

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 333 South Grand Avenue, Suite 3400, Los Angeles, CA 90071.

A true and correct copy of the foregoing document entitled (*specify*): **MOTION OF DEBTOR AND DEBTOR IN POSSESSION FOR AUTHORITY TO IMPLEMENT KEY EMPLOYEE RETENTION PLAN; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF KEVIN A. KRAKORA IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) December 21, 2022, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page.

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) December 21, 2022, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*)  December 21, 2022 , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| December 21, 2022 | Cheryl Caldwell | *Cheryl Caldwell* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

CC 52274685v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

ADDITIONAL SERVICE INFORMATION (if needed):

## 1. SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")

Dean C. Burnick on behalf of Interested Party Mt. Hawley Insurance Company **(RSN)**
dcb@proughlaw.com

Jacquelyn H. Choi on behalf of Creditor Napa County Treasurer-Tax Collector **(RSN)**

Trevor Ross Fehr on behalf of U.S. Trustee Office of the U.S. Trustee / SR
trevor.fehr@usdoj.gov

Mark S Horoupian on behalf of Debtor Spring Mountain Vineyard Inc.
mark.horoupian@gmlaw.com, cheryl.caldwell@gmlaw.com

Thomas Philip Kelly, III on behalf of Creditor Central Valley Builders Supply Inc. **(RSN)**
tomkelly@sonic.net

Steve Ma on behalf of Creditor MGG California, LLC
sma@proskauer.com

Jeff J. Marwil on behalf of Creditor MGG California, LLC
jmarwil@proskauer.com

Randall P. Mroczynski on behalf of Creditor Ford Motor Credit Company LLC **(RSN)**
rmroczynski@cookseylaw.com

Office of the U.S. Trustee / SR
USTPRegion17.SF.ECF@usdoj.gov

Elvina Rofael on behalf of U.S. Trustee Office of the U.S. Trustee / SR
elvina.rofael@usdoj.gov, Katina.Umpierre@usdoj.gov,GemMil.Langit@usdoj.gov

Victor A. Sahn on behalf of Debtor Spring Mountain Vineyard Inc.
victor.sahn@gmlaw.com, Karen.Files@gmlaw.com

Michael St. James on behalf of Interested Party Arcade Capital, LLC **(RSN)**
ecf@stjames-law.com

John G. Warner on behalf of Creditor Francois Freres USA Inc. **(RSN)**
warnerwest@aol.com

Ashley M. Weringa on behalf of Creditor MGG California, LLC
aweringa@proskauer.com

Steven F. Werth on behalf of Debtor Spring Mountain Vineyard Inc.
steven.werth@gmlaw.com, Patricia.Dillamar@gmlaw.com

Peter J Young on behalf of Creditor MGG California, LLC
pyoung@proskauer.com

CC 52274685v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                         F 9013-3.1.PROOF.SERVICE

Case: 22-10381    Doc# 168    Filed: 12/21/22    Entered: 12/21/22 10:52:53    Page 30 of
34

**SERVED BY EMAIL OR UNITED STATES MAIL**

**Secured Creditor**
Imperial PFS aka IPFS
49 Stevenson St. #127
San Francisco, CA 94105-2909
(877) 687-9826
Lisa Chandler, Litigation and Bankruptcy
Recovery Manager
lisa.chandler@ipfs.com

**Largest Unsecured Creditors**
Allen Wine Group LLP
Attn:  Timothy Allen, CPA - Managing Partner
120 Stony Point Road,  #230
Santa Rosa, CA 95401
(707) 528-3860
tim@allenwine.com
Tim@allengroupllp.com
Brent Garrison
Brent@allengroupllp.com

Bartelt Engineering
Attn:  Paul Bartelt
1303 Jefferson St #200B
Napa, CA 94559
(707) 258-1301
paulb@barteltengineering.com

Belkorp AG, LLC
Attn:  Laura Correll, Accounting
2413 Crows Landing Rd
Modesto, CA 95358
(209) 205-3706
ar@belkorpag.com
AR@BelkorpAg.com
ldunhouse@belkorpag.com

Brown's Auto Parts
Attn Dan Beltramai, Owner
1218 Main St.
Saint Helena, CA 94574-1901
(707) 963-3638
brownsauto169@gmail.com

