# EXHIBIT 8

1

**STANZLER LAW GROUP**
A Professional Corporation

2

JORDAN S. STANZLER (54620)

3

jstanzler@stanzlerlawgroup.com
390 Bridge Parkway, Suite 220

4

Redwood City, CA 94065
Telephone: (650) 739-0200

5

**COHEN TAUBER SPIEVACK & WAGNER, P.C.**

6

Jay B. Spievack (*awaiting admission pro hac vice*)

7

jspievack@ctswlaw.com
Jackson S. Davis (*awaiting admission pro hac vice*)

8

Grace Guo (*awaiting admission pro hac vice*)
420 Lexington Ave., Suite 2400

9

New York, NY 10170-2499

FILED
10/24/2022 12:54 PM
Clerk of the Napa Superior Court
By: Tosha Deluna, Deputy

10

Attorneys for Plaintiff

11

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12

**IN AND FOR THE COUNTY OF NAPA**

13

**UNLIMITED JURISDICTION**

14

15

SPRING MOUNTAIN VINEYARDS, INC.,

16

Plaintiff,

17

v.

18

LANDMARK AMERICAN INSURANCE

19

COMPANY, KINSALE INSURANCE COMPANY,
MT. HAWLEY INSURANCE COMPANY,

20

HALLMARK SPECIALTY INSURANCE
COMPANY, WESTERN WORLD INSURANCE

21

COMPANY, AXIS SURPLUS INSURANCE
COMPANY, ARTHUR J. GALLAGHER & CO.,

22

AND DINA SMITH,

23

Defendants.

24

Case No.: 22CV000270

**SECOND AMENDED COMPLAINT
FOR**

**1. DECLARATORY JUDGMENT;**
**2. BREACH OF CONTRACT;**
**3. ALTERNATIVE BREACH OF
CONTRACT;**
**4. ALTERNATIVE DECLARATORY
JUDGMENT;**
**5. BREACH OF IMPLIED COVENANT
OF GOOD FAITH AND FAIR
DEALING;**
**6. NEGLIGENCE;**
**7. NEGLIGENT
MISREPRESENTATION; AND**
**8. BREACH OF FIDUCIARY DUTY**

25

26

COMES NOW Plaintiff Spring Mountain Vineyard, Inc. ("SMV"), by and through its

27

attorneys, for its Complaint for breach of contract, declaratory judgment, breach of the implied

28

1

**Second Amended Complaint**

covenant of good faith and fair dealing, and negligent misrepresentation, against Landmark American Insurance Company ("Landmark"), Kinsale Insurance Company ("Kinsale"), Mt. Hawley Insurance Company ("Mt. Hawley"), Hallmark Specialty Insurance Company ("Hallmark Specialty"), Western World Insurance Company ("Western World") and AXIS Surplus Insurance Company ("AXIS," together with Landmark, Kinsale, Mt. Hawley, Hallmark, Western World, the "Insurer Defendants"), and for negligence, negligent misrepresentation, and breach of fiduciary duty against Arthur J. Gallagher & Co. ("AJG") and Dina C. Smith ("Smith," together with the Insurer Defendants and AJG, "Defendants"), and, in support thereof, states as follows:

## <u>NATURE OF THE ACTION</u>

1. This is a civil action arising out of the Insurer Defendants' wrongful failure and refusal to pay SMV full policy limits of coverage under their respective excess "all risk" July 1, 2020-July 1, 2021, excess commercial property insurance policies (the "20-21 Excess Property Policies") insuring SMV's vineyard that are part of a $35,565,435 program (the "Insurance Program"). SMV incurred insured losses far exceeding the Insurance Program (and the Insurer Defendants' respective portions of that aggregate limit) due to property damage and loss resulting from the September 27, 2020 "Glass Line Fire" (herein, the "Fire").

2. SMV timely submitted claims to the Insurer Defendants for its losses caused by the Fire and provided all necessary proofs of loss demonstrating that the covered losses far exceeded each of the Insurer Defendants' respective policy limits.

3. The primary insurers, First Specialty Insurance Corporation together with Beazley Lloyds Syndicate 2623/623 (collectively, "First Specialty"), advanced payments to SMV to cover the losses, damage, or destruction to SMV's property due to the Fire. First Specialty did

Case: 22-10381   Doc# 250-8   Filed: 02/21/23   Entered: 02/21/23 22:37:19   Page 3 of 64

not dispute coverage and paid its full $5 million policy limit.

4. The 20-21 first layer excess insurers, Landmark and Kinsale, also advanced payments to SMV to cover the losses, damage, or destruction to SMV's property due to the Fire.

5. The Insurer Defendants' respective "all risk" 20-21 Excess Property Policies cover loss, damage, or destruction to SMV's property caused by the Fire, including the replacement costs and/or actual cash value of such property, and in or around late October 2020, the Insurer Defendants acknowledged through their agent, insurance claims adjuster McLarens Insurance ("McLarens"), that the actual cash value of property damage and losses from the Fire likely exceeded $30 million.

6. Despite their obligation to pay SMV's losses, Landmark and Kinsale wrongfully refused to pay their full $5 million combined policy limit to SMV. Landmark and Kinsale asserted coverage defenses and limitations that have no basis under their 20-21 combined first layer excess property policies and, on information and belief, materially misrepresented their promised coverages in an attempt to limit their insurance payments to $2,659,534.32. Consequently, Landmark and Kinsale are in breach of their policies, and SMV is entitled to recover at least $2,340,465.68 in insurance proceeds to pay the entire $5 million combined policy limit, plus attorneys' fees and costs.

7. Mt. Hawley has intentionally and deceitfully misrepresented its coverage position, *de facto* denied coverage, and anticipatorily breached its coverage obligations owed to SMV under its 2020-21 second layer excess property policy as it will not pay SMV's losses. Mt. Hawley also has violated its obligation of good faith and fair dealing owed to its policyholder. For instance, despite its clear intent not to pay any of its $10 million policy limit to SMV, Mt. Hawley continued to request that SMV produce documents and submit to multiple examinations

Second Amended Complaint

under oath long after it had completed any legitimate claims investigation to determine whether it would provide coverage.  In fact, Mt. Hawley's coverage investigation is a total sham. Consequently, SMV asserts claims for breach against Mt. Hawley because it has, in effect, already denied any coverage obligation to SMV under its applicable second layer excess policy and seeks an order declaring that Mt. Hawley (a) has anticipatorily breached its second layer 20-21 excess property policy, violated its implied covenant of good faith and fair dealing, and engaged in bad faith claims handling practices and (b) must pay its full $10 million second layer excess property policy limit to SMV when triggered,  but must pay SMV for its damages resulting from Mt. Hawley's bad faith, and SMV's associated attorney's fees and costs.

8.     The third combined layer excess property insurers Hallmark Specialty and Western World and the final fourth layer excess property insurers AXIS also have denied any obligation to cover and pay SMV's losses under their respective 20-21 excess property policies. Consequently, SMV asserts claims for breach against Hallmark Specialty, Western World, and AXIS because they each have denied coverage under their respective applicable policies and seeks an order declaring that (a) Hallmark Specialty and Western World anticipatorily breached their obligation to pay SMV up to $10 million for its losses caused by the Fire when triggered, but must pay SMV for its attorney's fees and costs and (ii) AXIS anticipatorily breached its obligation to pay SMV up to $5,565,435 for its losses caused by the Fire when triggered,  but must pay SMV for its attorney's fees and costs.

9.     California law implies a duty of good faith and fair dealing into every contract, including insurance policies.  Among other things, this duty obligates the Insurer Defendants to (a) do nothing that would deprive the policyholder of their contractual rights; (b) provide the coverage the policyholder's request or to provide fair notice to their policyholder regarding any

proposed changes or limits in that coverage; (c) perform full, fair, thorough, and prompt investigations of insurance claims; (d) investigate all possible bases for coverage; (e) seek out information that is supportive of coverage; (f) pay all undisputed amounts promptly and without delay; and (g) prohibits the Insurer Defendants from elevating their interests above their policyholder's interests. By failing and refusing to promptly pay SMV's proven, covered losses or provide a timely coverage response, and instead hiding behind specious defenses that misrepresent the facts about the coverages available and provided to SMV, , the Insurer Defendants all have also breached their obligations to act in good faith and forced SMV to bring this litigation.

10. In sum, the Insurer Defendants have individually and collectively breached the 20-21 Excess Property Policies by failing and refusing to honor their respective policy provisions and to pay their respective full policy limits to SMV for the proven, covered losses.

11. SMV's insurance and risk-management advisor and broker, AJG, and its account manager, Smith, are joined in this civil action because AJG and Smith are obligated to pay any losses or damages incurred by SMV due to the Fire that the Insurer Defendants do not otherwise pay to SMV. AJG and Smith had assured SMV that they had secured materially the same (if not better) commercial property policy coverages for the 2020-21 policy period than those in force for the expiring 2019-20 policy period. Except for four specific changes discussed below, AJG and Smith never (i) informed SMV about any other material changes in its program coverages or (ii) suggested any steps that SMV might take to secure similar coverage if, in fact, any of the terms, conditions, endorsements, exclusions, and limits in the 20-21 Property Policies materially differed from SMV's 2019-20 property policy coverages and open blanket limits.

12. For at least 15, and perhaps 25, years preceding the July 1, 2020 policy period,

SMV purchased property policies providing "open" blanket coverage for the property damages and losses for its vineyard commercial and residential property up to the approximately $36.6 million aggregate policy limit.[1] During this earlier period, AJG and its predecessor provided their insurance expertise and risk management advice and services to SMV and acted as SMV's insurance broker of record. AJG and Smith touted, among other things, AJG's insurance and risk management expertise and services relating to the unique business risks confronting wine producers and manufacturers, as well as its expertise and experience in relation to negotiating, underwriting, and securing the placement of property insurance to cover all such risks, including the increasing threat of wildfires.

13. For the policy period that commenced July 1, 2020, SMV sought the same approximately $36.6 million blanket property program coverage that was previously in effect. Despite their expertise and promised services, neither Smith nor anyone else at AJG informed SMV of any material changes in its commercial property coverage for the vineyard property except for the four specific changes discussed below. Rather, AJG and Smith told SMV that it secured the open blanket property program coverages for SMV's commercial vineyard property for the July 1, 2020 to July 1, 2021 policy period, including the same or better policy terms, conditions, and endorsements.

14. The Insurer Defendants, however, contend that none of the 20-21 property policies provided open blanket property coverage, and coverage available and promised for SMV's Fire-related property damage and losses are limited to the individual listed building's limit as stated on the Statement of Values. While the Insurer Defendants have nonetheless

---

[1] A blanket property policy covers property damage and losses up to the approximately $36.6 aggregate property policy limit, regardless of the individual building limit amount listed on the Statement of Values submitted in relation to the property insurance policies.

Case: 22-10381   Doc# 250-8   Filed: 02/21/23   Entered: 02/21/23 22:37:19   Page 7 of 64

misrepresented the coverage available and promised to SMV for its Fire-related losses and damages, the 20-21 Excess Property Policies subsequently provided to SMV do not reflect the same or materially better commercial property program coverages that AJG and Smith represented to SMV that they had, in fact, secured on its behalf.

15. To the extent that the 20-21 Excess Property Policies do not cover SMV's Fire-related property damage and losses, AJG and Smith must pay SMV for all Fire-related property damage and losses that the Insurer Defendants do not otherwise pay to it. AJG and Smith knew that SMV used the same badly outdated Statement of Values and that the individual building and structure values on that Statement were significantly below their individual market value and predicated on its open blanket property insurance program. If AJG and Smith knew that they could not secure a blanket property insurance program prior to when it asked SMV to bind the 20-21 Property Policies, they should have advised SMV to increase individual building and structure values that they knew were badly outdated to reflect SMV's significantly higher current appraisal value of the vineyard buildings and structures. They also should have included additional buildings and structures on SMV's Statement of Values.

16. AJG and Smith negligently failed to secure proper coverage for their client and misrepresented that the 20-21 Property Policies provided the same or materially better blanket commercial property coverages as those in force. AJG and Smith failed to (a) perform their respective work timely and professionally and (b) advise SMV about how best to secure its requested and required property coverages. AJG and Smith knew that SMV relied on them for their professional insurance and risk-management expertise and services to (i) secure the proper coverages or inform SMV of any proposed changes in coverage and how to best secure the required coverages in light of any such proposed changes and (ii) review and ensure that all

binders and policies issued to SMV were correct. AJG And Smith also knew that SMV also relied on them because their specialized insurance and risk-management expertise in relation to the needs of California wine manufacturers and producers, such as SMV. To the extent that the 20-21 Excess Policies do not cover all Fire-related property damage and losses, AJG and Smith failed to do their respective work professionally and properly.

