| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Victor A. Sahn (CA Bar No. 97299)<br>  victor.sahn@gmlaw.com<br>Mark S. Horoupian (CA Bar No. 175373)<br>  mark.horoupian@gmlaw.com<br>Steven F. Werth (CA Bar No. 205434)<br>  steven.werth@gmlaw.com<br>Greenspoon Marder LLP<br>a Florida limited liability partnership<br>333 South Grand Ave., Suite 3400<br>Los Angeles, CA 90071<br>Telephone: 213.626.2311<br>Facsimile: 954.771.9264<br><br>☐ *Individual appearing without attorney*<br>☒ *Attorneys for Spring Mountain Vineyard Inc.* | |

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA – SANTA ROSA DIVISION**

| In re:<br><br>SPRING MOUNTAIN VINEYARD INC., a Delaware corporation,<br><br><br>Federal EIN: 36-3844911<br><br>                       Debtor(s) | CASE NO.: 1:22-bk-10381 CN<br>CHAPTER: 11 |
|---|---|
| | **NOTICE OF LODGMENT OF ORDER IN BANKRUPTCY CASE RE:** (title of motion[1]): Debtor's Notice Of Motion And Motion For Entry Of (I) An Order Approving Auction And Bid Procedures For The Sale Of Its Wine Vineyard Business Including Real Property, Rights Running With The Certain Real Property, Wine Inventory, Certain Vineyard Business Rights And Contract Rights And (II) Granting Related Relief; Declaration Kevin A. Krakora, Chief Restructuring Officer, In Support Of Motion |

PLEASE TAKE NOTE that the order titled **ORDER (I) AUTHORIZING AND APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS AND (II) GRANTING RELATED RELIEF** was lodged on *(date)* April 7, 2023 and is attached. This order relates to the motion which is docket number 204.

---

[1] Please abbreviate if title cannot fit into text field

# ATTACHMENT

VICTOR A. SAHN (CA Bar No. 97299)
victor.sahn@gmlaw.com
**GREENSPOON MARDER LLP**
333 South Grand Avenue, 34th Floor
Los Angeles, CA 90071
Ph: (213) 626 2311
Fax: (213) 629 4520
Attorneys for Spring Mountain
Vineyard, Inc.
Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SANTA ROSA DIVISION

| | |
|---|---|
| In re:<br><br>SPRING MOUNTAIN VINEYARD INC., a Delaware corporation,<br><br>Federal EIN: 36-3844911<br><br>Debtor. | **Case No. 1:22-bk-10381 CN**<br><br>**Chapter 11**<br><br>**Judge Charles Novack**<br><br>**ORDER (I) AUTHORIZING AND APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS AND (II) GRANTING RELATED RELIEF** |

A hearing (the "Hearing") on the motion (the "Sale Motion") [ECF No. 204],[1] filed by the above-captioned debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 bankruptcy case (the "Case"), was held before this Court on April 7, 2023, at 11:00 a.m. PDT; appearances were as noted on the record.

Upon consideration of the Sale Motion, pursuant to sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6003, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Bankruptcy Rules for Northern District of California (the "Local Rules"), requesting entry of an order (this "Order"): (a) approving the sale of the Acquired Assets free and clear of any Liens and all Excluded Liabilities (the "Sale") to MGG California, LLC or its assignees or designees (collectively, "Buyer") (b) granting certain related relief; all as more fully set forth in

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Sale Motion or the Asset Purchase Agreement attached hereto as Exhibit 1 (the "Purchase Agreement"), as applicable.

the Sale Motion; and upon the *Declaration of Perry DeLuca Regarding Sale of Debtor's Assets and Marketing Process Conducted by BNP Paribas Securities, Inc., Debtor's Investment Banker* [ECF No. 314] and the *Declaration of Peter S. Kaufman in Support of Finding that Buyer Has Purchased in Good Faith in Accordance with 11 U.S.C. 363(m)* [ECF No. 315]; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 1334 and the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges* (General Order 24, N.D. Cal. Feb. 22, 2016), and Rule 5011-1(a) of the Local Rules; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Sale Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having considered the arguments made at the Hearing; and this Court having found that the relief requested in the Sale Motion is in the best interests of the Debtor's estate, its creditors, and other parties in interest; and this Court having found that the Debtor's notice of the Sale Motion and opportunity for a hearing on the Sale Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Sale Motion and all related pleadings, any opposition thereto, and having heard the statements in support of the relief requested therein at the Hearing; and this Court having determined that the legal and factual bases set forth in the Sale Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, based on the entire record and the representations of the parties,

**THE COURT HEREBY FINDS AND DETERMINES THAT:**

A. **Findings of Fact and Conclusions of Law**. The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the Court's findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the Court's conclusions of law constitute findings of fact, they are adopted as such.

B. **Final Order**. This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, waives any stay and expressly directs entry of judgment as set forth herein.

### Notice of Sale and Auction

C. On March 6, 2023, this Court entered the *Order Granting Debtor's Notice of Motion and Motion for Entry of (I) An Order Approving Auction and Bid Procedures for the Sale of Its Wine Vineyard Business Including Real Property, Rights Running with the Certain Real Property, Wine Inventory, Certain Vineyard Business Rights and Contract Rights and (II) Granting Related Relief* [ECF No. 261] (the "Bidding Procedures Order"): (a) approving certain bidding procedures; (b) scheduling an auction (the "Auction"); (c) approving the form and manner of notice thereof; (d) scheduling dates and deadlines in connection with the sale of all, substantially all, or any combination of the assets owned by the Debtor; (e) approving the form and manner of notice thereof; and (f) granting the Debtor related relief.

D. Pursuant to the Bidding Procedures Order, on March 24, 2023, the Debtor conducted the Auction for the sale of substantially all of the Debtor's assets, at which four parties (including Buyer) bid. After the Auction concluded, the Debtor determined MGG California, LLC to be the Successful Bidder and MGG California, LLC's forty-two million dollar ($42,000,000.00) credit bid (the "Purchase Price") to be the Successful Bid (each as defined in the Bidding Procedures Order) on the terms set forth in the Purchase Agreement, the form of which is filed at ECF No. 305.

E. Actual written notice of the Sale Motion, and a reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein, has been afforded to all known interested entities and parties.

Case: 22-10381    Doc# 316    Filed: 04/07/23    Entered: 04/07/23 18:10:10    Page 5 of 113

F.      Actual written notice of the Auction, the Sale Hearing, the Sale of the Acquired Assets, and a reasonable opportunity to object or be heard with respect thereto, has been afforded to all known interested entities and parties.

G.      Notice of the Auction, the Sale Hearing, and the Sale was timely, proper, and reasonably calculated to provide all interested entities and parties with timely and proper notice of the Auction, the Sale, and the Sale Hearing.

H.      The disclosures made by the Debtor concerning the Sale Motion, the Purchase Agreement, the Auction, the Sale Hearing, and the Sale were good, complete, and adequate.

**Credit Bid**

I.      Pursuant to Paragraph A of the *Final Order (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364; (II) Extending the Term for Cash Collateral Usage Pursuant to Existing Cash Collateral Orders to April 15, 2023, and (III) Granting Related Relief* [ECF No. 224] (the "Final DIP Order"), the Debtor stipulated to the amount and priority of Buyer's claim in connection with the Debtor's prepetition loan facility, which amount of such claim is stipulated to be not less than $202,315,536.14.

J.      Pursuant to sale procedures approved by the Bidding Procedures Order, Buyer has the right to credit bid (a "Credit Bid") all or a portion of its secured claim for its collateral pursuant to section 363(k) or section 1129(b) of the Bankruptcy Code.

K.      The Purchase Agreement provides that the Purchase Price comprised entirely of a Credit Bid shall constitute consideration for the Acquired Assets, which Credit Bid was a valid and proper bid pursuant to section 363(k) of the Bankruptcy Code and the Bidding Procedures Order.

**Good Faith of Buyer**

L.      The Purchase Agreement was negotiated and proposed by the Debtor and Buyer without collusion, in good faith, and from arm's-length bargaining positions.

M.      Neither the Debtor nor Buyer has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code.  Buyer

4

has not acted in a collusive manner with any person in connection with any aspect of the Auction or the Sale and the Purchase Price was not controlled by any agreement among the bidders.

N.     Buyer is purchasing the Acquired Assets in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code with respect to the transactions authorized by this Order and any Related Order (as defined in the Purchase Agreement). Buyer has proceeded in good faith in all respects in connection with the Sale including, but not limited to: (i) agreeing to subject its bid to the competitive bidding process contemplated in the Bidding Procedures Order in good faith; (ii) complying with the provisions in the Bidding Procedures Order; and (iii) disclosing all payments to be made by Buyer in connection with the Sale. Buyer is therefore entitled to all of the protections afforded under section 363(m) of the Bankruptcy Code.

### Highest and Best Offer

O.     The Debtor conducted the sale process in accordance with, and has otherwise complied in all respects with, the Bidding Procedures Order. The sale process set forth in the Bidding Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to submit a qualified bid, participate in the Auction and to make a higher or otherwise better offer to purchase the Acquired Assets. The Auction was duly noticed and conducted in a non-collusive, fair, and good-faith manner, and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Acquired Assets. As a result of the Auction conducted by the Debtor and its advisors pursuant to the Bidding Procedures Order, substantial additional value was generated for the Debtor's estate and the Auction resulted in the highest or best value for the Acquired Assets for the Debtor and its estate, and any other available transaction would not have yielded as favorable an economic result for the Debtor's estate, creditors, and other parties in interest.

P.     The Purchase Agreement constitutes the highest and best offer for the Acquired Assets, and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative. The Debtor's determination that the Purchase Agreement constitutes

Case: 22-10381    Doc# 316    Filed: 04/07/23    Entered: 04/07/23 18:10:10    Page 7 of 113

the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtor's business judgment.

Q.     The Purchase Agreement represents a fair and reasonable offer to purchase the Acquired Assets under the circumstances of this Case.  No other entity or group of entities has offered to purchase the Acquired Assets for greater overall value to the Debtor's estate than Buyer.

R.     Approval of the Sale Motion and the Purchase Agreement and the consummation of the transactions contemplated thereby are in the best interests of the Debtor's chapter 11 estate, its creditors, and other parties in interest.

## Compelling Circumstances for an Immediate Sale

S.     Good and sufficient reasons for approval of the Purchase Agreement and the Sale have been articulated.  To maximize the value of the Acquired Assets and preserve the viability of the business to which the Acquired Assets relate, it is essential that the Sale of the Acquired Assets occur within the time constraints set forth in the Purchase Agreement.  Time is of the essence in consummating the Sale.

Based on the foregoing and the findings and conclusions stated orally in the record, and good cause appearing therefor,

**IT IS HEREBY ORDERED** THAT:

## General Provisions

1.     The Sale Motion is GRANTED as set forth herein.

2.     All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled by announcement to the Court during the Hearing or by stipulation filed with the Court, including any and all reservations of rights included in such objections or otherwise, are hereby denied and overruled on the merits with prejudice for reasons stated at the Hearing, except as specifically set forth herein. Those parties who did not object or withdrew their objections to the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

6

3.      The relief requested in the Sale Motion and the transactions contemplated thereby are approved as set forth in this Order and on the record of the Hearing, which is incorporated herein as if set forth fully in this Order, and the Sale contemplated thereby is approved.

4.      This Order may be vacated on request of the Debtor with the written consent of Buyer and shall be vacated if the "Release Price" pursuant to that certain *Binding Settlement Agreement*, dated as of April 6, 2023, is paid to Buyer on or before June 28, 2023.

## Authority to Enter Into the Purchase Agreement

5.      The Sale of the Acquired Assets to Buyer is approved as the highest and best offer.

6.      Buyer's Credit Bid of $42,000,000.00 pursuant to section 363(k) of the Bankruptcy Code is approved, and the Debtor is authorized to sell the Acquired Assets to Buyer for the purchase price of $42,000,000.00, and in accordance with the terms and conditions that are set forth in the Purchase Agreement.

7.      The Closing Date shall occur not earlier than July 1, 2023 and not later than July 7, 2023.

8.      Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtor is authorized, empowered, and directed to use its reasonable best efforts to take any and all actions necessary or appropriate to (a) consummate the Sale of the Acquired Assets pursuant to and in accordance with the terms and conditions of the Purchase Agreement and the Ancillary Documents, (b) close the Sale of the Acquired Assets as contemplated in the Purchase Agreement and this Order, and (c) execute and deliver, perform under, consummate, implement, and fully close the Purchase Agreement and the Ancillary Documents together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement, the Ancillary Documents, and the Sale of the Acquired Assets. Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Purchase Agreement, the Ancillary Agreement, or any other Sale related document. The automatic stay imposed by section 362 of the Bankruptcy

Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order.

9.     This Order shall be binding in all respects upon the Debtor, its estate, all creditors of, and holders of equity interests in, the Debtor, any holders of Liens, Claims, or other interests (whether known or unknown) in, against or on all or any portion of the Acquired Assets, Buyer and all successors and assigns of Buyer, the Acquired Assets and any trustees, if any, subsequently appointed in the Case or upon a conversion to chapter 7 under the Bankruptcy Code of the Case. This Order, the Purchase Agreement, and the Ancillary Documents shall inure to the benefit of the Debtor, its estate and creditors, Buyer, and the respective successors and assigns of each of the foregoing.

## Transfer of the Acquired Assets

10.     Pursuant to sections 105(a), 363(b), and 363(f) of the Bankruptcy Code, the Debtor, acting by and through its existing agents, representatives, and officers, is authorized and directed to use reasonable best efforts to transfer the Acquired Assets to Buyer on the Closing Date, and such transfer shall constitute a legal, valid, binding, and effective transfer of the Acquired Assets and shall vest Buyer with title to the Acquired Assets and, upon the Debtor's receipt of the Purchase Price, other than Assumed Liabilities (as defined in the Purchase Agreement and as described in this Order), shall be free and clear of all Liens, Claims, and other interests of any kind or nature whatsoever, except for the Permitted Liens. Upon the Closing, Buyer shall take title to and possession of the Acquired Assets subject only to the Assumed Liabilities and Permitted Liens.

11.     On Closing Date, the Debtor shall pay all outstanding taxes due to the Napa County Treasurer – Tax Collector as of the Closing Date.

12.     All persons and entities that are in possession of some or all of the Acquired Assets on the Closing Date are directed to surrender possession of such Acquired Assets to Buyer or its assignee at the Closing. On the Closing Date, each of the Debtor's creditors is authorized and shall use commercially reasonable efforts to execute such documents and take all other actions as maybe

Case: 22-10381     Doc# 316     Filed: 04/07/23     Entered: 04/07/23 18:10:10     Page 10 of 113

reasonably necessary to release its Liens, Claims, or other interests in the Acquired Assets, if any, as such Liens, Claims or interests may have been recorded or may otherwise exist.

13. The Debtor is hereby authorized and directed to use reasonable best efforts to take any and all actions necessary to consummate the Purchase Agreement and the Ancillary Documents, including any actions that otherwise would require further approval by shareholders, members, or its board of directors, as the case may be, without the need of obtaining such approvals.

14. The transfer of the Acquired Assets to Buyer pursuant to the Purchase Agreement and the Ancillary Documents does not require any consents other than as specifically provided for in the Purchase Agreement. On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Debtor's interests in the Acquired Assets. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement and the Ancillary Documents.

15. A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder of any state, county, or local authority to act to cancel any of the Liens, Claims, and other interests of record except those assumed as Assumed Liabilities and Permitted Liens.

16. If any person or entity which has filed statements or other documents or agreements evidencing Claims or Liens on, or interests in, all or any portion of the Acquired Assets (other than statements or documents with respect to Assumed Liabilities or Permitted Liens) shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Claims, Liens, or interests which the person or entity has or may assert with respect to all or any portion of the Acquired Assets, the Debtor is hereby authorized and directed, and Buyer is hereby

authorized, on behalf of the Debtor and the Debtor's creditors, to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Acquired Assets; provided that the provisions of this Order authorizing the transfer of the Acquired Assets free and clear of all Liens, Claims, and interests (except only as to Assumed Liabilities, as defined in the Purchase Agreement and as described in this Order, or Permitted Liens) shall be self-executing, and the Debtor, Buyer, and creditors shall not be required to execute or file releases, termination statements, assignments, consents, or other instruments in order for the provisions of this Order to be effectuated, consummated and/or implemented.

17. On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Debtor's interests in the Acquired Assets and/or a bill of sale or assignment transferring good and marketable, indefeasible title and interest in the Acquired Assets to Buyer. This Order is and shall be effective as a determination that, on the Closing Date, all Liens, Claims, or other interests of any kind or nature whatsoever existing as to the Acquired Assets prior to the Closing Date, other than Assumed Liabilities and Permitted Liens, or as otherwise provided in this Order, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected; provided, that, for the avoidance of doubt and notwithstanding anything herein to the contrary, such Liens, Claims, and other interests shall attach to the proceeds of the Sale attributable to the Acquired Assets in which the holder thereof has or alleges any Lien, Claim, or other interest, in the same order of priority, with the same validity, force, and effect that such Lien, Claim, or other interest had prior to the Sale, subject to any claims and defenses the Debtor and its estate may possess with respect thereto.

18. This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract,

10

to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement and the Ancillary Documents.

19.     To the greatest extent available under applicable law, Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Debtor with respect to the Acquired Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to Buyer as of the Closing Date.

20.     To the extent permitted by section 525 of the Bankruptcy Code, no Governmental Entity may revoke or suspend any permit or license relating to the operation of the Acquired Assets sold, transferred, or conveyed to Buyer on account of the filing or pendency of the Case or the consummation of the transactions contemplated by the Purchase Agreement.

## No Successor Liability

21.     Except for the Permitted Liens and Assumed Liabilities, or as otherwise expressly provided for in this Order, Buyer shall not have any liability or other obligation of the Debtor arising under or related to any of the Acquired Assets.  Without limiting the generality of the foregoing, and except as otherwise specifically provided herein, Buyer shall not be liable for any Liens or Claims against the Debtor or any of their predecessors or Affiliates, and Buyer shall have no successor or vicarious liability of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, ERISA law, de facto merger, mere continuation, or substantial continuity, whether known or unknown, as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, Environmental Laws, and any taxes arising, accruing, or payable under, out of, in

Case: 22-10381    Doc# 316    Filed: 04/07/23    Entered: 04/07/23 18:10:10    Page 13 of 113

connection with, or in any way relating to the operation of any of the Acquired Assets prior to the Closing.

22. On the Closing Date, each creditor is authorized and shall use commercially reasonable efforts, and Buyer is hereby authorized, on behalf of each of the Debtor's creditors, to execute such documents and take all other actions as may be necessary to release Liens, Claims, and other interests in or on the Acquired Assets (except Assumed Liabilities or Permitted Liens), if any, as provided for herein, as such Liens, Claims, and other interests may have been recorded or may otherwise exist; provided, however, that, for the avoidance of doubt, any such release shall not release or otherwise affect the Liens, Claims, or other interests in the proceeds of the Sale attributable to the Acquired Assets in which the holder thereof has or alleges any Lien, Claim, or other interest which shall continue as provided for in paragraph 14 hereof.

## Other Provisions

23. For the avoidance of doubt, only those Liens, Claims, and other interests in or on the Acquired Assets being transferred to Buyer pursuant to the Purchase Agreement and the Ancillary Documents are being transferred free and clear pursuant to the terms of this Order, and any and all other assets of the Debtor that Buyer is not acquiring shall remain subject to all valid pre-existing Liens, Claims, interests, and other encumbrances. Any releases, terminations, termination statements, assignments, consents, or other instruments relating to Liens in or on the Acquired Assets shall properly be limited to the Acquired Assets being transferred to, and Assumed Liabilities and Permitted Liens being assumed by, Buyer.

24. Buyer has given substantial consideration under the Purchase Agreement for the benefit of the Debtor, its estate, and its creditors. The consideration provided by Buyer for the Acquired Assets under the Purchase Agreement is fair and reasonable and, accordingly, the Sale may not be avoided under section 363(n) of the Bankruptcy Code, or on any other basis.

25. The consideration provided by Buyer to the Debtor pursuant to the Purchase Agreement for the Acquired Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance

Case: 22-10381    Doc# 316    Filed: 04/07/23    Entered: 04/07/23 18:10:10    Page 14 of 113

Act, Uniform Law Commission's Uniform Voidable Transactions Act, and under any other laws of the United States, any state, territory, possession, or the District of Columbia.

26.     The transactions contemplated by the Purchase Agreement are undertaken by Buyer and the Debtor without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale of the Acquired Assets shall not affect the validity of the Sale of the Acquired Assets, unless such authorization and such Sale of the Acquired Assets are duly stayed pending such appeal. Buyer is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.  In the absence of a stay pending appeal, Buyer will be acting in good faith within the meaning of section 363(m) of the Bankruptcy Code in closing the transactions contemplated by the Purchase Agreement at any time after the entry of this Order.

27.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind (subject to paragraph 34 hereof) entered in (a) this Case, (b) any subsequent chapter 7 case into which any such chapter 11 case may be converted, or (c) any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions or the terms of this Order or the Purchase Agreement and the Ancillary Documents approved by this Order.

28.     For cause shown, pursuant to Bankruptcy Rules 6004(h) and 7062(g), this Order shall not be stayed, shall be effective immediately upon entry, and the Debtor and Buyer are authorized to close the Sale of the Acquired Assets immediately upon entry of this Order.

29.     All of the provisions of this Order are non-severable and mutually dependent.

30.     The Purchase Agreement, the Ancillary Documents, and any related agreements, documents or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of the Court; provided, however, that the Office of the United States Trustee receive a copy of any proposed modification(s) that have a material adverse effect on the economic return to the Debtor of the transactions contemplated by the Purchase Agreement or the proceeds of the Sale of the Acquired Assets at

least three (3) business days in advance of the proposed effective date of such modification(s), or as soon as reasonably practicable. During such three-day notice period, such parties may object to the proposed modification(s) of the Purchase Agreement, the Ancillary Documents, and any related agreements or instruments.

31. The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order, the Purchase Agreement, the Ancillary Documents, all amendments thereto and any waivers and consents thereunder, and each of the agreements executed in connection therewith to which the Debtor is a party or which has been assigned by the Debtor to Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale of the Acquired Assets, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets to Buyer, (b) interpret, implement, and enforce the provisions of this Order; and (c) protect Buyer against any Liens, Claims, or other interest in or against the Debtor or the Acquired Assets of any kind or nature whatsoever, other than the Assumed Liabilities and Permitted Liens.

32. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

33. Nothing in this Order or the Purchase Agreement (a) releases, nullifies, or enjoins the enforcement of any liability to a Governmental Entity under police and regulatory statutes or regulations or (b) authorizes the transfer or assignment to Buyer of any license, permit, registration, authorization, or approval of or with respect to a Governmental Entity without Buyer's complying with all applicable legal requirements under non-bankruptcy law governing such transfers or assignments.

34. Nothing in this Order shall override, impair, alter, modify, amend, or waive any term, condition, or other provision of the Final DIP Order and related orders entered at ECF Nos. 48, 76, 92, 120, and 209, the DIP Note, the DIP Loan Documents (each as defined in the Final DIP Order), the terms of which, in each case, shall remain in full force and effect from and after the entry of this Order.

14

35.     Subject to the terms of the Final DIP Order, between entry of this Order and the Closing Date, the Debtor shall operate in the ordinary course of business, in consultation with the Buyer.  Following the Closing Date, pursuant to that certain License Transfer and Transition Services Agreement by and among Buyer, SMV, and DNAW SPV CA Vineyard LLC, the Buyer shall operate the Business and the Debtor will assist the Buyer for some period, as necessary, in performing all services, including, but not limited to, winemaking, tasting room operation, storage, wholesale, and wine club.

36.     To the extent that this Order is inconsistent with any prior agreement, order, or pleading with respect to the Sale Motion in this Case, the terms of this Order shall govern.

37.     Buyer shall be deemed a party in interest and shall have standing to appear and be heard on all issues related to or otherwise connected with this Order, any Related Order, the Sale, or the Purchase Agreement and Ancillary Documents.