Castino Restaurant Equipment And Supply
50 Utility Ct.
Rohnert Park, CA 94928-1659
(707) 585-3566
sales@castinosolutions.com

Central Valley
Administrative Offices
1804 Soscol Ave., #205
Napa, CA 94559
Attn:  Gerry Cruz, Accounting Mgr.
(707) 261-7900
gerryc@central-valley.com

Chubb Group of Insurance Companies
P.O. Box 777-1630
Philadelphia, PA 19175-0001
(800) 372-4822
**Returned – Box Closed**

Conway Beverage Group, LLC
Dba:  Elite Brands
Elite Brokerage
3238 Old Heather Rd.
San Diego, CA 92111-7716
Attn:  Mr. Jay Conway
Jayconway@elitebrands.biz

Famille Sylvain
855 Bordeaux Way #239
Napa, CA 94558-7549
(707) 492-3308
contactusa@famillesylvain.com

Tonnellerie Sylvain
855 Bordeaux Way
Napa, CA 94558
(707) 492-3308
contactusa@famillesylvain.com

Francois Freres USA Inc.
1403 Jefferson St.
Napa, CA 94559-1708
(707) 294-2204
office@francoisfreresusa.com
julie@francoisfreresusa.com
accounting@francoisfreresusa.com
assistant@francoisfreresusa.com

CC 52274685v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

Case: 22-10381    Doc# 168    Filed: 12/21/22    Entered: 12/21/22 10:53:53    Page 31 of
34

F 9013-3.1.PROOF.SERVICE

G3 Enterprises Inc.
(Tapp Labels)
580 Gateway Dr.
Napa, CA 94558
(707) 252-8300
jeff.licht@tapplabel.com

Napa County Treasurer
1195 3rd St. #108
Napa, CA 94559-3035
(707) 253-4314
Dawnette.martindale@countyofnapa.org
Napa County Treasurer-Tax Collector
Bob.Minahen@countyofnapa.org
Napa County Attorney
Wendy.dau@countyofnapa.org

Napa Ford Lincoln
170 Soscol Ave.
Napa, CA 94559
(707) 255-2580
**Via Regular Mail**

Ford Motor Credit Company
National Bankruptcy Service Center
P O Box 62180
Colorado Springs CO 80962-2180
(800) 955-8322
fcffald@ford.com

Napa Valley Petroleum
P.O. Box 2670
Napa, CA 94558-0528
(707) 252-6888
kamh@napavalleypetroleum.com

Napa Valley Vintners Association
P.O. Box 141
Saint Helena, CA 94574
(707) 963-3388
Attn: Steve Tradewell, CFO
stradewell@napavinters.com

Ramondin U.S.A. Inc.
Tammy Frandsen
Finance Manager
541 Technology Way
Napa, CA 94558
(707) 944-2277
tfrandsen@ramondin.com

Stanzler Law Group
Attn: Jordan S. Stanzler
390 Bridge Pkwy #220
Redwood City, CA 94065
(650) 739-0200
Jstanzler@stanzlerlawgroup.com

Wilbur Ellis Company LLC
c/o Registered Agent Solutions Inc.
720 14th St.
Sacramento, CA 95814-1905
(707) 963-3495
KZavala@wilburellis.com
MHAMMETT@wilburellis.com

Wine Service Cooperative
1150 Dowdell Lane
Saint Helena, CA 94574
Attn:  Steven Tamburelli
General Manager
Tel: (707) 963-9474
Fax: (707) 963 9359
Steve@wineservicecoop.com

Bright Event Rental
22674 Broadway # A
Sonoma, CA 95476
(707) 940-6060
Attn:  Michelle Minsk, Acctg.
accountsreceivable@bright.com

CNH Capital
Dept. 1801104747435
P.O. Box 78004
Phoenix, AZ 85062
Attn:  Steve Wright, Bankruptcy Dept.
(717) 355-5790
**Via Regular Mail**

CNH Industrial Capital America, LLC
PO Box 71264
Philadelphia, PA 19176-6264
Attn:  John Chiavacci, HRBK Analyst
(717) 355-5913
john.chiavacci@cnhind.com

CC 52274685v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

Case: 22-10381    Doc# 168    Filed: 12/21/22    Entered: 12/21/22 10:52:53    Page 32 of
34