17. Consequently, AJG and Smith are liable for any of SMV's Fire-related property damage and losses that the Insurer Defendants do not cover in an amount to be determined at trial, but no less than an amount up to approximately $28 million.

## **THE PARTIES**

18. SMV is, and at all relevant times to this action was, a Delaware corporation having a principal place of business in St. Helena, California.

19. Landmark is, and at all relevant times to this action was, an Oklahoma corporation having a principal place of business in Atlanta, Georgia.

20. Kinsale is, and at all relevant times to this action was, an Arkansas corporation having a principal place of business in Richmond, Virginia.

21. Mt. Hawley is, and at all relevant times to this action was, an Illinois corporation having a principal place of business in Peoria, Illinois.

22. Hallmark Specialty is, and at all relevant times to this action was, an Oklahoma corporation having a principal place of business in Dallas, Texas.

23. Western World is, and at all relevant times to this action was, a New Hampshire corporation having a principal place of business in Franklin Lakes, New Jersey.

24. AXIS is, and at all relevant times to this action was, an Illinois corporation having a principal place of business in Alpharetta, Georgia.

Second Amended Complaint

25.    AJG is, and at all relevant times to this action was, a Delaware corporation having a principal place of business in Illinois.

26.    Dina Smith is, and at all relevant times to this action was, SMV's account manager at AJG.  Smith resides and/or is domiciled in or around either Napa County or San Francisco County, California.

## JURISDICTION AND VENUE

27.    This Court has personal jurisdiction over the Insurer Defendants because they each issued and delivered their respective 20-21 Excess Policies to insure SMV's property, which is located within Napa County, California.  The Insurer Defendants have purposefully availed themselves of the benefits and protections of the State of California by transacting business with SMV and have assumed continuing obligations to SMV in the State of California, as well as purposefully directing their activities to Napa County, California.

28.    This Court has personal jurisdiction over AJG because AJG transacted business with SMV and the Insurer Defendants and issued and delivered all 20-21 Excess Policies for SMV's property, which is located within Napa County.  AJG has purposefully availed itself of the benefits and protections of the State of California by transacting business with SMV and have assumed continuing obligations to SMV in the State of California, as well as purposefully directing their activities to Napa County.  AJG also is a necessary and indispensable party to this civil action.

29.    This Court has personal jurisdiction over Smith because she is a resident or otherwise domiciled in or around either Napa County or San Francisco County, California.  Smith also is a necessary and indispensable party to this civil action.

30.    The Court has subject matter jurisdiction over the controversy pursuant to Cal.

Second Amended Complaint

Const. Art. VI, § 10 and Cal. Civ. Proc. § 410.10, et seq.

31.     Venue is proper in this County pursuant to Cal. Civ. Proc. § 395(b) because the Defendants contracted to provide insurance (and in AJG's case, insurance and risk-management services) to SMV in California and entered into all relevant contracts in California.  Venue also is proper (a) pursuant to Cal. Civ. Proc. §395(a) because Smith is a resident or otherwise domiciled in California and (b) in this County because (i) the property at issue is located in this County; and AJG and Smith negligently performed their respective services, in significant part, in this County and (ii) pursuant to California Civ. Proc. § 395.5, the Insurer Defendants' obligations under the 20-21 Excess Property Policies to pay covered losses were to be performed in Napa County and their liability arose in Napa County and/or they breached their respective policies in Napa County.

## RELEVANT FACTUAL BACKGROUND

### I.     Spring Mountain Vineyard

32.     SMV owns and operates an award-winning winery at the Miravalle Ranch ("Miravalle") and its three adjacent ranches-Chateau Chevalier Ranch ("Chevalier"), La Perla Ranch ("La Perla"), and Alba Ranch ("Alba")-in California's Napa Valley.  Aside from producing world-class wines, SMV's ranches are famous because the Miravalle Victorian house and the ranches provided the setting for the CBS television drama Falcon Crest, which aired from 1981 until 1990.

33.     SMV's property consists of 850 total acres, which includes a number of buildings, structures, and covered property as defined in the 20-21 primary property policy that are used, inter alia, in making, processing, and manufacturing SMV's wines.  The covered property includes trellises (used to support the vines from which SMV's wine is made) and irrigation

Case: 22-10381     Doc# 250-8     Filed: 02/21/23     Entered: 02/21/23 22:37:19     Page 11
of 64

systems used to water and nurture the grape vines.

**II.       SMV's Insurance Programs**

34.       SMV annually purchases insurance policies for its vineyard operations, which include, among others, property/lost business income, liability, umbrella/excess, business automobile, equipment breakdown, inventory wine stock, earthquake/flood, and worker's compensation coverages.

35.       For many years (some 15-25) preceding the 20-21 policy period, SMV consistently maintained approximately $36.6 million in blanket coverage for property damage and losses for any covered property, including buildings and structures identified on the Statement of Values form submitted in conjunction with the property program policies.  Blanket property coverage ensured coverage for loss up to the aggregate policy limit, without reference to the specific covered property damaged or any individual building or structure values on SMV's Statement of Values

36.       AJG and its predecessor (collectively, "AJG") was SMV's insurance and risk management advisor and insurance broker for the purpose of securing its insurance policies for the policy periods prior to July 1, 2020.  AJG acquired its California based predecessor because of its specialized insurance and specialized risk-management expertise in relation to the needs of California wine manufacturers and producers given, among other things, its geographical proximity and knowledge of the California wine and agribusiness industry.  At all relevant times herein, Smith was SMV's account manager and supervisor at AJG.

37.       AJG and Smith provided SMV numerous insurance-related services, including (a) placing, negotiating and underwriting coverages in accordance with SMV's directives, needs and expectations; (b) communicating with SMV about coverages available or not available; (c)

Second Amended Complaint

advising SMV about possible alternatives designed to meet SMV's stated directives, needs and expectations so that any coverage decisions, if any, would be made well in advance of any policy purchase; (d) binding coverages that reflected SMV's final directives, needs and expectations, after discussing any coverage related issues; (d) ensuring that the policy binder reflects SMV's stated coverage directives, needs and expectations, and informing SMV about any potential discrepancies; (e) contacting insurers about any policy binder terms, conditions, exclusions, endorsements, or limitations that are incorrect to ensure that the policies accurately provide the necessary and bargained for coverages; (f) securing, renewing and analyzing policies to ensure that they reflect SMV's stated coverage directives, needs and expectations, and informing SMV and insurers about any discrepancies to ensure that the insurers correct them; and (g) assisting SMV in all aspects of the claim process to ensure that SMV maximizes any coverages available to pay for its losses and damages resulting from a claim. At all relevant times herein, Smith managed and supervised AJG's above-referenced services.

38. SMV relied entirely on AJG and Smith's expertise for their insurance needs, and to ensure that the proper coverage was obtained.

39. Additionally, AJG also provided specialized risk-management expertise and services in relation to the needs of California wine manufacturers and producers that went well beyond its above-referenced insurance advisor and broker services. These wine-related business risk management expertise and services for wine manufacturer and producer profiles included (i) exposure summary; (ii) geographical coding exposures based on locations; (iii) values of building, structures and property bases on values, construction, occupancy, fire protection, square footage, years built and stories ranges; and (iv) various perils, catastrophic and otherwise as it relates to a wine manufacturer and producer property, based on AJG's analysis of the

Second Amended Complaint

vineyard's operations and facilities in relation to risk, past events, climate, topography and the frequency of perils, including wildfires. To the extent necessary, AJG applied this specialized wine-business risk management expertise and experience to its insurance sold to wine manufacturers and producers, including property insurance. In other words, in regard to property insurance coverage, AJG tailored policy values, limits and premiums for its wine manufacturer and producer to its above-referenced specialized risk management profiles.

40. At all relevant times, AJG provided SMV with the above-referenced specialized wine-business risk management services and indicated that it tailored SMV's policy values, limits and premiums to its risk management profile and analysis prepared by AJG. At all relevant times herein, Smith managed and supervised these above-referenced risk management services and tailored SMV's insurance (including property insurance) to its AJG prepared SMV risk management profile and analysis.

41. For at least the 15-policy periods prior to the 2020-2021 policy period, AJG secured approximately $36.6 million in open blanket commercial and residential property policy coverage for SMV through Allianz-related entities, including Associated Indemnity Corporation and Firemen's Fund Insurance Company. Since the Allianz-related entities renewed blanket property coverage, AJG treated the property policy renewal as automatic, without devoting significant time to that part of the insurance program. AJG and Smith did not recommend to SMV to update the individual building/structures either on the Statement of Values or that Statement's individual value because all covered property (including those properties) was insured up to the aggregate limit, notwithstanding its location or the four separate ranches' individual limits.

42. At all relevant times up to the July 1, 2020 renewal period, SMV had an excellent

Case: 22-10381    Doc# 250-8    Filed: 02/21/23    Entered: 02/21/23 22:37:19    Page 14
of 64

payment and loss history. SMV paid its premiums and had no major losses. This was another reason that SMV's annual policy renewals with Allianz involved little effort and apparently AJG and Smith anticipated the same for the 2020-21 policy period.

43. SMV and AJG believed that the approximately $36.6 million open blanket coverage for property loss or damage to its property sufficiently insured any property damage or loss that any covered property might suffer, given the vineyard's topography and its loss mitigation program.

**III.      The 20-21 Property Program**

44. In mid-March 2020, Allianz informed AJG it planned to exit the wine-related business and that it would not renew SMV's property programs. AJG, through Smith, told SMV that they expected that remarketing SMV's coverage would be a relatively easy process, based upon SMV's history of timely premium payment and excellent loss and loss control history. AJG and Smith informed SMV that wildfire property exposure could affect the premium price.

45. SMV asked AJG and Smith to secure an open blanket property program for the 2020-21 policy period that was the same (if not better) in all material respects to its Allianz policies because, as AJG and Smith both knew, SMV had to keep that coverage in place to comply with its lender's loan covenants. At SMV's direction, AJG and Smith submitted an application for approximately $36.6 million in open blanket commercial and residential property coverage that sought at least the same material terms, conditions, endorsements, limitations or exclusions as previously obtained from Allianz.

46. At all relevant times herein, AJG and Smith knew that California law distinguished between "open" and "valued" policies and—with respect to covering the peril of fires or wildfires—precludes insurers from treating property policies as "stated value" policies.

Second Amended Complaint

AJG and Smith also knew that the California Insurance Code (e.g., §§ 410-412, 2052-2053) defined a policy as either "open" or "closed," and that SMV requested it apply for and secure open blanket property coverage for SMV.

47. During the 20-21 policy negotiation, underwriting and placement period (mid-March 2020 to June 30, 2020), AJG periodically requested that SMV provide it with specific discrete information that it needed either (i) to secure the requested property coverages; or (ii) to respond inquiries from the insurers or their agents. SMV timely responded to each request and provided the requested information and/or documents.

48. SMV called AJG and Smith weekly to check on progress securing coverages for the June 1, 2020 to June 1, 2021 policy period. In late May 2020, AJG informed SMV that it asked Allianz to extend its 2019-20 Property Policies for an additional month until July 1, 2020, while AJG finalized SMV's new property program.

49. At no time before June 22, 2020 did AJG and Smith inform SMV of any issues that would prevent AJG from securing a new SMV property insurance program that was materially the same as the 2019-20 property program. In fact, AJG and Smith did not alert SMV to any problems that they might have in securing the exact same blanket property coverage until June 26, 2020.

50. On June 11, 2020 (just 19 days before the new policies needed to be in effect), AJG told SMV that the underwriters had requested updates on SMV's Statement of Values for (a) the buildings' conditions; (b) swimming pools; (c) type and age of roof; (d) electrical-years updated and confirmation of circuit breakers; (e) plumbing-years updated and confirm water heaters strapped for residences; (f) HVAC-age and confirm regularly maintained; (g) fire hydrant distances; and (h) eq-retrofit.

Second Amended Complaint

51.     SMV provided AJG with the information requested.  AJG and Smith did not ask for additional information to secure property coverage consistent with SMV's application, needs and directives.  As such, SMV continued to believe that AJG's efforts to remarket its property coverage were proceeding smoothly and had no reason to believe that its coverages would be materially different from past years.

52.     On June 22, AJG and Smith first informed SMV that AJG was still awaiting premium quotes but that the insurers were slow to respond, and there were concerns related to wildfires and building updates.  AJG and Smith also informed SMV, for the first time, that 6 insurers had declined to provide SMV with property and equipment coverage.  AJG and Smith did not tell SMV that AJG was unable to secure open blanket property coverage comparable to that in force or suggest to SMV that it might need to alter its property coverage application in any way to secure the desired coverages.