38.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

* * END OF ORDER * *

15

**Exhibit 1**

**ASSET PURCHASE AGREEMENT**

by and between

**MGG CALIFORNIA, LLC,**

AS BUYER,

and

**SPRING MOUNTAIN VINEYARD INC.,**

AS SELLER,

**Dated as of April [•], 2023**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS; INTERPRETATION ....................................................... 1

    1.01    Definitions ........................................................................................ 1

    1.02    Other Definitional Provisions .......................................................... 12

ARTICLE II PURCHASE AND SALE ..................................................................... 13

    2.01    Acquired Assets ............................................................................... 13

    2.02    Excluded Assets ............................................................................... 15

    2.03    Assumed Liabilities ......................................................................... 16

    2.04    Excluded Liabilities ......................................................................... 16

    2.05    Assumption/Assignment of Contracts and Rights ........................... 17

    2.06    [Reserved]. ....................................................................................... 18

    2.07    Purchase Price .................................................................................. 18

    2.08    The Closing ...................................................................................... 18

    2.09    Closing Deliverables ....................................................................... 18

ARTICLE III REPRESENTATIONS AND WARRANTIES REGARDING SELLER ............. 19

    3.01    Organization and Corporate Power .................................................. 19

    3.02    Authorization; Valid and Binding Agreement; No Breach ............... 20

    3.03    Financial Statements ........................................................................ 20

    3.04    Absence of Certain Developments ................................................... 21

    3.05    Real Property .................................................................................... 21

    3.06    Tax Matters ...................................................................................... 22

    3.07    Material Contracts ........................................................................... 22

    3.08    Intellectual Property ........................................................................ 24

    3.09    Litigation ......................................................................................... 25

    3.10    Employee Benefit Plans ................................................................... 25

    3.11    Insurance ......................................................................................... 27

    3.12    Compliance with Laws .................................................................... 27

    3.13    Environmental Compliance and Conditions ..................................... 28

    3.14    Affiliated Transactions .................................................................... 29

Case: 22-10381    Doc# 316    Filed: 04/07/23    Entered: 04/07/23 18:10:10    Page 20 of 113

| | | |
|---|---|---|
| 3.15 | Employment and Labor Matters | 29 |
| 3.16 | Brokerage | 30 |
| 3.17 | Suppliers | 30 |
| 3.18 | Quality and Safety of Food & Beverage Products | 30 |
| 3.19 | Title to Assets; Sufficiency of Acquired Assets | 31 |
| 3.20 | No Other Representations and Warranties | 31 |

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER .................................. 31

| | | |
|---|---|---|
| 4.01 | Organization and Power | 31 |
| 4.02 | Authorization; Valid and Binding Agreement | 31 |
| 4.03 | No Breach | 32 |
| 4.04 | Consents | 32 |
| 4.05 | Litigation | 32 |
| 4.06 | Brokerage | 32 |
| 4.07 | [Reserved]. | 32 |
| 4.08 | [Reserved] | 33 |
| 4.09 | Investigation | 33 |

ARTICLE V CERTAIN PRE-CLOSING COVENANTS ........................................ 33

| | | |
|---|---|---|
| 5.01 | Conduct of the Business | 33 |
| 5.02 | Cooperation | 35 |
| 5.03 | Consents; Notices | 35 |
| 5.04 | Access to Information | 36 |
| 5.05 | Contact with Customers, Suppliers and Other Business Relations | 37 |
| 5.06 | Bankruptcy Court Matters | 37 |
| 5.07 | Bulk Sales | 38 |
| 5.08 | Replacement Deposits | 38 |

ARTICLE VI ADDITIONAL COVENANTS ........................................ 39

| | | |
|---|---|---|
| 6.01 | Access to Books and Records | 39 |
| 6.02 | Employee Matters | 39 |
| 6.03 | Further Assurances | 41 |
| 6.04 | Confidentiality Agreements; Post-Closing Confidentiality | 41 |

Case: 22-10381    Doc# 316    Filed: 04/07/23    Entered: 04/07/23 18:10:10    Page 21 of
113

ARTICLE VII CONDITIONS TO CLOSING .................................................................. 42

    7.01    Conditions to All Parties' Obligations ................................................. 42

    7.02    Conditions to Buyer's Obligations ...................................................... 42

    7.03    Conditions to Seller's Obligations ...................................................... 43

    7.04    Waiver of Conditions ........................................................................... 43

    7.05    Frustration of Closing Conditions ....................................................... 43

ARTICLE VIII TERMINATION ................................................................................... 44

    8.01    Termination ........................................................................................... 44

    8.02    Effect of Termination ........................................................................... 45

ARTICLE IX TAX MATTERS ..................................................................................... 45

    9.01    Books and Records; Cooperation ......................................................... 45

    9.02    Transfer Taxes ...................................................................................... 46

    9.03    Straddle Period Allocation ................................................................... 46

    9.04    Purchase Price Allocation .................................................................... 46

ARTICLE X MISCELLANEOUS ................................................................................. 47

    10.01    Survival ............................................................................................... 47

    10.02    Press Releases and Communications .................................................. 47

    10.03    Expenses ............................................................................................. 47

    10.04    Notices ................................................................................................ 47

    10.05    Assignment ......................................................................................... 48

    10.06    Severability ......................................................................................... 48

    10.07    No Strict Construction ........................................................................ 49

    10.08    Amendment and Waiver ..................................................................... 49

    10.09    Complete Agreement .......................................................................... 49

    10.10    Counterparts ....................................................................................... 50

    10.11    Governing Law ................................................................................... 50

    10.12    CONSENT TO JURISDICTION AND SERVICE OF PROCESS ..... 50

    10.13    WAIVER OF JURY TRIAL ............................................................... 51

    10.14    No Third Party Beneficiaries ............................................................. 52

    10.15    Representation of Seller and its Affiliates ......................................... 52

Case: 22-10381   Doc# 316   Filed: 04/07/23   Entered: 04/07/23 18:10:10   Page 22 of
113

10.16  No Additional Representations; Disclaimer; Non-Recourse ................................ 53

10.17  Conflict Between Transaction Documents ........................................................ 54

10.18  Specific Performance; Other Remedies ........................................................... 54

10.19  Electronic Delivery ......................................................................................... 54

10.20  Buyer Deliveries ............................................................................................. 55

Case: 22-10381   Doc# 316   Filed: 04/07/23   Entered: 04/07/23 18:10:10   Page 23 of
113

Exhibits

Exhibit A    -    Form of Bill of Sale and Assignment and Assumption Agreement

Exhibit B    -    Form of Intellectual Property Assignment and Assumption Agreement

Exhibit C    -    Form of Grant Deed

Case: 22-10381    Doc# 316    Filed: 04/07/23    Entered: 04/07/23 18:10:10    Page 24 of
113

<u>ASSET PURCHASE AGREEMENT</u>

This ASSET PURCHASE AGREEMENT (this "<u>Agreement</u>") is made as of April **[•]**, 2023, by and between MGG California, LLC, a California limited liability company ("<u>Buyer</u>" or "<u>MGG</u>"), and Spring Mountain Vineyard Inc., a Delaware corporation (the "<u>Company</u>" or "<u>Seller</u>").  Capitalized terms used and not otherwise defined herein have the meanings set forth in <u>Section 1.01</u> hereof.

WHEREAS, Seller is engaged in the business of owning and operating an approximately 845 acre vineyard in Napa County, California (the "<u>Business</u>");

WHEREAS, Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") on September 29, 2022 in the United States Bankruptcy Court for the Northern District of California (the "<u>Bankruptcy Court</u>");

WHEREAS, Seller desires to sell, transfer, convey, assign and deliver the Acquired Assets and to assign the Assumed Liabilities, and Buyer desires to purchase, accept and acquire such Acquired Assets and to assume such Assumed Liabilities, in each case upon the terms and subject to the conditions set forth herein and in accordance with, inter alia, Sections 105, 363 and 365 of the Bankruptcy Code;

WHEREAS, in connection with such transactions, Buyer shall credit bid on a dollar-for-dollar basis a portion of the outstanding MGG Secured Claims pursuant to Section 363 of the Bankruptcy Code;

WHEREAS, immediately following the execution and delivery of this Agreement, Buyer and Seller are entering into a Transition Services Agreement, dated as of the date hereof (the "<u>Transition Services Agreement</u>"), pursuant to which Seller will provide or cause to be provided certain transition services to Buyer as specified therein;

WHEREAS, the consummation of the transactions contemplated by this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court, under, *inter alia*, Sections 363 and 365 of the Bankruptcy Code; and

WHEREAS, the parties desire to consummate the proposed transaction no earlier than July 1, 2023 and no later than July 7, 2023, following the Bankruptcy Court's entry of the Sale Order.

NOW, THEREFORE, in consideration of the mutual covenants, representations, warranties, conditions and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I

<u>DEFINITIONS; INTERPRETATION</u>

1.01    <u>Definitions</u>.  For purposes of this Agreement, the following terms, when used herein with initial capital letters, will have the respective meanings set forth below:

1

"Acquired Assets" has the meaning set forth in Section 2.01.

"Acquired Inventory" has the meaning set forth in Section 2.01(f).

"Acquired IP" has the meaning set forth in Section 2.01(c).

"Acquired Machinery" has the meaning set forth in Section 2.01(d).

"Acquired Permits" has the meaning set forth in Section 2.01(e).

"Acquired Real Property" has the meaning set forth in Section 2.01(a).

"Action" means any claim, action, hearing, arbitration, mediation, investigation, complaint, suit or other proceeding, at law or in equity, before or by any Governmental Body.

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, Contract or otherwise.

"Agreement" has the meaning set forth in the preamble to this Agreement.

"Allocation" has the meaning set forth in Section 9.04.

"Ancillary Documents" means the Bidding Procedures Order, the Bill of Sale, the Assignment and Assumption Agreement, the Intellectual Property Assignment Agreement, the Transition Services Agreement, and each other agreement, certificate and instrument delivered pursuant to, or in connection with, the transactions contemplated by this Agreement.

"Assignment Order" has the meaning set forth in Section 5.06(a)(i).

"Assumed Contracts" has the meaning set forth in Section 2.01(g).

"Assumed Liabilities" has the meaning set forth in Section 2.03.

"Auction" has the meaning set forth in Section 5.06(a)(i).

"Bankruptcy Case" means the Chapter 11 case of Seller under the case, *In re Spring Mountain Vineyard, Inc.*, Case No. 22-10381, pending before the Bankruptcy Court.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Rules" has the meaning set forth in Section 5.06(b).

"Benefit Plan" means each management, employment, severance, retention, transaction bonus, change in control, consulting, relocation, repatriation or expatriation agreement and any salary, bonus, incentive, vacation, deferred compensation, incentive compensation, stock

2

purchase, stock option, restricted stock, equity or equity-based, severance pay, termination pay, death and disability benefits, hospitalization, medical, life or other insurance, flexible benefits, supplemental unemployment benefits, profit-sharing, pension or retirement plan, policy, program, agreement or arrangement and each other employee benefit plan or arrangement sponsored, maintained, contributed to or required to be contributed to by Seller for the benefit of any current or former employee of any Seller or of any other entity for or with respect to which Seller has any Liability or potential Liability, without regard to whether such Benefit Plan is subject to ERISA.

"Bidding Procedures Order" means the *Order Granting Debtor's Notice of Motion and Motion for Entry of (I) An Order Approving Auction and Bid Procedures for the Sale of its Wine Vineyard Business Including Real Property, Rights Running with the Certain Real Property, Wine Inventory, Certain Vineyard Business Rights and Contract Rights and (II) Granting Related Relief*, entered in the Bankruptcy Case on March 6, 2023, ECF No. 261.

"Business" has the meaning set forth in the Recitals.

"Business Benefit Plan" means any Benefit Plan that is not a Multiemployer Plan.

"Business Day" means any day other than a Saturday, Sunday or a day on which banks in New York, New York are not open for business.

"Buyer" has the meaning set forth in the preamble to this Agreement.

"Buyer Fundamental Representations" means the representations in Section 4.01 (Organization and Power), Section 4.02 (Authorization; Valid and Binding Agreement) and Section 4.06 (Brokerage).

"Buyer Related Parties" means, collectively, Buyer, its Affiliates, and their respective owners, advisors and Representatives.

"Cash" means, as of the Closing, the aggregate of all cash, all Cash Equivalents and all restricted cash (including all cash posted to support letters of credit, performance bonds or other similar obligations), in each case, determined in accordance with GAAP (to the extent not addressed in the definition hereof).  For the avoidance of doubt, Cash will be calculated net of issued but uncleared checks and drafts and will include checks, wire transfers in transit and drafts deposited or available for deposit for the account of Seller.

"Cash Equivalents" means cash, checks, money orders, funds in time and demand deposits or similar accounts, marketable securities, short-term investments, and other cash equivalents and liquid investments.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"Closing" has the meaning set forth in Section 2.08.

"Closing Date" has the meaning set forth in Section 2.08.

Case: 22-10381    Doc# 316    Filed: 04/07/23    Entered: 04/07/23 18:10:10    Page 27 of 113

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" has the meaning set forth in the preamble to this Agreement.

"Company Confidentiality Agreements" means those confidentiality agreements entered into prior to the Closing between Seller, on the one hand, and Persons expressing an interest in acquiring the Company or any assets thereof, on the other hand.

"Company Employee" means each individual employed by Seller and classified for payroll tax reporting purposes as employed by Seller, including employees who are on short-term disability, long-term disability, military leave, or any other approved leave of absence as of the Closing, and excludes any individual who has a Contract with Seller as an independent contractor.

"Confidential Information" means any proprietary or confidential information to the extent related to the Business, the Acquired Assets or the Assumed Liabilities, excluding any information that (a) is (as of the Closing Date) or becomes generally available to the public other than as a result of a breach of Section 6.04(c) or (b) becomes available to Seller, its Affiliates, or its or their respective directors and officers after the Closing Date on a non-confidential basis from a source other than Buyer or its Affiliates, provided that such source is not bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to Buyer or its Affiliates or any other Person with respect to such information.

"Consent" means any consent, approval, clearance, authorization, certification or permit of, filing with, or notification to, any Governmental Body.

"Contract" means any legally binding written or oral agreement, lease, license, contract, note, mortgage, indenture or other legally binding obligation.

"Credit Bid Amount" has the meaning set forth in Section 2.07.

"Cure Costs" means all amounts payable in order to cure any and all defaults required to be cured under Section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption by and assignment of the Assumed Contracts by Buyer.

"DIP Facility" means Seller's debtor-in-possession financing facility, entered into connection with the Bankruptcy Case, as the same may be amended, restated, supplemented or refinanced from time to time, including any orders approving or authorizing Seller's entry into and performance under such facility, the *Interim Order: (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364; (II) Extending the Term for Cash Collateral Usage Pursuant to Existing Cash Collateral Orders to April 15, 2023, and (III) Granting Related Relief* [ECF No. 209], the *Final Order: (I) Authorizing Secured Post-Petition Financing Pursuant to 11 U.S.C. § 364; (II) Extending the Term for Cash Collateral Usage Pursuant to Existing Cash Collateral Orders to April 15, 2023, and (III) Granting Related Relief* [ECF No. 224], and the *Debtor in Possession Secured Multi-Draw Term Promissory Note*, dated as of January 18, 2023.

"Disclosure Schedules" means the disclosure schedules delivered by Seller to Buyer concurrently with the execution and delivery of this Agreement.

"Documents" means all files, documents, instruments, papers, books, reports, records, databases, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer and supplier lists, databases and information, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), cost of pricing information, business plans, quality control records and procedures, blueprints, accounting, legal and tax files (including all related memoranda and analyses therein), all files, customer and supplier files and documents (including credit information), personnel files and employment records relating to employees (including applicable completed I-9 forms), supplier lists, records, literature and correspondence, including records relating to payroll, sales, expenses and the plans, specifications, passwords and combinations for the Facilities, together with other similar materials, in each case, to the extent related to the Business and used or held for use by Seller, whether or not in electronic form.

"Electronic Delivery" has the meaning set forth in Section 10.19.

"Environmental Laws" means all applicable laws and regulations, judicial or administrative orders and other legally enforceable requirements of a Governmental Body concerning worker health and safety (to the extent relating to exposure to hazardous or toxic materials), pollution or protection of the environment, including all those relating to the generation, handling, transportation, treatment, storage, disposal, distribution, labeling, discharge, release, threatened release, control, or cleanup of any Hazardous Substances, as such of the foregoing are promulgated and in effect on or prior to the Closing Date.

"Environmental Permits" means all Permits required under any applicable Environmental Law.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended and in effect from time to time.

"Events" has the meaning set forth in the definition of "Material Adverse Effect."

"Excluded Assets" has the meaning set forth in Section 2.02.

"Excluded Contract" has the meaning set forth in Section 5.08.

"Excluded Liabilities" has the meaning set forth in Section 2.04.

"Facilities" means the Vineyard, offices and storage facilities of Seller.

"Final Order" means an order or judgment of the Bankruptcy Court (a) which is not the subject of a pending appeal, petition for certiorari, or other proceeding for review, rehearing or reargument, (b) which has not been reversed, stayed, modified or amended and (c) respecting which the time to appeal from or petition for certiorari or to seek review, rehearing or reargument of such order shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules and other applicable law, and there shall not be in effect any preliminary or permanent injunction, stay or order or decree or ruling by any

5

Governmental Body preventing consummation of the transactions contemplated by this Agreement.

"Financial Statements" has the meaning set forth in Section 3.03.

"Furnishings and Equipment" means all furniture, fixtures, trade fixtures, shelving, and refrigeration equipment and other appliances owned by Seller, in each case other than Machinery.

"GAAP" means United States generally accepted accounting principles as in effect on the date hereof, applied in a manner consistent with Seller's past practice.

"Governmental Body" means any federal, state, local, municipal, foreign or other government or quasi-governmental authority or any department, agency, commission, board, subdivision, bureau, agency, instrumentality, court or other tribunal of any of the foregoing.

"Hazardous Substance" means petroleum or any hazardous substance or waste as defined in CERCLA.

"Indebtedness" means the principal amount, plus any related accrued and unpaid interest, fees and prepayment or other premiums or penalties, of all indebtedness for borrowed money of Seller owed under a credit facility or evidenced by any note, debenture or other debt security. Notwithstanding the foregoing, Indebtedness does not include (a) any operating or lease obligations (other than capital leases) or (b) any letters of credit, performance bonds, bankers' acceptances or similar obligations.

"Initially Non-Assumed Contract" has the meaning set forth in Section 2.05(b).

"Intellectual Property" means (a) all United States and foreign patents and patent applications; (b) all United States and foreign trade names, trade dress, trademarks, service marks, or internet domain names, including all goodwill associated therewith, together with all registrations and applications relating thereto; (c) all United States and foreign copyrights, original works of authorship (including rights in Software), together with all registrations and applications relating thereto; (d) all proprietary databases and data; (e) all industrial designs and any registrations and applications therefor throughout the world; (f) all inventions, invention disclosures, improvements, mask works, trade secrets, manufacturing, test and qualification processes, designs, know how, proprietary information, technical data, customer and vendor lists, and proprietary confidential information; and (g) any and all similar or equivalent rights to any of the foregoing anywhere in the world.

"Inventory" means all inventory of goods, merchandise, Supplies, beverages, and other products (including, to the extent transferable to Buyer pursuant to the transactions contemplated hereby and under applicable law, alcohol and other alcoholic beverages) wherever located, including inventory on order for or in transit to or from Seller, in each case, that is, or is intended to be, offered for sale to customers and owned by Seller.

"IT Systems" has the meaning set forth in Section 3.08(e).

Case: 22-10381    Doc# 316    Filed: 04/07/23    Entered: 04/07/23 18:10:10    Page 30 of 113

"Knowledge" and any derivation thereof means (a) with respect to the knowledge of Seller, the actual knowledge, after reasonable inquiry, of Constantine Yannias (President and Chairman of the Company), and (b) with respect to the knowledge of Buyer, the actual knowledge, after reasonable inquiry, of Patrick Flynn.

"Latest Balance Sheet" has the meaning set forth in Section 3.03(a).

"Liability" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated and whether due or to become due) regardless of when arising.

"Liens" means any lien (statutory or otherwise), mortgage, security interest, pledge, deposit or other encumbrance.

"Liquor License Approvals" has the meaning set forth in Section 5.03(c).

"Liquor Licenses" means all alcoholic beverage licenses, permits or approvals held by Seller.

"Machinery" means all production machinery, equipment, motor vehicles, goods, fixtures, and other supplies and spare and repair parts, tools, stores, and other tangible personal property, owned or leased and used or held for use in the conduct of the viticulture and enology business, as applicable, together with any rights, claims and interests arising out of maintenance or service contracts relating thereto or the breach of any express or implied warranty by the manufacturers of any such assets or component part thereof.

"Material Adverse Effect" means an event, change, effect, matter, occurrence or development (collectively, the "Events") that, individually or in the aggregate, would reasonably be expected to be, or is, materially adverse to the Business, the Acquired Assets and the Assumed Liabilities, taken as a whole, except any Event related to or resulting from (a) changes in the general business or economic conditions affecting the United States wine industry; (b) national or international political or social conditions or events, including the engagement by the United States in hostilities or the escalation thereof, whether or not pursuant to the declaration of a national emergency or war, or the occurrence or the escalation of any military or terrorist attack upon the United States, or any of its territories, possessions, or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States; (c) changes in any credit, debt, financial, banking or securities markets or in interest or exchange rates (including any disruption thereof and any decline in the price of any security or any market index); (d) changes in GAAP or accounting rules; (e) changes or proposed changes in laws, rules, regulations, orders or other binding directives issued by any Governmental Body; (f) the taking of any action requested by Buyer or which is contemplated by this Agreement or any Ancillary Document; (g) the identity of Buyer or its Affiliates or the announcement, pendency or completion of this Agreement, the Ancillary Documents or the transactions contemplated hereby or thereby or Buyer's disclosure of its plans or intentions with respect to the conduct of the Business after the Closing (including, in each case, the impact thereof on relationships, contractual or otherwise, with, or actual or potential loss or impairment of, customers, suppliers, vendors, partners, employees or Governmental

7

Bodies); (h) any filing or motion made under Sections 1113 or 1114 of the Bankruptcy Code; (i) any failure by Seller or the Business to meet any projections, forecasts or estimates of revenue or earnings (as distinguished from any Event that caused such failure); (j) any Event related to, or that is caused by any delay in consummating the Closing in accordance with <u>Section 2.08</u> as a result of (i) any violation or breach by Buyer of any covenant, agreement, representation or warranty contained in this Agreement which has prevented the satisfaction of any condition to the obligations of Seller at the Closing or (ii) Buyer's failure to consent to any actions with respect to which Seller makes a reasonable request for consent with respect to actions restricted by <u>Section 5.01(b)</u>; (k) any epidemic, pandemic, disease outbreak or public health crisis (including the COVID-19 virus); or (l) the Bankruptcy Case and reasonably anticipated Events thereof on the Business, the Acquired Assets or the Assumed Liabilities; <u>provided</u> that any of the matters described in clauses (a) through (e) or (k) shall be taken into account in determining whether there is (or would reasonably be expected to be) a Material Adverse Effect if, and to the extent, that there is a disproportionate adverse effect on the Business, the Acquired Assets or the Assumed Liabilities, compared to others operating in the United States wine industry.

"<u>Material Contract</u>" or "<u>Material Contracts</u>" has the meaning set forth in <u>Section 3.07(a)</u>.

"<u>MGG Secured Claims</u>" means the aggregate amount of (a) all obligations owing by Seller as of the Closing under the DIP Facility, including any unpaid principal, interest, fees, and costs, and (b) all obligations owing by Seller as of the Closing under the Pre-Petition Loan, including any unpaid principal, interest, fees, and costs.

"<u>Multiemployer Plan</u>" means any Benefit Plan that is a "multiemployer plan" within the meaning of Section 3(37) of ERISA.

"<u>OFAC</u>" means the office of Foreign Assets Control, an agency of the U.S. Treasury Department.

"<u>Organizational Documents</u>" means, with respect to any entity, (a) the certificate or articles of incorporation and by-laws, the certificate of formation and partnership agreement or operating agreement (as applicable), (b) any organizational documents comparable to those described in clause (a) as may be applicable to such entity pursuant to any applicable law and (c) with respect to clauses (a) and (b), any amendments thereto.

"<u>Owned Intellectual Property</u>" means any Intellectual Property owned by Seller and primarily held for use in the Business or the Acquired Assets.

"<u>Owned Real Property</u>" has the meaning set forth in <u>Section 3.05(c)</u>.

"<u>Permits</u>" means registrations, licenses, exemptions, authorizations and permits of any Governmental Body, including the Liquor Licenses.

"<u>Permitted Lien Costs</u>" has the meaning set forth in the definition of "Permitted Liens."

"<u>Permitted Liens</u>" means (a) (i) outstanding ad valorem real property tax liens and (ii) statutory Liens, in each case for current Taxes not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings by Seller, provided that

Case: 22-10381    Doc# 316    Filed: 04/07/23    Entered: 04/07/23 18:10:10    Page 32 of 113

adequate reserves with respect to Taxes which are being contested are maintained in accordance with GAAP, (b) mechanic's, carriers', workers', repairers', and similar statutory Liens arising or incurred in the ordinary course of business for amounts which are not delinquent, (c) public roads and highways, (d) matters which would be disclosed on an accurate survey of each parcel of real property, (e) Liens arising under worker's compensation, unemployment insurance, social security, retirement, and similar legislation, (f) purchase money Liens and Liens securing rental payments under capital lease arrangements, (g) other Liens arising in the ordinary course of business which are not material in amount and not incurred in connection with the borrowing of money, (h) Liens arising under the Perishable Agricultural Commodities Act (PACA), the Packers and Stockyards Act (PSA) or similar laws in connection with the purchase of agricultural or meat and dairy products in the ordinary course of business ("Agricultural Liens"), and (i) Liens that will be released, discharged or otherwise extinguished pursuant to the Sale Order, which in the case of clauses (a), (b), (e), (f) and (g) (the aggregate amount secured by liens described in such clauses, "Permitted Lien Costs") are not for amounts as to which payment and enforcement is stayed under the Bankruptcy Code or pursuant to orders of the Bankruptcy Court. For the avoidance of doubt, Agricultural Liens shall not count towards the amount of Permitted Lien Costs.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a Governmental Body.

"Personal Element" means a natural person's last name, telephone number, email address, mailing address or any other information, alone or in combination, that allows the identification of such natural person.

"Personal Information" means in, addition to any definition for any similar term provided by applicable Law (e.g., "personal data" or "personally identifiable information"), any information that identifies, could be used to identify, or is otherwise associated with an individual person, including, but not limited to, User Data.

"Petition Date" means September 29, 2022.

"Pre-Closing Tax Period" means (a) any taxable period ending on or before the Closing Date and (b) the portion of any Straddle Period beginning on the first day of such Straddle Period and ending at the close of business on the Closing Date.

"Pre-Petition Loan" means the pre-Petition Date financing facility provided to Seller under that certain Credit and Guaranty Agreement, dated as of October 11, 2018 (as amended, restated, supplemented or otherwise modified from time to time), together with any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, by among Seller, the lenders from time to time party thereto, and MGG, as collateral agent and administrative agent.

"Principles of Equity" has the meaning set forth in Section 3.02(a).

Case: 22-10381   Doc# 316   Filed: 04/07/23   Entered: 04/07/23 18:10:10   Page 33 of 113

"Privacy Laws" mean any and all applicable laws and legal requirements relating to the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security, disposal, destruction, disclosure or transfer (including cross-border) of Personal Information.

"Purchase Price" has the meaning set forth in Section 2.07.

"Registered Intellectual Property" has the meaning set forth in Section 3.08(a).

"Rehired Employee" has the meaning set forth in Section 6.02(a).

"Rehired Employees' Employment Date" has the meaning set forth in Section 6.02(c).

"Rejected Deposits" means all of Seller's security deposits, prepaid rent, prepaid expenses, lease deposits and other cash deposits with third parties (including landlords), in each case, except those paid pursuant to, or otherwise in connection with, any Assumed Contract.

"Related Order" means the Sale Order, the Assignment Order and any other order of the Bankruptcy Court necessary to consummate the transaction contemplated hereunder.

"Replaced Contract" has the meaning set forth in Section 5.08.

"Replacement Contract Notice" has the meaning set forth in Section 5.08.

"Replacement Contracts" has the meaning set forth in Section 5.08.

"Replacement Deposits" has the meaning set forth in Section 5.08.

"Representatives" of any Person means such Person's directors, managers, officers, employees, agents, attorneys, accountants, consultants, professional advisors or other representatives.

"Retained Documents" has the meaning set forth in Section 2.02(f).

"Sale Order" has the meaning set forth in Section 5.06(b).

"Sanctioned Person" means any Person that is the subject or target of sanctions or restrictions under any anti-corruption, anti-bribery, trade or economic sanction, anti-money laundering or similar law, including: (a) any individual or entity listed on any applicable U.S. or non-U.S. sanctions- or export-related restricted party list, including, OFAC's Specially Designated Nationals and Blocked Persons List; (b) any Person that is, in the aggregate, fifty percent (50%) or greater owned, directly or indirectly, or otherwise controlled by a Person or Persons described in clause (a); or (c) any national of a Sanctioned Country.

"Seller" has the meaning set forth in the preamble to this Agreement.

"Seller Fundamental Representations" means the representations in Section 3.01 (Organization and Corporate Power), Section 3.02 (Authorization; Valid and Binding Agreement;

No Breach), Section 3.16 (Brokerage), the first two sentences of Section 3.19 (Title to Assets; Sufficiency of Acquired Assets).

"Seller Related Parties" means, collectively, Seller, its Affiliates and its and their respective owners and Representatives and each of their respective successors and assigns.

"Software" means all computer software programs, together with any error corrections, updates, modifications, or enhancements thereto, in both machine-readable form and human readable form, including all firmware and all comments and any procedural code.

"Straddle Period" means any taxable period beginning before the Closing Date and ending after the Closing Date.

"Supplemental Assumption Motion" has the meaning set forth in Section 2.05(b).

"Supplemental Assumption Notice" has the meaning set forth in Section 2.05(b).

"Supplemental Assumption Period" has the meaning set forth in Section 2.05(b).