F 9013-3.1.PROOF.SERVICE

ETS Laboratories
c/o Marjorie Burns 899 Adams Street #A
Saint Helena, CA 94574-1160
(707) 963-4806
Attn Accounts Receivable Team
ar@etslabs.com
accounts@etslabs.com

Matheson Tri-Gas Inc.
Dept. LA 23793
Pasadena, CA 91185
(707) 963-4307
**Via Regular Mail**

Sovos Compliance LLC
200 Ballardvale St. Bldg 1 4th Fl.
Wilmington, MA 01887
(866) 890-3970
**Via Regular Mail**

Wine Technology America
aka Wine Technology, Inc.
474 Walten Way
aka Vinwizard
Windsor, CA 95492
(707) 703-5919
Attn:  Kelly Graves, Director
(720) 284-2059
kelly@vinwizard.us

Wine Technology America Inc.
c/o Lloyd Matthews, Agent
1899 Larkspur St.
Yountville, CA 94599-1237
**Via Regular Mail**

Wyatt Irrigation Co.
4407 Solano Ave.
Napa, CA 94558
(707) 578-3747
Lynne Colombano, Acct Receivable Mgr.
lynne@wyattsupply.com

Wyatt Irrigation Co.
c/o CSC - Lawyers Incorporating Service
2710 Gateway Oaks Dr. #150N
Sacramento, CA 95833-3502
**Via Regular Mail**

**Request for Special Notice**
Alcohol & Tobacco Tax & Trade Bureau
Attn:  Daniel Paralta, Senior Counsel, Field
Operations
1436 2nd Street #531
Napa, CA 94559
**Via Regular Mail**

Dept. of the Treasury, Alcoholic Beverage Control
Attn: Tracie Parker, Lic. Rep. I
50 D Street Room 130
Santa Rosa, CA. 95404
Phone: (707) 576-2165
Fax: (707) 638-9537
tracie.parker@abc.ca.gov

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346
(800) 973-0424
**Via Regular Mail**

California Department of Tax and Fee
Administration
Special Operations Bankruptcy Team MIC: 74
P.O. Box 942879
Sacramento, CA 94279-0074
(800) 400-7115
**Via Regular Mail**

Franchise Tax Board
Attn: Vivian Ho
Bankruptcy Section, MS A-340
P.O. Box 2952
Sacramento, CA 95812-2952
916-845-7069
Vivian.Ho@ftb.ca.gov

Employment Development Department
Bankruptcy Unit-MIC 92E
P.O. Box 826880
Sacramento, CA 94280-0001
**Via Regular Mail**

Employment Development Department
Attn: MIC 53
800 Capital Mall
Sacramento, CA 95814
**Via Regular Mail**

CC 52274685v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                                                                F 9013-3.1.PROOF.SERVICE

**Courtesy Email**

Jay B. Spievack, Esq.
Cohen Tauber Spievack & Wagner P.C.
420 Lexington Ave., Suite 2400
New York NY 10170-2499
(212) 381-8735
email:  jspievack@ctswlaw.com

Joseph Vann, Esq.
Cohen Tauber Spievack & Wagner P.C.
420 Lexington Ave., Suite 2400
New York NY 10170-2499
(212) 381-8724
email:  jvann@ctswlaw.com

Will Densenberger
Engel & Volkers St. Helena - Napa Valley
1111 Main Street, Suite A
St. Helena, CA 94574
(707) 302-8133
email:  will@nvwineestates.com

John C. Vaughan
Newmark Knight Frank
4675 MacArthur Court, Suite 1600
Newport Beach, CA 92660
(808) 797-0148
email:  john.vaughan@nmrk.com

Mark Kasowitz:  MKasowitz@kasowitz.com

Gavin D. Schryver:  GSchryver@kasowitz.com

Attorneys for Napa County Treasurer
Jacquelyn H. Choi
jacquelyn.choi@rimonlaw.com,
docketing@rimonlaw.com

Luckey McDowell
luckey.mcdowell@shearman.com
Jonathan Dunworth
jonathan.dunworth@shearman.com

CC 52274685v1 This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                                          F 9013-3.1.PROOF.SERVICE

Case: 22-10381     Doc# 168     Filed: 12/21/22     Entered: 12/21/22 10:52:53     Page 34 of
34