53.     On Friday June 26, 2020, AJG and Smith first informed SMV that no property carrier had agreed to provide the desired coverage, and that AJG was exploring a layered approach involving 9 insurers.  AJG and Smith advised SMV that it had four (4) insurers that would provide the first $10 million with Swiss Re (First Specialty) as the lead, but it did not (a) disclose to SMV how or if this layered approach might impact its property coverages or pricing; or (b) suggest that SMV consider alternative coverage strategies that AJG and Smith could pursue on its behalf to secure the coverages required.

54.     AJG and Smith also informed SMV that the property policies would not include certain residential properties in the 20-21 property coverage.  They informed SMV, however, that AJG expected to separately secure such residential property coverage.

55.     AJG and Smith did not tell SMV that they could not secure the same (if not

Second Amended Complaint

better) open blanket commercial property coverages in all other material respects as those in force with Allianz through 11:59 pm PT on June 30, 2021.  AJG and Smith also did not suggest that SMV explore alternative ways to expand its 20-21 property coverage or alter its property application in any way to address issues that had arisen during AJG's dealing with First Specialty, any of the Insurer Defendants, or their designated agent underwriters.

56.     On Monday June 29 at 11:32 pm CT, AJG and Smith notified SMV that it obtained $35,565,435 in property and business income coverage and that AJG had 8 of the 9 different insurers in place for a $662,168.08 premium payment.  They also notified SMV that AJG and Smith (a) believed that AJG would secure the additional half layer for an additional $32,000 premium; and (b) was also finalizing residential quotes for SMV.  The proposed premium was almost 7-times greater than the 2019-20 Allianz property premium of $111,048 for both commercial and residential property coverage.

57.     AJG and Smith always informed and led SMV to believe that they had, in fact, secured approximately $35.6 in open blanket commercial property coverage based on SMV's Statement of Values' aggregate total.

58.     Thus, as of June 30, the sole coverage changes that AJG and Smith disclosed to SMV were that the 20-21 Property Policies would (i) have a $35,565,435 aggregate policy limit for SMV's Covered (commercial) Property because the coverage would not include residential property; (ii) have a higher wildfire deductible; (iii) be layered among 9-different insurers; and (iv) have a significantly higher premium.

59.     In the morning of June 30 (the day coverage had to be bound), SMV expressed shock at the proposed significantly higher property premium.  AJG and Smith told SMV that it could reduce the premium by $95,000 and keep all locations in its property program if it reduced

Second Amended Complaint

the total aggregate loss limit for the property program policies to $20 million instead of maintaining the $35,565,435 Statement of Value aggregate policy limit. Given that its lender required SMV to keep the same coverages in effect, SMV told AJG and Smith that it opted to pay the higher premium to maintain the same (if not better) open blanket commercial property coverage in all other material respects as it currently had in force with Allianz.

60.     In a conference call on June 30, SMV's Assistant Secretary and insurance manager, Mary Seavoy ("Seavoy"), asked AJG and Smith to confirm that it had secured $35,565,435 in open blanket commercial property coverage before it authorized AJG and Smith to bind the 20-21 property coverage on its behalf. Smith confirmed that they had secured that coverage. She assured Seavoy that the commercial property coverage was the same if not better in all other material respects as the coverage in force.

61.     Relying upon those representations, SMV authorized AJG and Smith to accept the insurance coverage for the 20-21 property policies, and SMV subsequently signed its Statement of Values on July 2, 2020. Had SMV known that AJG and Smith had not, in fact, acquired the property coverage that it authorized them to bind, SMV would not have allowed AJG and Smith to bind the 20-21 property policy coverages.

62.     On July 15, 2020, AJG emailed the purported policy binders to SMV. As its insurance advisor/broker of record and its account manager, AJG and Smith were obligated to review the policy binders, inform SMV if they contained any mistakes and contact the insurers to correct any such mistakes. At all relevant times, SMV relied on AJG and Smith to perform this critical evaluation given that it did not have any in-house insurance coverage expertise.

63.     In its July 15 transmittal email, AJG did not discuss details about the 20-21 property policy's terms, conditions, exclusions, endorsements, or limitations. Nor did AJG or

Smith tell SMV that they had not reviewed the policy binders to confirm that the property coverage bound accurately reflected the open blanket property coverage that SMV authorized AJG and Smith to secure on its behalf.

64. SMV reasonably believed that AJG and Smith performed their jobs, reviewed the binders, and found that the policy binders reflected that SMV had received, at minimum, the open blanket property coverages that it authorized AJG and Smith to secure on its behalf in order to protect SMV's business from, *inter alia,* catastrophic property damage or losses caused by any covered peril, including wildfires.

65. On information and belief, AJG and Smith did not review the policy binders. Had they done so, they would have seen that the binders did not provide open blanket property coverage and that policy terms, conditions, endorsements, exclusions, and limitations were not, at minimum, materially the same as those found in its now expired 2019-20 Allianz property policies. Had they conducted such a review, AJG and Smith also would have been required to (a) inform SMV that the binders did not reflect the property coverages that SMV authorized them to secure and (b) contact the insurers to correct all coverages. AJG did neither.

### IV. The Glass Fire Damaged SMV's Covered Property

66. On September 27, 2020, a large wildfire (later dubbed the "Glass Fire") swept through Napa Valley, ultimately damaging large swaths of SMV's covered property.

67. The Fire caused catastrophic fire and smoke damage to (i) the La Perla Historic Winery building, its Red Barn, and 3-farmhouses; (ii) the Chevalier Red Barn and the Chevalier Historic Winery building; (iii) the Alba Winery buildings; (iv) several Miravalle buildings; and (v) virtually all of SMV's trellises and irrigation systems that serviced the winery buildings and all of SMV's wine processing and making operations.

68.     SMV still has not discovered all of the damage the Fire caused to its property; SMV's current, best estimate puts the total at more than $38,500,000.

## V.      The Property Insurers' Claim Investigation
## And 20-21 Property Policies' Coverage

69.     In early October 2020, SMV hired the Greenspan Company/Adjusters International ("Greenspan") to (a) quantify its losses; (b) interface with the property insurers' adjustor McLarens; (c) secure required advance payments; and (iv) maximize its blanket property coverage to pay for SMV's losses to its covered property.

70.     As of early October 2020, AJG still had not provided SMV with its 20-21 property policy coverages.  At Greenspan's request, SMV asked AJG and Smith to provide the 20-21 property policies for review.

71.     On or about October 2, AJG emailed SMV that the property insurers had sent some of 20-21 Property Policies.  AJG emailed those policies to SMV and its representatives but indicated that AJG and Smith had not yet conducted its final check process to ensure that the policies received accurately reflected SMV's requested coverage.  On or about October 9, AJG delivered the remaining 20-21 property policies to SMV and its representatives.

72.     On an October 13, 2020, conference call, SMV and AJG discussed the coverage in effect under the 20-21 Property Policies for the Fire-related damage.  During that call, Smith: (i) said that SMV had open blanket property coverage that conformed in all material respects to its earlier policies; (ii) acknowledged that on June 30, 2020, she told SMV's Mary Seavoy that she had secured open blanket property coverage for SMV and that that property coverages conformed in all material respects and was, at least, as broad as to the expiring Allianz property coverages; and (iii) said that she still had to conduct her final policy check process to ensure that the 20-21 Property Policies accurately reflected the property coverages that AJG and she secured

20
**Second Amended Complaint**

Case: 22-10381    Doc# 250-8    Filed: 02/21/23    Entered: 02/21/23 22:37:19    Page 21 of 64

for SMV.

### A.  The Initial Claims and Coverage Investigation

73.    On October 14, Greenspan and the Insurer Defendants' claims adjustor agent, McLarens, met at SMV's property to begin to assess the property damage and losses that SMV sustained due to the Fire and to discuss advance actual cash value payments.  At a subsequent site visit in or around late October 2020, both SMV's and the property insurers' representatives acknowledged that the vineyard's total damages likely exceeded $30 million.  McLarens also told SMV's representatives that the 20-21 Property Insurers would advance payments for the structures listed/detailed on SMV's Statement of Values but not for other buildings or structures.

74.    In response, SMV and its representatives began to review the 20-21 Property Policies.  SMV requested that AJG and Smith expedite its internal policy review.

75.    SMV subsequently learned that the 20-21 Property Policies had certain material terms, conditions, endorsements, and limitations that were inconsistent with the open blanket property coverages that AJG said it had obtained.  SMV asked Smith to contact the 20-21 Property Insurers and their underwriters to correct their insurance binders and 20-21 Property Policies to reflect the open blanket coverage and the policy terms, conditions, endorsements, exclusions, and limitations that, according to AJG and Smith, the 20-21 Property Insurers agreed to provide.

76.    Shockingly, AJG and Smith refused to convey its client's request to the 20-21 Property Insurers.  To SMV's knowledge, AJG and Smith also never conducted its final policy check to confirm that the 20-21 Property Policies accurately reflected the open blanket coverage and policy terms, conditions, endorsements, exclusions, and limitations that AJG and Smith requested SMV authorize them to bind.

77.   Moreover, notwithstanding its above-referenced representations to SMV, Smith subsequently emailed SMV and its representatives that "we confirm that no insurer agreed to provide blanket coverage and a quote would not have been provided had blanket limit limits been required."  Additionally, since AJG and Smith determined that they could not obtain open blanket coverage that they previously represented that they secured, AJG and Smith apparently decided that they no longer had to review the accuracy of the 20-21 Property Policies and push for corrections.

78.   AJG and Smith never discharged their duties to review the 20-21 Property Policies and request that the 20-21 Property Insurers correct any inaccurate terms, conditions, endorsements, exclusions, or limitations contained therein.

**B.  The 20-21 Property Policies in SMV's Possession**

79.   The 20-21 Property Insurers, along with several additional insurers not named in this action, issued "all risks" commercial property policies for SMV for the policy period of July 1, 2020-July 1, 2021.

80.   First Specialty issued and delivered a $5 million primary property policy to SMV for covered property damage or loss subject to all terms, conditions, endorsements, exclusions, and limitations that are not at odds with California public policy, statutes, regulations, or law. The First Specialty policy had a $500,000 deductible for wildfires.  The 20-21 primary property policy provides, in relevant part, that:

- [The Insurer] will pay for direct physical loss of or damages to Covered Property at the premises described in the Declaration caused by or resulting from any Covered Causes of Loss.

- Covered Property…means Buildings, meaning the building or structure described in the Declarations, including (1) completed additions; (2) Fixtures, including outdoor fixtures; (3) Permanently installed: (a) Machinery; and (b) Equipment.  The Declaration Item 2 "PREMISES

DESCRIBED" refers to the "schedule on file received by us on: 06/25/2020."

- Covered Property also includes Business Personal Property, which consists of the following property located in or on the building or structure described in the Declarations or in the open within 100 feet of the building or structure or within 100 feet of the premises described in the Declaration, whichever distance is greater: (1) furniture or fixtures; (2) Machinery or equipment; [and] (3) "Stock."

- The premises described in the Declarations are SMV and its four (4) ranches.

- When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy. The Declarations show "Special" and the Policy covers direct physical loss caused by a WILDFIRE.

- A "WILDFIRE" is a partially or wholly uncontrolled wildland or wilderness fire, human or naturally caused. Wildfire . . . shall include escaped prescribed fires, brush fires, bushfires, desert fires, forest fires, grass fires, hill fires, peat fires, vegetation fires, veld fires, and any embers arising from such fire, when such embers result in covered fire or loss damage, and any smoke, soot, or ash remediation expenses as insured by this POLICY, to INSURED PROPERTY at INSURED LOCATION(S)."

- Replacement Costs (without deduction for depreciation) replaces Actual Cash Value in the Valuation Loss Condition of this Coverage Form. The Declaration states that SMV is entitled to Replacement Costs, which is separately endorsed for Roofs, Roofing Systems or Roof Coverings.[2]

- In the event of loss hereunder, the total Program Limit of Liability . . . shall be limited to the least of the following: a. The actual adjusted amount of loss, less applicable deductible(s), b. The total stated value for the property involved, as shown on the latest Statement of Values on file with us, less applicable deductible(s), c. The limit of Liability or Limit of Insurance shown on the face of this Policy or endorsed onto this Policy.

- Loss or damages for, among others, tree, shrub or plant removal and debris removal are covered.

81.     SMV's property damaged by the Fire is either INSURED Property at the

INSURED LOCATION(S) or Covered Property and not subject to any exclusions or limitations

---

[2] SMV can elect Actual Cash Value but still be entitled to Replacement Costs.