"Supplemental Contracts" has the meaning set forth in Section 2.05(b).

"Supplies" means cleaning supplies (including materials, solutions and waxes), small wares, office supplies, production supplies and any similar items at the Facilities.

"Tax" or "Taxes" means any federal, state, local or foreign income, gross receipts, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, stamp, excise, occupation, sales, use, transfer, value added, alternative minimum, estimated or other tax or imposition, including any interest, penalty or addition thereto.

"Tax Authority" means any domestic, foreign, federal, national, state, county or municipal or other local government, any subdivision, agency, commission or authority thereof, or any quasi-governmental body exercising any Tax authority or power with respect to Taxes.

"Tax Returns" means any return, report, information return or other document (including schedules or any related or supporting information) filed or required to be filed with any Tax Authority in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Termination Date" has the meaning set forth in Section 8.01.

"Transfer Taxes" has the meaning set forth in Section 9.02.

"Transition Services Agreement" has the meaning set forth in the Preamble to this Agreement.

"User Data" means, with respect to end users of any website of Seller or the Business and any related mobile applications of the Business: (a) all data related to impression and click-through activity of such end users, including user identification; (b) all data that contains or can be

11

associated with a Personal Element; and (c) all derivatives and aggregations of clauses (a) and (b) that contain a Personal Element.

"Vineyard" means the approximately 845 acres property located at 2805 Spring Mountain Road, St. Helena, California 94574, including all estate residences, two winery buildings, a tasting room, six wells, cisterns, historic barn, other buildings located therein, reservoir and winery caves.

"Wine Library" has the meaning set forth in Section 2.01(b).

1.02    Other Definitional Provisions.

(a)    Accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control.

(b)    Any reference to any particular Code section or any other law or regulation will be interpreted to include any revision of or successor to that section regardless of how it is numbered or classified.

(c)    All references in this Agreement to Exhibits, Disclosure Schedules, Articles, Sections, subsections and other subdivisions refer to the corresponding Exhibits, Disclosure Schedules, Articles, Sections, subsections and other subdivisions of or to this Agreement unless expressly provided otherwise. The table of contents and the titles appearing at the beginning of any Articles, Sections, subsections or other subdivisions of this Agreement the Exhibits are for convenience only, do not constitute any part of this Agreement or such Exhibit, and will be disregarded in construing the language hereof.

(d)    Exhibits and Disclosure Schedules to this Agreement are incorporated herein for all purposes.

(e)    The words "this Agreement," "herein," "hereby," "hereunder" and "hereof," and words of similar import, refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited. The words "this Article," "this Section" and "this subsection," and words of similar import, refer only to the Article, Section or subsection hereof in which such words occur.

(f)    All references to "$" and dollars will be deemed to refer to United States currency unless otherwise specifically provided.

(g)    Pronouns in masculine, feminine or neuter genders will be construed to state and include any other gender, and words, terms and titles (including terms defined herein) in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.

(h)    The word "threatened" means threatened in writing.

Case: 22-10381    Doc# 316    Filed: 04/07/23    Entered: 04/07/23 18:10:10    Page 36 of 113

(i)     All references to days or months will be deemed references to calendar days or months unless otherwise expressly specified.

(j)     The word "including" and words of similar import shall mean "including without limitation" (unless otherwise specified).

(k)     The phrase "date hereof" means the date of this Agreement without giving effect to any amendments, modifications or supplements hereto.

ARTICLE II

PURCHASE AND SALE

2.01    Acquired Assets. Upon the terms and subject to the conditions set forth in this Agreement, to the maximum extent permitted by Section 363 of the Bankruptcy Code, at the Closing, Seller shall sell, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept from Seller, on an "as is, where is" basis and without any representation or warranty (other than those representations and warranties set forth in this Agreement) on the part of Seller as to fitness, merchantability or otherwise, all right, title and interest of any kind or nature owned, licensed or leased by Seller, including goodwill and other intangibles of Seller, as of the Closing Date in and to all assets, properties and rights used or held for use by, for or on behalf of, Seller in the operation of the Business, including the assets, properties and rights set forth below (the "Acquired Assets"), free and clear of all claims (as defined in Section 101 of the Bankruptcy Code) and other Liens (other than Permitted Liens and the Assumed Liabilities) to the maximum extent permitted by Section 363(f) of the Bankruptcy Code:

(a)     all real property set forth in Schedule 2.01(a), collectively with all Furnishings and Equipment located therein or thereon (collectively, the "Acquired Real Property");

(b)     all Inventory of bottled and cased wine set forth in Schedule 2.01(b) (the "Wine Library");

(c)     all Owned Intellectual Property set forth in Schedule 2.01(c) (the "Acquired IP");

(d)     all Machinery set forth in Schedule 2.01(d) (the "Acquired Machinery");

(e)     all Permits and Liquor Licenses of Seller set forth in Schedule 2.01(e) and assignable to Buyer under applicable law (and, for the avoidance of doubt, solely to the extent the applicable Governmental Body consents to or otherwise approves the assignment or transfer of the applicable Permit or Liquor License (the "Acquired Permits"); provided that Seller shall only transfer, assign, convey, and deliver to Buyer such Permits or Liquor Licenses, in each instance, upon issuance of such requisite Consent or approval or Liquor License Approval, as the case may be);

(f)     all Inventory, other than the Wine Library, set forth in Schedule 2.01(f) (including inventory held for Seller in suppliers' warehouses, that is, or is intended to be,

13

offered for sale to customers, but excluding alcoholic beverage inventories in jurisdictions where, and to the extent, applicable law does not permit Buyer to take title to such inventories until it obtains the requisite Liquor License Approvals from the relevant Governmental Body (the "Acquired Inventory"); provided, however, Seller shall transfer, assign, convey and deliver to Buyer such alcoholic beverage inventories in each instance upon issuance of the relevant Liquor License Approval or other authorization from the relevant Governmental Body (whichever occurs first));

(g)     all rights under (i) each of the Contracts set forth in Schedule 2.01(g) under the heading "Assumed Contracts", other than those Contracts that expire or that are terminated prior to the Closing in accordance with their respective terms, together with (ii) all Contracts entered into or acquired by Seller in connection with the operation of the Business between the date hereof and the Closing (subject to compliance with Section 5.01), including, in each case, the right to possess or use the property that is the subject of the Assumed Contracts; provided that Seller shall not reject or terminate any Contract used or held exclusively in the operation of the Business without Buyer's written consent prior to the foregoing deadlines (such Contracts, the "Assumed Contracts");

(h)     causes of Action, lawsuits, judgments, claims and demands of any nature related to the Business (other than under this Agreement or any Ancillary Document), whether arising by way of counterclaim or otherwise, in each case, to the extent arising from the Owned Intellectual Property, Assumed Contracts or otherwise related to the Acquired Assets or the Assumed Liabilities, including any claims arising under Chapter 5 of the Bankruptcy Code;

(i)     all customer data and information derived from branded loyalty promotion and other similar information related to customer purchases;

(j)     all existing and present insurance policies relating to any Acquired Asset to the extent assignable;

(k)     any Replacement Deposits, calculated in accordance with Section 5.08;

(l)     to the extent assignable or transferable, all warranties related to any of the foregoing;

(m)     all Documents (other than the Retained Documents) relating to the foregoing;

(n)     any Tax refund, rebate, abatement, reimbursement, deposit, prepayment, credit, attribute, or other Tax asset of or with respect to Seller pertaining to Taxes paid or payable by Seller using proceeds from the DIP Facility; and

(o)     all other properties, assets and rights, including those set forth in Schedule 2.01(o), owned by Seller as of the Closing Date, or in which Seller has an interest, which are not otherwise Excluded Assets.

14

2.02    Excluded Assets.  Notwithstanding any other provision of this Agreement to the contrary, the Acquired Assets shall not include the following assets, properties or rights (the "Excluded Assets"):

(a)    all real property, collectively with all Furnishings and Equipment located therein or thereon, that is not Acquired Real Property;

(b)    all Owned Intellectual Property that is not Acquired IP;

(c)    all Machinery that is not Acquired Machinery;

(d)    all Permits and Liquor Licenses of Seller that are not Acquired Permits;

(e)    all Inventory that is not Acquired Inventory;

(f)    all books and records that Seller is required by law to retain or that Seller determines are necessary or advisable to retain, including all: (i) Organizational Documents, qualifications to conduct business as a foreign corporation, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates, and other similar documents relating to Seller's organization, maintenance and existence; and (ii) books and records related to any claims, obligations or Liabilities which are Excluded Liabilities (collectively, the "Retained Documents"); provided that Buyer shall have the right to make copies of any portion of the Retained Documents and records related to the Business, the Acquired Assets or the Assumed Liabilities;

(g)    except as set forth in Section 2.01(n), any Tax refund, rebate, abatement, reimbursement, deposit, prepayment, credit, attribute, or other Tax asset of or with respect to Seller pertaining to Taxes paid or payable by Seller;

(h)    all capital stock or equity securities held by Seller;

(i)    all of Seller's rights under this Agreement or any Ancillary Document;

(j)    all of Seller's rights under any Contracts related to any Excluded Asset, unless such Contract is an Assumed Contract;

(k)    all Contracts other than the Assumed Contracts;

(l)    adequate assurance deposits posted in accordance with Section 366 of the Bankruptcy Code;

(m)    all bank accounts of Seller;

(n)    all Cash of Seller;

(o)    those items set forth on Schedule 2.02(o) under the heading "Excluded Assets;" and

15

(p)     the Rejected Deposits, as reduced by the amount of Replacement Deposits pursuant to Section 5.08.

As promptly as practicable following the Closing Date (and in any event within fifteen (15) Business Days), Seller shall remove at its expense all of the Excluded Assets that are located at the Facilities. Any Excluded Assets not timely removed by Seller may be disposed of by Buyer in its sole discretion, without Liability on the part of Buyer.

2.03     Assumed Liabilities.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer agrees to assume, pay, perform and discharge, promptly when payment or performance is due or required, the following (the "Assumed Liabilities"):

(a)     all Liabilities arising from the ownership, possession or use of the Acquired Assets from and after the Closing;

(b)     all Liabilities under the Assumed Contracts arising from and after the Closing Date (other than any Cure Costs or Permitted Lien Costs); and

(c)     all Taxes attributable to any breach of any covenant or the inaccuracy of any representation or warranty made by Buyer.

2.04     Excluded Liabilities.  Notwithstanding any other provision of this Agreement to the contrary, the Assumed Liabilities shall not include any of the following liabilities or obligations (the "Excluded Liabilities"):

(a)     any Liability not relating to or arising out of the Business or the Acquired Assets, including any Liability exclusively relating to or exclusively arising out of the Excluded Assets;

(b)     any Liability of Seller or its Affiliates for the unpaid Taxes of any Person under Treasury Regulation § 1.1502-6 (or any similar provision of state, local, or non-U.S. law), as a transferee or successor, by contract, or otherwise;

(c)     any Liability of Seller or its Affiliates for Taxes and any Taxes with respect to the Business or the Acquired Assets relating to the Pre-Closing Tax Period, including any Transfer Taxes and any Taxes arising from or relating to the consummation of the transactions contemplated by this Agreement;

(d)     all Indebtedness of Seller for borrowed money, all accounts payable, and any claims or rights of recovery against Seller that are not Assumed Liabilities;

(e)     all Liabilities with respect to current or former employees of Seller or any individuals claiming to be Company Employees, for any action or inaction of Seller or its Affiliates (or any predecessor of Seller or any such Affiliate);

(f)     any Liability, whether civil, criminal, or administrative in nature, relating to any Liquor License and the sale or service of alcoholic beverages thereunder, where the

16

circumstances upon which such Liability is predicated occurred prior to the Closing, unless expressly assumed by Buyer; and

(g)     all Liabilities of Seller under this Agreement or any Ancillary Document and the transactions contemplated hereby or thereby.

2.05     <u>Assumption/Assignment of Contracts and Rights</u>.

(a)     The Assumed Contracts shall be assigned by Seller and assumed by Buyer at the Closing pursuant to Section 365 of the Bankruptcy Code.  Seller shall have sole responsibility for paying any Cure Costs due in connection with the assumption and assignment of the Assumed Contracts.

(b)     In the event that there are Contracts to which Seller is a party not included as an Assumed Contract (each, an "<u>Initially Non-Assumed Contract</u>"), Buyer shall have the right to direct Seller in writing prior to the Closing not to reject any Initially Non-Assumed Contract specified in such writing for a period from Closing to not more than thirty (30) days after Closing (the "<u>Supplemental Assumption Period</u>").  During the Supplemental Assumption Period, Buyer may provide written notice (a "<u>Supplemental Assumption Notice</u>") to Seller that Buyer elects to add some or all of such Contracts to <u>Schedule 2.01(g)</u> of the Disclosure Schedules, and such Contracts (the "<u>Supplemental Contracts</u>") so added shall constitute Assumed Contracts.  Seller shall file a supplemental motion (a "<u>Supplemental Assumption Motion</u>") in the Bankruptcy Court to assume and assign such Supplemental Contracts to the extent not already covered in the Bidding Procedures Order.  Buyer shall (i) have sole responsibility to pay any Cure Cost in connection with the assumption and assignment of each Supplemental Contract, and (ii) pay to Seller all costs and expenses incurred by Seller in respect of such Supplemental Contract from the date Seller receives the Supplemental Assumption Notice to the date of the entry of a Final Order in connection with the applicable Supplemental Assumption Motion relating to such Supplemental Contract; provided, Buyer shall not pay any such costs and expenses in respect of any Supplemental Contract not included in the Contract List (as defined in <u>Schedule 2.01(d)</u> of the Disclosure Schedule).

(c)     Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Acquired Asset or any right thereunder if an attempted assignment, without the consent of a third party, would constitute a breach or in any way adversely affect the rights of Buyer or Seller thereunder, unless and until such time as all necessary consents for such assignment have been obtained or a Sale Order effects such assignments (and thereby eliminates the need for such consents). If the assignment of an Assumed Contract is not attainable pursuant to Section 105, 363 and/or 365 of the Bankruptcy Code, then (i) Seller, from and after the Closing and until the earlier to occur of (A) the date on which such applicable consent is obtained and (B) the date on which such Seller liquidates and ceases to exist, shall use reasonable best efforts to (x) provide Buyer the benefits under such Assumed Contract, (y) cooperate in any reasonable and lawful arrangement (including holding such Assumed Contract in trust for the Buyer designed to provide the benefits of such Assumed Contract set to the Buyer), and (z) enforce for the account of the Buyer any rights of Seller with respect to

Case: 22-10381     Doc# 316     Filed: 04/07/23     Entered: 04/07/23 18:10:10     Page 41 of 113

such Assumed Contract upon the direction of the Buyer, and (ii) such Assumed Contract shall not be transferred hereunder and the Closing shall proceed with respect to the remaining Assumed Contracts without any reduction in the Purchase Price.

2.06    [Reserved].

2.07    Purchase Price.  The total consideration to be paid by Buyer to Seller for the Acquired Assets (the "Purchase Price") is: (a) a credit bid, on a dollar-for-dollar basis, pursuant to Section 363(k) of the Bankruptcy Code, in an aggregate amount of Forty-Two Million Dollars ($42,000,000.00), of a portion of the MGG Secured Claims (the amount of such credit bid, which may be increased by Buyer, in the Buyer's sole discretion, at any time prior to the Closing, and such amount, *"Credit Bid Amount"*); and (b) the assumption by Buyer of the Assumed Liabilities. At the Closing, Buyer shall deliver to Seller a payoff letter, release letter or other similar document acknowledging the conversion of the Credit Bid Amount as consideration for the transfer of the Acquired Assets.

2.08    The Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") will take place at the offices of Proskauer Rose LLP or such other mutually agreeable location in Los Angeles, California, on the third Business Day following satisfaction of the conditions to the Closing set forth in Article VII (other than those conditions that by their nature are to be satisfied at the Closing) or such other date as Buyer and Seller may mutually agree; provided, however, that Closing shall occur no later than July 7, 2023, which date shall automatically be extended by thirty (30) day intervals by Buyer in its sole discretion.  The date of the Closing is herein referred to as the "Closing Date." The Closing will be deemed to occur at 12:01 A.M. Pacific time on the Closing Date.

2.09    Closing Deliverables.

(a)    At the Closing, Seller will deliver or cause to be delivered to Buyer the following:

(i)    a certificate of Seller executed by a duly authorized officer thereof, dated as of the Closing Date, stating that the conditions set forth in Section 7.02(a) and Section 7.02(b) have been satisfied;

(ii)    a duly completed Form W-9 executed by Seller (or if Seller is a disregarded entity for U.S. federal income tax purposes, a Form W-9 executed by the Person treated as its regarded owner for U.S. federal income purposes);

(iii)    a duly executed bill of sale and assignment and assumption agreement between Seller and Buyer substantially in the form of Exhibit A (the "Bill of Sale and Assignment and Assumption Agreement");

(iv)    duly executed assignment of the Owned Intellectual Property, substantially in the form of Exhibit B (the "IP Assignment and Assumption Agreement");

(v)     one or more duly executed and acknowledged grant deeds substantially in the form of Exhibit C (collectively, the "Grant Deed");

(vi)    a statement setting forth in reasonable detail the Permitted Lien Costs, which shall be delivered to Buyer one (1) Business Day prior to the Closing Date;

(vii)   such other documents reasonably requested by Buyer to effectuate the transactions contemplated in this Agreement; and

(viii)  a certified copy of the Sale Order entered by the Bankruptcy Court.

(b)     At the Closing, Buyer will deliver or cause to be delivered to Seller the following:

(i)     a payoff letter, release letter or other similar document acknowledging the conversion of the Credit Bid Amount as consideration for the transfer of the Acquired Assets;

(ii)    a certificate of Buyer executed by a duly authorized officer thereof, dated as of the Closing Date, stating that the conditions set forth in Section 7.03(a) and Section 7.03(b) have been satisfied;

(iii)   the Bill of Sale and Assignment and Assumption Agreement duly executed by Buyer; and

(iv)    the IP Assignment and Assumption Agreements duly executed by Buyer.

2.10    Withholding. Buyer, its Affiliates and Representatives, and any other applicable withholding agent shall be entitled to deduct and withhold from any payments made pursuant to this Agreement such amounts as Buyer is required to deduct and withhold with respect to the making of any such payment under any applicable law. To the extent that amounts are so withheld, and paid to the proper Governmental Body pursuant to any applicable law, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to such holder in respect of which such deduction and withholding was made.

ARTICLE III
REPRESENTATIONS AND WARRANTIES REGARDING SELLER

Except as set forth on the Disclosure Schedules, Seller represents and warrants to Buyer as of the date hereof and as of the Closing Date as follows:

3.01    Organization and Corporate Power. Seller is a legal entity duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and  has all requisite corporate power and authority and all authorizations, licenses, Permits, Liquor Licenses and other qualifications necessary to own and operate its properties and assets and to carry on the Business as now conducted (including all necessary Permits and Liquor Licenses for the production and sale

19

of alcohol), except where the failure to hold such authorizations, licenses or Permits would not have a Material Adverse Effect. Seller is qualified to do business in every jurisdiction in which its ownership, leasing or operation of property and assets or the conduct of its business as now conducted requires it to qualify, except where the failure to be so qualified would not have a Material Adverse Effect.

3.02    Authorization; Valid and Binding Agreement; No Breach.

(a)    Subject to the entry and effectiveness of the Bidding Procedures Order, the Sale Order and any Related Order, the execution, delivery and performance by Seller of this Agreement and each Ancillary Document to which Seller is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite action on the part of Seller. Assuming that this Agreement and each Ancillary Document to which Seller is party is a valid and binding obligation of Buyer, and subject to the entry and effectiveness of the Bidding Procedures Order, the Sale Order and any Related Order, this Agreement and each such Ancillary Document constitute a valid and binding obligation of Seller, enforceable in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other laws affecting creditors' rights generally from time to time in effect and to general equitable principles (collectively, "Principles of Equity").

(b)    Except as set forth on Schedule 3.02(b), and subject to the entry of the Sale Order and any Related Order, the execution, delivery and performance by Seller of this Agreement and each Ancillary Document to which Seller is a party and the consummation of the transactions contemplated hereby and thereby do not conflict with or result in any breach of, constitute a default under, result in a violation of, result in the creation of any Lien upon any assets of Seller, or require any authorization, Consent, approval, exemption or other action by or notice to any Governmental Body or other third party (in each case, except as would be excused by or unenforceable as a result of the entry or effectiveness of the Sale Order and any Related Order), under (i) Seller's Organizational Documents, or (ii) the provisions of any Contract to which Seller is bound, Permit or Liquor License, in either case, that relates to the Acquired Assets or the Business, or any law, statute, rule or regulation or order, judgment, injunction, or decree to which Seller is subject other than (A) the Liquor License Approvals and (B) any such authorizations, Consents, approvals, exemptions or other actions the failure of which to obtain would not reasonably be expected to prohibit or materially delay Seller's ability to consummate the transactions contemplated under this Agreement or to have any adverse effect on the Acquired Assets.

3.03    Financial Statements.

(a)    Schedule 3.03(a) consists of:  (i) the unaudited consolidated balance sheet of Seller as of December 31, 2022 (the "Latest Balance Sheet") and the related consolidated statement of operations of Seller for the 12-month period then ended, and (ii) the audited consolidated balance sheets and statements of operations and cash flows of Seller for the fiscal years ended December 31, 2021 and December 31, 2020 (all such financial statements referred to in clauses (i) and (ii), the "Financial Statements").  The Financial Statements present fairly, in all material respects, the consolidated financial position and

consolidated results of operations of Seller as of the times and for the periods referred to therein in accordance with GAAP, consistently applied (subject in the case of the unaudited financial statements to (A) the absence of footnote disclosures and (B) changes resulting from customary year-end adjustments in accordance with past practice).

(b)     All accounts receivable of Seller (i) represent monies due for goods sold and delivered or services rendered, in each case, in the ordinary course of business, (ii) are free and clear of all defenses and claims of any nature whatsoever other than claims for warranties and claims made in the ordinary course of business that are not material in the aggregate, are valid and enforceable claims, are subject to no set-off or counterclaim and are current and fully collectible in the ordinary course of business.  Neither the Seller nor the Business have any accounts receivable or loans receivable from any Person which is affiliated with such Seller or any of its directors, officers, members, managers, employees or equityholders.

(c)     All accounts payable and notes payable of the Seller arose in bona fide arm's length transactions in the ordinary course of business and no such account payable or note payable is delinquent in its payment.  Neither Seller nor the Business have any accounts payable or loans payable to any Person which is affiliated with Seller or any of its directors, officers, members, managers, employees or equityholders.

3.04    Absence of Certain Developments.  Since the date of the Latest Balance Sheet through the date hereof, except as contemplated herein or as set forth on Schedule 3.04(a), Seller has operated the Business in the ordinary course of business consistent with past practice.  Since the date of the Latest Balance Sheet, there has not occurred any event, condition, change or effect that has had, or would reasonably be expected to have a Material Adverse Effect.  Without limiting the generality of the preceding sentence, except as set forth in Schedule 3.04(b), since the date of the Latest Balance Sheet, other than the commencement of the Bankruptcy Case, the Seller nor the Business has not taken any action that would be prohibited from being freely taken by Section 5.01(b) if such action had been taken after the date of this Agreement.

3.05    Real Property.

(a)     Seller (i) owns good title to all of the personal property shown to be owned by Seller on the Latest Balance Sheet, and (ii) holds, pursuant to valid and enforceable leases, all of the personal property used in the operation of the Business that is owned by any other party, in each case, free and clear of all Liens (except for Permitted Liens), except for assets disposed of by Seller in the ordinary course of business consistent with past practice since the date of the Latest Balance Sheet.

(b)     [Reserved].

(c)     Schedule 3.05(c)(i) lists all of the real property together with the residential address of such property, which is owned by Seller (the "Owned Real Property"). Other than the Owned Real Property, Seller is not a party to any Contract, option or other right to purchase or acquire any real property. Other than as listed in Schedule 3.05(c)(ii), Seller is the sole and lawful owner of and has good and valid title to all of the Owned Real

Case: 22-10381    Doc# 316    Filed: 04/07/23    Entered: 04/07/23 18:10:10    Page 45 of 113

Property, free and clear of all Liens other than Permitted Liens. As of immediately prior to the Closing and subject to the entry of the Sale Order, Seller shall be the sole and lawful owner of, and have good title to, and the power to sell, assign or transfer to Buyer, all of the Owned Real Property.

3.06    Tax Matters.

(a)    All income and material federal, state, local and foreign Tax Returns required to be filed by Seller with respect to the Acquired Assets or the Assumed Liabilities have been timely filed when due (taking into account all valid extensions of due dates) and all such Tax Returns are true, correct and complete in all material respects.  All Taxes, whether or not shown to be due and payable on such Tax Returns, that are due and payable by Seller with respect to the Acquired Assets or the Assumed Liabilities have been timely paid in full by the due date thereof. Except as described on Schedule 3.06(a), no claim has ever been made in writing by any taxing authority in any jurisdiction with respect to which Seller does not file or has not filed Tax Returns that Seller is or may be subject to taxation by that jurisdiction.

(b)    In all material respects, Seller has (i) withheld and paid over to the appropriate Tax Authority all Taxes it is required to withhold from amounts paid or owing to any employee, independent contractor, creditor, or other third party under applicable laws, (ii) where applicable, retained all records or forms required to support or qualify the status as such of any Person referenced in the preceding clause, and (iii) retained any forms or other Documents supporting the exemption of any Person from Tax that Seller was otherwise required to collect, withhold or pay.

(c)    The Seller is not, nor has been, a United States real property holding corporation (as defined in Section 897(c)(2) of the Code) during the applicable period specified in Section 897(c)(1)(a) of the Code.

3.07    Material Contracts.

(a)    Except as set forth on Schedule 3.07(a), as of the date hereof, Seller is not party to any of the following (each, a "Material Contract" and, collectively, the "Material Contracts"):

(i)    any Contract that contains a non-competition covenant that prohibits Seller or any of its Affiliates from conducting the Business or owning the Acquired Assets in any geographic location, except for any such Contract that may be cancellable without any payment by Seller or any of its Affiliates, as applicable, on notice of sixty (60) or fewer days;

(ii)    any Contract with any collective bargaining organization, labor union or other employee representative group that covers any Company Employee (collectively, "Union Agreements");

22

(iii)  any Contract for the employment of any Company Employee (other than any seasonal employee);

(iv)  any guaranty of any obligation for Indebtedness;

(v)  any Contract, the primary purpose of which is to provide indemnification rights;

(vi)  any lease or agreement under which it is lessee of, or holds or operates any personal property primarily for use in connection with the Business and owned by any other party;

(vii)  any lease or agreement under which it is lessor of or permits any third party to hold or operate any property, real or personal, primarily held for use in connection with the Business;

(viii)  any Contract for the purchase by Seller of products or services in connection with the Business, under which the undelivered balance of such products and services has a selling price in excess of $10,000 (other than purchase orders entered into in the ordinary course of business);

(ix)  any Contract with any vendor for merchandise resold by Seller in connection with the Business which contains any minimum requirements, exclusivity, "most favored nation," or similar provisions;

(x)  any Contracts granting any Person a Lien (other than Permitted Liens) on all or any part of the assets of Seller or relating to the Business;

(xi)  any Contracts related to Intellectual Property, except for commercially available "off-the-shelf" Software licensed by the Seller on generally standard terms and conditions with a replacement cost or annual license and maintenance fee payable by the Seller of less than $5,000;

(xii)  any Contract with any Governmental Body; or

(xiii)  any Contract relating to any (A) pending acquisition or disposition of any business or Person by Seller, (B) completed acquisition or disposition of any business or Person (whether by purchase, merger, consolidation or otherwise) by Seller with material surviving obligations thereunder on the part of Seller or (C) joint venture, partnership, strategic alliance or other similar agreement, in each case, in connection with the Business.