**Second Amended Complaint**

in the 20-21 First Specialty primary property policy.

82. Landmark and Kinsale issued and delivered a $5 million 20-21 first layer of excess property coverage to SMV for covered property damage or loss between $5 million and $10 million subject to the policy's terms, conditions, endorsements, exclusions, and limitations that are not at odds with California public policy, statutes, regulations or law. The combined coverage is $5 million above First Specialty's $5 million and is split equally between Landmark and Kinsale, such that each is responsible for $2.5 million of the $5 million combined limit.

83. The Landmark/Kinsale 20-21 first layer excess policies separately provide, in relevant part, that:

- In respect of the perils hereby insured against, this Policy follows the form and is subject to the same warranties, terms and conditions (except as regards the premium, the amount and limits of liability other than the deductible or self-insurance provision where applicable and the renewal agreement, if any; and EXCEPT AS OTHERWISE PROVIDED HEREIN) as are contained in …the First Specialty primary policy.

- (Per endorsement): In the event of loss hereunder, liability of the Company shall be limited to the least of the following liability limitation measures in any one "occurrence": a. The actual adjusted amount of the loss, less applicable deductibles and primary and underlying excess limits; or b. 100% of the individually stated value for each scheduled item of coverage insured at the location which had the loss as shown on the latest Statement of Values on file with this Company, less applicable deductibles and primary and underlying excess limits; or c. The Limit of Liability as shown on the Declarations page of this policy or as endorsed to this policy, if, after the application of the limits in a. or b. above to each scheduled item of coverage which had the loss, the total exceeds such Limit of Liability.

84. SMV's property damaged by the Fire is Covered Property and not subject to any exclusions or limitations in the Landmark/Kinsale 20-21 first layer excess property policies.

85. Mt. Hawley issued and delivered a $10 million 20-21 second layer of excess property policy to SMV for covered property damage or loss between $10 million and $20 million subject to the policy's terms, conditions, endorsements, exclusions, and limitations that

24

are not at odds with California public policy, statutes, regulations or law.

86. Mt. Hawley's second layer excess property policy provided, in relevant part, that:

- In consideration of the payment of the premium stated in the declarations and subject to the terms and conditions contained in our policy or endorsed hereon, we agree to insure against risks of direct physical loss or damage to covered property per the terms and conditions of the First Specialty policy, except as excluded herein.

- Our policy insures against loss or damage as per the terms and conditions of the First Specialty policy, except that where our provisions and stipulations are more restrictive or contrary to those of the First Specialty policy, our policy will supersede.

- In no event shall the "Ultimate Net Loss" exceed the less[er] [sic] of the following: A. Actual adjusted amount of loss; B. Total stated value for the property lost or damaged, as shown on the latest statement of values on file with us; C. Your financial interest.

- Ultimate Net Loss means the actual loss or damage sustained by you (including any Deductible or self-insured retention amount) as a direct result of perils insured against and the coverages provided in our policy for Covered Property hereunder arising from one loss or disaster, after making Deductions for salvage, subrogation and recoveries from any source other than our policy and the underlying and excess insurance policies.

87. SMV's property damaged by the Fire is Covered Property and not subject to any exclusions or limitations in the Mt. Hawley 20-21 second layer excess property policies.

88. Hallmark Specialty and Western World issued and delivered a $10 million 20-21 third layer of excess property coverage to SMV for covered property damage or loss between $20 million and $30 million subject to the policy's terms, conditions, endorsements, exclusions, and limitations that are not at odds with California public policy, statutes, regulations or law. The combined coverage is $10 million above first $20 million in property coverage and is split equally between Hallmark Specialty and Western World, such that each is responsible for $5 million of the $10 million combined limit.

89. The Hallmark/Western World 20-21 third layer excess policies provide, in

25

relevant part, that:

- Subject to the limitations, terms, and conditions contained in this Policy or any endorsement attached hereto, Hallmark Specialty and Western World agree to indemnify the Insured for direct physical loss or damage to the covered property at covered locations, occurring during the Policy Period, and caused by covered perils, all as defined in the First Specialty policy.

- Except as regards the premium, the amounts and Limit of Liability other than deductible or self-insured retentions where applicable, and the renewal agreement, if any, AND EXCEPT AS OTHERWISE PROVIDED HEREIN, this Policy is subject to the same limitations, terms, and conditions contained in the First Specialty policy and, to the extent that coverage is further limited or restricted thereby to those contained in any Underlying Insurance.

- (Per a Hallmark Specialty endorsement): In the event of loss here under, liability of the Company shall be limited to the least of the following liability limitation measures in any one "occurrence": a. The actual adjusted amount of the loss, less applicable deductibles and primary and underlying excess limits; b. the individually stated value for each scheduled unit of insurance for Building, Personal Property, Time Element or other coverage at the location which had loss shown on the latest Statement of Values on file with the Company, less applicable deductibles and primary and underlying excess limits. If no value is shown for a scheduled item then there is no coverage for that item; or c. The Limit of Liability as shown on the Declarations page of this policy or as endorsed to this policy.

- (Per a Western World endorsement): In the event of loss or damage, liability of the Company shall be limited to the lesser of the following: (1) the actual value of the loss or damage after loss adjustment, less all applicable underlying Insurance Policies, deductibles, and self-insured retentions; (2) the stated value for the lost or damaged property, as shown on the latest statement of values on file with the Company prior to the date of loss or damage, less all applicable Underlying Insurance Policies, deductibles and self-insured retentions; or (3) the applicable Limit of Insurance shown in the Declaration.

90. SMV's property damaged by the Fire is Covered Property and not subject to any exclusions or limitations in the Hallmark Specialty/Western World 20-21 combined third layer excess property policies.

91. AXIS issued and delivered the final $5,565,435 20-21 fourth layer of excess

property policy to SMV for covered property damage or loss between $30 million and $35,565,435 subject to the policy's terms, conditions, endorsements, exclusions, and limitations that are not at odds with California public policy, statutes, regulations or law.

92. The AXIS fourth layer excess policy provided, in relevant part, that:

- Subject to the limitations, terms, and conditions contained in this Policy or any endorsement attached hereto, AXIS agree to indemnify the Insured for direct physical loss or damage to the covered property at covered locations, occurring during the Policy Period, and caused by covered perils, all as defined in the First Specialty policy.

- Except as regards the premium, the amounts and Limit of Liability other than deductible or self-insured retentions where applicable, and the renewal agreement, if any, AND EXCEPT AS OTHERWISE PROVIDED HEREIN, this Policy is subject to the same limitations, terms, and conditions contained in the First Specialty policy and, to the extent that coverage is further limited or restricted thereby to those contained in any Underlying Insurance.

- The Company shall not be liable for more than the Total Limit of Liability for this Policy as shown on Item 1 of the Schedule in any one Occurrence regardless of the number of Locations or coverages involved.

93. SMV's property damaged by the Fire is Covered Property and not subject to any exclusions or limitations in the AXIS 20-21 fourth layer excess property policies.

**C. The 20-21 Insurer Defendants' Bad Faith Claims Handling**

94. During a site visit and investigation in or around late October 2020, McLarens acknowledged that actual cash value of SMV's Fire-related loss and property damage to Covered Property was at least between $20-$25 million, and that the vineyard likely suffered property damage and loss from the Fire that exceeded $30 million.

95. Thereafter, First Specialty agreed to make an initial $1 million advance payment. On October 29, 2020, SMV submitted its first Sworn Statement in Partial Proof of Loss.

96. First Specialty subsequently agreed that SMV's Fire loss and damage was fully covered under the 20-21 primary property policy and agreed to pay its full $5 million policy

limit. It requested and received two more Sworn Statements in Partial Proof of Loss from SMV and paid its full $5 million policy limit.

97. As a result, the 20-21 first layer excess Landmark/Kinsale polices were triggered. However, notwithstanding their knowledge of actual cash value of SMV's Fire-related Covered Property loss and damages, Landmark and Kinsale did not make any advanced payments to SMV to cover the actual cash value of undisputed amounts.

98. Therefore, in early 2021, SMV asked the Insurer Defendants to provide their coverage positions. SMV reiterated its requests several times during the next few months and SMV's adjustor also repeatedly asked McLarens to obtain the Insurer Defendants' coverage positions. Greenspan also repeatedly asked McLarens to have the Insurer Defendants respond to SMV's position concerning the scope of First Specialty's broad Covered Property definition in relation to SMV's Fire-related claims.

99. The Insurer Defendants' withholding of actual cash value advance payments breached their respective duties to promptly pay undisputed amounts as required by the implied covenant of good faith and fair dealing attaching to each policy.

100. The Insurer Defendants' refusal to pay the 20-21 Excess Property Policies' remaining $30,565,435 in insurance proceeds was inherently unreasonable and in conscious disregard of established California law.

101. First, California law distinguishes between "open" policies and "valued" policies and - with respect to policies covering the peril of fire (like the Insurers' Policies) - precludes the Insurers from treating the Policies as "stated value" policies.

102. Cal. Ins. Code § 410 states: "[a] policy is either open or valued."

103. Cal. Ins. Code § 411 defines an "open policy" as "one in which the value of the

Second Amended Complaint

subject matter is not agreed upon but is left to be ascertained in case of loss."

104.     Cal. Ins. Code § 412 defines a "valued policy" as "one which expresses on its face an agreement that the thing insured shall be valued at a specified sum."

105.     To create a "valued" policy, California law requires that the "building or structure to be examined by the insurer and the value of the insured's interest therein shall be fixed at the time by the parties." Cal. Ins. Code § 2052. California law also requires that "[a] clause shall be inserted in such a valued policy, stating substantially that the value of the insured's interest in the insured building or structure has been thus fixed." Cal. Ins. Code § 2053.

106.     The Insurer Defendants did not satisfy either of these requirements. The 20-21 Property Insurers and their agents did not examine SMV's buildings, structures and covered property and personal property prior to issuing the 20-21 Property Policies and did not fix the value of SMV's interest in any of that property or set a specific sum.

107.     On information and belief, the 20-21 Property Insurers knew that buildings, structures, and personal property listed on SMV's Statement of Values were outdated and did not reflect their significantly higher current market value. The Insurer Defendants' failure to request new values constituted a violation of both their respective duties of good faith and fair dealing and California insurance regulations.

108.     The 20-21 Property Policies also do not include any clause directly located in any the Policies that the value of any of SMV's building, structure, covered property or covered personal property had been fixed at a specific sum. Nonetheless, the Insurer Defendants continue to treat the 20-21 Excess Property Policies as specific sum policies by applying limits commensurate with SMV's Statement of Values without complying with California's "valued" policy requirements established by the Insurance Code. In so doing, the Insurer Defendants are

Second Amended Complaint

violating California law.

109. On or about March 8, 2022, the Insurer Defendants' claims adjustor forwarded to SMV its preliminary statement of loss, which showed the actual cash value of SMV's fire-related property damage and that the losses sustained as a result of the Glass Fire exceeded $16 million, notwithstanding the Insurers Defendants' earlier acknowledgment that SMV's damages exceeded $20 to $25 million. Despite their purported preliminary statement of loss, the Insurer Defendants refused to advance payments to SMV that they recognized to be due and owing for losses that SMV sustained due to the Glass Fire. Moreover, the Insurer Defendants' preliminary statement of loss showed that they intended to take the position that coverage was limited to a single individual building's or structure's limits on SMV's Statement of Values. The Insurer Defendants took this position despite their (a) insistence that their coverage investigation was ongoing, and they had not denied coverage; and (b) purported 20-21 Property Policies' language did not (even assuming such those policies are the operative ones) support such a limitation of liability claim.

110. On March 22, 2021, the Insurer Defendants' adjustor forwarded to SMV's insurance adjustor a proposed SMV Proof of Loss for another $2,508,855.85 advance payment without performing a full, fair, and thorough investigation of SMV's Fire-related claims as required by California's implied covenant of good faith and fair dealing. Landmark and Kinsale would each pay fifty percent (50%) of the advance payment. Mt. Hawley refused to make any advance payment to SMV despite the Insurer Defendants' preliminary statement of loss showing that SMV's fire-related losses required it to make such an advance payment, and the Insurer Defendants' claims adjuster informed SMV's representative that, notwithstanding SMV's repeated requests for their coverage positions, the Insurer Defendants continued to investigate

SMV's Fire-related claim pursuant to their respective reservation of rights letters. In fact, Landmark sent a March 24, 2021, reservation of rights letter to SMV, which noted that it continued to investigate the loss and would not yet issue a coverage position.