(b)  Buyer has been given access to a true and correct copy of all Material Contracts, together with all material amendments, waivers or other changes thereto.

(c)  Except as set forth on Schedule 3.07(c), as of the date hereof (i) other than as a result of the Bankruptcy Case, Seller is not in material default under any Material Contract, (ii) to Seller's Knowledge, each other party to each of the Material Contracts is

23

not in material default thereunder, and (iii) to Seller's Knowledge, excluding the effect of the Bankruptcy Case, no Event has occurred that with the passage of time or giving of notice or both would constitute a material breach or material default by any party under any Material Contract, except, in the case of the foregoing clauses (i) and (iii), for any breach or default, individually or in the aggregate, (x) that would not reasonably be expected to be material to the Business, the Acquired Assets, or the Assumed Liabilities or (y) that has been cured or will be cured as a result of the payment of the applicable Cure Costs and entry and effectiveness of the Sale Order and any other Related Order.

3.08    Intellectual Property.

(a)    All of the patents, internet domain names, social media accounts, registered trademarks, registered service marks, registered copyrights, label approvals, trade or bottling names, formulas, and applications for any of the foregoing owned by Seller (collectively, "Registered Intellectual Property") are set forth on Schedule 3.08(a). Seller owns and possesses all right, title, and interest in and to each Registered Intellectual Property, free and clear of all Liens other than Permitted Liens and Seller owns, free and clear of all Liens other than Permitted Liens, or has a license or other right to use, all other Intellectual Property material to the conduct of the Business, except for any Excluded Assets.

(b)    The Registered Intellectual Property included in the Acquired Assets are subsisting and, to Seller's Knowledge, valid and enforceable in their respective jurisdictions of registration in accordance with the applicable laws of such jurisdictions. The foregoing will not be construed as any representation that any Registered Intellectual Property included in the Acquired Assets will issue on any application therefor. All filing, examination, issuance, and post-registration fees associated with or required with respect to the Registered Intellectual Property included in the Acquired Assets that were due prior to the Closing have been timely paid.

(c)    No Registered Intellectual Property included in the Acquired Assets is involved in or, in the three (3) years prior to the date hereof, has been involved in, any opposition, cancellation or similar proceeding, and no such proceeding is threatened in writing. (i) To Seller's Knowledge, Seller is not infringing, misappropriating, or otherwise violating the Intellectual Property rights of any other Person, (ii) to Seller's Knowledge, no Person is currently infringing, misappropriating, or otherwise violating, any Owned Intellectual Property, and (iii) there is not pending before any Governmental Body any claim, Action, or proceeding alleging any of the foregoing (in clauses (i) or (ii)) or contesting the use, validity, enforceability, or ownership of any Owned Intellectual Property.

(d)    To Seller's Knowledge, there have been no breaches, security incidents, misuse of or unauthorized access to or disclosure of any Personal Information by or on behalf of Seller in violation of Privacy Laws. To Seller's Knowledge, Seller has not received notice of any claims or investigations or inquiries by Governmental Bodies related to, or been charged with, the violation of any Privacy Laws with respect to Personal

24

Information. To Seller's Knowledge, there are no facts or circumstances that could reasonably form the basis of any such notice or claim.

(e)     Seller owns or has a valid right to access and use pursuant to a valid, written Contract all computer systems, networks, hardware, technology, databases, websites, and equipment used to process, store, maintain and operate data, information, and functions used in and material to the Business (the "IT Systems").  The IT Systems have not suffered any material malfunction, failure, or security breach.

(f)     Seller has, with respect to the Business, taken reasonable and necessary measures, including all actions common in the industry, to maintain, protect, preserve and enforce the trade secrets included in the Owned Intellectual Property and other confidential or proprietary information relating to the Business, including by requiring all Persons having access thereto to execute binding, enforceable, written non-disclosure Contracts and implementation and maintenance of appropriate and reasonable security measures.

(g)     Seller has entered into binding, valid, written and enforceable Contracts with each current and former employee, consultant or independent contractor of Seller involved in conducting research, development, design, marketing or commercialization efforts or any other activities that could reasonably be expected to result in the development or creation of Intellectual Property for use in the conduct of the Business.  It is not necessary to, and Seller does not, utilize in connection with the conduct of the Business any inventions or other Intellectual Property of any employees, consultants or independent contractors of Seller (or Persons that Seller currently intends to hire) made prior to or during their employment by Seller, other than those that have been assigned to Seller.

3.09     Litigation.  Except as set forth on Schedule 3.09 and other than the Bankruptcy Case, as of the date hereof, there are no Actions pending or, to Seller's Knowledge, threatened against Seller, at law or in equity, or before or by any Governmental Body, to which Seller is a party or relating to any Acquired Assets or the Business, or that challenge the validity or enforceability of this Agreement or any Ancillary Documents or that seeks to enjoin or prohibit the consummation of the transactions contemplated hereby and thereby, and Seller is not subject to any outstanding judgment, order or decree (i) relating to any Acquired Asset or the Business or (ii) of any Governmental Body, that would materially adversely affect the Acquired Assets or the Business or prevent or materially delay the consummation of the transactions contemplated in this Agreement.

3.10     Employee Benefit Plans.

(a)     Schedule 3.10(a) contains a true and complete list of each material Benefit Plan.  Each Business Benefit Plan is sponsored or maintained by Seller.  Each of the Benefit Plans that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the Internal Revenue Service (provided that the foregoing is limited to Seller's Knowledge with respect to any Multiemployer Plans), and (to Seller's Knowledge with respect to any Multiemployer Plans), no facts or circumstances exist that would adversely affect the qualified status of any such Benefit Plan.  Except as would not reasonably be expected to have a Material Adverse Effect or as set forth on

Case: 22-10381     Doc# 316     Filed: 04/07/23     Entered: 04/07/23 18:10:10     Page 49 of 113

Schedule 3.10(a), and limited to Seller's Knowledge with respect to any Multiemployer Plans, each Benefit Plan has been maintained and administered in compliance in form and in operation in all respects in accordance with its terms and with applicable law, including the requirements of the Code and ERISA.

(b) With respect to each Benefit Plan, to Seller's Knowledge, all required contributions of Seller due on or before the Closing Date have been made within the time periods prescribed by ERISA and the Code, and all contributions for any period ending on or before the Closing Date that are not yet due have been made or properly accrued on or before the Closing Date in accordance with GAAP or otherwise reflected on the Financial Statements.

(c) Except as set forth on Schedule 3.10(c), none of the Benefit Plans is subject to Title IV of ERISA nor provides for medical, life, or disability insurance benefits to retired or former employees of Seller (other than as required under Code Section 4980B, or similar state law). Except as set forth on Schedule 3.10(c), Seller is not a participating or contributing employer in or to any Multiemployer Plan with respect to employees of Seller nor has Seller received notice of any claim or demand for a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA, respectively) that has not been satisfied in full.

(d) No Benefit Plan is, and Seller has no any Liability with respect to, any (i) "plan maintained by more than one employer" within the meaning of Section 413(c) of the Code or (ii) "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA.

(e) Seller is in material compliance with the Patient Protection and Affordable Care Act and all regulations thereunder as applicable to Seller, including specifically and without limitation Sections 4980D and 4980H of the Code.

(f) Each Business Benefit Plan that constitutes a "nonqualified deferred compensation plan" (within the meaning of Section 409A of the Code) has been operated and maintained, in form and operation, in all material respects in accordance with all applicable requirements of Section 409A of the Code and all applicable guidance.

(g) There are no Actions on behalf of, with respect to or against any of the Business Benefit Plans, or any trusts or individual or group Contracts or policies related thereto, or any fiduciaries acting (or, obligated to act) with respect to any such Business Benefit Plans, and, to Seller's Knowledge, there are no facts that would reasonably be expected to give rise thereto (other than the ordinary and usual claims for benefits by participants, dependents or beneficiaries). To Seller's Knowledge, there have been no non-exempt "prohibited transactions" (as defined in Section 406 of ERISA or Section 4975 of the Code) or breaches of fiduciary duty with respect to any Business Benefit Plan. None of the Business Benefit Plans are presently under audit or examination (nor has notice been received by Seller of a potential audit or examination) by any Governmental Body.

26

(h)     No current or former employee, officer, director or other individual service provider of Seller is entitled to any gross-up, make-whole or other additional payment in respect of any Tax imposed under Section 4999 or 409A of the Code or interest or penalty related thereto.

(i)     Except as set forth on Schedule 3.10(i), neither the execution of this Agreement nor the consummation of the transactions contemplated by this Agreement will (i) result in any payment becoming due or payable, or required to be provided, from Seller to any employee, officer, director, stockholder or other service provider of Seller (whether current, former or retired) or its beneficiaries, (ii) accelerate the time of payment, funding or vesting, or increase the amount of compensation or benefits due to any employee, officer, director, stockholder or other service provider of Seller (whether current, former or retired) or its beneficiaries, or (iii) limit or restrict the ability of Seller (or any successor) to amend or terminate any Business Benefit Plan.  No amount that could be payable by Seller (whether in cash or property or the vesting of property) as a result of the consummation of the transactions contemplated by this Agreement to any employee, officer, director, stockholder or other service provider of Seller under any Benefit Plan or otherwise would reasonably be expected to be non-deductible by reason of Section 280G of the Code or to be subject to an excise tax under Section 4999 of the Code.

3.11     Insurance.  Schedule 3.11 lists each material insurance policy providing coverage for the Acquired Assets maintained by Seller.  As of the date hereof, (a) all insurance policies of Seller are in full force and effect, (b) no written notice of default or termination has been received by Seller in respect of any such insurance policy, and (c) all premiums due on such insurance policies have been paid in full.

3.12     Compliance with Laws.

(a)     Except as set forth on Schedule 3.12(a), to Seller's Knowledge, Seller (i) is and for the past six (6) years has been in compliance with all Permits and laws applicable to the Acquired Assets and the Assumed Liabilities, except where any noncompliance would not reasonably be expected to have a Material Adverse Effect, (ii) possesses all material Permits required under applicable law to carry on the Business as currently being conducted, and (iii) to Seller's Knowledge, there are no proceedings pending or, to the Seller's Knowledge, threatened which may reasonably be expected to result in the revocation, cancellation or suspension thereof. Except as set forth on Schedule 3.12(a), the consummation of the transactions contemplated hereby will not result in any such revocation, cancellation or suspension of any Permit, nor require Seller or Buyer to make any filing or take any action in order to maintain the validity of any Permit applicable to the Acquired Assets.

(b)     Schedule 3.12(b) sets forth a complete and correct list of all Liquor Licenses held or used by Seller, including the Person in whose name such license is issued, dated of issuances and renewal date.  Except as set forth on Schedule 3.12(b), since December 31, 2018, (i) there have been no Actions brought or, to the Seller's Knowledge, threatened to be brought by or before a Governmental Body in respect of any such Liquor License or the activities of Seller or any of its Affiliates in connection with any such Liquor License (or

27

in connection with any other alcoholic beverage licenses previously held or used by Seller), (ii) no such Liquor License is subject to any due but unpaid tax obligation owed to a Governmental Body, the outstanding nature of which would preclude transfer of such Liquor License from Seller to Buyer, and (iii) no such Liquor License has been threatened by a Governmental Body to be revoked, limited or not renewed. Except as set forth on Schedule 3.12(b), the execution, delivery and performance by Seller of this Agreement and each Ancillary Document to which Seller is a party and the consummation of the transactions contemplated hereby and thereby does not require any Consent, authorization, exemption or other action by or notice to any Governmental Body.

(c)     None of the Seller nor any of its subsidiaries, nor any Representatives acting on their behalf, nor the Business, is currently, or has been in the last six (6) years:  (i) a Sanctioned Person, (ii) organized, resident or located in any country or region that is subject or target of a comprehensive embargo under applicable Anti-Corruption and Trade Control Laws ("Sanctioned Country"), (iii) engaged in any dealings or transactions with any Sanctioned Person or in any Sanctioned Country; (iv) engaged in any export, re-export, transfer or provision of any goods, technology, or service without, or exceeding the scope of, any required or applicable licenses or authorizations under all applicable Laws, or (v) otherwise in violation of applicable Anti-Corruption and Trade Control Laws.  During the six (6) years prior to the date hereof, none of Seller nor any of its subsidiaries has, in connection with or relating to the Business, (A) received from any Governmental Authority or any other Person any notice, inquiry, or internal or external allegation, (B) made any voluntary or involuntary disclosure to a Governmental Authority or (C) conducted any internal investigation or audit concerning any actual or potential violation or wrongdoing related to Anti-Corruption and Trade Control Laws.

3.13    Environmental Compliance and Conditions.

(a)     Seller is in material compliance with all applicable Environmental Laws, except for such instances of noncompliance that would not reasonably be expected to have a Material Adverse Effect.  Seller holds and is in compliance with all material Permits required under applicable Environmental Laws to operate at the Owned Real Property and to carry on the Business as now conducted.

(b)     There is no Action pursuant to any Environmental Law pending or, to the Seller's Knowledge, threatened in writing against Seller that would reasonably be expected to have a Material Adverse Effect.  Seller is not a party to or subject to any judgment, order or decree of any Governmental Body issued pursuant to an Environmental Law that would reasonably be expected to have a Material Adverse Effect.

(c)     To Seller's Knowledge, there are no Hazardous Substances present in the environment associated with any Owned Real Property or other Facility operated by any Seller that require remedial action by any Seller pursuant to any applicable Environmental Law, except where such presence would not reasonably be expected to have a Material Adverse Effect.

28

(d)     Seller has delivered or made available to Buyer copies of all material (i) reports, assessments, audits or tests prepared within the last three (3) years with respect to compliance of the Business and the Acquired Assets with any applicable Environmental Laws, (ii) Documents related to the use or the presence of Hazardous Substances on, in, at, under or from the Owned Real Property or otherwise relating to the Acquired Assets or the Business, (iii) notices of violation, orders or decrees with respect to compliance of the Business and the Acquired Assets with any applicable Environmental Law, (iv) Environmental Permits and (v) Documents and agreements related to any proceedings arising under or pursuant to any Environmental Law that have been asserted, or which are pending or threatened against the Seller or any of its Affiliates relating to any Owned Real Property, the Acquired Assets or the Business, in each case in clauses (i) through (v) of this Section 3.15(d), which are in Seller's or any of its Affiliates' possession, custody or control.

3.14     Affiliated Transactions.  Except as set forth on Schedule 3.14, no officer, director, controlling shareholder or Affiliate of Seller nor, to Seller's Knowledge, any individual in such officer's, director's or controlling shareholder's or Affiliate's immediate family is a party to any material agreement, Contract, commitment or transaction with Seller (other than employment-related matters) or has any material interest in any of the Acquired Assets.

3.15     Employment and Labor Matters.

(a)     Except as set forth on Schedule 3.15, (i) Seller is not a party to or bound by any Union Agreement; (ii) within the past three years, Seller has not experienced any strike, slowdown, work stoppage, lockout or material labor dispute, claim of unfair labor practices, grievances (other than routine individual grievances), arbitration decisions, or other material dispute nor has there been any such material dispute, to Seller's Knowledge, threatened in writing; (iii) there are no material disputes pending or, to Seller's Knowledge, threatened in writing with respect to any current or former Company Employees; (iv) there are no current union representation questions involving employees of Seller; and (v) to Seller's Knowledge there are no demands for recognition for any Company Employees or union organizing efforts among Company Employees underway.

(b)     No other organization is a joint or co-employer of the Company Employees.

(c)     Except as set forth on Schedule 3.15(c), there are, and since January 1, 2018, there have been no, Contracts with independent contractors or sole proprietors to perform services that are the same or substantially similar to services performed by current or former Company Employees; nor are there any material disputes pending or, to Seller's Knowledge, threatened in writing with respect to any independent contractor engaged by Seller.

(d)     Except as set forth on Schedule 3.15(d): (i) Seller is in compliance in all material respects with all applicable laws respecting employment and labor including those laws respecting worker classification, overtime pay and wages and hours, paid time off, employee leave, employment discrimination, harassment, immigration, layoffs (including the WARN Act), workers' compensation, termination and severance pay, human rights,

29

occupational health and safety, equal opportunity, labor relations, collective bargaining and the payment of social security and other employment-related Taxes; (ii) since January 1, 2018, there has been no wage and hour investigation, employment discrimination charge, or written complaint pertaining to any such charge against or affecting Seller in respect of the Business, nor has Seller received written notice of the intent of any Governmental Body responsible for the enforcement of labor, employment, occupational health and safety or workplace safety and insurance/workers compensation laws, including any state labor relations board or equal opportunity agency or any court or tribunal, to conduct an investigation of Seller relating to the Business, nor has any written complaint or complaint been filed against Seller.

3.16    Brokerage.  Except as set forth on Schedule 3.16, there are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement or the Ancillary Documents based on any arrangement or agreement made by or on behalf of Seller or any of its Affiliates.

3.17    Suppliers.  Schedule 3.17 sets forth an accurate and complete list of the ten (10) largest third-party suppliers (based on the total amount purchased from such supplier) (each, a "Material Supplier") of the Business for the 12-month period ended December 31, 2022.  Seller has not received any written notice from any such Material Supplier stating that such supplier has terminated or materially diminished, or intends to terminate or materially diminish, its relationship with Seller. Since the beginning of the current fiscal year, Seller has made all material payments to the Material Suppliers pursuant to the terms of any Contract or arrangement between Seller and any Material Supplier, in each case, consistent with the Seller's payment practices in the ordinary course of business (including subject to good faith disputes and customary reconciliations of amounts owed), and, to Seller's Knowledge, the business relationship with each Material Supplier is in good standing.

3.18    Quality and Safety of Food & Beverage Products. Seller's practices with respect to the production, storage, preparation, handling, labeling, and sale for each of the food and beverage products (including alcoholic beverages) produced, stored, prepared, handled, labeled, or sold at the Facilities are in compliance with applicable laws (including all laws relating to food and beverage (including alcoholic beverages) storage, preparation, handling, labeling, and sale) in all material respects. Seller has not had any Liability for recall of any food or beverage products, nor any Liability to any Person as a result of the possession or use of any of the food or beverage products (including alcoholic beverages) produced, stored, prepared, handled, labeled, or sold in connection with the Business. There are no Actions pending or, to Seller's Knowledge, threatened against Seller with respect to any violations of such laws (including all laws relating to food and beverage (including alcoholic beverages) production, storage, preparation, handling, labeling, and sale). Seller has not received any written notice as to any claim or allegation of injury or death to any Person, any claim for punitive damages, any claim for contribution or indemnification or other economic damages, or any claim for injunctive relief or product recall in connection with any food or beverage product (including alcoholic beverages) produced, stored, prepared, handled, labeled, or sold in connection with the Business. Seller has made available to Buyer true and complete copies of all reports resulting from any audits and inspections conducted by third parties of the quality or safety management practices completed since January 1, 2018 with respect to the quality and safety of food and beverage products (including alcoholic beverages) at the Facilities.

Case: 22-10381    Doc# 316    Filed: 04/07/23    Entered: 04/07/23 18:10:10    Page 54 of 113

3.19    Title to Assets; Sufficiency of Acquired Assets.  Seller has good and valid title to, or the right to use, all of the Acquired Assets, free and clear of all Liens (other than Permitted Liens). Upon the entry and effectiveness of the Sale Order and any Related Order, Seller will have the power and right to convey such title or rights to use, all of the Acquired Assets, free and clear of all Liens (other than Permitted Liens), to the maximum extent permitted by the provisions of the Bankruptcy Code.  Except as set forth on Schedule 3.19, (a) all of the buildings, equipment and other tangible personal property used in (to the extent Seller hold rights, title and interest in such tangible personal property) or held for use in connection with the Business that are included as Acquired Assets, are in good operating condition and repair, free of defects and in a state of good maintenance, ordinary wear and tear excepted, in all material respects, and (b) all Inventory of Seller is in good, merchantable and usable condition in the ordinary course of business.  The Inventory is of a quantity as maintained by the Seller in the ownership and operation of the Business in the ordinary course of business.  Except for the Excluded Assets and as set forth on Schedule 3.19, the Acquired Assets constitute all of the assets, rights, interests, claims and properties of every nature and kind whatsoever used in (to the extent Seller holds rights, title and interest in such tangible personal property) or held for use in the conduct of the Business, or otherwise necessary for Buyer to conduct and operate the Business immediately after the Closing in all material respects as presently conducted by Seller.  All tangible Acquired Assets are located on the Owned Real Property.

3.20    No Other Representations and Warranties.    EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES REGARDING SELLER CONTAINED IN THIS ARTICLE III, SELLER MAKES NO EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, AND SELLER HEREBY DISCLAIMS ANY SUCH REPRESENTATION OR WARRANTY WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT AND THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.  BUYER WILL ACQUIRE THE ACQUIRED ASSETS WITHOUT ANY REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, IN AN "AS IS" CONDITION AND ON A "WHERE IS" BASIS, EXCEPT AS OTHERWISE EXPRESSLY REPRESENTED OR WARRANTED IN THIS AGREEMENT.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as of the date hereof and as of the Closing Date as follows:

4.01    Organization and Power.  Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the state of its organization, with full corporate power and authority to enter into this Agreement and the Ancillary Documents, consummate the transactions contemplated hereby and thereby and perform its obligations hereunder and thereunder.

4.02    Authorization; Valid and Binding Agreement.    The execution, delivery and performance by Buyer of this Agreement and each Ancillary Document to which Buyer is a party

31

and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite action on the part of Buyer, and no other proceedings on Buyer's part are necessary to authorize the execution, delivery or performance by Buyer of this Agreement or such Ancillary Documents. Assuming that this Agreement and each Ancillary Document to which Buyer is a party is a valid and binding obligation of Seller, this Agreement and each such Ancillary Document constitutes a valid and binding obligation of Buyer, enforceable in accordance with its terms, except as enforceability may be limited by Principles of Equity.

4.03    No Breach.  The execution and delivery by Buyer of this Agreement and any Ancillary Document to which it is a party, the consummation of the transactions contemplated hereby and thereby and the performance of its obligations hereunder and thereunder will not conflict with or result in any material breach of, constitute a material default under, result in a material violation of, result in the creation of any material Lien upon any material assets of Buyer, or require any material authorization, Consent, approval, exemption or other material action by or notice to any Governmental Body or other third party, under (a) Buyer's Organizational Documents other than such Consents as have been obtained as of the date hereof or (b) the provisions of any material indenture, mortgage, lease, loan agreement or other material agreement or instrument to which Buyer is bound, or any law, statute, rule or regulation or order, judgment or decree to which Buyer is subject other than in the case of clause (b), any such breaches, defaults, violations or Liens that, individually or in the aggregate, would not materially delay the ability of Buyer to perform any of its obligations under this Agreement or the Ancillary Documents to which Buyer is a party.

4.04    Consents.  Other than as may be required in connection with obtaining the Sale Order and any Related Order, and as set forth on Schedule 3.12(b), Buyer is not required to submit any notice, report or other filing with any Governmental Body in connection with the execution, delivery or performance by it of this Agreement, each Ancillary Document to which it is a party or the consummation of the transactions contemplated hereby and thereby.  Other than the Sale Order and any Related Order, and as set forth on Schedule 3.12(b), no Consent, approval or authorization of any Governmental Body or any other party or Person is required to be obtained by Buyer in connection with its execution, delivery and performance of this Agreement, each Ancillary Document to which it is a party or the consummation of the transactions contemplated hereby and thereby.

4.05    Litigation.  There are no Actions pending or, to Buyer's Knowledge, threatened in writing against Buyer, at law or in equity, or before or by any Governmental Body, nor is Buyer subject to any outstanding judgment, order or decree of any Governmental Body which would reasonably be expected to adversely affect Buyer's performance under this Agreement, each Ancillary Document to which it is a party or the consummation of the transactions contemplated hereby and thereby.

4.06    Brokerage.  There are no claims for brokerage commissions, finders' fees or similar compensation in connection with the transactions contemplated by this Agreement based on any arrangement or agreement made by or on behalf of Buyer or any of its Affiliates.

4.07    [Reserved].

4.08    [Reserved].

4.09    <u>Investigation</u>.    Buyer acknowledges that, except for the representations and warranties set forth in this Agreement, it is relying on its own independent investigation and analysis in entering into the transactions contemplated hereby.  Buyer is Knowledgeable about the industries in which the Business operates and is capable of evaluating the merits and risks of the transactions contemplated by this Agreement and is able to bear the substantial economic risk of such investment for an indefinite period of time.  To Buyer's Knowledge, Buyer has been afforded full access to the books and records, Facilities and personnel of the Business for purposes of conducting a due diligence investigation and has conducted a full due diligence investigation of the Business, the Acquired Assets, the Assumed Liabilities and the Assumed Contracts.  For the avoidance of doubt, nothing herein shall affect Buyer's right to rely on the representations and warranties set forth in this Agreement.

ARTICLE V

CERTAIN PRE-CLOSING COVENANTS

5.01    <u>Conduct of the Business</u>.

(a)    From the date hereof until the earlier of the Closing Date and the date on which this Agreement is terminated pursuant to <u>Section 8.01</u>, except (i) as set forth on <u>Schedule 5.01</u>, (ii) as specifically required or contemplated by this Agreement, (iii) as required by applicable law (including the Bankruptcy Code), (iv) as required by any order of the Bankruptcy Court or (v) with the prior written consent of Buyer (which consent will not be unreasonably withheld, conditioned or delayed and notice of which consent or rejection shall be provided by Buyer within five Business Days following any such request from Seller), Seller will use commercially reasonable efforts to:

(i)    conduct the Business in the ordinary course of business (including maintain the cash in the registers located at the Facilities in the ordinary course); and

(ii)    maintain and preserve intact the Business's goodwill.