111. The Insurer Defendants also did not ask SMV to submit a formal proof of loss to confirm that its total Fire-related insurance claim exceeded the $20-$25 million that the adjustors (both SMV's and the Insurer Defendants') previously agreed was a fair and reasonable estimate of the actual cash value of SMV's Fire-related loss and damages to Covered Property.

112. On July 13, 2021, SMV emailed the Insurer Defendants' adjustor and submitted a Sworn Statement in Partial Proof of Loss subject to its reservation of all rights. In its email, SMV noted that it currently sought an additional $27,849,027.80 and requested that the Insurer Defendants pay their respective shares of SMV's loss within 30-days. The email also noted that, despite SMV's repeated requests, the Insurer Defendants still had not submitted a formal coverage response almost 9-months after this claim was made. SMV also requested that the Insurer Defendants or McLarens provide SMV with (a) any questions or comments about SMV's Proof and Statement of Loss with 14-days; and (b) the Insurer Defendants' coverage positions.

113. On August 5, 2021, Mt. Hawley sent a sham reservation of rights letter to SMV. Mt. Hawley did not reference its March 8 preliminary statement of loss (which showed that the Insurer Defendants' claimed that insurance proceeds for SMV's Glass Fire-related property damage and losses was limited), but cited its purported limitation of liability endorsement as a Mt. Hawley policy provision relevant to coverage under Mt. Hawley's policy. Mt. Hawley also cited, in part, its purported applicable Covered Property definition in a manner that limited its purported available coverage. Notwithstanding its clear indication that it would deny coverage, Mt. Hawley intentionally and falsely indicated that its coverage investigation was ongoing and

asked SMV to respond to its voluminous document requests and submit to examinations under oath conducted by its attorneys. Mt. Hawley also acknowledged that it was investigating this matter with the assistance of its representative adjustor McLarens but erroneously claimed that SMV's Sworn Statement in Partial Proof of Loss was its first indication that SMV's Fire-related claims might implicate its excess coverage layer. As noted above, Mt. Hawley's claims agent previously acknowledged that SMV's Fire-related losses exceeded $30 million, and McLarens subsequently did a preliminary analysis that showed that certain SMV losses and damages to Covered Property totaled at least $16 million.

114. On or about August 10, 2021, McLarens asked SMV to clarify its July 13 Sworn Statement in Partial of Loss calculations and address additional issues. By letter of August 23, 2021, SMV stated that it would revise its July 13 Sworn Statement in Partial Proof of Loss and answered McLarens' questions. SMV submitted its Revised Sworn Statement of Partial Proof of Loss subject to its reservation of all of its rights on August 26, 2021.

115. McLarens also continued to investigate SMV's Fire-related claims on the Insurer Defendants' behalf and again visited SMV to inspect its loss and property damage on September 1, 2021.

116. On September 22, McLarens sent another proposed Proof of Loss to SMV for an additional advance payment and attached its updated Statement of Loss.

117. On September 27, 2021, SMV submitted its Sworn Statement in Partial Proof of Loss subject to its full reservation of rights. In its email, SMV noted that (a) none of the Insurer Defendants have issued a coverage opinion and analysis despite SMV's repeated requests; (b) their failure to timely provide such letters, opinions and analyses greatly prejudiced SMV; (c) the Insurer Defendants have breached their respective obligations of good faith and fair dealing

owed to their insured; (d) absent SMV's review and analysis of such coverage letters, opinions or analyses, SMV will not accept any statement of loss or statements of value that characterizes a payment as anything besides either (i) a partial payment against the remaining balance owed on SMV's August 26 Sworn Statement of Partial and Statement Proof of Loss; or (ii) an advance payment; and (e) all of SMV's previous proofs of loss, in fact, were submitted and paid on an advanced payment basis for actual cash value losses.

118.    SMV also stated that (a) it informed its 20-21 Property Insurers and McLarens that they promised to, did and were obligated to provide coverage on an open blanket coverage basis; (b) at the time of either the payment of the initial premium or promise to pay the initial premium on or about June 30, 2020, SMV was informed that the 20-21 Property Insurers had bound coverage and would issue policies on an open blanket coverage basis for any and all property loss at the property unless any such loss was specifically excluded; and (c) any deviation from this promise would, among other things, constitute a breach of their contractual obligation, bad faith, and misrepresentations.

119.    McLarens responded by letter to SMV's claims adjustor, Greenspan's Tim Larsen, dated September 29, 2021 stating that its response was submitted for the Insurer Defendants except for Mt. Hawley.  McLarens' Mike Vadney stated that the parties had so-called "Resolved Items" for which First Specialty, Landmark and Kinsale had paid $7,508,855.85 but agreed to pay a small additional amount to bring the total alleged market payments to $7,659,534.86.  At the same time, McLarens' Vadney stated that the Insurer Defendants (except Mt. Hawley) denied coverage and disputed their obligation to pay any of the remaining $25,308,287.32 for SMV's Fire-related claims.

120.    The September 29, 2021 letter was the first (and only) coverage declination sent

to SMV for its Fire-related claims.  Landmark, Kinsale, Hallmark Specialty, Western World and AXIS coordinated their coverage positions and stated that (a) the 20-21 Property Policies limited the 20-21 Property Insurers' liability to a total of $4.8 million for the La Perla Historic Winery and $525,000 for the Alba Winery buildings #1-2; and (b) they declined to pay any additional amounts claimed for these buildings or any Covered (La Perla and Alba) Property on SMV's Statement and Proof of Loss.  Their letter  accepted that First Specialty's Covered Property definition covered more than the buildings and structures on SMV's Statement of Values, but also stated that SMV's trellises and irrigation systems did not fall within that policy's Covered Property definition.  Therefore, Landmark, Kinsale, Hallmark Specialty, Western World and AXIS also denied coverage for SMV's trellises and irrigation damages.

121.    By virtue of their September 29 letter, Landmark and Kinsale denied coverage and refused to make additional payments to SMV to compensate it for its Glass Fire related losses, despite SMV's losses triggering the purported 20-21 excess policies' coverage.  For their part, Hallmark Specialty, Western World, and AXIS denied any coverage obligation to SMV, refused to advance any payments to SMV to compensate it for its Glass Fire-related losses, and informed SMV that they would not pay SMV for any such losses if and when its purported 20-21 policies required them to compensate SMV for its Glass Fire-related losses.  The Insurer Defendants also rejected SMV's claim that the operative 20-21 Property Policies were supposed to provided blanket coverage.

122.    On October 29, 2021, SMV responded, in part, to McLarens' September 29 letter, noting that it would update and revise its Statement and Proof of Loss (the "Second Revised Proof of Loss") to include, among others, the Chevalier Red Barn, as well as other properties.  It noted that those excess property insurer defendants' Covered Property interpretation showed that

Case: 22-10381    Doc# 250-8    Filed: 02/21/23    Entered: 02/21/23 22:37:19    Page 35 of 64

they should have covered several other damaged buildings and structures. SMV also disputed the excess property insurer defendants' Miravalle Shop damages calculation and its coverage declination for SMV's trellises and irrigation systems. SMV requested that the 20-21 Insurer Defendants pay open claims and reserved its rights. Finally, SMV questioned their reliance on the policy's purported liability limit language and indicated that it continued to investigate the 20-21 Property Policies' intended coverage, including whether the 20-21 Property Policies had open blanket property coverage.

123.    On November 2, 2021, SMV submitted its Second Revised Sworn Proof of Loss and its Revised Statement of Loss, in which it claimed that the Insurer Defendants owed their respective excess policy limits to pay their shares of the full $35,565,435 aggregate 20-21 Property Policies' limit. Exhibit 1 is a copy of SMV's Second Revised Sworn Statement of Proof of Loss and its Revised Statement of Loss

124.    Pursuant to its August 5 and subsequent requests, SMV also produced documents and submitted to five (5) examinations under oath requested by Mt. Hawley. During the 2021 examinations, it became clear that Mt. Hawley's coverage position and claims investigation was a ruse and that it had coordinated its coverage position with the other excess property insurer defendants and *de facto* denied coverage on the same grounds raised by them. Because Mt. Hawley clearly had made its coverage determination, but deliberately withheld it from SMV while forcing SMV to engage in a seemingly never-intending investigation, Mt. Hawley's purported coverage investigation was done in bad faith.

125.    SMV also sent a demand letter to all of the Insurer Defendants requesting (i) $2,340,465.14 from Landmark/Kinsale (which represents the amount still due pursuant to their $5 million combined first layer excess property policy's limit); (ii) Mt. Hawley's full $10 million

policy limit for its 2020-21 second layer excess property policy; and (iii) at least $9,153,414.20 of Hallmark Specialty/Western World's 2020-21 $10 million combined third layer excess property policy. SMV also informed the Insurer Defendants that it continued to investigate whether the 20-21 Property Insurers agreed to provide open blanket property coverage and whether the 20-21 Property Policies had to be revised or reformed to reflect that promised coverage. SMV also informed the Insurer Defendants that: (i) the 20-21 Excess Property Policies did not limit liability to a total of $4.8 million for the La Perla Historic Winery and $525,000 for the Alba Winery buildings #1-2; (ii) First Specialty's Covered Property definition required the Insurer Defendants to pay SMV for the property damage and loss sustained at additional properties, including the Chevalier Red Barn, the La Perla Red Barn, and SMV's trellises and irrigation systems; and (iii) they should pay SMV additional monies for the damages sustained at Miravalle Shop.

126. Mt. Hawley did not respond to SMV's above-referenced coverage letter, but insisted that its coverage investigation was on going. Mt. Hawley's coverage investigation was—and always has been—a pure sham. On April 22, 2022, Mt. Hawley filed a declaratory judgment action in New York captioned *Mt. Hawley Insurance Company v. Spring Mountain Vineyard, Inc.*, 1:22-cv-03191-GHW (S.D.N.Y.) (the "New York Federal Action"). In that Action, Mt. Hawley claimed that SMV breached its cooperation clause and pled claims that showed it would deny coverage based on the very same grounds that Landmark, Kinsale, Hallmark Specialty, Western World, and AXIS raised in their September 29, 2021, coverage denial. Moreover, Mt. Hawley insisted until August 16, 2022, that it was still conducting its coverage investigation and demanded additional documents and an additional examination under oath, notwithstanding its New York Federal Action. Mt. Hawley did so despite that it also

subsequently filed an amended complaint to allege that SMV owed it damages due to its breach of their contract's New York forum selection clause—a claim that it clearly could have asserted when it originally filed its complaint in the New York Federal Action. This is one of the numerous acts and omissions by defendant Mt. Hawley that show that it: (i) intentionally and deceitfully lied about its coverage position; (ii) denied coverage and refused to advance payments to SMV to covered its Fire-related losses while its purported coverage investigation was on-going; (iii) has anticipatorily breached its obligation to cover and agree to pay SMV for its property damage and loss sustained to its Covered Property due to the Glass Fire when triggered; and (iv) has engaged in bad faith claims handling and in violation of its obligation of good faith and fair dealing with its insured, SMV.

127.    For their part, on April 26, 2021, Landmark, Kinsale, Hallmark Specialty, Western World, and AXIS reiterated their coverage denial. As a result, Landmark and Kinsale have breached their obligation to cover and pay SMV for its property damage and losses sustained to its Covered Property due to the Glass Fire. In particular, Hallmark Specialty, Western World, and AXIS have (i) refused to advance legitimate payments requested to compensate SMV for its Glass Fire-related losses; (ii) anticipatorily breached their respective obligations to cover and if and when triggered, their respective obligations to pay SMV for its property damage and losses sustained to its Covered Property due to the Glass Fire; and (iii) engaged in bad faith claims handling and in violation of their respective obligation of good faith and fair dealing with their insured, SMV.

### FIRST CAUSE OF ACTION
### DECLARATORY JUDGMENT
### (Against the Insurer Defendants)

128.    SMV incorporates by reference the preceding paragraphs as if fully set forth

herein.

129. SMV entered into legally binding written contracts with First Specialty and each of the Insurer Defendants. SMV is the named "Insured" under each 20-21 Property Policy, including the 20-21 Excess Property Policies.

130. SMV provided timely notice of its Fire-related insurance claims the 20-21 Property Insurers, including the Insurer Defendants. SMV notified them that it made claims for all insurance benefits, losses, costs, and expenses arising from the Fire.

131. SMV has complied in all material respects with the conditions and requirements of the 20-21 Property Policies and/or (a) such conditions and requirements have been waived; or (b) their satisfaction is otherwise excused by either operation of California public policy, statutes, regulations, or law, or the Insurer Defendants' conduct. The Insurer Defendants are estopped from asserting all contractual provisions, if any, that (i) purport to limit or otherwise negate their obligations to provide insurance benefits, losses, costs, and expenses under the 20-21 Excess Property Policies and California law; (ii) purport to limit in any coverage terms, conditions or obligations not otherwise disclosed to SMV by the 20-21 Property Insurers before the July 1, 2020 policy period commenced; and/or (iii) are at odds with California public policy, statutes, regulations or law that protect, among others, California policyholders and/or California properties.