(b)    From the date hereof until the earlier of the Closing Date and the date on which this Agreement is terminated pursuant to <u>Section 8.01</u>, except (i) as set forth on <u>Schedule 5.01</u>, (ii) as specifically required or contemplated by this Agreement, (iii) as required by applicable law (including the Bankruptcy Code), (iv) as required by any order of the Bankruptcy Court or (v) with the prior written consent of Buyer (which consent may be given or withheld in Buyer's sole discretion and notice of which consent or rejection shall be provided by Buyer within five (5) Business Days following any such request from Seller), Seller will not take or permit any of the following actions:

(i)    amend or modify the Organizational Documents of Seller;

(ii)     declare, set aside or pay any dividend or other distribution of assets in respect of its capital stock;

(iii)    subject any Acquired Assets to any Liens other than (A) Permitted Liens and (B) any Liens securing any DIP Facility;

(iv)     sell, lease, transfer or otherwise dispose of any Acquired Assets other than sales, leases, transfers or dispositions (A) of obsolete, broken or unsalable equipment or other assets no longer used or usable in the Business or (B) of Inventory in the ordinary course of business;

(v)      sell, assign or transfer any Intellectual Property;

(vi)     make or commit to make capital expenditures (except as permitted pursuant to the DIP Facility);

(vii)    change in any material respect any of its material accounting principles, practices or methods, except as may be required by any Governmental Body or to comply with changes in GAAP or applicable law;

(viii)   (A) make, revoke, amend or change any Tax election with respect to the Business or any Acquired Assets, (B) change any Tax accounting methods, (C) settle any audit or other proceeding with respect to Taxes relating to the Business or any Acquired Assets, or (D) amend any Tax Return with respect to a material amount of Taxes, or (E) surrender any right to claim a refund of Taxes with respect to the Business or any Acquired Assets;

(ix)     except to the extent required by law or by any existing employee benefit plan, Union Agreement or employment Contract in existence as of the date hereof or as otherwise done in the ordinary course of business (A) grant any bonuses, severance or equity incentive award, or increase the compensation or benefits of any Person or alter any such Person's title, (B) pay any pension, severance or retirement benefits not required by any existing plan or similar agreement (C) make or grant any increase in any employee benefit plan or similar arrangement, or amend or terminate any existing employee benefit plan or similar arrangement or severance agreement or employment Contract or adopt any new employee benefit plan or similar arrangement or severance agreement or employment Contract or (D) hire or promote any employee who provides services primarily to the Business;

(x)      acquire (by merging or consolidating with, purchasing all or substantially all of the assets or capital stock of, or by any other manner acquiring) any Person;

(xi)     enter into any Contract that if entered into prior to the date hereof would be a Material Contract or amend in any material respect or terminate or extend any Material Contract;

34

(xii)    waive, release, assign, settle or compromise any claim, Action or proceeding in respect of the Business, the Assumed Liabilities or the Acquired Assets;

(xiii)    allow any Liquor License to expire, or initiate new Liquor License applications or updates; or

(xiv)    agree or commit to do any of the foregoing.

5.02    Cooperation.

(a)    Through the earlier of the Closing and the date on which this Agreement is terminated in accordance with Section 8.01, each party shall, and shall cause its Affiliates to, use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws to consummate and make effective the transactions contemplated hereby as soon as practicable, including satisfaction, but not waiver, of the conditions to Closing set forth in Article VII.

(b)    Without limiting the generality of the foregoing, neither Buyer nor Seller shall take any action, or permit any of their respective subsidiaries to take any action, to materially diminish the ability of any party to consummate, or materially delay any party's ability to consummate, the transactions contemplated hereby, including any action that is intended or would reasonably be expected to result in any of the conditions to any party's obligations to consummate the transactions contemplated hereby set forth in Article VII to not be satisfied.

(c)    The obligations of Seller pursuant to this Section 5.02 shall be subject to any orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Bankruptcy Case), and Seller's obligations as a debtor-in-possession to comply with any order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) and Seller's duty to seek and obtain the highest or otherwise best price for the Business as required by the Bankruptcy Code.

5.03    Consents; Notices.

(a)    Without limiting the generality of Section 5.02, each party shall use its reasonable best efforts to obtain all Consents necessary in connection with the consummation of the transactions contemplated hereunder prior to the Closing, and to cooperate in connection with any inquiry by a Governmental Body in connection with the transactions contemplated hereunder.  Notwithstanding anything herein to the contrary, neither Buyer nor Seller shall have any obligation to agree to amend or modify any Contract or pay any fee to any third party (including filing or other fees payable to Governmental Bodies) for the purpose of obtaining any such Consent, or any costs and expenses of any third party resulting from the process of obtaining such Consent, in each case, except for each party's respective obligation to pay Cure Costs in accordance with Section 2.05 with

35

respect to any Assumed Contract. Each party shall timely make or cause to be made all filings and submissions under laws applicable to it as may be required for the consummation of the transactions contemplated hereunder. Buyer acknowledges that certain Consents and waivers with respect to the transactions contemplated hereunder may be required from third parties under certain Assumed Contracts and that obtaining such Consents is not a condition to the consummation of the transactions contemplated hereunder.

(b)     With respect to any obligations under the under the federal Worker Adjustment and Retraining Notification Act of 1988 ("WARN Act"), or any similar Laws related to plant closings, relocations, mass layoffs and employment losses (collectively "WARN Obligations") that may arise with respect to the Business or as a result of the transaction contemplated hereby, Seller shall be responsible for any WARN Obligations arising solely as a result of any employment losses occurring prior to the Closing Date, and Buyer shall be responsible for any WARN Obligations arising as a result of any employment losses occurring upon or following the Closing Date.  In addition, Buyer covenants and agrees that from and after the Closing Date, Buyer will not implement any action that would cause any pre-Closing action of Seller (that would not otherwise trigger notice obligations under the WARN Act) to be a violation of the WARN Act;  provided, however, that Seller shall provide to Buyer on or prior to the Closing Date a schedule reflecting all layoffs of permanent employees implemented by Seller with respect to Company Employees, by location, during the ninety (90) day period preceding the Closing Date.  "Employment Loss" for the purpose of this Section 5.03(b) shall have the same meaning as in the WARN Act or any similar Laws related to plant closings, relocations, mass layoffs and employment losses.

(c)     At Buyer's sole cost and expense, Seller shall assist Buyer with the preparation, filing and prosecution  of each application, petition or other filing with any Governmental Body with respect to obtaining the necessary Consents and approvals pertaining to transfer or issuance of the Liquor Licenses to Buyer ("Liquor License Approvals"), including, at Buyer's sole cost and expense, (i) making reasonably available to the Buyer's authorized signers the Seller's employees or service providers responsible for managing the Seller's Liquor Licenses and Seller's Liquor License counsel (subject to compliance with ethical rules) to assist and consult with Buyer on the Liquor License Approvals, and (ii) participating in any Actions reasonably requested by Buyer to obtain such Liquor Licenses.

5.04    Access to Information.

(a)     Subject to applicable laws, during the period from the date hereof through the earlier of the Closing and the date on which this Agreement is terminated in accordance with Article VIII, Seller shall permit Buyer and its authorized Representatives to have reasonable access, during normal business hours and upon reasonable advance notice, to the offices, management-level employees and books and records of the Business, and shall furnish, or cause to be furnished, to Buyer such financial, Tax and operating data and other information with respect to such Persons and their respective offices, employees, businesses and operations as Buyer shall from time to time reasonably request.  All access

36

Case: 22-10381    Doc# 316    Filed: 04/07/23    Entered: 04/07/23 18:10:10    Page 60 of 113

and investigation pursuant to this Section 5.04 shall be coordinated through Seller's Chief Executive Officer and in such a manner as not to interfere with the normal operations of the businesses of Seller.

(b)     Notwithstanding anything herein to the contrary, Seller shall not be required to provide access to or to disclose information where such access or disclosure would reasonably be expected to (i) violate or prejudice the rights of its customers, (ii) jeopardize any attorney-client, accountant-client or other privilege or other immunity or protection from disclosure of Seller, (iii) contravene any law, Contract or any other obligation of confidentiality, (iv) jeopardize trade secret protection or result in the disclosure of competitively sensitive information or (v) relate to the Business' sale process, including any information related to proposals from other Persons relating to any other potential transaction with Seller or its Affiliates. Seller shall have the right to have one or more of its Representatives present at all times during any visits, examinations, discussions or contacts contemplated by this Section 5.04.

5.05   Contact with Customers, Suppliers and Other Business Relations. Prior to the Closing, Buyer and its Representatives will not contact or communicate with the employees, customers, suppliers, partners and other business relations of Seller regarding the business, operations, assets, financial condition or prospects of the Business, Seller or the transactions contemplated hereby without prior consultation with and written approval of Seller (which approval may not be unreasonably withheld, conditioned or delayed).

5.06   Bankruptcy Court Matters.

(a)     Bankruptcy Court Filings.

(i)     Provided Buyer is selected as the winning bidder at the auction undertaken in accordance with the Bidding Procedures Order (the "Auction"), Seller shall diligently seek entry of the Sale Order and any Related Orders by the Bankruptcy Court necessary to consummate the transactions contemplated hereunder in accordance with the terms and conditions of the Bidding Procedures Order, including any and all Assignment Orders (the "Assignment Order"), which shall be in form and substance reasonably satisfactory to Buyer and which shall provide for the assumption and assignment to Buyer of the Assumed Contracts. Seller shall seek entry of an order waiving any stay requirement under, *inter alia*, Federal Rules of Bankruptcy Procedures 6004 and 6006.

(ii)     Buyer and Seller understand and agree that the consummation of the transactions contemplated by this Agreement is subject to approval by the Bankruptcy Court. Buyer agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order and any Related Orders including a finding of adequate assurance of future performance by Buyer, including by furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of future performance by Buyer under this Agreement and the Assumed Contracts and demonstrating that Buyer is a "good faith" purchaser under

37

Section 363(m) of the Bankruptcy Code.  Buyer shall not, without the prior written consent of Seller, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Acquired Assets hereunder.

(iii)  Seller shall file such motions or pleadings as may be appropriate or necessary to assume and assign the Assumed Contracts and to determine the amount of the Cure Costs; provided, that, except to the extent otherwise expressly provided in Section 2.05(b) hereof, nothing herein shall preclude Seller from filing such motions, including upon commencement of the Bankruptcy Case, to reject any Contracts that are not Assumed Contracts.

(b)  Bankruptcy Court Milestones.  Seller shall seek to have a hearing with the Bankruptcy Court no later than April 7, 2023 to obtain entry of (x) the Assignment Order and (y) an order, which shall be in form and substance reasonably satisfactory to Seller and Buyer and which shall approve the transactions contemplated by this Agreement (the "Sale Order"), including, but not limited to, the sale of all of the Acquired Assets free and clear of all Liens (except Permitted Liens) and shall, without limitation, contain findings of fact and conclusions of law that: (I) Buyer is a good faith purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code and the sale contemplated by this Agreement does not violate and is not subject to avoidance under Section 363(n) of the Bankruptcy Code; (II) all of the requirements of Sections 363 and 365 of the Bankruptcy Code have been satisfied (including approval of the Credit Bid Amount pursuant to Section 363(k) of the Bankruptcy Code); (III) any Liens on the Acquired Assets shall attach to the proceeds received by Seller pursuant to this Agreement and to the extent, and with the same validity, priority, perfection and enforceability, as such Liens had with respect to the Acquired Assets; (IV) notice of the hearing on the transactions contemplated by this Agreement was (A) given to all holders of claims (as defined in Section 101 of the Bankruptcy Code) or interests entitled to receive such notice under, and in accordance with the applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and (B) constitutes such notice as is appropriate under the particular circumstances and in accordance with the Bankruptcy Code and applicable law; (V) neither Buyer nor its designees shall be considered successors of Seller or any of Seller's Affiliates, except as expressly assumed in writing by Buyer pursuant to this Agreement; (VI)  if the Bankruptcy Court determines that the law so permits, the transfer of the Acquired Assets shall not be subject to the imposition or payment of any transfer, stamp or similar Tax, and there shall not be in effect any preliminary or permanent injunction, stay, order, decree or ruling limiting the effect of the Sale Order by a court of competent jurisdiction; and (VII) provisions for the Bankruptcy Court's retention of jurisdiction over matters arising out of or related to this Agreement and the transactions contemplated hereby.

5.07  Bulk Sales.  Seller and Buyer hereby waive compliance with the requirements and provisions of "bulk-transfer" or similar laws of any jurisdiction that may otherwise be applicable with respect to the sale, conveyance, assignment or transfer of any or all of the Acquired Assets to Buyer.

5.08  Replacement Deposits.  During the period between the date hereof and the Closing, Buyer may negotiate with third-parties to replace any Contract that constitutes Excluded Assets as

of the date hereof (each, an "Excluded Contract") with a new Contract covering substantially similar subject matter as such Excluded Contract (each, a "Replacement Contract"). If, prior to the Closing Date, Buyer (a) enters into any Replacement Contract (with effectiveness subject to consummation of the transactions contemplated by this Agreement) and (b) provides written certification to Seller (the "Replacement Contract Notice") that identifies such Replacement Contract, the subject matter thereof, the Excluded Contract such Replacement Contract intends to replace (the "Replaced Contract"), and the amount of any upfront cash deposit required under such Replacement Contract (such deposit, a "Replacement Deposit"), then the amount of any Rejected Deposit corresponding to the Replaced Contract actually returned to Seller shall be promptly remitted to the Buyer in an amount up to the amount of such Replacement Deposit corresponding to such Replacement Contract as set forth in the Replacement Contract Notice; provided, that (i) in no case shall the aggregate amount of the Rejected Deposits be reduced below zero dollars ($0.00); and (ii) Seller shall not have any obligation to pay Buyer any portion of any Rejected Deposit that it does not actually receive, whether because of offset or counterclaim asserted by the counterparty, unwillingness or inability to pursue recovery of such Rejected Deposit or otherwise. Notwithstanding the foregoing, nothing in this Section 5.08 shall require the Buyer to agree to the terms of any Replacement Contract.

ARTICLE VI

ADDITIONAL COVENANTS

6.01    Access to Books and Records.  From and after the Closing, Buyer will provide Seller and its authorized Representatives information reasonably requested by Seller or such Representatives regarding the Business prior to Closing, including by providing either (a) reasonable access (for the purpose of examining and copying), during normal business hours, to the personnel, books and records of or relating to the Acquired Assets, the Assumed Liabilities or the Assumed Contracts for a period of one (1) year following the Closing or (b) a copy, at Seller's expense, of such books and records. For a period of six years after the Closing, unless otherwise consented to in writing by Seller, Buyer will not, and will not permit any of its Affiliates to, destroy, alter or otherwise dispose of any material books and records of or relating to the Acquired Assets, the Assumed Liabilities or the Assumed Contracts, or any portions thereof, relating to periods prior to the Closing Date without first giving reasonable prior notice to Seller and offering to surrender to Seller such books and records or such portions thereof. Without limiting the generality of the foregoing, from and after the Closing, Buyer will provide Seller (at no added cost or expense to Buyer) with reasonable assistance, support and cooperation with Seller's wind-down and related activities (e.g., helping to locate documents or information related to prosecution or processing of insurance/benefit claims); provided that such assistance, support and cooperation does not interfere unreasonably with the normal business operations of Buyer.

6.02    Employee Matters.

(a)    Effective as of the Closing Date, Buyer shall offer to employ a sufficient number of Company Employees so as not to trigger any obligation to provide notice in accordance with the WARN Act.  For each Company Employee who is offered employment, and whose employment is not otherwise assumed by Buyer, such offer shall include (A) base salary or hourly wages and incentive compensation opportunities no less

Case: 22-10381    Doc# 316    Filed: 04/07/23    Entered: 04/07/23 18:10:10    Page 63 of 113

favorable than he or she was eligible to receive immediately prior to the Closing and (B) employee benefits (including perquisites, vacation, retirement and savings plans and severance) and other terms and conditions of employment that are economically comparable, in the aggregate, to those in effect immediately prior to the Closing. Any Company Employee who becomes employed by Buyer pursuant to this Section 6.02(a) is a "Rehired Employee".

(b)     For purposes of eligibility, vesting, and solely with respect to vacation and severance, accrual and entitlement to benefits, under the benefit and compensation plans, programs, Contracts and arrangements of Buyer and its Affiliates in which Rehired Employees are eligible to participate following the Closing (each, a "Buyer Plan"), Buyer shall, or shall cause its Affiliates to, credit each Rehired Employee with his or her years of service with Seller and any predecessor Persons, to the same extent as such employee was entitled immediately prior to the Closing to credit for such service under any similar Benefit Plan, except where such crediting would result in duplication of benefits. The Buyer Plans shall use commercially reasonable efforts to credit such Rehired Employees for any deductibles and out-of-pocket expenses paid prior to the Closing Date in satisfying any deductibles and out-of-pocket expenses in the applicable plan year to which such deductibles and out-of-pocket expenses relate.

(c)     Seller shall be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence sustained by Seller's employees prior to the Closing.  Buyer shall be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence, sustained by Rehired Employees on and after the dates (hereinafter, "Rehired Employees' Employment Date") Buyer hires them, including injuries sustained by a Rehired Employee on or after the Rehired Employees' Employment Date that are aggravations, exacerbations or re-injuries of medical conditions or diagnoses resulting from injuries that were sustained before the Rehired Employees' Employment Date.  Seller shall be liable for all workers' compensation claims arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, originating from within Seller's Facilities and which are alleged to have been sustained or contracted prior to the Closing Date, provided such claims are filed with the appropriate workers' compensation authority within forty-five (45) days after the Rehired Employees' Employment Date.  Buyer shall be liable for all workers' compensation claims arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, which are alleged to have been sustained or contracted either before or after the Rehired Employees' Employment Date, provided that, in the case of any such injuries or diseases allegedly sustained before the Rehired Employees' Employment Date, such claims are filed with the appropriate workers' compensation authority more than forty-five (45) days after the Rehired Employees' Employment Date.

(d)     Buyer and Seller specify that the "Asset Purchase Transaction Exception" set forth in Section 1.409A-1(h)(4) of the Treasury Regulations shall apply to the transactions contemplated under this Agreement so that each Rehired Employee who provides services to Buyer and its Affiliates after and in connection with the transactions contemplated hereby will not be treated as having experienced a separation of service for purposes of applying the provisions of any Business Benefit Plan that is a nonqualified

40

deferred compensation plan and is assumed by Buyer under or in connection with the consummation of this Agreement.

(e)     Notwithstanding anything in this Section 6.02 to the contrary, nothing contained herein, whether express or implied, shall be treated as an amendment or other modification of any Benefit Plan, Buyer Plan or other employee benefit plan, program or arrangement of Buyer or its Affiliates, or shall limit the right of Buyer to amend, terminate or otherwise modify any Benefit Plan or any employee benefit plan, program or arrangement of Buyer or its Affiliates following the Closing Date in accordance with the terms thereof.  The Parties hereto acknowledge and agree that all provisions contained in this Section 6.02 are included for the sole benefit of the Parties hereto, and that nothing in this Agreement, whether express or implied, shall create any third party beneficiary or other rights (i) in any other Person, including any employees or former employees of Seller, any participant in any Benefit Plan, Buyer Plan or any employee benefit plan, program or arrangement of Buyer or its Affiliates, or any dependent or beneficiary thereof, or (ii) to continued employment with Buyer or any of its Affiliates (including, after the Closing, Seller).

6.03     Further Assurances.  From time to time, as and when requested by any party hereto and at such requesting party's expense, any other party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement, including the recording of the Grant Deed in the Official Records of Napa County Recorder; provided, however, Seller shall be entitled to take such actions as are required in connection with the discharge of their fiduciary duties during the Bankruptcy Case (including soliciting higher or better offers for the Acquired Assets).

6.04     Confidentiality Agreements; Post-Closing Confidentiality.  From time to time, as and when requested by any party hereto and at such requesting party's expense, any other party will execute and deliver, or cause to be executed and delivered, all such documents and instruments and will take, or cause to be taken, all such further or other actions as such requesting party may reasonably deem necessary or desirable to evidence and effectuate the transactions contemplated by this Agreement; provided, however, Seller shall be entitled to take such actions as are required in connection with the discharge of its fiduciary duties during the Bankruptcy Case (including soliciting higher or better offers for the Acquired Assets as provided in the Bidding Procedures Order).

(a)     [Reserved].

(b)     Effective at the Closing, Seller hereby assigns to Buyer the rights under the Company Confidentiality Agreements to enforce the non-use, non-disclosure and return or destruction of "Confidential Information" (as such term is defined in the Company Confidentiality Agreements) to the extent related to the Business, the Acquired Assets and the Assumed Liabilities and the non-solicitation provisions with respect to the Rehired Employees; provided, that the Company retains all other rights and remedies thereunder.

41

(c)     For a period of ten (10) years following the Closing Date, Seller shall not, and shall cause its Affiliates and its and their respective directors and officers not to, disclose to any Person other than the directors, officers, employees and authorized representatives of Buyer and its Affiliates, or use or otherwise exploit for their benefit, any Confidential Information, except (i) pursuant to any Order, as required in any Action or as otherwise required by applicable law, (ii) to enforce its rights and remedies under this Agreement or (iii) disclosure of Confidential Information in connection with the Bankruptcy Case shall not constitute a breach of this Section 6.04(c); provided, however, that in the event disclosure is required by applicable law or in connection with the Bankruptcy Case, Seller shall, to the extent reasonably possible, provide Buyer with prompt notice of such requirement prior to making any disclosure so that Buyer may seek at its own cost and expense an appropriate protective order.

ARTICLE VII

CONDITIONS TO CLOSING

7.01    Conditions to All Parties' Obligations.  The respective obligations of each party to consummate the transactions contemplated by this Agreement are subject to the satisfaction or, to the extent permitted, waiver in writing, of each of the following conditions at or prior to the Closing:

(a)     no judgment, decree or order entered by any Governmental Body shall be in effect which would prevent the consummation of any of the transactions contemplated hereby;

(b)     no law shall have been enacted or promulgated by any Governmental Body that prevents, or makes illegal, the consummation of the transactions contemplated hereby; and

(c)     the Bankruptcy Court shall have entered each of (a) the Sale Order, (b) the Assignment Order and (c) any Related Order (if any).

7.02    Conditions to Buyer's Obligations.  The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction or, to the extent permitted, waiver in writing, of each of the following conditions at or prior to the Closing:

(a)     The representations and warranties of Seller (i) set forth in the Seller Fundamental Representations shall be true and correct in all respects as of the Closing as if made on and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date), and (ii) set forth in Article III (other than the Seller Fundamental Representations), without giving effect to any materiality or "Material Adverse Effect" qualifications therein, shall be true and correct as of the Closing as if made on and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date), except, in the case of this clause (ii), where the failure to be so true and correct would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

42

(b)     Seller shall have performed and complied in all material respects with the covenants, agreements, and obligations required to be performed by Seller under this Agreement at or prior to the Closing.

(c)     Seller shall have delivered or caused to be delivered to Buyer each of the deliveries required to be made to Buyer pursuant to Section 2.09(a).

(d)     All authorizations, Consents, orders and approvals of the Bankruptcy Court necessary for the consummation of the transaction contemplated by this Agreement shall have been obtained, including, but not limited to, those set forth in Section 7.01(c), and Buyer shall have received from the Bankruptcy Court all other orders, approvals and Consents required to transfer the Acquired Assets and to consummate the transactions contemplated by this Agreement.

7.03     Conditions to Seller's Obligations.  The obligation of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction or, to the extent permitted, waiver in writing, of each of the following conditions at or prior to the Closing:

(a)     The representations and warranties of Buyer (i) set forth in the Buyer Fundamental Representations shall be true and correct in all material respects as of the Closing as if made on and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date), and (ii) set forth in Article IV (other than the Buyer Fundamental Representations), without giving effect to any materiality or "material adverse effect" qualifications therein, shall be true and correct as of the Closing as if made on and as of the Closing (except to the extent expressly made as of an earlier date, in which case as of such date), except, in the case of this clause (ii), where the failure to be so true and correct would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on, or a material delay in, the ability of Buyer to consummate the transactions contemplated hereby.

(b)     Buyer shall have performed and complied in all material respects with the covenants, agreements, and obligations required to be performed by Buyer under this Agreement at or prior to the Closing.

(c)     Buyer shall have delivered or caused to be delivered each of the deliveries required to be made to Seller pursuant to Section 2.09(b).

7.04     Waiver of Conditions.  All conditions to the Closing will be deemed to have been satisfied or waived from and after the completion of Closing.

7.05     Frustration of Closing Conditions.  No party may rely on the failure of any condition set forth in this Article VII to be satisfied if such failure was caused by such party's breach of this Agreement.

Case: 22-10381   Doc# 316   Filed: 04/07/23   Entered: 04/07/23 18:10:10   Page 67 of 113

# ARTICLE VIII

## TERMINATION

8.01    <u>Termination</u>.  This Agreement may be terminated at any time prior to the Closing (such date, the "<u>Termination Date</u>"):

(a)    by the mutual written consent of Buyer and Seller;

(b)    by Seller, subject to MGG's prior written consent in its sole discretion, if the Closing shall not have occurred on or prior to the Closing Date (as may be extended in accordance with <u>Section 2.08</u>); <u>provided</u>, <u>however</u>, that Seller shall not have the right to terminate this Agreement pursuant to this <u>Section 8.01(b)</u> if the Closing shall not have occurred on or prior to the Closing Date due to Seller's failure to perform any covenants or breach of any representation or warranty of such party set forth in this Agreement.

(c)    by either Buyer or Seller, if any restraint or any judgment, order or decree of any Governmental Body or applicable law of the type set forth in <u>Section 7.01(a)</u> or <u>(b)</u> permanently prohibiting the consummation of the transactions contemplated hereby shall have become final and non-appealable;

(d)    by Buyer, if any representation or warranty of Seller set forth in <u>Article III</u> shall be or shall have become inaccurate or Seller shall have breached or failed to perform any of its covenants set forth in this Agreement, which inaccuracy, breach or failure to perform would, if occurring or continuing on the Closing Date, give rise to the failure of any of the conditions set forth in <u>Section 7.02</u>, and which inaccuracy, breach or failure to perform cannot be cured by Seller, as the case may be, or, if capable of being cured, shall not have been cured prior to the earlier of (i) two (2) Business Days prior to the Termination Date and (ii) the date that is fifteen (15) calendar days after receipt by Seller of notice in writing from Buyer specifying the nature of such inaccuracy, breach or failure to perform and requesting that it be cured; <u>provided</u> that Buyer shall not have the right to terminate this Agreement pursuant to this <u>Section 8.01(d)</u> if Buyer is then in breach of this Agreement and such breach would give rise to the failure of any of the conditions set forth in <u>Section 7.03</u>;

(e)    by Seller, if any representation or warranty of Buyer set forth in <u>Article IV</u> shall be or shall have become inaccurate or Buyer shall have breached or failed to perform any of its covenants set forth in this Agreement (including to consummate the transactions contemplated hereby in accordance herewith), which inaccuracy, breach or failure to perform would, if occurring or continuing on the Closing Date, give rise to the failure of any of the conditions set forth in <u>Section 7.03</u>, and which inaccuracy, breach or failure to perform cannot be cured by Buyer or, if capable of being cured, shall not have been cured prior to the earlier of (i) two (2) Business Days prior to the Termination Date and (ii) the date that is fifteen (15) calendar days after receipt by Buyer of notice in writing from Seller specifying the nature of such inaccuracy, breach or failure to perform and requesting that it be cured; <u>provided</u> that Seller shall not have the right to terminate this Agreement

Case: 22-10381    Doc# 316    Filed: 04/07/23    Entered: 04/07/23 18:10:10    Page 68 of
113

pursuant to this Section 8.01(e) if Seller is then in breach of this Agreement and such breach would give rise to the failure of any of the conditions set forth in Section 7.02;

(f)    by Seller, subject to MGG's prior written consent in its sole discretion, if (i) all of the conditions of the obligations to Buyer at the Closing have been satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing, and which conditions could be satisfied if the Closing were to occur on such date), (ii) Buyer fails to complete the Closing on the date that the Closing should have occurred pursuant to Section 2.08 (as may be extended in accordance with the terms of such Section), (iii) Seller has notified Buyer in writing that Seller stands ready, willing and able to consummate the Closing, and (iv) Buyer has not consummated the Closing within two (2) Business Days of the delivery by Seller to Buyer of written notice of its intent to terminate this Agreement pursuant to this Section 8.01(f), and, in each case, Seller stood ready, willing and able to consummate the Closing on that date; or

(g)    by Seller or Buyer, if the Bankruptcy Court enters an order that precludes the consummation of the transactions contemplated hereby on the terms and conditions set forth in this Agreement, including (i) if for any reason Buyer is unable, pursuant to Bankruptcy Code Section 363(k), to credit bid in payment of all of the Credit Bid Amount, or (ii) if the Sale Order fails to include findings of fact that Buyer is a good faith purchaser pursuant Bankruptcy Code Section 363(m) in form and substance acceptable to Buyer.