132. SMV's Fire-related claims are covered under the 20-21 Property Policies and not excluded, including under each of the respective 20-21 Excess Property Policies. The 20-21 Property Policies also do not exclude or limit coverage for the damaged completed additions, fixtures including outdoors fixtures or permanently installed machinery and equipment including the trellises and irrigation systems. As such, all of this property is covered because the damages

Case: 22-10381    Doc# 250-8    Filed: 02/21/23    Entered: 02/21/23 22:37:19    Page 39
of 64

arose from a covered peril and was not otherwise excluded or limited.

133.    The Insurer Defendants do not dispute that SMV's Fire-related La Perla Historic Winery building and Alba Winery building #1-2 claims triggered the 20-21 Property Policies Coverage or that First Specialty, Landmark and Kinsale had a duty to pay SMV for its insurance benefits, losses, costs, and expenses for these claims.  The Insurer Defendants do not dispute that the 20-21 Property Policies were triggered by certain of SMV's Fire-related claims and that First Specialty, Landmark and Kinsale had a duty collectively to pay SMV $7,659,534.86 for its insurance benefits, losses, costs, and expenses related to (a) the La Perla Historic Winery (First Specialty alone); (b) Alba Winery buildings #1-2; (c) Miravalle Shop damage; (d) the building cleaning at the Miravalle Winery Office, Victorian House, Cottage, Shop, Barn,  Greenhouse, Cave and the Chevalier Historic Winery building; (e) the personal property cleaning at Miravalle Winery Office, Victorian House, Cottage, Shop, Barn and the Miravalle Cave and its Barrels and Inventory; (f) painting of the Miravalle Winery Office, Victorian House, Cottage, and Barn; (g) $100,000 for the La Perla House; and (h) $10,000 for certain outdoor property.

134.    Rather, the Insurer Defendants dispute their obligation to pay SMV: (a) $19,316,701.76 for the covered La Perla Winery building damage; and (b) $741,474.47 for the covered Alba Winery buildings #1-2.  The Insurer Defendants state that liability for (i) the La Perla Historic Winery is limited to $4.8 million that First Specialty paid to SMV under its 20-21 property policy and (ii) the Alba Winery buildings #1-2 is limited to a $525,000 that First Specialty and/or Landmark and Kinsale paid to SMV.

135.    The Insurer Defendants' denial of coverage and failure to pay constitutes a breach of contract.  Landmark and Kinsale have breached their obligations owed to SMV under their respective 20-21 excess property policies.  For their part, Mt. Hawley, Hallmark Specialty,

Western World, and AXIS have breached their obligation to advance payments due and owing to SMV for its Glass Fire-related losses and have breached their respective coverage obligations and anticipatorily breached their respective duties to compensate SMV for its Glass Fire-related losses when that duty to pay is triggered.

136. As a result, Mt. Hawley's 20-21 second layer excess property policy coverage also is triggered and, at minimum, Hallmark Specialty's and Western World's third-layer excess policies are also triggered.

137. Pursuant to the limitations of liability endorsement in the Mt. Hawley 20-21 excess policy, Mt. Hawley must pay $4.8 million to cover the La Perla Winery's damages. Its limitation of liability provision would, if applicable, only limit any of its La Perla Winery Covered Property obligation to a total $4.8 million payment under its 20-21 second layer excess property policy.

138. Pursuant to their respective limitation of liability provisions, all of the estimated $741,474.47 in Fire-related damages to the Alba Winery buildings #1-2 is covered as follows: either (a) First Specialty $200,000, Landmark/Kinsale $200,000 ($100,000 each), and Mt. Hawley at least $341,474.47; or (b) in a manner under the Insurer Defendants' 20-21 Excess Property Policies that maximizes coverage for all of SMV's Fire-related claims.

139. The Insurer Defendants' interpretation of their respective limit of liability provisions also constitutes a breach of their respective obligations pursuant to California Insurance Code §§ 410-412 and 202-2053 and implied covenants of good faith and fair dealing. The 20-21 Property Policies do not reflect an agreement to value any of SMV's Covered Property at a specific sum.

140. The Insurer Defendants also dispute, pursuant to SMV's Covered Property

definition, that they have a duty to cover and pay SMV's insurance benefits, losses, costs and expenses due to Fire-related damage to the Chevalier Red Barn, the La Perla Red Barn, 3-La Perla Farmhouse structures and SMV's trellises and irrigation systems.

141. The Insurer Defendants are obligated to cover Covered Property in accordance with the terms, conditions, endorsements, exclusions, and limitations in their respective 20-21 Excess Property Policies.

142. The Insurer Defendants also dispute SMV's Miravalle Shop's damages.

143. The Insurer Defendants have denied any obligation to cover any additional loss under their respective 20-21 Excess Property Policies.

144. As such, an actual and justiciable controversy exists between SMV and the Insurer Defendants concerning: (a) the application of (i) the Insurer Defendants' respective limitation of liability endorsements (if any) to their respective obligations to pay some or all of the remaining La Perla Historic Winery building and Alba Winery buildings #1-2 Fire-related loss or property damage and (ii) First Specialty's Covered Property definition to the Insurer Defendants' respective obligations to cover and pay some or all of the Fire-related loss and damage to Chevalier Red Barn, the La Perla Red Barn, 3-La Perla Farmhouse structures and SMV's trellises and irrigation systems; and (b) all of the Miravalle Shop's loss or damages.

145. SMV seeks a declaration from the Court as to the appropriate construction and meaning of the Insurer Defendants' 20-21 Excess Property Policies. This includes a declaration regarding the parties' rights and obligations under the 20-21 Excess Property Policies, including that (a) the Insurer Defendants' respective limitation of liability endorsements do not bar SMV's recovery of its La Perla Historic Winery building and Alba Winery buildings #1-2 Fire-related loss or damage and that their proffered interpretation violates, among others, California public

Case: 22-10381    Doc# 250-8    Filed: 02/21/23    Entered: 02/21/23 22:37:19    Page 42
of 64

policy and is at odds with California's Insurance Code; (b) the Chevalier Red Barn, the La Perla Red Barn, 3-La Perla Farmhouse structures and SMV's trellises and irrigation systems are all "Covered Property" under those Policies; (iii) all of the Miravalle Shop's damages are covered; and (iv) all SMV's 20-21 Property Policies should be interpreted to maximize SMV's recovery of its loss and damages sustained due to the Fire, including the 20-21 Excess Property Policies at issue.

146.    SMV also seeks a declaration that it is entitled to its attorney's fees, costs and expenses resulting from the Insurer Defendants' breaches.

### SECOND CAUSE OF ACTION
### BREACH OF CONTRACT
### (Against the Insurer Defendants)

147.    SMV incorporates by reference the preceding paragraphs as if fully set forth herein.

148.    SMV entered into legally binding written contracts with First Specialty and each of the Insurer Defendants.  SMV is the named "Insured" under each 20-21 Property Policy, including the 20-21 Excess Property Policies.

149.    SMV provided timely notice of its Fire-related claims to the 20-21 Property Insurers, including the Insurer Defendants.  SMV notified them that it made claims for insurance benefits, losses, costs, and expenses arising from the Fire.

150.    SMV has complied with the conditions and requirements of the 20-21 Property Policies and/or (a) such conditions and requirements have been waived; or (b) their satisfaction is otherwise excused by either operation of California public policy, statutes, regulation or law, or the Insurer Defendants' conduct.  The Insurer Defendants are estopped from asserting all contractual provisions, if any, that (i) purport to limit or otherwise negate their obligations to

provide insurance benefits, losses, costs, and expenses under the 20-21 Excess Policies; (ii) purport to limit in any coverage terms, conditions or obligations not otherwise disclosed to SMV by the 20-21 Property Insurers before the July 1, 2020 policy period commenced; and/or (iii) are at odds with California public policy, statutes, regulations or law that protect, among others, California policyholders and/or California properties.

151.    SMV's Fire-related claims are covered under the 20-21 Property Policies as outlined herein and not excluded, including under each of the respective 20-21 Excess Property Policies.  The 20-21 Property Policies also do not exclude or limit coverage for the damaged completed additions, fixtures including outdoors fixtures or permanently installed machinery and equipment including the trellises and irrigation systems.  As such, all of this property is covered because the damages arose from a covered peril and was not otherwise excluded or limited.

152.    Landmark and Kinsale breached their respective 20-21 first layer excess property policies because they denied coverage and refused to exhaust their respective $2.5 ($5 million together) policy limit and pay $2.4 million each ($4.8 million together) for SMV's Fire-related loss and damage at the La Perla Historic Winery building and $100,000 each ($200,000 together) for its Fire-related damage to Alba Winery Buildings #1-2.

153.    Mt. Hawley has breached its 20-21 second layer excess property policy because it has intentionally lied about its coverage position, *de facto* denied coverage, and indicated it anticipatorily intends to, among other things, refuse to exhaust its $10 million policy limit when triggered and pay (i) at least $4.8 million for SMV's Fire-related loss and damage at the La Perla Historic Winery building and $341,474.47 for its Fire-related damage Alba Winery Buildings #1-2 and (ii) $5.2 million for SMV's Fire-related Covered Property loss or damage in a manner that maximizes SMV's total 20-21 Property Policies' coverage.

154. Hallmark Specialty and Western World breached their respective 20-21 third layer excess property policies because they have denied coverage and indicated that they anticipatorily intend to, among other things, refuse to exhaust their respective $5 million policy (together $10 million) limit when triggered and pay $2.4 million each ($4.8 million together) for any Fire-related La Perla Historic Winery Covered Property loss or damage and $2.6 million each ($5.2 million) for any SMV Fire-related Covered Property loss or damage in a manner that maximizes SMV's total 20-21 Property Policies' coverage.

155. AXIS also breached its 20-21 fourth layer excess property policy because it denied coverage and indicated that it anticipatorily intends to refuse to exhaust its $5,565,435 policy limit when triggered and pay for any remaining Fire-related SMV Covered Property loss or damage in a manner that maximizes SMV's total 20-21 Property Policies' coverage.

156. The Insurer Defendants' interpretation of their respective limit of liability provisions also violates, among others, their respective obligations pursuant to California Insurance Code §§ 410-412 and 202-2053 and implied covenants of good faith and fair dealing. The 20-21 Property Policies do not reflect an agreement to value any of SMV's Covered Property at a specific sum.

157. By failing and refusing to honor the 20-21 Excess Property Policies and paying their respective full limits of coverage or any insurance proceeds due to SMV, the Insurer Defendants have individually and collectively breached the Policies.

158. As a direct and proximate result of such breaches, SMV has been deprived of the benefit of the Insurer Defendants' insurance coverage and have incurred damages in an amount to be proven at trial, but in no event less than the approximately $28 million still due under the 20-21 Excess Property Policies for SMV's Fire-related loss and damage to its Covered Property,

plus its attorney's fees, costs and expenses.

## THIRD CAUSE OF ACTION
## ALTERNATIVE BREACH OF CONTRACT
## (Against the Insurer Defendants)

159.   SMV incorporates by reference the preceding paragraphs as if fully set forth herein.

160.   For the 20-21 policy year, SMV submitted an application for slightly more than $36.6 million blanket open property coverage that provided the same material terms, conditions, endorsements, limitations, and/or exclusions as the 2019-20 Allianz property policies in force.

161.   During the underwriting, negotiation, and placement process, the 20-21 Property Insurers and their agents indicated that they would provide such coverage, subject only to the following changes: (i) the 20-21 Property Policies would not cover SMV's residential properties; (ii) the total aggregate commercial property coverage policy limit would be reduced to $35,565,435; (iii) the 20-21 Property Policies would be layered and include 9 separate insurers; (iv) the wildfire deductible would be raised to $500,000; and (v) SMV would pay a substantially higher premium.

162.   On information and belief, the 20-21 Property Insurers were obligated to provide blanket open property coverage and the 20-21 Property Policies must provide such coverage, including the 20-21 Excess Property Policies.

163.   The 20-21 Property Insurers also did not follow California Insurance Code §§ 410-412 and 202-2053 and the 20-21 Property Policies do not reflect an agreement to value any of SMV's Covered Property at a specific sum.

164.   First Specialty paid its $5 million limit to SMV for its Fire-related insurance claims.  On information and belief, First Specialty never earmarked its $5 million payment

Second Amended Complaint

because it knew SMV's loss was covered.