The party desiring to terminate this Agreement pursuant to any clause (b), (c), (d) or (e) of this Section 8.01 shall give written notice of such termination to the other party in accordance with Section 10.04 specifying the provision or provisions hereof pursuant to which such termination is effected.

8.02    Effect of Termination.  In the event of the termination of this Agreement by either Buyer or Seller as provided above, the provisions of this Agreement will immediately become void and of no further force or effect (other than this Section 8.02, Article I, and Article X hereof which will survive the termination of this Agreement and remain valid and binding obligations of each of the parties) and there will be no Liability on the part of any of the parties to one another.  Nothing in this Article VIII will be deemed to impair the right of any party to compel specific performance by another party of its obligations under this Agreement.

ARTICLE IX

TAX MATTERS

9.01    Books and Records; Cooperation.  Buyer and Seller shall provide the other party and its Affiliates with such assistance as may reasonably be requested by the other party in connection with the preparation of any Tax Return, any audit or other examination by any Tax Authority, any Tax refund claim, or any judicial or administrative proceedings related to Liability for Taxes (other than any proceeding between Buyer and Seller), and each will retain and provide the requesting party (to the extent reasonably requested and at the requesting party's expense) with any records or information which may be relevant to such Tax Return, audit or examination, refund claim, proceedings or determination.  However, in no event shall (i) Seller have access to any of

45

the Tax Returns or other books and records of Buyer or any of its Affiliates (other than Tax Returns primarily related to the Acquired Assets) or (ii) Buyer have access to any of the Tax Returns of Seller or other books and records of or any of its Affiliates (other than Tax Returns primarily related to the Acquired Assets). Any information obtained pursuant to this Section 9.01 or pursuant to any other Section hereof providing for the sharing of information or review of any Tax Return or other schedule relating to Taxes shall be kept confidential by the parties hereto, except as necessary to be disclosed in connection with such return, audit or examination, refund claim, proceedings or determination, or as required by applicable law.

9.02 Transfer Taxes. All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with the transactions contemplated by this Agreement (including any real property transfer Tax and any other similar Tax), as well as any related Tax Return preparation and filing costs (collectively, "Transfer Taxes"), shall be borne solely by Seller. Accordingly, if Buyer is required by law to pay any such Transfer Taxes, Seller shall promptly reimburse Buyer for the amount of such Transfer Taxes actually paid by Buyer. Each Tax Return with respect to Transfer Taxes will be prepared and filed by the party that customarily has primary responsibility for filing such Tax Return pursuant to applicable law. The parties will each timely sign and deliver (or cause to be timely signed and delivered) such certificates or forms as may be necessary or appropriate (and will each otherwise cooperate) to establish any available exemption from (or otherwise reduce) any such Taxes or fees.

9.03 Straddle Period Allocation. To the extent it is necessary for purposes of this Agreement to determine the allocation of Taxes among a Straddle Period, the amount of any Taxes based on or measured by income, receipts, payroll or sales for the Pre-Closing Tax Period will be determined based on an interim closing of the books as of the close of business on the Closing Date (and for such purpose, the taxable period of any partnership or other pass through entity in which Seller or any of its subsidiaries hold a beneficial interest will be deemed to terminate at such time) and the amount of other Taxes for a Straddle Period that relates to the Pre-Closing Tax Period will be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending on the Closing Date and the denominator of which is the number of days in such Straddle Period.

9.04 Purchase Price Allocation. Buyer shall, not later than 120 days after the Closing Date, prepare and deliver to Seller a schedule allocating the Purchase Price, including Assumed Liabilities to the extent that such Liabilities are required to be treated as part of the purchase price for Tax purposes, among the Acquired Assets of Seller (such schedule, the "**Allocation**"). Seller and Buyer shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith (including in any audits or examinations by any Governmental Body or any other proceeding), unless otherwise required by a final determination within the meaning of Section 1313 of the Code. Buyer and Seller shall cooperate in the filing of any forms, Tax Returns or other documents with respect to the Allocation, including any amendments to such forms, Tax Returns or other documents required pursuant to this Agreement with respect to any adjustment to the Purchase Price.

46

## ARTICLE X

### MISCELLANEOUS

10.01 <u>Survival</u>. Except for any covenant that by its terms is to be performed (in whole or in part) by any party following the Closing, none of the representations, warranties, or covenants of any party set forth in this Agreement or in any certificate delivered pursuant to <u>Section 7.02(c)</u> or <u>Section 7.03(c)</u> shall survive, and each of the same shall terminate and be of no further force or effect as of, the Closing.

10.02 <u>Press Releases and Communications</u>. No press release or public announcement related to this Agreement or the Ancillary Documents or the transactions contemplated herein or therein or any other announcement or communication to the employees, customers or suppliers of the Business will be issued or made by any party hereto prior to the Closing without the joint approval of Buyer and Seller, unless required by law (in the reasonable opinion of counsel) in which case Buyer and Seller will have the right to review such press release, announcement or communication prior to its issuance, distribution or publication; <u>provided</u>, <u>however</u>, that the foregoing will not restrict or prohibit (a) Buyer or any of its Affiliates from making any announcement to its employees, customers and other business relations to the extent Buyer or such Affiliate reasonably determines in good faith that such announcement is necessary or advisable or (b) any disclosure required under any Contract to which Buyer or any of its Affiliates is a party.

10.03 <u>Expenses</u>. Except as otherwise expressly provided herein (including <u>Section 8.02</u> and <u>Section 9.02</u>), each party will each pay its own expenses (including attorneys' and accountants' fees and expenses) in connection with the negotiation of this Agreement and the Ancillary Documents, the performance of its obligations hereunder and thereunder the consummation of the transactions contemplated hereby and thereby (whether consummated or not).

10.04 <u>Notices</u>. All notices, requests, claims, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been duly given or made pursuant to this <u>Section 10.04</u> (a) when personally delivered, (b) the day (except if not a Business Day then the next Business Day) on which the same has been delivered if sent by a reputable national overnight air courier service or (c) when received, if sent by certified or registered mail, postage prepaid, return receipt requested or (d) on the day such communication was sent via electronic mail to the e-mail address set forth below for the Person to whom such notice, request, claim, demand or other communication is directed, unless the sender receive a "bounce back" or similar indication that the e-mail was not delivered to the recipient. Notices, requests, claims, demands and other communications, in each case to the respective parties, will be sent to the applicable address set forth below, unless another address has been previously specified in writing:

<u>Notices to Buyer</u>:

MGG California, LLC
Attn: Patrick Flynn
One Penn Plaza, Suite 5320

47

New York, New York 10119
Email: PFlynn@mgginv.com

with a copy to (which will not constitute notice):

Proskauer Rose LLP
Attn: Jeff J. Marwil
70 West Madison, Suite 3800
Chicago, Illinois 60602-4342
Email: jmarwil@proskauer.com

Proskauer Rose LLP
Attn:   Peter J. Young
        Steve Y. Ma
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Email: pyoung@proskauer.com
        sma@proskauer.com

Notices to Seller:

Getzler Henrich & Associates LLC
150 S. Wacker Drive, 24th Floor
Chicago, IL 60606
Attn: Kevin A. Krakora, Chief Restructuring Officer for
Spring Mountain Vineyard, Inc.
Email: kkrakora@getzlerhenrich.com
        pekman@hilcoglobal.com

with a copy to (which will not constitute notice):

Greenspoon Marder LLP
Attn: Victor A. Sahn
333 South Grand Avenue, 34th Floor
Los Angeles, CA 90071
Email: victor.sahn@gmlaw.com

10.05   Assignment.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties and their respective successors and permitted assigns. Buyer may assign any and all of its rights, title and interest in this Agreement to any Person at its sole election. Seller may not assign this Agreement or any right or obligation hereunder without the prior written consent of Buyer, and any purported assignment not permitted under this Section 10.05 will be null and void.

10.06   Severability.   Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will

48

be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement, and the parties will amend or otherwise modify this Agreement to replace any prohibited or invalid provision with an effective and valid provision that gives effect to the intent of the parties to the maximum extent permitted by applicable law.

10.07   No Strict Construction.  The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any Person.  The Disclosure Schedules have been arranged for purposes of convenience in separately numbered sections corresponding to sections of this Agreement; provided however, each section of the Disclosure Schedules will be deemed to incorporate by reference all information disclosed in any other section of the Disclosure Schedules solely to the extent reasonably apparent on the face of such disclosure.  Capitalized terms used in the Disclosure Schedules and not otherwise defined therein have the meanings given to them in this Agreement.  The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement or the Disclosure Schedules or Exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the ordinary course of business, and no party will use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement or the Disclosure Schedules or Exhibits in any dispute or controversy between the parties as to whether any obligation, item or matter not described or included in this Agreement or in any Disclosure Schedule or Exhibit is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or is within or outside of the ordinary course of business for purposes of this Agreement.  The information contained in this Agreement and in the Disclosure Schedules and Exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein will be deemed to be an admission by any party hereto to any third party of any matter whatsoever (including any violation of law or breach of contract).

10.08   Amendment and Waiver.  Any provision of this Agreement may be amended, modified, supplemented or waived if, and only if, such amendment, modification, supplement or waiver is in writing and signed, in the case of an amendment, modification or supplement, by Buyer and Seller, or in the case of a waiver, by the party against whom the waiver is to be effective. No waiver of any provision hereunder or any breach or default thereof will extend to or affect in any way any other provision or prior or subsequent breach or default.  No failure or delay by any party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

10.09   Complete Agreement.  This Agreement (including the Disclosure Schedules and the exhibits) and the documents referred to herein (including the Ancillary Documents) contain the complete agreement by, between and among the parties relating to the subject matter contained herein and therein and supersede any prior understandings, agreements or representations by, between or among the parties, written or oral, which may have related to the subject matter hereof or thereof in any way.  The parties agree that prior drafts of this Agreement and the Related Documents and of any provision herein or therein will be deemed to not provide any evidence as

49

to the meaning of any provision hereof or thereof, the intent of the parties with respect hereto or thereto and that such drafts will be deemed joint work product of the parties. The parties hereto have voluntarily agreed to define their rights, Liabilities and obligations respecting the sale and purchase of the Acquired Assets and the assumption of the Assumed Liabilities exclusively in Contract pursuant to the express terms and provisions of this Agreement; and the parties hereto expressly disclaim that they are owed any duties or are entitled to any remedies not expressly set forth in this Agreement. Furthermore, the parties each hereby acknowledge that this Agreement embodies the justifiable expectations of sophisticated parties derived from arm's-length negotiations; all parties to this Agreement specifically acknowledge that no party has any special relationship with another party that would justify any expectation beyond that of an ordinary buyer and an ordinary seller in an arm's-length transaction.

10.10 <u>Counterparts</u>. This Agreement may be executed in multiple counterparts (including by means of telecopied signature pages or electronic transmission in portable document format (pdf)), any one of which need not contain the signatures of more than one party, but all such counterparts taken together will constitute one and the same instrument.

10.11 <u>Governing Law</u>. This Agreement, and all Actions (whether in Contract, tort or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution, performance, non-performance, interpretation, termination or construction of this Agreement (including any Action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement) or the legal relationships of the parties hereto will be governed by and construed in accordance with the internal laws of the State of Delaware applicable to agreements executed and performed entirely within such State, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

10.12 <u>CONSENT TO JURISDICTION AND SERVICE OF PROCESS</u>. EACH OF THE PARTIES TO THIS AGREEMENT IRREVOCABLY SUBMITS AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURTS IN RESPECT OF THE INTERPRETATION AND ENFORCEMENT OF THE PROVISIONS OF THIS AGREEMENT AND ANY ANCILLARY DOCUMENT DELIVERED IN CONNECTION HEREWITH, THE LEGAL RELATIONSHIP OF THE PARTIES AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY. EACH PARTY ALSO WAIVES, AND AGREES NOT TO ASSERT: (I) ANY DEFENSE TO JURISDICTION OR VENUE IN THE CHOSEN COURTS FOR ANY ACTION RELATING TO THE INTERPRETATION OR ENFORCEMENT OF THIS AGREEMENT AND ANY ANCILLARY DOCUMENT DELIVERED IN CONNECTION HEREWITH, THE LEGAL RELATIONSHIP OF THE PARTIES AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY; (II) THAT THIS AGREEMENT MAY NOT BE ENFORCED IN OR BY THE BANKRUPTCY COURTS; (III) THAT THEIR PROPERTY IS EXEMPT OR IMMUNE FROM EXECUTION; OR (IV) THAT THE ACTION IS BROUGHT IN AN INCONVENIENT FORUM; <u>PROVIDED</u>, <u>HOWEVER</u>, THAT UPON THE CLOSING OF THE BANKRUPTCY CASE, THE PARTIES AGREE TO UNCONDITIONALLY AND IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE DELAWARE COURTS OF CHANCERY LOCATED IN WILMINGTON, DELAWARE OR (BUT ONLY TO THE EXTENT THE CHANCERY COURT DECLINE JURISDICTION) THE DELAWARE

Case: 22-10381    Doc# 316    Filed: 04/07/23    Entered: 04/07/23 18:10:10    Page 74 of 113

STATE COURTS OR THE UNITED STATES DISTRICT COURT LOCATED IN WILMINGTON, DELAWARE AND ANY APPELLATE COURT THEREFROM. THE PARTIES INTEND THAT ALL FOREIGN JURISDICTIONS WILL ENFORCE ANY DECREE OF THE BANKRUPTCY COURT IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT FURTHER AGREES THAT SERVICE OF PROCESS WITH RESPECT TO ANY ACTION GOVERNED BY THIS SECTION 10.12 MAY BE MADE UPON A PARTY BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS AS PROVIDED IN SECTION 10.04. THE PROVISIONS OF SECTION 10.13 BELOW RELATING TO THE WAIVER OF JURY TRIAL SHALL APPLY TO ANY SUCH PROCEEDING. EACH PARTY AGREES THAT ANY FINAL AND NON-APPEALABLE JUDGMENT AGAINST IT IN ANY PROCEEDING DESCRIBED IN THIS SECTION 10.12 SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY OTHER JURISDICTION WITHIN OR OUTSIDE OF THE UNITED STATES BY SUIT ON SUCH JUDGMENT, A CERTIFIED COPY OF WHICH SHALL BE CONCLUSIVE EVIDENCE OF THE FACT AND AMOUNT OF SUCH JUDGMENT. THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF KNOWING AND VOLUNTARY AND BARGAINED AGREEMENT BETWEEN THE PARTIES.

10.13 WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES. ACCORDINGLY AND TO THE EXTENT PERMITTED BY LAW, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE ANCILLARY DOCUMENTS, THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR THE RELATIONSHIP BETWEEN THE PARTIES, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE AND REGARDLESS OF WHICH PARTY INITIATES SUCH ACTION. THE PARTIES TO THIS AGREEMENT EACH AGREE AND CONSENT THAT ANY SUCH ACTION SHALL BE DECIDED BY COURT TRIAL IN THE CHOSEN COURTS WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT: (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER; (B) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (C) EACH SUCH PARTY MAKES THIS WAIVER VOLUNTARILY; AND (D) EACH SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.13.

Case: 22-10381   Doc# 316   Filed: 04/07/23   Entered: 04/07/23 18:10:10   Page 75 of 113

10.14  No Third Party Beneficiaries.  Nothing in this Agreement, express or implied, is intended to confer upon any Person other than the parties to this Agreement, or any of their respective successors or permitted assigns, any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.

10.15  Representation of Seller and its Affiliates.  Buyer agrees, on its own behalf and on behalf of the Buyer Related Parties, that (a) Seller and its Affiliates have retained Greenspoon Marder LLP to act as their counsel in connection with the transactions contemplated by this Agreement as well as other past matters; (b) Greenspoon Marder LLP have not acted as counsel for any other Person in connection with the transactions contemplated by this Agreement and no Person other than Seller and its Affiliates has the status of a Greenspoon Marder LLP client for conflict of interest or any other purpose as a result thereof, and (c) following the Closing, Greenspoon Marder LLP may serve as counsel to Seller in connection with any matters related to this Agreement and the transactions contemplated hereby, including any litigation, claim or obligation arising out of or relating to this Agreement or the transactions contemplated by this Agreement notwithstanding any representation by Greenspoon Marder LLP prior to the Closing Date of Seller.  Buyer (on behalf of itself and its subsidiaries) hereby (i) waive any claim they have or may have that Greenspoon Marder LLP has a conflict of interest or is otherwise prohibited from engaging in such representation and (ii) agree that, in the event that a dispute arises after the Closing between Buyer or Seller or any of their respective Affiliates, Greenspoon Marder LLP may represent Seller in such dispute even though the interests of such Person(s) may be directly adverse to Buyer or Seller and even though Greenspoon Marder LLP may have represented Seller or other Persons in a matter substantially related to such dispute and may be handling other ongoing matters for a Buyer Related Party.  Buyer represents that Buyer's own attorney has explained and helped Buyer evaluate the implications and risks of waiving the right to assert a future conflict against Greenspoon Marder LLP, and Buyer's consent with respect to this waiver is fully informed. Buyer (on behalf of itself and its subsidiaries) also further agree that, as to all communications among Greenspoon Marder LLP, on the one hand, and Seller or Seller's Affiliates and Representatives, on the other hand, that relate in any way to the transactions contemplated by this Agreement, the attorney client privilege and the expectation of client confidence belongs to Seller and may be controlled by Seller and will not pass to or be claimed by Buyer or any of its Affiliates. In addition, if the Closing occurs, all of the client files and records in the possession of Greenspoon Marder LLP related to this Agreement and the transactions contemplated hereby will continue to be property of (and be controlled by) Seller will retain any copies of such records or have any access to them.  Without limiting the foregoing, Buyer on behalf of itself, its Affiliates, subsidiaries and their respective current and future members, partners, equityholders, Representatives and each of the successors and assigns of the foregoing (the "Waiving Parties"), hereby acknowledge and agree that all (x) emails and other communications from or among any Seller Related Party or any Affiliates, directors, managers, officers, employees, agents, advisors, attorneys, accountants, consultants or other representatives of any Seller Related Party concerning, related to or in respect of the sale process, this Agreement or any agreement entered into in connection with herewith or related hereto (including all prior drafts), the assets, Liabilities, operations, prospects and condition of Seller and its business as related to the foregoing, and any other matter relating to any of the foregoing (whether or not such email or other communication is entitled to any attorney-client or other privilege) and (y) Documents or materials created by or on behalf of any Seller Related Party in connection with, in preparation for, related to or arising out of the sale process, any prior sale

52

processes, this Agreement or any agreement entered into in connection herewith or related hereto (including all prior drafts) and the subject matter hereof and thereof, or any dispute or proceeding arising out of or relating to, the sale process, this Agreement, any agreement entered into in connection herewith, the transactions contemplated hereby or any matter relating to any of the foregoing, will be exclusively owned and controlled by Seller and will not pass to or be claimed by Buyer thereof and from and after the Closing neither Buyer nor any other Person purporting to act on behalf thereof or any of the Waiving Parties will seek to access, obtain, use, rely on or otherwise disclose the same, including, without limiting the foregoing, by or through any legal or other process, without in each case first obtaining Seller's consent, which may be granted or withheld in its sole discretion. In furtherance of the foregoing, Buyer acknowledges that it would be impractical to remove all such emails and communications from the records (including emails and other electronic files) of Seller and that any possession of Buyer of any of the foregoing will not affect or alter the ownership of such emails and communications. Notwithstanding the foregoing, in the event that a dispute arises between Buyer or Seller and a third party other than a party to this Agreement (or an Affiliate thereof) after the Closing, Seller may assert the attorney client privilege to prevent disclosure of confidential communications by Greenspoon Marder LLP to such third party; provided, however, that Seller does not waive such privilege except as expressly provided in writing.

10.16   No Additional Representations; Disclaimer; Non-Recourse.

(a)     Buyer acknowledges that it has conducted to its satisfaction an independent investigation of the Business, the Acquired Assets and the Assumed Liabilities and, in making its determination to proceed with the transactions contemplated by this Agreement, Buyer has relied solely on the results of its own independent investigation and the representations and warranties of Seller expressly and specifically set forth in Article III, as qualified by the Disclosure Schedules.

(b)     In connection with the investigation by Buyer and its Affiliates of the Business, the Acquired Assets, the Assumed Liabilities and the Assumed Contracts, Buyer and its Affiliates have received or may receive from Seller certain projections, forward-looking statements and other forecasts and certain business plan information. Buyer acknowledges on behalf of itself and its Affiliates that there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, that Buyer is familiar with such uncertainties, that Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and that Buyer and its Affiliates will have no claim against anyone with respect thereto. Accordingly, Buyer acknowledges, on behalf of itself and its Affiliates, that neither Seller, nor any member, officer, director, employee or agent of any of the foregoing, whether in an individual, corporate or any other capacity, make any representation, warranty, or other statement with respect to, and Buyer is not relying on, such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and Buyer agrees that it and its Affiliates have not relied thereon.

Case: 22-10381   Doc# 316   Filed: 04/07/23   Entered: 04/07/23 18:10:10   Page 77 of 113

10.17 <u>Conflict Between Transaction Documents</u>.  The parties hereto agree and acknowledge that to the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of any other agreement, document or instrument contemplated hereby (other than the Sale Order, the Assignment Order or any Related Order) this Agreement will govern and control.

10.18 <u>Specific Performance; Other Remedies</u>.

(a) The provisions of this Agreement are uniquely related to the desire of the parties and their respective Affiliates to consummate the transactions contemplated hereunder, and the transactions contemplated hereunder represent a unique business opportunity at a unique time for each of the parties and their respective Affiliates; therefore (i) irreparable damage would occur if any provision of this Agreement were not performed in accordance with its terms or otherwise breached and, (ii) although monetary damages may be available for the breach of such covenants, obligations and undertakings, monetary damages would be an inadequate remedy therefor.  Accordingly each party agrees, on behalf of itself and its Affiliates, that if any party hereto breaches or threatens to breach any provision of this Agreement, the counterparty shall be entitled to an injunction or injunctions, specific performance and other equitable relief to prevent or restrain such breaches or threatened breaches of this Agreement, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the terms and provisions of this Agreement.  Any party seeking an injunction or injunctions to prevent breaches of this Agreement or to enforce specifically the terms and provisions of this Agreement shall not be required to provide, furnish or post any bond or other security in connection with or as a condition to obtaining any such order or injunction, and each party irrevocably waives any right it may have to require the provision, furnishing or posting of any such bond or other security.  If any Action should be brought in equity to enforce the provisions of this Agreement, no party shall allege, and each party waives the defense, that there is an adequate remedy at law.  The rights in this <u>Section 10.18</u> are in addition to any other remedy to which a party may be entitled at law or in equity (subject to the limitations herein), and the exercise by a party of one remedy shall not preclude the exercise of any other remedy.

(b) To the extent any party brings any Action to enforce specifically the performance of the terms and provisions of this Agreement (other than an action to enforce specifically any provision that expressly survives termination of this Agreement), the Termination Date shall automatically be extended to (i) the 20th Business Day following the resolution of such Action, if later than the date the Termination Date would otherwise occur pursuant to the terms hereof or (ii) such other time period established by the court presiding over such Action.

10.19 <u>Electronic Delivery</u>.  This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments hereto or thereto, to the extent delivered by means of a facsimile machine or electronic mail (any such delivery, an "<u>Electronic Delivery</u>"), will be treated in all manner and respects as an original agreement or instrument and will be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such

54

agreement or instrument, each other party hereto or thereto will re execute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or instrument will raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a Contract, and each such party forever waives any such defense, except to the extent such defense related to lack of authenticity.

10.20   <u>Buyer Deliveries</u>.  Any document or item will be deemed "delivered", "provided" or "made available" within the meaning of this Agreement if such document or item (a) is included in the electronic data room or (b) actually delivered or provided to Buyer or any of its Representatives.

*       *       *       *       *

55

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement on the day and year first above written.

SELLER:

**SPRING MOUNTAIN VINEYARD INC.**

By: _____
    Name:
    Title:


BUYER:

**MGG CALIFORNIA, LLC**

By: _____
    Name:
    Title:

**Exhibit A**

**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**

This BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment") is made as of [●], 2023 (the "Closing Date"), by and among DNAW SPV CA Vineyard, LLC, a California limited liability company ("Buyer"), and Spring Mountain Vineyard Inc., a Delaware corporation ("Seller").

RECITALS

WHEREAS, this Assignment is made pursuant to that certain Asset Purchase Agreement, dated as of [●], 2023, by and among Buyer (as assignee of MGG California, LLC, a California limited liability company) and Sellers (the "Purchase Agreement");

WHEREAS, each capitalized term used but not otherwise defined in this Assignment has the meaning ascribed to it in the Purchase Agreement;

WHEREAS, pursuant to the Purchase Agreement, (i) Seller has agreed to sell, transfer, convey, assign, and deliver the Acquired Assets and to assign the Assumed Liabilities, and (ii) Buyer has agreed to purchase, accept and acquire such Acquired Assets and to assume such Assumed Liabilities; and

WHEREAS, the assignment of the Acquired Assets (including, for the avoidance of doubt, the Assumed Contracts), and the assumption of the Assumed Liabilities (including those relating to the Assumed Contracts), has been approved by the Sale Order.

AGREEMENT

NOW, THEREFORE, in consideration of the premises and of the representations, warranties, covenants, and agreements contained in the Purchase Agreement and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties to this Assignment agree as follows:

1. **Acquired Assets.** Subject to the terms of the Purchase Agreement, the Sale Order, the Assignment Order and any other Related Order, Seller hereby sells, conveys, assigns, transfers and delivers to Buyer, and Buyer hereby accepts from Seller, effective as of the Closing Date, all of Seller's right, title and interest in and to the Acquired Assets (including, for the avoidance of doubt, the Assumed Contracts), except for certain Owned Intellectual Property, which is subject to the IP Assignment and Assumption Agreement entered into as of the Closing Date. For the avoidance of doubt, notwithstanding anything in this Assignment to the contrary, the parties hereby agree and affirm that Seller is not selling, conveying, assigning, transferring or delivering any of the Excluded Assets.