165.     Nonetheless, the Insurer Defendants now intentionally and willfully attempt, in bad faith, to push a purported interpretation of that 20-21 Property Policies' terms, conditions, endorsements, limitations, and exclusions that significantly deviate from the property coverages that they promised to SMV.  Their purported interpretation is a classic bait and switch and also is at odds with California Insurance Code (see §§ 410-412 and 202-2053), California public policy, and California law.

166.     Landmark and Kinsale breached their respective 20-21 first layer excess property policies because they denied coverage and refused to exhaust their respective policy limits in a manner at odds with their promise to provide $5 million in blanket open property coverage.

167.     Mt. Hawley  breached its 20-21 second layer excess property policy because it has intentionally lied about its coverage position, *de facto* denied coverage, and indicated it anticipatorily intends  to refuse to advance legitimate amounts due and owing to SMV for its Glass Fire-related damages when triggered and to exhaust its $10 million policy limit to cover SMV's proven Covered Property insurance claims.

168.     Hallmark Specialty, Western World, and AXIS also have  breached their respective 20-21 excess property policies because they have denied coverage and all have indicated that they   will refuse to advance legitimate amounts due and owing to SMV for its Glass Fire-related damages when their respective coverage obligations are triggered and to exhaust their respective policy limits (together $15,565,435) and not pay SMV for its proven Covered Property insurance claims.

169.     By failing and refusing to honor the 20-21 Excess Property Policies' agreed terms, conditions, endorsements, limitation, and exclusions, Landmark and Kinsale  have individually

and collectively breached and Mt. Hawley, Hallmark Specialty, Western World and AXIS have breach or anticipatorily breached their respective 20-21 Excess Property Policies, and all of the Insurer Defendants also have violated §§ 410-412 and 202-2053 of the California Insurance Code, California public policy, and California law.

170.     As a direct and proximate result of such breaches, SMV has been deprived of the benefit of the Insurer Defendants promised blanket open insurance coverage and have incurred damages in an amount to be proven at trial but in no event less than the approximately $28 million that remains unpaid and owed under the 20-21 Excess Property Policies' aggregate property policy limits, plus its attorney's fees, costs, and expenses.

**FOURTH CAUSE OF ACTION**
**ALTERNATIVE DECLARATORY JUDGMENT**
**<u>(Against All Insurer Defendants)</u>**

171.     SMV incorporates by reference the preceding paragraphs as if fully set forth herein.

172.     An actual and justiciable controversy exists between SMV and the Insurer Defendants under the 20-21 Excess Property Policies as to, among other things, whether: (i) the 20-21 Property Insurers and their agents, without disclosing material changes before the start of the July 1, 2020 policy period, could alter any of the material terms, conditions, endorsement, limitations, and exclusions that they promised would remain and (ii) the 20-21 Excess Property Policies must comport to the original promised property coverage for SMV due to the Insurer Defendants' violations of their respective duties of good faith and fair dealing and California's Insurance Code, regulations, public policy and law.

173.     SMV seeks a declaration from the Court as to the appropriate construction and meaning of the Insurer Defendants' 20-21 Excess Property Policies.  This includes a declaration

from the Court regarding the parties' rights and obligations under the 20-21 Excess Property Policies, including that, except as otherwise disclosed to SMV on or before July 1, 2022: (i) the Insurer Defendants cannot alter or otherwise vary any of the material terms, conditions, endorsements, limitations or exclusions that they promised would remain at least materially the same as those in the expiring 2019-20 Property Policies, including the Insurer Defendants' promise to provide blanket open property coverage and (ii) SMV's 20-21 Property Policies should be interpreted to maximize SMV's recovery of its loss and damages sustained due to the Fire.

174.    SMV also seeks a declaration that it is entitled to its attorney's fees, costs and expenses resulting from the Insurer Defendants' breaches.

## FIFTH CAUSE OF ACTION
## BREACH OF THE IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING
## (<u>Against all Insurer Defendants</u>)

175.    SMV incorporates by reference the preceding paragraphs of this Complaint as if fully set forth herein.

176.    The Insurer Defendants are obligated under California law to honor the covenant of good faith and fair dealing implied in each of their respective 20-21 Excess Property Policies.

177.    The Insurer Defendants are required by law not to impair the SMV's rights, including their right to receive all available benefits under the 20-21 Excess Property Policies. The Insurer Defendants also are prevented from elevating their interests above SMV's.

178.    At all material times herein, the Insurer Defendants and their agents breached the covenant of good faith and fair dealing by, inter alia, the consciously and unreasonably:

    A.  Refusing to advance payments to SMV for its proven, covered losses;

    B.  Refusing to pay SMV's proven, covered losses.

48

C. Asserting in a coordinated fashion, baseless defenses that misrepresent the facts and pertinent policy terms, conditions, endorsements, limitations, and/or exclusions.

D. Refusing to respond to SMV's proven, covered losses in a timely manner.

E. Purposefully delaying submission of a coverage position.

F. Refusing to deliver promised policy coverage.

G. Failing to investigate or evaluate SMV's Fire-related insurance claims in good faith.

H. Failing to give SMV's interests at least as much consideration as the Insurer Defendants gave to their own interests.

I. Failing to adopt and implement appropriate standards for the prompt and fair investigation and processing of SMV's Fire-related insurance claims.

J. Failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of SMV's Fire-related insurance claims even though liability was and is reasonably clear.

179.    For its part, Mt. Hawley has conducted a sham coverage investigation and repeatedly, intentionally lied about its coverage position and the fact that it has, in fact, already denied coverage for SMV's Glass Fire-related claims. Mt. Hawley's intentional and deceitful acts, errors and omissions and its refusal to set forth its coverage position have caused SMV to suffer contractual and extra contractual damages, have been done in bad faith, and have caused SMV to incur additional time and expense, including associated attorney's fees and costs. As a result of its repeated intentional and deceitful acts, errors, and omissions, Mt. Hawley is also liable for punitive damages in an amount to awarded at trial.

180.    Each of these actions—and Mt. Hawley's above-referenced acts, errors and omissions—violates not only the implied covenant of good faith and fair dealing, but also numerous applicable Insurance Codes and Regulations with respect to proper claims handling practices, including, without limitation, Cal. Ins. Code § 790.03(h).

181.    The Insurer Defendants' actions constituted an intentional effort to delay complying with their obligations under their respective 20-21 Excess Property Policies issued to cover the exact type of catastrophic fire loss SMV suffered here.

182.    The Insurer Defendants' individual and collective bad faith conduct has directly and proximately caused damage to SMV, including without limitation by losing the time value of the insurance proceeds needed to cover the Fire-related claims, losing the ability to perform timely repairs and collecting the benefit of contractual required replacement costs value, sparking unnecessary litigation, and forcing SMV to incur unnecessary attorneys' fees and costs, including hiring counsel to pursue the Insurer Defendants and now file this action due to their unfair and deceptive investigation and wrongful, unreasonable denial of coverage. The Insurer Defendants are legally obligated to pay all damages caused by their bad faith conduct.

183.    At all material times herein, the Insurer Defendants have engaged in the conduct discussed herein that was oppressive, fraudulent, and malicious within the meaning of Civil Code §3294, and the Insurer Defendants are liable for exemplary damages in an amount to be determined at trial, plus SMV's attorney's fees, costs and expenses.

### SIXTH CAUSE OF ACTION
### NEGLIGENCE
### (Against Defendants AJG and Smith)

184.    SMV incorporates by reference the preceding paragraphs as if fully set forth herein.

185.     AJG was SMV's insurance advisor and broker of record before July 1, 2020. AJG represented SMV in relation to the negotiation, underwriting, and placement of its insurance policies, including policies part of its commercial and residential property program. At all relevant times herein, Smith was SMV's account manager at AJG.

186.     For many policy periods preceding the July 1, 2020, policy period, SMV purchased property policies that provided an aggregate property program policy limit of slightly more than $36.6 million and "open" blanket coverage.  AJG secured this insurance coverage on SMV's behalf.

187.     As SMV's insurance advisor and broker of record, AJG and its account manager Smith provided SMV with numerous insurance and risk management related services, including: (a) placing, negotiating, and underwriting coverages in accordance with SMV's directives, needs, and expectations in a timely fashion and well in advance of any renewal date; (b) communicating with SMV about available coverage  and advising SMV about possible alternative insurance programs designed to meet SMV's stated directives, needs, and expectations so that any coverage decisions, if any, would be made with SMV's full knowledge and well in advance of any policy's purchase; (c) binding coverages that reflected SMV's final directives, needs, and expectations, after the discussing any coverage-related issues; (d) analyzing binders to ensure that the policy binder reflected SMV's stated coverage directives, needs, and expectations, and informing SMV about any potential discrepancies; (e) contacting insurers about any policy binder terms, conditions, exclusions, endorsements, or limitations that are incorrect to make sure that the insurers correct any and all such errors; (f) securing and analyzing the policies to ensure that they reflect SMV's stated coverage directives, needs, and expectations, and informing SMV about any potential discrepancies; (g) contacting insurers

Second Amended Complaint

about any policy terms, conditions, exclusions, endorsements or limitations that were incorrect to make sure that the insurers correct any and all such errors so that all coverages, at least, reflected SMV's insurance directives, needs and expectations; and (h) assisting SMV in all aspects of the claim process to ensure that SMV maximizes all coverages available to pay for its losses and damages resulting from a claim. AJG and Smith also knew that SMV's needs, and expectations and used AJG's specialized wine manufacturer and producer risk management business experience and expertise to negotiate, underwrite, and secure property insurance coverage that adequately protect SMV's 850-acre covered property from losses, including losses due to a catastrophic event such as a wildfire.

188. SMV relied entirely on AJG and Smith for their insurance and risk-related expertise, including AJG's expertise in relation to the placement, negotiation and underwriting of property insurance coverage. SMV also exclusively relied on AJG and Smith to make sure that the policy binders and policies reflected the coverages that SMV authorized AJG and Smith to purchase on its behalf.

189. For the policy period that commenced July 1, 2020, SMV requested that AJG and Smith secure for it approximately the same $36.6 million blanket property program coverages that were in place for the past 15-to-25-year period. AJG and Smith agreed, and they submitted an application for open blanket property coverage on SMV's behalf that sought the same (if not better) material property coverages that SMV had in place for years.

190. Prior to binding the 20-21 property policy coverages, AJG and Smith failed to inform SMV of any material changes from the prior coverage other than the changes referenced above. AJG and Smith told SMV that it secured open blanket property program coverages for SMV's commercial vineyard property for the July 1, 2020-July 1, 2021, policy period that were

**Second Amended Complaint**

materially the same in all respects as (if not better than) those contained in the previous policies.

191.    On June 30, 2020, SMV asked AJG and Smith to confirm that it had secured $35,565,435 in open blanket commercial property coverage prior to authorizing AJG and Smith to bind the 20-21 property coverage.  Smith confirmed that she had secured that property coverage for SMV and, except for the above-referenced changes, AJG and Smith assured SMV that the commercial property coverage was at least the same in all other material respects to the Allianz 2019-20 blanket property coverages in force until 11:59 pm PT that night.

192.    On information and belief, AJG and Smith did not adequately inquire, review, or understand the commercial property coverages that the 20-21 Property Insurers offered to provide to SMV on, before or after June 30, 2020.  AJG and Smith had not requested or received information that would help them ensure that the 20-21 commercial property coverage was the same in all other material respects to the Allianz's open blanket property coverage.

193.    Relying on their respective statements that it would receive commercial property coverage that was the same in almost all material respects to that in force for its commercial vineyard property, SMV agreed to bind coverage for the 20-21 property policies and, on July 2, 2020, SMV signed its Statement of Values.  Had SMV known that AJG and Smith had not, in fact, acquired the property coverage that it authorized them to bind, SMV would not have agreed to bind the 20-21 property policy coverages.

194.    On or about July 15, 2020, the 20-21 Property Insurers sent policy binders to AJG, who forwarded them to SMV.  AJG and Smith never reviewed the purported policy terms, conditions, endorsements, exclusions, and limitations referenced in the binders.  Had AJG or Smith reviewed the binders, they would have seen that the 20-21 Property Insurers were not providing the same commercial property coverages to SMV that AJG and Smith told SMV that

53

they had secured.

195.    Nor did they tell SMV that they had not reviewed the policy binders to confirm that the property coverage bound accurately reflected the open blanket property coverage that SMV authorized AJG and Smith to secure.