2. **Assumed Liabilities.** Subject to the terms of the Purchase Agreement, the Sale Order, Assignment Order and any other Related Order, Seller hereby assigns to Buyer, and Buyer hereby assumes and agrees to pay, discharge and perform in accordance with their terms, the Assumed Liabilities. For the avoidance of doubt, notwithstanding anything in this Assignment to the contrary, the parties hereby agree and affirm that Buyer is not assuming or in any way becoming liable or responsible for the Excluded Liabilities.

3.      <u>Further Assurances</u>.  Seller and Buyer hereby covenant and agree to, from time to time, as and when requested by any party hereto and at such requesting party's expense, execute and deliver, or cause to be executed and delivered, such other instruments of conveyance and transfer as the other party may reasonably request or as may be otherwise necessary to more effectively convey and transfer to, and vest in, Buyer and put Buyer in possession of, each of the Acquired Assets and Assumed Liabilities.

4.      <u>Purchase Agreement Controlling</u>.  This Assignment is intended to evidence the consummation of certain transactions contemplated by the Purchase Agreement.  This Assignment is made without representation or warranty, except as and to the extent provided in the Purchase Agreement.  To the extent that any provision of this Assignment is inconsistent or conflicts with the Purchase Agreement, the Sale Order, the Assignment Order and any other Related Order, the provisions of the Purchase Agreement, the Sale Order, the Assignment Order and any other Related Order, as applicable, shall control.  Nothing contained in this Assignment shall be deemed to supersede, enlarge, limit or otherwise modify any of the obligations, agreements, covenants, representations or warranties of Seller contained in the Purchase Agreement.

5.      <u>Miscellaneous</u>.  This Assignment is binding upon, and inures to the benefit of and is enforceable by, Buyer, Seller and their respective successors and permitted assigns. This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Sections 10.04, 10.05, 10.06, 10.11, 10.12, 10.13 and 10.19 of the Purchase Agreement shall apply to and govern this Assignment, *mutatis mutandis*.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be executed on the date first written above by their respective duly authorized officers.

SELLER:

**SPRING MOUNTAIN VINEYARD, INC.**

By: _____
Name:
Title:


BUYER:

**DNAW SPV CA VINEYARD LLC**


By: _____
Name:
Title:

**Exhibit B**

# INTELLECTUAL PROPERTY, ASSIGNMENT AND ASSUMPTION AGREEMENT

This INTELLECTUAL PROPERTY, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Assignment"), dated as of [●], 2023 ("Effective Date"), is entered into by and among DNAW SPV CA Vineyard, LLC, a California limited liability company ("Assignee"), and Spring Mountain Vineyard Inc., a Delaware corporation ("Assignor"). Assignor and Assignee are collectively referred to herein as the "Parties."

## RECITALS

WHEREAS, this Assignment is made pursuant to that certain Asset Purchase Agreement, dated as of [●], 2023, by and among Assignee (as assignee of MGG California, LLC, a California limited liability company) and Assignor (the "Purchase Agreement"), pursuant to which Assignor has agreed to sell, assign, transfer and convey to Assignee, among other things, all of Assignor's right, title and interest in certain assets to Assignee, and Assignee agreed to assume certain liabilities of the Assignor;

WHEREAS, each capitalized term used but not otherwise defined in this Assignment has the meaning ascribed to it in the Purchase Agreement;

WHEREAS, Assignor is the owner of the Registered Intellectual Property set forth on Schedule A hereto and the other Owned Intellectual Property; and

WHEREAS, Assignor wishes to assign to Assignee, and Assignee wishes to accept from Assignor the assignment of, all right, title and interest of Assignor in and to the Owned Intellectual Property pursuant to and in accordance with the Purchase Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereto, intending to be legally bound hereby, agree as follows:

1.      Assignment.  Subject to the terms of the Purchase Agreement, the Sale Order, Assignment Order and any other Related Order, Assignor hereby sells, assigns, transfers, conveys and delivers to Assignee, and Assignee hereby accepts the sale, assignment, transfer, conveyance and delivery of, (i) all of Assignor's right, title, and interest in, to, and under the Owned Intellectual Property, including any common law rights associated with the Registered Intellectual Property, (ii) all goodwill associated with the trademarks set forth on Schedule A, and (iii) any and all rights, claims, credits, causes of action, defenses and rights of offset or counterclaim to the extent arising from the rights in clause (i) and (ii) that are available to or being pursued by Assignor against third parties (and the right to receive all monies, proceeds, settlements and recoveries in connection therewith).

2.      Recording the Assignment. The Parties hereby authorize and request the relevant authorities at the United States Patent and Trademark Office and all applicable foreign agencies to record this Assignment and record Assignee as the owner of the Registered Intellectual

Property, as assignee of the entire right, title and interest in, to and under the same, for the sole enjoyment of Assignee and its successors and assigns.

3. <u>Purchase Agreement Controlling</u>. This Assignment is intended to evidence the consummation of certain transactions contemplated by the Purchase Agreement. This Assignment is made without representation or warranty, except as and to the extent provided in the Purchase Agreement. To the extent that any provision of this Assignment is inconsistent or conflicts with the Purchase Agreement, the Sale Order, the Assignment Order or any other Related Order, the provisions of the Purchase Agreement, the Sale Order, the Assignment Order or any other Related Order, as applicable, shall control. Nothing contained in this Assignment shall be deemed to supersede, enlarge, limit or otherwise modify any of the obligations, agreements, covenants, representations or warranties of Seller contained in the Purchase Agreement.

4. <u>Miscellaneous</u>. This Assignment is binding upon, and inures to the benefit of and is enforceable by, Assignor and Assignee and their respective successors and permitted assigns. This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Sections 10.04, 10.05, 10.06, 10.11, 10.12, 10.13 and 10.19 of the Purchase Agreement shall apply to and govern this Assignment, *mutatis mutandis*.

*[Signature page follows.]*

Case: 22-10381    Doc# 316    Filed: 04/07/23    Entered: 04/07/23 18:10:10    Page 87 of 113

IN WITNESS WHEREOF, each party hereto has caused this Assignment to be duly executed on its behalf as of the day and year first above written.

ASSIGNOR:

**SPRING MOUNTAIN VINEYARD, INC.**


By: _____
    Name:
    Title:


ASSIGNEE:

**DNAW SPV CA VINEYARD LLC**


By: _____
Name:
Title:

## Schedule A

### Registered Intellectual Property

U.S. Trademark Registrations:

| Trademark | Filing Date | Serial No. | Reg. Date | Reg. No. | Owner |
|---|---|---|---|---|---|
| CHATEAU CHEVALIER | February 24, 2006 | 78822757 | August 7, 2007 | 3274645 | Spring Mountain Vineyard Inc. |
| ELIVETTE | September 28, 1999 | 75809606 | June 15, 2004 | 2854066 | Spring Mountain Vineyard Inc. |
| SPRING MOUNTAIN (Typed Drawing) | August 3, 1993 | 74421065 | March 21, 1995 | 1885177 | Spring Mountain Vineyard Inc. |

Non-U.S. Trademark Registrations:

| Country | Mark | Owner of Record | Goods/services | Reg. No. | Date of Reg. |
|---|---|---|---|---|---|
| Hong Kong | ELIVETTE | Spring Mountain Vineyard Inc. | Class 33: Wine; alcoholic beverages, except beers. | 302332854 | May 30, 2013 |
| Singapore | SPRING MOUNTAIN / SPRING MOUNTAIN | Spring Mountain Vineyard Inc. | Class 33: Alcoholic beverages, except beers; Wine-based beverages; Wine-based drinks; Wines; all the aforesaid goods originating from Spring Mountain, a region in Napa Valley, California. | 40202127795P | September 12, 2022 |
| Switzerland | SPRING MOUNTAIN VINEYARD and Design | Spring Mountain Vineyard Inc. | Class 33: Wine with the geographical indication Spring Mountain District; alcoholic beverages, except beers and wine. | 780857 | May 6, 2022 |
| United Kingdom | ELIVETTE | Spring Mountain Vineyard Inc. | Class 33: Wine | UK00801118673 | May 02, 2013 |

| | | | | | |
|---|---|---|---|---|---|
| United Kingdom | SPRING MOUNTAIN | Spring Mountain Vineyard Inc. | Class 33: Wine | UK00801116192 | April 9, 2013 |
| WIPO (Designated countries: **China, European Union, Japan, Singapore, Switzerland**) | ELIVETTE | Spring Mountain Vineyard Inc. | Class 33: Wine | 1118673 | April 16, 2012 |
| WIPO (Designated countries: **European Union, Japan**) | SPRING MOUNTAIN | Spring Mountain Vineyard Inc. | Class 33: Wine | 1116192 | April 16, 2012 |

**Exhibit C**

RECORDING REQUESTED BY
AND WHEN RECORDED MAIL TO:

NAME         Douglas B. Frank, Esq.
                Proskauer Rose LLP
STREET       2029 Century Park E.
                Ste 2400
CITY/STATE  Los Angeles, California  90067


**MAIL TAX STATEMENTS TO:**

NAME       _____

                _____
STREET      _____
CITY/STATE  _____

**SPACE ABOVE THIS LINE FOR RECORDER'S USE**

**GRANT DEED**

**APNs:  009-450-001-000; 022-180-15-000; 022-180-017-000; 022-180-020-000; 022-180-021-000; 022-180-053-000; 022-180-058-000; 022-260-012-000; 022-260-013-000**

The undersigned grantor(s) declare(s):

Documentary transfer tax is: $[0.00*]

(  )  Computed on full value of property conveyed, or
(  )  Computed on full value less value of liens and encumbrances remaining at time of sale.
(  )  Unincorporated area:  ( X ) City of [_____], and

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**Spring Mountain Vineyard Inc.,** a Delaware corporation, hereby grants to
_____,

(i) that certain real property located in Napa County, California (collectively, the "Land"), more particularly described in Exhibit A attached hereto, and (ii) all buildings and improvements now located or hereafter constructed on the Land.

*[Signatures on the next page]*

IN WITNESS WHEREOF, Grantor has executed this Grant Deed as of [●], 2023.

**SPRING MOUNTAIN VINEYARD INC.,** a Delaware corporation

By: _____
Name
Title

**CERTIFICATE OF ACKNOWLEDGMENT OF NOTARY PUBLIC**

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

STATE OF _____         }

COUNTY OF _____                }

On _____, before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _____ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature:_____(Seal)

EXHIBIT A

**LEGAL DESCRIPTION**

(Address: 2805 and 2849 Spring Mountain, St. Helena, CA)

**APNs:  009-450-001-000; 022-180-15-000; 022-180-017-000; 022-180-020-000; 022-180-021-000; 022-180-053-000;**
**022-180-058-000; 022-260-012-000; 022-260-013-000**

TRACT ONE:

Commencing at a point on the Westerly boundary line of the Carne Humana Rancho distant thereon 29.19 chains Northerly from corner C. H. No. 8 of said Rancho and running thence due North along said Western boundary line of said Rancho 24.40 chains to a stone monument which is one of the corners of the Western boundary line of the Town of St. Helena; thence following the boundary line of said Town of St. Helena South 84-1/2° East 3.11 chains, North 55° East 86 links, South 83° East 2.80 chains, South 72-1/4° East 3.30 chains and North 89-3/4° East 1.60 chains to a large white oak marked "C" standing on the bank of a small branch of York Creek, said point being also a Northwesterly corner of the premises conveyed to E. R. Palmer, et ux, by Deed recorded May 11, 1932 in Book 68 at page 394 of Official Records of Napa County; thence South 27° West along a Westerly line of said premises so conveyed to E. R. Palmer, et ux, and along a Westerly line of the premises conveyed to Alfred H. Meyer, et ux, by Deed recorded June 6, 1935 in Book 98 at page 377 of Official Records of Napa County, 26 chains to the point of commencement.

EXCEPTING THEREFROM that certain property described as Parcel 2 conveyed to Alfred H. Meyer, et ux, by Deed recorded August 23, 1939 in Book 142 at page 418 of Official Records of Napa County.

APN 009-450-001

TRACT TWO:

Commencing at a point formed by the intersection of the Western boundary line of the Carne Humana Rancho with the Southerly line of Hudson or York Creek and running thence Southerly along said boundary line to a stone monument which is one of the corners of the Westerly boundary of the Town of St. Helena; thence following said boundary line of the Town of St. Helena, South 84-1/4° East 3.11 chains, North 55° East 86 links, South 83° East 2.80 chains, South 72-1/4° East 3.30 chains and North 89-3/4° East 1.60 chains to a large white oak marked "C" standing on the bank of a small branch of York Creek, said point being also a Northwesterly corner of the premises conveyed to E. R. Palmer, et ux, by Deed recorded May 11, 1932 in Book 68 at page 394 of Official Records of Napa County; thence South 81-1/2° East along a Northerly
line thereof, 5.31 chains to a point from which a black oak tree marked "Y" bears Northeasterly 19 yards, said point being on the Westerly line of the premises conveyed to Ralph R. McMasters, et ux, by Deed recorded June 22, 1936 in Book 107 at page 454 of Official Records of Napa County; thence North 1-3/4° West along said Westerly line and along the Westerly line of the premises conveyed to William L. Gaylord, et ux, by Deed recorded August 31, 1927 in Book 25 at page 320, Napa County Records; 9.28 chains; thence North 35-3/4° East along a Northwesterly line of said premises conveyed to William L. Gaylord, et ux, to the Southerly line of Hudson or York Creek; thence in a general Westerly direction along the Southerly line of said creek to the point of commencement.

APN 022-180-021

Case: 22-10381    Doc# 316    Filed: 04/07/23    Entered: 04/07/23 18:10:10    Page 95 of 113

TRACT THREE:

The Southeast quarter of the Northeast quarter of Section 34, the South half of the Northwest quarter, the Northeast quarter of the Northwest quarter, the Southwest quarter of the Northeast quarter and all that portion of the Northwest quarter of the Northeast quarter of Section 35 lying Southerly of the Southerly line of the first parcel of land described in the Lis Pendens recorded April 2, 1938 in Book 129 at page 94 of Official Records of Napa County, of Section 35, Township 8 North, Range 6 West Mount Diablo Base and Meridian.

APN 022-180-020

TRACT FOUR:

Beginning at a nail and tag stamped LS 4510 in the center of Lemme Road on the North and South line through the middle of the Southeast quarter of Section 27, Township 8 North, Range 6 West, Mount Diablo Base and Meridian, said nail and tag perpetuates the location of Lemme Gate and is shown on Map No. 4084 filed in Book 26 of Surveys at pages 10-11 in the office of the County Recorder of said Napa County; thence along the centerline of Lemme Road, South 88° 48' 46" West 11.84 feet and on the arc of a tangent curve to the right having a radius of 300 feet through a central angle of 15° 08' 59" an arc distance of 79.32 feet; thence leaving said centerline North 1° 10' 23" West 16.00 feet to a rebar and cap stamped LS 4510; thence continuing North 1° 10' 23" West 345.98 feet to a rebar and cap stamped LS 4510; thence North 1° 22' 07" East 183.97 feet to a rebar and cap stamped LS 4510; thence North 88° 26' 35" West 517.19 feet to a rebar and cap stamped LS 4510 at the Northeast corner of the Southeast quarter of the Southwest quarter of said Section 27; thence along the lines of said Southeast quarter of the Southwest quarter South 89° 57' 28" West 1329.32 feet to the Northwest corner thereof and South 0° 03' 16" West 774.71 feet, more or less, to the most Northerly corner of the 7.5 acre tract conveyed to Jerome C. Draper, et ux, by Deed recorded July 17, 1943 in Book 202 at page 18 of Official Records of Napa County; thence along the Northwesterly line of said 7.5 acre tract South 69° 16' 23" West, 932.00 feet; thence leaving said northwesterly line south 12° 53' 26" West, 2145.36 feet to the west line of Section 34 of said Township and Range; thence along the west line of said Section 34, South 0° 38' 53" West, 760.00 feet to the west quarter corner of said Section 34; thence along the East-West center of section line of Section 34 East 2640 feet, more or less, to the center of Section 34; thence along the North-South center of section line of Section 34, North 1320 feet, more or less, to the Northwest corner of the Southwest quarter of the Northeast quarter of said Section 34; thence along the North line of said Southwest quarter of the Northeast quarter East 1320 feet, more or less, to the Southeast corner of the Northwest quarter of the Northeast quarter of said Section 34; thence along the East line of said Northwest quarter of the Northeast quarter, North 867 feet, more or less, to the Southerly corner of the 5.55 acre tract conveyed from Charles Lemme to Jacob L. Beringer, recorded in Book 30 of Deeds at page 429, said Napa County Records; thence along the Southwesterly line of said 5.55 acre tract North 40-1/2° West 12.60 chains to the center of a ravine and Easterly down the center of said ravine to a point from which the point of beginning bears North 1° 34' 10" East; thence North 1° 34' 10" East 4.55 chains to the point of beginning.

APN 022-180-058

TRACT FIVE:

PARCEL ONE:

Commencing at the Lemme Gate on the north and south line through the center of the southeast quarter of Section 27, Township 8 North, Range 6 West, Mount Diablo Base and Meridian; and running thence along the old Lemme Road (which is also the southern line of the parcel of land heretofore conveyed to George F. Chevalier by Deed of record in Book 68 of Deeds at page 229, Napa County Records, as follows: South 85-1/2° East 3.96 chains, South 57° East, 5.27 chains, South 16° East 1.80 chains, south 74° East, 1.36 chains, South 54-1/2° East 2.17 chains, South 88° East, 1.95 chains, North 60-1/2° East 4.30 chains, south 67° East 1.71 chains, South 14° West, 1.49 chains, South 38-1/2° East, 5.17 chains, North 84-1/2° East 8.71 chains, North 35° East, 2.50 chains, North 76° East 3.67 chains, South 80-1/2° East 2.23 chains, South 52° East 1.72 chains, North 63° East, 2.22 chains, South 76° East, 1.72 chains, North 55-3/4° East, 3.75 chains, South 52-3/4° East, 2.70 chains, South 12-1/2° East, 1.50 chains, South 78-1/2° East, 1.36 chains, South 84° East, 1.91 chains, North 60° East 1.97 chains, South 69° East, 1.38 chains, East 3.00 chains, South 61° East 3.00 chains and

A-2

South 33° 41' East 0.61 chains, to the line of land formerly owned by St. Helena Water Company; thence Southerly and along the line of land so owned by said Company to a point on the line between Sections 26 and 35, in Township 8 North, Range 6 West, distance about 50 links west of the quarter section corner; thence with government subdivision lines as follows: West 19.50 chains, South 20 chains and west 40 chains to the aforesaid north and south centerline of the southeast quarter of Section 27, in Township 8 North, Range 6 West; and thence North along last mentioned line, 31 chains to the point of commencement. Being a portion of the south half of the southwest quarter of Section 26 and of the southeast quarter of the southeast quarter of Section 27 and all of the northeast quarter of the northeast quarter of Section 34, all of the northwest quarter of the northwest quarter of Section 35, all in Township 8 North, Range 6 West, Mount Diablo Base and Meridian.

APN 022-180-017 (portion)

PARCEL TWO:

The southwest quarter of the northeast quarter of Section 34, Township 8 North, Range 6 West, Mount Diablo Base and Meridian.

APN 022-180-017 (portion)

PARCEL THREE:

Commencing in the center of a ravine running through the Dixon flat and distant due South along the north and south centerline of the southeast quarter of Section 27, Township 8 North, Range 6 West, Mount Diablo Base and Meridian, 4.55 chains from the point of commencement, designated in the description next proceeding; running thence due south, along said north and south centerline, 12.36 chains, to a stake at the foot of a small oak marked "L&B", at the junction with the line of the former Lemme Vineyard fence continued; thence North 40-1/2° West, 12.60 chains, in line with said vineyard fence and along the same and the continuation thereof, to the center of the aforesaid ravine; and thence down said ravine, following all of its meanderings, to the point of commencement. Being a portion of the southwest quarter of the southeast quarter of Section 27 and of the northwest quarter of the northeast quarter of Section 34, in Township 8 North, Range 6 West, Mount Diablo Base and Meridian, and being the same parcel of land acquired by Jacob L. Beringer by Deed from Chas. Lemme of record in Book 30 of Deeds at page 429, Napa County Records.

APN 022-180-017 (portion)

TRACT SIX:

Commencing on the South side of York Creek at the point of intersection of a line on a water level with the County Road on the North side of said creek with the North line of the Lemme Road near the quarter section corner of the South boundary of Section 26, Township 8 North, Range 6 West, Mount Diablo Base and Meridian; thence along said Lemme Road the following courses and distances: North 33° 41' West 0.61 chains, North 61° West 3.00 chains, West 3.00 chains, North 69° West 1.38 chains, South 60° West 1.97 chains, North 84° West 1.91 chains, North 78-1/2° West 1.36 chains, North 12-1/2° West 1.50 chains, North 52-3/4° West 2.70 chains, South 55-3/4° West 3.75 chains, North 76° West 1.72 chains, South 63° West 2.22 chains, North 52° West 1.72 chains, North 80-1/2° West 2.33 chains, South 76° West 3.67 chains, South 35° West 2.50 chains, South 84-1/2° West 8.71 chains, North 38-1/2° West 1.50 chains; thence leaving said Lemme Road, North 22-1/2° East 21.21 chains, more or less, to a point on the South side of York Creek on a water level with the County Road on the North side of said creek; and thence Southeast down the South side of York Creek and on a water level with the County Road on the North side of said creek to said Lemme Road and the point of commencement.

Case: 22-10381   Doc# 316   Filed: 04/07/23   Entered: 04/07/23 18:10:10   Page 97 of 113

EXCEPTING THEREFROM any portion lying within the bounds of the tract of land described in the Judgment to the Town of St. Helena, rendered in the Superior Court of the State of California, in and for the County of Napa, Case No. 7761, a Notice of Lis Pendens having been recorded April 2, 1938 in Book 129 at page 94 of Official Records of Napa County.

APN 022-180-015

TRACT SEVEN:

Beginning at a nail and tag stamped LS 4510 on the centerline of Lemme Road as shown on Map No. 4531 filed in Book 28 of Surveys at page 47 in the office of the County Recorder of said Napa County, said point being the Southwest corner of Parcel Two as shown on said map; thence leaving said centerline of Lemme Road along the Westerly line of said Parcel Two as shown on said map, North 1° 10' 23" West 16.00 feet to a rebar and cap stamped LS 4510; thence continuing North 1° 10' 23" West 345.98 feet to a rebar and cap stamped LS 4510; thence North 1° 22' 07" East 183.97 feet to a rebar and cap stamped LS 4510; thence leaving said Westerly line of Parcel Two, North 88° 28' 11" East 21.08 feet to a rebar and cap stamped LS 4510; thence North 29° 46' 59" East 140.36 feet to a rebar and cap stamped LS 4510; thence North 61° 59' 13" East 136.20 feet to a rebar and cap stamped LS 4510; thence North 51° 31' 51" East 119.53 feet to a rebar and cap stamped LS 4510; thence North 60° 07' 31" East 172.56 feet to a rebar and cap stamped LS 4510; thence South 14° 00' 40" East 114.88 feet to a rebar and cap stamped LS 4510; thence South 53° 12' 33" East 33.51 feet to a rebar and cap stamped LS 4510; thence South 45° 02' 37" East 323.99 feet to a rebar and cap stamped LS 4510; thence North 52° 13' 22" East 163.29 feet, more or less, to the North side of "Chevalier's Road" up the South side of York Creek; thence Southeasterly down the South side of York Creek, and on a water level with the County Road on the North side of said creek to the Northwestern corner of the property described in the Deed to Dudley R. Day, et ux, recorded December 5, 1949 in Book 319 at page 364 of Official Records of Napa County; thence South 22-1/2° West along the Western line of said Day's property, 21.21 chains, more or less, to Lemme Road; thence along Lemme Road Westerly to the point of commencement.

APN 022-180-053

TRACT EIGHT:

Beginning at a rebar stamped LS 4510 at the Southwest corner of the Northeast quarter of the Southwest quarter of Section 27, Township 8 North, Range 6 West, Mount Diablo Base and Meridian, said rebar and cap being shown on Map No. 4084 filed in Book 26 of Surveys at pages 10-11 in the office of the County Recorder of said Napa County; thence North 0° 03' 16" East 1050.17 feet along the West line of the Northeast quarter of the Southwest quarter of said Section 27 to a rebar and cap stamped LS 4510; thence continuing North 0° 03' 16" East 32.05 feet to a nail and tag stamped LS 4510 on the centerline of Spring Mountain Road, said point being on a non-tangent curve from which the radius point bears South 19° 52' 21" East 500.00 feet; thence Northeasterly along the centerline of Spring Mountain Road on said non-tangent curve to the right having a radius of 500.00 feet through a central angle of 6° 07' 47" an arc length of 53.49 feet; thence on a tangent course North 76° 15' 26" East 78.71 feet; thence on a tangent curve to the right having a radius of 250.00 feet through a central angle of 43° 25' 37" an arc length of 189.48 feet; thence on a tangent course South 60° 18' 58" East 0.67 feet; thence on a tangent curve to the left having a radius of 75.00 feet through a central angle of 93° 02' 02" an arc length of 121.78 feet; thence on a tangent course North 26° 39' 00" East 138.74 feet; thence on a tangent curve to the right having a radius of 300.00 feet through a central angle of 4° 43' 57" an arc length of 24.78 feet to a nail and tag stamped LS 4510, said point being on the North line of the Northeast quarter of the Southwest quarter of said Section 27; thence leaving said centerline of Spring Mountain Road and along said North line South 89° 45' 02" East 35.79 feet to a rebar and cap stamped LS 4510; thence continuing along said North line South 89° 45' 02" East 244.15 feet to the center of York Creek; thence up the center of said creek the following courses: South 63° 26' 50" West 168.42 feet, South 9° 54' 54" West 50.15 feet, South 40° 24' 39" East 115.99 feet, South 27° 48' 41" West 64.76 feet, South 13° 40' 59" East 150.40 feet, North 55° 39' 19" East 9.71 feet, North 68° 58' 59" East 101.30 feet, South 35° 36' 48" East 129.48 feet, South 5° 32' 59" East 55.71 feet, North 87° 13' 40" East 93.47 feet, South 8° 59' 16" West 83.26 feet, South 34° 28' 49" East 217.85 feet, South 53° 26' 00" East 36.39 feet, South 13° 34' 30" West 170.81 feet, South 18° 36' 18" East 163.50 feet, South 50° 00' 00" West 100.00 feet and South 40° 00' 00" West 86.23 feet to the South line of the Northeast quarter of the

A-4

Southwest quarter of said Section 27; thence along said line South 89° 57' 28" West 988.38 feet to the point of beginning.