196.    At all relevant times, AJG and Smith knew and acknowledged that they had a duty to ensure that the binders and the policies reflected the coverages that AJG requested SMV to bind.  AJG and Smith also knew that SMV relied on AJG and Smith to perform this critical evaluation and that SMV would reasonably assume unless they told it otherwise, that they performed their job, reviewed the binders and policies, and found that the policy binders and policies accurately reflected that SMV had received the open blanket property coverages.  SMV also reasonably assumed that AJG and Smith would, as part of their job, contact the 20-21 Property Insurers if any of the policy terms, conditions, endorsements, or exclusions were incorrect to have the Insurers make appropriate corrections.

197.    AJG and Smith unreasonably failed to review the binders, inform SMV of any errors, and contact the 20-21 Property Insurers or their agents to correct those errors before they issued the 20-21 Property Policies.  Despite acknowledging their duties to do so, no one at AJG, including Smith, reviewed the 20-21 Property Policies for accuracy or tried to have the 20-21 Property Insurers correct their terms, conditions, endorsements, limitations, or exclusions.

198.    The Insurer Defendants claim that the 20-21 Property Policies did not provide open blanket commercial property program coverage.  The Insurer Defendants contend that the 20-21 Property Policies limit coverage available to SMV for Fire-related damage to its alleged total value listed on SMV's Statement of Values.  The Insurer Defendants also claim that First Specialty's Covered Property definition does not cover SMV's trellises and irrigation systems or

many of the buildings and structures damaged by the Fire. As a result, the Insurer Defendants claim that the 20-21 Property Insurers have no obligation to pay SMV more than $7,659,534.86 for its Fire-related claims and they have refused to pay SMV $28 million for its Fire-related claims.

199. As its insurance expert, advisor, and broker, AJG owed SMV a duty to perform its work professionally and with the skill, prudence, and diligence that members of their profession commonly possess and exercise.

200. At all relevant times herein, AJG and Smith consciously and/or unreasonably failed to perform their duties as SMV's insurance expert, advisor and/or broker and account executive in several ways. First, AJG and Smith made no attempt to ensure that they obtained the open blanket property coverage that SMV requested and authorized it to obtain on its behalf.

201. Second, AJG and Smith failed to seek information about the coverages that they obtained before they informed SMV that they, in fact, had obtained the very coverage that SMV requested in all material respects except for four (4) disclosed changes (see 56).

202. Third, AJG and Smith failed to investigate the availability of open blanket property coverage for SMV. In fact, AJG and Smith failed to advise SMV that blanket coverage was unavailable or otherwise provide SMV with any notice that blanket coverage may be difficult to acquire.

203. Fourth, had AJG and Smith found that open blanket coverage was unavailable, they failed to advise SMV to: (i) significantly increase its badly outdated individual property values on SMV's Statement of Values to cover the full value of their buildings, structures and other covered property in the event of loss or damage; (ii) list separately more buildings or structures on its Statement of Values or request to endorse and broaden the First Specialty

Covered Property definition if necessary. Clearly, AJG and Smith recommending that SMV try to obtain these and/or other changes in the 20-21 Property Insurers proposed property policy coverages would have helped SMV to obtain both the coverages that it sought and that its lender required.

204. Fifth, AJG and Smith failed to (a) review the binders and policies provided; and (b) request that the 20-21 Property Insurers and their agents make appropriate and necessary corrections. Indeed, many of the 20-21 Property Policies' coverage terms, conditions, endorsements, limitations, and exclusions do not provide the same level of commercial property coverage that SMV had in its earlier property policies.

205. Finally, AJG and Smith failed to help SMV maximize any coverage available for its Fire-related claims. Instead, AJG and Smith abdicated this responsibility and ignored all of SMV's requests.

206. AJG's and Smith's above describe acts, errors and omissions constitute a breach of their duties to SMV, including but not limited to, their special duties pursuant to SMV's request, AJG and Smith's promises and representations and the parties' agreement.

207. As a direct and proximate result of AJG's negligent procurement of SMV's 20-21 commercial property coverages and the 20-21 Property Policies, the Insured Defendants have denied coverage and have not agreed to cover the full scope of SMV's losses resulting from the Fire. To the extent that the Insurer Defendants are not required to pay any more of SMV for its Fire-related claims, AJG and Smith are obligated to pay AMV for its Fire-related claims not covered as a result of their negligence. SMV's damages as a result of AJG's and Smith's negligence are likely between $6 million and $28 million depending, in part, on what the Insurer Defendants pay to SMV for its Fire-related claims.

Case: 22-10381   Doc# 250-8   Filed: 02/21/23   Entered: 02/21/23 22:37:19   Page 57 of 64

208. SMV is entitled to damages in an amount to be determined at trial, plus attorney's fees, costs and expenses.

## SEVENTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
### (<u>Against AJG and Smith</u>)

209. SMV incorporates by reference the preceding paragraphs as if fully set forth herein.

210. AJG and Smith made the above-referenced representations to SMV, including that they secured (a) an open blanket property program for SMV for the July 1, 2020-July 1, 2021 policy period that except for the disclosed changes (see, e.g., 56), had in all material respect to the same (if not better) policy coverages than those in Allianz's earlier property policies; and (b) the open blanket property policies and coverages were what SMV requested for that policy period. These representations, including factual misrepresentations about the policies, were false and untrue, and AJG and Smith knew or should have known that the representations were untrue when they were made.

211. Defendants AJG and Smith intended to induce SMV to rely on the representations to bind the 20-21 property coverages, and SMV reasonably relied on the representations to their detriment.

212. As a proximate result of AJG's and Smith's acts, errors, and omissions, SMV has incurred damages in an amount to be determined at trial but in no event less than $6 million, plus attorney's fees, costs, and expenses.

## EIGHTH CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY
### (<u>Against AJG and Smith</u>)

213. SMV incorporates by reference the preceding paragraphs as if fully set forth

herein.

214.  As set forth above, SMV entrusted AJG and Smith to act as its insurance expert and advisor because, among other things, AJG provided a myriad of specialized risk-management expertise and services to AJG that went well beyond merely acting as an insurance broker.  Among other things, AJG detailed its wine-related business risk management expertise and services in risk profiles sent to SMV that included (i) exposure summary; (ii) geographical coding exposures based on locations; (iii) values of its building, structures and property bases on values, construction, occupancy, fire protection, square footage, years built, and stories ranges; and (iv) various perils, catastrophic and otherwise, as they relate to SMV's property, based on AJG's analysis of the vineyard's operations and facilities in relation to risk, past events, climate, topography and the frequency of perils, including wildfires.  To the extent necessary, AJG applied this specialized wine-business risk management expertise and experience to SMV's insurance, including its property insurance.  In other words, AJG tailored SMV's policy values, limits, and premiums to its above-referenced specialized risk management profiles.

215.  SMV relied on AJG and Smith to apply this specialized wine-business risk management expertise and experience to the negotiation, underwriting, and placement of its property insurance for policy period that commenced on July 1, 2020, including to the negotiation, underwriting, and placement of the 20-21 Excess Property Policies.

216.  By virtue of the trust and confidence that SMV placed in them due to AJG's specialized wine-business risk management expertise and experience, and the considerable discretion that SMV afforded to them in relation to the negotiation, underwriting, and procurement of the relevant insurance policies as a result thereof (including but not limited to exclusively relying on their recommendations with respect to coverage), AJG and Smith owed

fiduciary duties to SMV.

217.    AJG and Smith breached their fiduciary duties to SMV in that they failed, among other things, to: (i) secure open blanket property coverage or to tailor SMV's property policy coverages and values, limits and premium based on AJG's risk management profile and analysis to the coverages offered; (ii) advise SMV that additional changes were necessary and advisable based on AJG's risk assessment and profile given the coverage offered (such as updating SMV's Statement of Values to reflect current market values); (iii) communicate about the availability of coverage, including what coverage was offered or declined, and the steps necessary to obtain the coverage that SMV needed, given AJG's risk assessment and profile; (iv) review the coverage offered, the binders, and policy terms (in addition to making false statements and misrepresentations in relation thereto); and (v) correct any inaccuracies regarding coverage, the binders, and policy terms.

218.    SMV has been damaged in an amount to be proven at trial as the result of such breaches of fiduciary duty.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Spring Mountain Vineyard, Inc. prays for the following relief

A.     Entering a declaration as to the appropriate construction and meaning of the 20-21 Excess Property Policies and the disputed terms, conditions, endorsements, exclusions and/or limitations. This includes a declaration of SMV's and the Insurer Defendants' respective rights and obligations under the 20-21 Excess Property Policies, including : (a) whether the 20-21 Property Policies (including the 20-21 Excess Property Policies provide open $35,565.435 aggregate commercial blanket property coverage for any of SMV's Fire-related Covered Property loss or damage; (b) the application of (i) the Insurer Defendants' purported respective limitation of liability endorsements (if any) to their respective obligations to pay some or all of the

remaining La Perla Historic Winery building and Alba Winery buildings #1-2 Fire-related loss or property damage and (ii) the First Specialty's Covered Property definition to the Insurer Defendants' respective obligations to cover and pay some or all of the Fire-related loss and damage to Chevalier Red Barn, the La Perla Red Barn, 3-La Perla Farmhouse structures and SMV's trellises and irrigation systems; and (c) all of the Miravalle Shop's loss or damages.

B.    Award SMV its actual and consequential damages sustained as a result of the Insurer Defendants' individual and collective breaches of the 20-21 Excess Property Policies as triggered in an amount to be established through proof.

C.    Award SMV its actual, consequential, and punitive damages sustained as a result of the Insurer Defendants' individual and collective breaches of the implied covenant of good faith and fair dealing (and, in particular, Mt. Hawley for its intentional and deceitful acts, errors, and omissions).

D.    Award SMV its actual and consequential damages sustained as a result of AJG and Smith's negligence.

E.    Award SMV its actual and consequential damages sustained as a result of AJG and Smith's negligent misrepresentations.

F.    Award SMV its actual and consequential damages sustained as a result of AJG and Smith's breaches of their fiduciary duties.

G.    Enter a judgment awarding SMV pre-judgment interest and post-judgment interest under applicable law.

H.    Enter a judgment awarding SMV its attorneys' fees, costs, expenses, and any other and further relief to which they may justly be entitled.

## **JURY DEMAND**

SMV hereby demands a trial by jury of all issues so triable that are raised herein, or

which may be raised in this action.

Dated: October 11, 2022

By: /s/ Jordan S. Stanzler
    Jordan S. Stanzler
    STANZLER LAW GROUP
    Jordan S. Stanzler Bar No.54620

Jstanzler@stanzlerlawgroup.com
390 Bridge Parkway, Suite 220
Redwood City, CA 9406

COHEN TAUBER SPIEVACK &
WAGNER, P.C.

Jay B. Spievack (*pro hac vice forthcoming*)
jspievack@ctswlaw.com
Jackson S. Davis (*pro hac vice forthcoming*)
Grace Guo (*pro hac vice forthcoming*)
420 Lexington Ave., Suite 2400
New York NY 10170-2499

*Counsel for Plaintiff Spring Mountain Vineyard, Inc.*

PROOF OF SERVICE

I am employed in Redwood City, County of San Mateo, State of California, I am over the age of 18 and not a party to the within action; my business address is 390 Bridge Parkway, Suite 220, Redwood City, California 94065.

On October 24. 2022 I caused to be served the foregoing document(s) described as follows:  SECOND AMENDED COMPLAINT on the interested party(ies) VIA EMAIL addressed as follows:

Jordon Harriman, Esq.
Jordon.Harriman@lewisbrisbois.com
Lewis Brisbois Bisgaard & Smith LLP
633 West 5th Street, Suite 4000
Los Angeles, CA 90071

Attorneys for Defendants Landmark American Insurance Company, Kinsale Insurance Company, Hallmark Specialty Insurance Company, Western World Insurance Company, AXIS Surplus Insurance Company

Michael Prough, Esq.
mdp@proughlaw.com
Dean Burnick, Esq.
dcb@proughlaw.com
Prough Law APC
1550 Parkside Drive, Suite 200
Walnut Creek, CA 94596

Attorneys for Mt. Hawley Insurance Company

Kristi Dean, Esq.
kdean@stonedeanlaw.com
Alisa Morgenthaler, Esq.
amorgenthaler@stonedeanlaw.com
Stone/Dean LLP
21052 Oxnard Street
Woodland Hills, CA 91367

Attorneys for Defendants Arthur Gallagher & Co. and Dina Smith

[   ]     BY MAIL:  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Fremont, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ X ]   BY EMAIL IN THE FORM OF PDF FILE

1

[  ]     BY FED EX [Marked priority next day am delivery]

I declare that I am employed in the office of the member of the bar of this Court at whose direction the service was made. Executed on October 24, 2022.

/s/Sharran Rodd
Sharran Rodd

2