APN 022-260-012

TRACT NINE:

Beginning at a rebar and cap stamped LS 4510 at the Northeast corner of Draper as shown on Map No. 4531 filed in Book 28 of Surveys at page 47 in the office of the County Recorder of said Napa County; thence North 88° 28' 11" East 21.08 feet to a rebar and cap stamped LS 4510; thence North 29° 46' 59" East 140.36 feet to a rebar and cap stamped LS 4510; thence North 61° 59' 13" East 136.20 feet to a rebar and cap stamped LS 4510; thence North 51° 31' 51" East 119.53 feet to a rebar and cap stamped LS 4510; thence North 60° 07' 31" East 172.56 feet to a rebar and cap stamped LS 4510; thence South 14° 00' 40" East 114.88 feet to a rebar and cap stamped LS 4510; thence South 53° 12' 33" East 33.51 feet to a rebar and cap stamped LS 4510; thence North 45° 02' 37" East 323.99 feet to a rebar and cap stamped LS 4510; thence North 52° 13' 22" East 163.29 feet, more or less, to the North side of "Chevalier's Road" up the South side of York Creek; thence Northwesterly up the Southerly side of York Creek, and a water level with the County Road on the North side of said creek to the North line of the Northwest quarter of the Southeast quarter of Section 27, Township 8 North, Range 6 West, Mount Diablo Base and Meridian; thence North 89° 45' 02" West along said line 146.38 feet, more or less, to the center of said Section 27; thence along the East-West center of section line of said Section 27, North 89° 45' 02" West 560.94 feet to the center of York Creek; thence up the center of said creek the following courses: South 63° 26' 50" West 168.42 feet, South 9° 54' 54" West 50.15 feet, South 40° 24' 39" East 115.99 feet, South 27° 48' 41" West 64.76 feet, South 13° 40' 59" East 150.40 feet, North 55° 39' 19" East 9.71 feet, North 68° 58' 59" East 101.30 feet, South 35° 36' 48" East 129.48 feet, South 5° 32' 59" East 55.71 feet, North 87° 13' 40" East 93.47 feet, South 8° 59' 16" West 83.26 feet, South 34° 28' 49" East 217.85 feet, South 53° 26' 00" East 36.39 feet, South 13° 34' 30" West 170.81 feet, South 18° 36' 18" East 163.50 feet, South 50° 00' 00" West 100.00 feet and South 40° 00' 00" West 86.23 feet to the South line of the Northeast quarter of the Southwest quarter of said Section 27 as shown on Map No. 4084 filed in Book 26 of Surveys at pages 10-11 in the office of the County Recorder of said Napa County; thence along said South line North 89° 57' 28" East 340.95 feet to a rebar and cap stamped LS 4510 at the Southeast corner of the Northeast quarter of the Southwest quarter of said Section 27 as shown on said Map No. 4084 and Map No. 4531; thence along the Southerly lines of said Parcel One as shown on said Map No. 4531, South 88° 26' 35" East 517.19 feet to a rebar and cap stamped LS 4510 and South 89° 23' 32" East 733.91 feet to the point of beginning.

APN 022-260-013

Case: 22-10381   Doc# 316   Filed: 04/07/23   Entered: 04/07/23 18:10:10   Page 99 of 113

**Form of Transition Services Agreement**

# LICENSE TRANSFER AND TRANSITION SERVICES AGREEMENT

THIS LICENSE TRANSFER AND TRANSITION SERVICES AGREEMENT (this "**Agreement**") is made and executed as of [●], 2023 (the "**Signing Date**"), by and between MGG CALIFORNIA LLC, a California limited liability company ("**MGG**"), SPRING MOUNTAIN VINEYARD INC., a Delaware corporation ("**SMV**"), and **DNAW SPV CA VINEYARD LLC**, a California limited liability company ("**DNAW**" and, together with MGG, "**Buyer**") (each of MGG, SMV and DNAW is sometimes hereinafter referred to individually as a "**Party**" and collectively as the "**Parties**"), with respect to the following facts:

## RECITALS

A.     MGG and SMV are parties to that certain Asset Purchase Agreement, dated as of the date hereof (the "**APA**"), pursuant to which, among other things, MGG has agreed to purchase the Acquired Assets and assume the Assumed Liabilities.  Capitalized terms used but not defined herein shall have the meaning assigned to them in the APA.

B.     MGG has assigned its rights and obligations under the APA to DNAW.

C.     SMV holds certain licenses and permits allowing for the production and sale of wine at the Vineyard (collectively, the "**Winery Licenses**"), including but not limited to: (i) Winery Basic Permit No. BW-CA-5707 issued by the United States Alcohol and Tobacco Tax and Trade Bureau (the "**TTB**") and (ii) Winegrower License No. 02-282407 issued by California Department of Alcoholic Beverage Control (the "**ABC**").  SMV also holds Winegrower License No. 02-283613 issued by the ABC at 1150 Dowdell Lane in Saint Helena, a location of its remote storage and fulfillment provider, Wine Services Cooperative (the "**Fulfillment House License**").  In addition, SMV holds various tax permits, business registrations or ancillary permits necessary to support the Business, including, but not limited to permits to ship wine to wholesalers outside of California, permits to ship wine to consumers outside of California, weigh scale permits, air tank permits, fire alarm permits, FDA registrations or seller's permits.  The Winery Licenses, the Fulfillment House License and all others held by SMV are collectively referred to herein as "**SMV's Licenses**."

D.     Pursuant to the APA, SMV agrees to transfer to Buyer SMV's Licenses via (i) a Change of Proprietorship/Control referencing SMV's TTB permit, (ii) a transfer of SMV's ABC licenses with a temporary permit to operate to be issued on or after the Closing Date, and (iii) cooperation to transfer all transferable ancillary permits required to operate the Business or to provide information as requested by Buyer to assist Buyer to obtain such permits. Buyer is not required to accept transfer of all SMV Licenses, but SMV is required to transfer any SMV License requested by Buyer. When Buyer has received notice that the applicable TTB permit and ABC permanent licenses have been approved, Buyer will operate at the Winery under the authority of those licenses (the "**Permit Issue Date**").

E.     Buyer intends to operate the Business for winemaking activity on and after the Closing Date. The activities contemplated by Buyer require alcoholic beverage licensing, but Buyer will not have all such necessary licenses as of the Closing Date, so some activity on and after the Closing Date requiring alcoholic beverage licensing in connection with the Business will

1

be done under the authority of SMV's alcoholic beverage licenses until such time as those licenses transfer to Buyer or Buyer is able to obtain new licenses.

F.    The Parties desire that SMV maintain SMV's Licenses in good standing and that the Vineyard continue to operate under SMV's Licenses during the Term, or until SMV is advised by DNAW as to any particular license. For avoidance of doubt, SMV shall aid Buyer in performing all services, including winemaking, tasting room operation, storage, wholesale, and wine club during the Term. Buyer will have complete control and exclusive access to the Business, with access for SMV limited to only what is necessary to comply with this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants and conditions contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    <u>Term.</u>

1.1    This Agreement shall become effective on the Closing Date and shall continue until December 31, 2023, after which it shall automatically renew for successive calendar months thereafter until DNAW provides written notice of termination to SMV (the "**Term**"); <u>provided</u>, that DNAW may terminate this Agreement at any time upon two Business Days' prior written notice to SMV.

1.2    Upon expiration or termination of this Agreement, in addition to any other rights or remedies of the Parties under this Agreement or applicable law, (a) the Parties shall promptly cease all services, and (b) each of the Parties shall promptly return all confidential or proprietary information received from the other Party in connection with this Agreement. Should this Agreement be terminated by Buyer with respect to any particular service only, this <u>Section 1.2</u> shall apply with respect only to that particular service for which such termination has been exercised, and all other rights and obligations under this Agreement shall continue in full force and effect.

2.    <u>DNAW's Obligations.</u>  During the Term, DNAW agrees:

2.1    To allow SMV to keep the Winery Licenses and Fulfillment House License in effect and good standing until the Permit Issue Date;

2.2    To allow SMV to keep the remainder of SMV's Licenses in good standing during the Term, unless instructed by DNAW to transfer or cancel;

2.3    To reasonably cooperate with SMV in the transfer of the SMV Licenses, including preparation and filing of relevant documents;

2.4    To comply in all material respects with all federal, state, and local laws and regulations applicable to the Business, including, but not limited to, federal and state laws governing alcoholic beverages, federal and state employment and labor laws, and federal, state and local environmental and land use laws; and

2

2.5     To make such payments as required under this Agreement.

3.     <u>SMV's Obligations.</u>  During the Term, SMV agrees:

3.1     To provide all services reasonably necessary to run the Business in the ordinary course, consistent with past practices including, for the avoidance of doubt:

3.1.1     To pay Approved Expenses (as defined below) and make such other payments as and when directed by Buyer;

3.1.2     To provide such information regarding the Business to the Buyer as Buyer may reasonably request, including, but not limited to, in respect of the costs and expenses of the Business;

3.1.3     To direct and manage all Business activity under this Agreement, including, but not limited to, tasting room operations, direct-to-consumer shipments, wholesale channel operations, winemaking, and sole responsibility for operating forklifts, machinery, pumps, etc.;

3.1.4     To employ, manage, and direct suitable personnel necessary to operate the Business and to take responsibility for all employee-related compensation, including, but not limited to, salaries, federal and state withholding taxes, federal and state social security contributions, federal and state health insurance, and worker's compensation insurance;

3.1.5     To prepare and file the monthly reports due to the TTB and any other regulatory agencies related to DNAW-directed activities occurring at the Vineyard, as well as other regulatory filings including, but not limited to, obtaining Certificates of Label Approvals ("**COLAs**"), adding trade names, and filing reports; and to provide to Buyer the information to review the reports on request; and

3.1.6     To maintain appropriate and accurate records of all grapes received, fermentations, bulk wine movements, blends, bottlings, and shipments in order that the Parties can accurately report such information to TTB, ABC and any other appropriate federal, state or local agencies;

3.2     To support and cooperate with Buyer so that Buyer is able to take all necessary regulatory actions contemplated by this Agreement on SMV's behalf, including compliance with all state and federal regulatory filings, paying all renewal fees as necessary to keep SMV's Licenses in effect and in good standing, signing any necessary documents to support compliance, and providing access to all regulatory filings to Buyer upon its request and in accordance with this Agreement;

3

3.3     To sign, process and/or file any documents necessary to transfer SMV's Licenses to DNAW and to provide information, documentation and cooperation as requested by Buyer to assist with the transfer, including, but not limited to (1) promptly filing a Notice of Discontinuance with the TTB when requested; (2) notarized completion of the ABC sign-off forms, with requests for a temporary permit, in form and substance requested by Buyer in its sole discretion at any time or from time to time, with the understanding that they may need to be completed again if it the signatures become stale, the forms change, or for any other reason; (3) completion of the ABC notice of transfer forms in form and substance requested by Buyer in its sole discretion at any time or from time to time, with the understanding that they may need to be completed again if it the signatures become stale, the forms change, or for any other reason; (4) preparing and filing any necessary paperwork, as reasonably directed by Buyer; (5) posting any necessary notices, including any postings requested by Buyer; and (6) allowing necessary documents to be filed so long as SMV retains the SMV Licenses until at or after the Closing Date;

3.4     Subject to continued use of SMV's Licenses as agreed to herein, to make the Vineyard available to DNAW from and after the Closing Date;

3.5     To grant Patrick Flynn, Kristen Techel, and Jemma Jorel Lester, as of the Closing Date or at any time thereafter during the Term, a full power of attorney ("**POA**") for the TTB in form and substance requested by Buyer in its sole discretion at any time or from time to time, for the purpose of communicating with the TTB, viewing information, and making certain filings under SMV's licenses on SMV's behalf. DNAW shall indemnify, defend and hold harmless SMV from and against any loss, cost, claim, liability or expense, including but not limited to the imposition of any fines or penalties by a governmental agency related to DNAW's use of the POA;

3.6     To permit the storing of all bonded and taxpaid wine Inventory at the Business for DNAW under the SMV Licenses until the Permit Issue Date;

3.7     To maintain product and general liability insurance policies in the amounts maintained by SMV immediately prior to the Closing Date in full force and effect solely at the expense of DNAW;

3.8     To permit DNAW to comply with all federal, state, and local laws and regulations applicable to the business, including, but not limited to, federal and state laws governing alcoholic beverages, federal and state employment and labor laws, and federal, state and local environmental and land use laws; and

3.9     To comply in all material respects with all federal, state, and local laws and regulations applicable to the Business, including, but not limited to, federal and state laws governing alcoholic beverages, federal and state employment and labor laws, and federal, state and local environmental and land use laws.

4.      Actions on Permit Issue Date.

4.1     SMV shall permanently vacate the Vineyard.

4.2     DNAW and SMV shall cooperate to prepare and file all state and federal forms necessary to transfer all nontaxpaid wine, bond to bond, from SMV's bonded premises to

4

DNAW's bonded premises. This can occur earlier than the Permit Issue Date if the TTB permit issues before the California permits.

5.  Lease of Winery.

5.1 Grant of Lease. Commencing on the Closing Date through the end of the Term, DNAW hereby leases to SMV, and SMV hereby accepts same, a lease of the Vineyard, subject to the terms and conditions set forth herein (this "**Lease**").

5.2 Rent. In consideration for the other agreements and obligations between the Parties, DNAW shall permit SMV to occupy the Vineyard for no rent during the term of the Lease.

5.3 Use of Vineyard . SMV shall use and occupy the Vineyard solely for the purposes as described in this Agreement. SMV shall not use, or permit any third party to use, any part of the Vineyard for any purpose other than the purposes for which the Vineyard is leased under this Agreement.

5.4 Encumbrances. The Lease is subject to all existing easements, servitudes, licenses, and rights-of-way for roads, highways, telephone and electric power lines, water rights, pipelines, and other purposes, whether recorded or not recorded, which may burden the Vineyard.

5.5 Access to Vineyard. Each Buyer, on behalf of itself and its Representatives, invitees, licensees and guests, reserves the right to enter and to use the Vineyard for any purpose, at any time, and in any manner which does not unreasonably interfere with SMV's use of the Vineyard pursuant to the terms of the Lease.

6.  Payments. SMV will not incur any costs or expenses under this Agreement or otherwise relating to the Business or the Vineyard without the prior written approval of DNAW, to be given or withheld in DNAW's sole discretion (each such approved expense, an "**Approved Expense**"). DNAW will, at its election and in its sole discretion, either (a) reimburse SMV or (b) pay to such other Persons entitled to receive such payment, in any case the amount of any such Approved Expense on or before the applicable date payment of such Approved Expense is due.

7.  Confidentiality. Each Party agrees that the terms of this Agreement shall be subject to Section 6.04 of the APA.

8.  Independent Contractor Relationship. Nothing in this Agreement creates a partnership, joint venture, employer/employee, principal-and-agent, or any similar relationship between the Parties.

9.  General Provisions.

9.1 Entire Agreement; Incorporation of Recitals. This Agreement and the exhibits hereto, together with the APA and related ancillary documents, contain the entire agreement between the Parties, and supersedes all prior negotiations, drafts, and other understandings that the Parties may have had concerning the subject matter hereof. The foregoing recitals are true and correct and are incorporated herein by this reference.

5

9.2 <u>Successors</u>. The provisions of this Agreement shall inure to the benefit of, and shall be binding upon, the respective heirs, successors, executors, administrators and assigns of the Parties.

9.3 <u>Amendments</u>. This Agreement may not be amended or modified except by written document signed by MGG and SMV.

9.4 <u>Severability</u>. Whenever possible, each provision of this Agreement shall be interpreted so as to be effective and valid under applicable law. If any provision of this Agreement is held to be prohibited by, or invalid under, applicable law, the remainder of this Agreement and any other application of such provision shall not be affected thereby.

9.5 <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Each Party agrees that the other Party may rely upon the facsimile and portable document format signature of the other Party to this Agreement as constituting a duly authorized, irrevocable, actual, current delivery of this Agreement as fully as if this Agreement contained the original ink signature of the Party supplying a facsimile or portable document format signature.

9.6 <u>Notice</u>. Any notice, demand, request, consent or other communication which any Party desires or is required to give to any other Party shall be in writing and shall be deemed to have been given (i) when delivered personally to the recipient, (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), (iii) one (1) Business Day after being sent to the recipient by confirmed facsimile transmission, (iv) four (4) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and (v) the date when sent by electronic mail provided such electronic mail was sent before 4:00 p.m. Eastern Time on a Business Day and further provided the sender does not receive a "bounce-back" of such electronic mail indicating that the transmission was either not sent or received by the recipient, and addressed to the address set forth below. Any Party may designate another address for itself at any time upon written notice to the other Parties pursuant to this <u>Section 9.6</u>.

MGG:
MGG CALIFORNIA LLC
Attn: Patrick Flynn
One Penn Plaza, Suite 5320
New York, New York 10119
Email: PFlynn@mgginv.com

<u>with a copy to (which will not constitute notice)</u>:

Proskauer Rose LLP
Attn: Jeff J. Marwil
70 West Madison, Suite 3800
Chicago, Illinois 60602-4342
Email: jmarwil@proskauer.com

Proskauer Rose LLP

6

Attn:   Peter J. Young
        Steve Y. Ma
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Email: pyoung@proskauer.com
        sma@proskauer.com


SMV:
Getzler Henrich & Associates LLC
Attn: Kevin A. Krakora, Chief Restructuring Officer for
Spring Mountain Vineyard, Inc.
150 S. Wacker Drive, 24th Floor
Chicago, IL 60606
Email: kkrakora@getzlerhenrich.com
        pekman@hilcoglobal.com

with a copy to (which will not constitute notice):

Greenspoon Marder LLP
Attn: Victor A. Sahn
333 South Grand Avenue, 34th Floor
Los Angeles, CA 90071
Email: victor.sahn@gmlaw.com


DNAW:
DNAW SPV CA Vineyard LLC
Attn:  Patrick Flynn
One Penn Plaza
Suite 5320
New York, NY 10119


with a copy to (which will not constitute notice):

Proskauer Rose LLP
Attn: Jeff J. Marwil
70 West Madison, Suite 3800
Chicago, Illinois 60602-4342
Email: jmarwil@proskauer.com

Proskauer Rose LLP
Attn:   Peter J. Young
        Steve Y. Ma
2029 Century Park East, Suite 2400
Los Angeles, California 90067
Email: pyoung@proskauer.com
        sma@proskauer.com

7

9.7    <u>Electronic Delivery</u>.  This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments hereto or thereto, to the extent delivered by means of a facsimile machine or electronic mail (any such delivery, an "**Electronic Delivery**"), will be treated in all manner and respects as an original agreement or instrument and will be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto will re execute original forms thereof and deliver them to all other parties.  No party hereto or to any such agreement or instrument will raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a Contract, and each such party forever waives any such defense, except to the extent such defense related to lack of authenticity.

9.8    <u>Headings</u>.  The titles and headings of the various sections of this Agreement have been inserted only for convenience of reference. They are not part of this Agreement and may not be used to construe or interpret any of the terms hereof.

9.9    <u>Expense of Enforcement</u>.  If any action, proceeding, litigation, or arbitration is commenced to enforce any provision of this Agreement, then the prevailing party shall be entitled to be reimbursed by the unsuccessful party for all costs incurred in connection with such action, proceeding, litigation, or arbitration, including a reasonable allowance for attorneys' fees, expert witness fees and costs, which amount shall be added to and become part of the final decision in such matter.

9.10    <u>Governing Law</u>.  This Agreement, and all Actions (whether in Contract, tort or otherwise) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution, performance, non-performance, interpretation, termination or construction of this Agreement (including any Action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement) or the legal relationships of the Parties hereto will be governed by and construed in accordance with the internal laws of the State of Delaware applicable to agreements executed and performed entirely within such State, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

9.11    <u>CONSENT TO JURISDICTION AND SERVICE OF PROCESS</u>. EACH OF THE PARTIES TO THIS AGREEMENT IRREVOCABLY SUBMITS AND CONSENTS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURTS IN RESPECT OF THE INTERPRETATION AND ENFORCEMENT OF THE PROVISIONS OF THIS AGREEMENT AND ANY ANCILLARY DOCUMENT DELIVERED IN CONNECTION HEREWITH, THE LEGAL RELATIONSHIP OF THE PARTIES AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.  EACH PARTY ALSO WAIVES, AND AGREES NOT TO ASSERT:  (I) ANY DEFENSE TO JURISDICTION OR VENUE IN THE CHOSEN COURTS FOR ANY ACTION RELATING TO THE INTERPRETATION OR ENFORCEMENT OF THIS AGREEMENT AND ANY ANCILLARY DOCUMENT DELIVERED IN CONNECTION HEREWITH, THE LEGAL RELATIONSHIP OF THE

8

PARTIES AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY; (II) THAT THIS AGREEMENT MAY NOT BE ENFORCED IN OR BY THE BANKRUPTCY COURTS; (III) THAT THEIR PROPERTY IS EXEMPT OR IMMUNE FROM EXECUTION; OR (IV) THAT THE ACTION IS BROUGHT IN AN INCONVENIENT FORUM; PROVIDED, HOWEVER, THAT UPON THE CLOSING OF THE BANKRUPTCY CASE, THE PARTIES AGREE TO UNCONDITIONALLY AND IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE DELAWARE COURTS OF CHANCERY LOCATED IN WILMINGTON, DELAWARE OR (BUT ONLY TO THE EXTENT THE CHANCERY COURT DECLINE JURISDICTION) THE DELAWARE STATE COURTS OR THE UNITED STATES DISTRICT COURT LOCATED IN WILMINGTON, DELAWARE AND ANY APPELLATE COURT THEREFROM. THE PARTIES INTEND THAT ALL FOREIGN JURISDICTIONS WILL ENFORCE ANY DECREE OF THE BANKRUPTCY COURT IN ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY RELATED AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT FURTHER AGREES THAT SERVICE OF PROCESS WITH RESPECT TO ANY ACTION GOVERNED BY THIS SECTION 9.11 MAY BE MADE UPON A PARTY BY MAILING A COPY THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH PARTY AT ITS ADDRESS AS PROVIDED IN SECTION 9.6. THE PROVISIONS OF SECTION 9.12 BELOW RELATING TO THE WAIVER OF JURY TRIAL SHALL APPLY TO ANY SUCH PROCEEDING. EACH PARTY AGREES THAT ANY FINAL AND NON-APPEALABLE JUDGMENT AGAINST IT IN ANY PROCEEDING DESCRIBED IN THIS SECTION 9.11 SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY OTHER JURISDICTION WITHIN OR OUTSIDE OF THE UNITED STATES BY SUIT ON SUCH JUDGMENT, A CERTIFIED COPY OF WHICH SHALL BE CONCLUSIVE EVIDENCE OF THE FACT AND AMOUNT OF SUCH JUDGMENT. THE PARTIES AGREE THAT ANY OF THEM MAY FILE A COPY OF THIS PARAGRAPH WITH ANY COURT AS WRITTEN EVIDENCE OF KNOWING AND VOLUNTARY AND BARGAINED AGREEMENT BETWEEN THE PARTIES.

9.12 WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES. ACCORDINGLY AND TO THE EXTENT PERMITTED BY LAW, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE ANCILLARY DOCUMENTS, THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR THE RELATIONSHIP BETWEEN THE PARTIES, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY OR OTHERWISE AND REGARDLESS OF WHICH PARTY INITIATES SUCH ACTION. THE PARTIES TO THIS AGREEMENT EACH AGREE AND CONSENT THAT ANY SUCH ACTION SHALL BE DECIDED BY COURT TRIAL IN THE CHOSEN COURTS WITHOUT A JURY AND THAT THE PARTIES TO THIS AGREEMENT MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE IRREVOCABLE WAIVER OF THEIR RIGHT TO TRIAL BY JURY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT:

9

(A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER; (B) EACH SUCH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (C) EACH SUCH PARTY MAKES THIS WAIVER VOLUNTARILY; AND (D) EACH SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.12.

9.13    No Third Party Beneficiaries.    Nothing in this Agreement, express or implied, is intended to confer upon any Person other than the parties to this Agreement, or any of their respective successors or permitted assigns, any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.

*[SIGNATURES FOLLOW ON NEXT PAGE]*

10

IN WITNESS WHEREOF, the Parties have executed this License Transfer and Transition Services Agreement as of the Signing Date.

**MGG:**

MGG CALIFORNIA LLC
a California limited liability company

By: _____

Name: _____

Title: _____

**SMV:**

SPRING MOUNTAIN VINEYARD INC.
a Delaware corporation

By: _____

Name: _____

Title: _____

**DNAW:**

DNAW SPV CA VINEYARD LLC
a California limited liability company

By: _____

Name: _____

Title: _____

11

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is 333 South Hope Street, Ste. 3400, Los Angeles, CA 90071-1406.

A true and correct copy of the foregoing document entitled:  **NOTICE OF LODGMENT OF ORDER IN BANKRUPTCY CASE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>:**  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) April 7, 2023 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Steve Burnell on behalf of Debtor Spring Mountain Vineyard Inc.
steve.burnell@gmlaw.com

Dean C. Burnick on behalf of Interested Party Mt. Hawley Insurance Company **(RSN)**
dcb@proughlaw.com

Jacquelyn H. Choi on behalf of Creditor Napa County Treasurer-Tax Collector **(RSN)**

Louis J. Cisz  lcisz@nixonpeabody.com on behalf of Don Yannias **(RSN)**

Trevor Ross Fehr on behalf of U.S. Trustee Office of the U.S. Trustee / SR
trevor.fehr@usdoj.gov

Mark S Horoupian on behalf of Debtor Spring Mountain Vineyard Inc.
mark.horoupian@gmlaw.com, cheryl.caldwell@gmlaw.com

Thomas Philip Kelly, III on behalf of Creditor Central Valley Builders Supply Inc. **(RSN)**
tomkelly@sonic.net

Steve Ma on behalf of Creditor MGG California, LLC
sma@proskauer.com

Jeff J. Marwil on behalf of Creditor MGG California, LLC
jmarwil@proskauer.com

Randall P. Mroczynski on behalf of Creditor Ford Motor Credit Company LLC **(RSN)**
rmroczynski@cookseylaw.com

Office of the U.S. Trustee / SR
USTPRegion17.SF.ECF@usdoj.gov

Elvina Rofael on behalf of U.S. Trustee Office of the U.S. Trustee / SR
elvina.rofael@usdoj.gov, Katina.Umpierre@usdoj.gov,GemMil.Langit@usdoj.gov

Victor A. Sahn on behalf of Debtor Spring Mountain Vineyard Inc.
victor.sahn@gmlaw.com, Karen.Files@gmlaw.com

Michael St. James on behalf of Interested Party Arcade Capital, LLC **(RSN)**
ecf@stjames-law.com

John G. Warner on behalf of Creditor Francois Freres USA Inc. **(RSN)**
warnerwest@aol.com

Case: 22-10381    Doc# 316    Filed: 04/07/23    Entered: 04/07/23 18:10:10    Page 112 of 113

Ashley M. Weringa on behalf of Creditor MGG California, LLC
aweringa@proskauer.com

Steven F. Werth on behalf of Debtor Spring Mountain Vineyard Inc.
steven.werth@gmlaw.com, Patricia.Dillamar@gmlaw.com

Peter J Young on behalf of Creditor MGG California, LLC
pyoung@proskauer.com

☐ Service information continued on attached page.

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| April 7, 2023 | Cheryl Caldwell | */s/Cheryl Caldwell* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

CC 52145193v1